1    Ms. Lewin, what were you asked to do?

2    A.   I was asked to review the losses as a

3    result of this breach of contract. But, candidly,

4    it is the losses to each of the parties as a result

5    of the eating nonkosher food; and the losses are in

6    relationship to destruction of relations that

7    ensued.

8    Q.   I am confused. Were you asked to assess

9    the losses based on a breach of contract or other

10    types of losses?

11    A.   Well, my understanding is the breach of

12    contract; but I was asked to evaluate the emotional

13    distress losses.

14    Q.   Were you asked to assume a contract was

15    breached or were you asked to evaluate whether you

16    believe the contract was breached?

17    A.   The former.

18    Q.   Okay. So you have never seen a contract?

19    A.   Correct.

20    Q.   It is fair to say you have no opinion one

21    way or the other as to whether a contract was

22    breached?

23    A.   Correct.

24    Q.   So the losses that you were asked to

14

1   you prepared these reports, you had not spoken to
2   any of the plaintiffs; is that a fair statement?
3      A.   Not as yet, correct.
4      Q.   And when you say not as yet, you mean
5   sitting here today you have still not spoken to any
6   of the six plaintiffs, correct?
7      A.   That's right.
8      Q.   Stephanie Uhl, what is her position?
9      A.   An economist who works for me.
10     Q.   When you say works for me, who is her
11  employer?
12     A.   Smith Economics Group, my company.
13     Q.   How long has Ms. Uhl worked for you?
14     A.   Just about five years.
15     Q.   So what did you ask her to do?
16          Again, so I don't miss anything, I want
17  you to take me in sequence from your first call in
18  January with Alyza Lewin.  Presumably in that call,
19  you agreed to undertake this assignment?
20     A.   Yes.
21     Q.   And then what did you do?
22     A.   I asked Stephanie to interview each of the
23  six plaintiffs and get information regarding the
24  circumstances that resulted in the emotional

18

1    distress.

2        Q.    And did you ask her to meet with them in

3    person or to do it by phone?

4        A.    By phone.

5        Q.    Is it your understanding that she did all

6    six interviews by phone?

7        A.    Yes.

8        Q.    Was it one call per plaintiff?

9        A.    Yes.

10       Q.    So there were six separate phone calls?

11       A.    Yes.

12            It may be that, for example, when we

13    talked to the mother and the father of the bride,

14    it might have been sequential on the same dial.

15       Q.    But not two people being interviewed

16    simultaneous?

17       A.    Not to my knowledge, it is not generally

18    how we conduct matters.

19       Q.    Did you ask Ms. Uhl that specific

20    question?

21       A.    She is trained to do that.

22       Q.    But you don't know in this case whether

23    she did?

24       A.    I don't know if she used a ventriloquist

19

1    that.

2            Do you make assumptions in your analysis

3    as to whether and to what extent his loss of

4    enjoyment of life will remediate or be ameliorated

5    in any respect?

6        A.   The loss tables that I portray don't show

7    an amelioration; but if the trier of fact believes

8    there may be one, my tables can be modified because

9    I see them as a tool and aid and guide for the

10   jury, not their final answer.

11           I have made some projections here, but

12   these are easily modifiable.  It is the method and

13   model I intend to present to the jury, giving them

14   instructions on how they may, if they choose, alter

15   some of the assumptions that went into the model

16   and the method.

17       Q.   So I think I understand your answer.  Let

18   me break it down.  If Mr. Siegel -- let me take it

19   piece by piece.

20           You don't know, sitting here today,

21   whether Mr. Siegel does or does not treat with a

22   mental health professional, correct?

23       A.   Correct.

24       Q.   If he does, that could theoretically

28

1  ameliorate his loss of enjoyment of life, correct?

2     A.   I don't know.

3     Q.   It may?

4     A.   I can't say.  It is outside my field.  It
5  may be his way of coping, but I can't say that it
6  will or won't ameliorate.  I suppose in theory
7  anything is possible.

8     Q.   Well, let's take that then.  Do you
9  acknowledge the fact that there may be
10 circumstances that may ameliorate his loss of
11 enjoyment of life prospective?

12    A.   I don't know.  There could be, but I can't
13 say.

14    Q.   Okay.  And with that uncertainty as to
15 what may or may not ameliorate, none the less, your
16 report and your opinion in this case, does not take
17 into account any amelioration of the loss; is that
18 fair to say?

19    A.   Correct, no amelioration or no
20 aggravation.

21    Q.   Right.

22         So you assume that the loss is the loss
23 and will not be ameliorated in any respect until
24 his projected death, correct?

29

1     A.    Nor aggravated.

2     But, again, the tables can be modified to
3  make an assumption that there is an amelioration or
4  an aggravation.

5     Q.    Fair enough. I will get there. But just
6  stick with my question for a minute.

7     Just going forward until Mr. Siegel's
8  death, projected death, your analysis that you have
9  submitted assumes that the loss will not be
10  ameliorated at all, correct?

11    A.    It assumes a constant degree of loss, yes.

12    Q.    Okay. And you make that assumption
13  without knowledge one way or another because it is
14  not in your field as to whether there will be a
15  constant degree of loss, correct?

16    A.    Correct.

17    Q.    And you are saying that your presentation
18  provides a methodology for calculating loss that
19  could be modified if, in fact, there is
20  amelioration of the loss?

21    A.    Or aggravation, yes.

22    Q.    Okay. So is it fair to say, you are not
23  opining what the loss is, you are opining on how
24  the loss could be calculated once factors such as

30

1    amelioration or aggravation are factored in?

2        A.    Correct.

3              For example, Mr. Siegel says that there
4    doesn't appear to have been any improvement over
5    the last ten months from the time of the incident
6    until the interview. But he says he wakes up in
7    the middle of the night, but he says he is hopeful
8    it could get better.

9        Q.    He is hoping for amelioration is what he
10   communicated?

11       A.    Well, yeah, I suppose anybody would; but
12   he says, it hasn't so far.

13       Q.    As of ten months?

14       A.    Correct.

15       Q.    But getting back to my question, you are
16   not opining as to the amount of his loss through
17   age 80, you are opining as to a methodology that
18   could be used to compute the loss, once the factors
19   such as amelioration or deterioration were factored
20   in?

21       A.    Well, actually, no, I am opining as to the
22   loss and also to the methodology. But I have an
23   opinion as to the loss under the assumption that
24   the degree of distress continues to be constant as

31

1   it had been for the ten months, and I have a

2   specific loss assessment based on that.

3           If -- I also expect to opine on a

4   methodology a trier of fact could use in the event

5   they believe there could be a change for the better

6   or worse in the future.

7       Q.   But you are not opining that for the next

8   22 years, he is not going to -- this loss of

9   enjoyment of life will not be ameliorated, you are

10  not opining one way or the other about that,

11  correct?

12      A.   Correct.

13      Q.   But the numbers you use are assuming no

14  amelioration?

15      A.   They are assuming the same constant loss

16  that he indicated existed for the prior ten months

17  without change, yes.

18      Q.   Okay.  But as I understand your testimony,

19  you are not saying that because he indicated that

20  they existed for ten months without change, you are

21  not projecting that out and saying, therefore, it

22  won't ameliorate?

23      A.   Correct, I am just projecting out what has

24  been so.

32

1  Q.  But that's not unique to Mark Siegel. In
2  other words, all six of these plaintiffs, I noted,
3  you did not factor in any amelioration, correct?
4  A.  Or aggravation.
5  Q.  And Mark Siegel is the only one who talked
6  about the fact that it hasn't gotten better yet,
7  correct?
8  A.  I haven't memorized the notes but --
9  Q.  But assume for purposes of my question
10 that they didn't all say that. As I understand
11 your testimony, his statement that it hasn't gotten
12 better for ten months was not material to your
13 determination to have a separate line that presumes
14 no amelioration, correct, you did that for all of
15 them?
16 A.  I assumed no improvement and no
17 aggravation for the future for all of them. I have
18 got to assume the actual day of the event, it was
19 far worse than what they were reported at the time
20 of interview at least on that single day.
21 Q.  Your assumption is that they underreported
22 their aggravation?
23 A.  No.
24 Q.  So what do you mean you assume it was far

33

1    Q.    Again, first generically, not specific to
2    Mark Siegel, what is that category for?
3    A.    Well, this is really the assessment of the
4    evaluation of emotional distress that has resulted,
5    the onset of emotional distress that has impacted
6    their ability to enjoy life.  So here we just
7    generally show two different levels of emotional
8    distress.
9          In this particular case, Mr. Siegel
10   reported a 50 to 60 percent reduction in his
11   capacity to enjoy life as a result of the emotional
12   distress.  This tells how we have illustrated his
13   statements.
14         In the one set of calculations I show a
15   50 percent loss in '06 -- well, '05 and '06, a
16   45 -- and then an improvement, only 45 percent loss
17   in '07, 35 percent in '08, 25 percent in '09,
18   15 percent from 2010 and then constant thereafter.
19   In the second set of calculations -- so we actually
20   show a significant amelioration but then at some
21   point a leveling out at 10 percent.
22   Q.    So does that change your testimony earlier
23   that you didn't -- that you assume no amelioration?
24   A.    Well, at some point we assumed no

43

1      Q.   Based on his hope?

2      A.   Based on his hope, yes.

3      Q.   So if he hadn't hoped there would be, you

4   would assume no amelioration?

5      A.   Not necessarily.

6           Understand, we are trying to give the jury

7   a tool here. We are showing them on one hand, the

8   possibility of a significant reduction; and on the

9   other hand, there is reduction but nowhere near as

10  great.

11     Q.   So these are tools that a jury could work

12  with. You are not saying that you did ameliorate

13  by 5 percent from your once a year or that you

14  didn't; you have no idea, right?

15     A.   Well, we don't know what will happen in

16  the future.

17     Q.   Okay. So how did you come up with

18  50 percent on Year 1?

19     A.   He said it was at 40 to 50 percent.

20     Q.   Who said?

21     A.   Who are we talking about here?

22          Mr. Siegel, right?

23     Q.   Mark Siegel said, I am suffering 40 to

24  50 percent loss of enjoyment of life?

45

1    A.    Actually 50 to 60 percent, he said.  He
2  said, his enjoyment is at 40 to 50 of what it was
3  before.  So that's at a 50 to 60 percent loss.
4         We were slightly more conservative and
5  took the lower end of that range at a 50 percent
6  loss and showed a fairly aggressive improvement for
7  the next five or six years and then a less
8  aggressive improvement in the second set of
9  calculations.
10    Q.    And the aggressive improvement and then
11  the less aggressive improvement has nothing to do
12  with Mark Siegel and his unique capacity for
13  healing or not?
14    A.    It is intended to be unique to him, yes.
15    Q.    And what about him led you to show
16  aggressive improvement and then a decline in
17  improvement and, ultimately, a leveling off?  What
18  about his characteristics led you to that?
19    A.    What do you mean a decline in improvement?
20    Q.    Well, you said there was aggressive
21  improvement for five years and then it leveled off?
22    A.    Right.
23    Q.    And then in the second table, you said
24  less aggressive improvement?

46

1    A.    And then a leveling off.

2    Q.    And then a leveling off. You said you do
3  this unique to the victim?

4    A.    Because he indicated he hopes it gets
5  better in a few years.

6    Q.    And it was just that line, nothing else,
7  that led to your projection?

8    A.    Yes.

9    Q.    And if he had said he suffers an
10  80 percent loss of life, would your number have
11  been 80?

12   A.    We would have probably illustrated that
13  testimony, yes.

14   Q.    Okay. So you -- and so it is your
15  standard methodology to leave it to the victim to
16  determine the percentage loss of enjoyment of life?

17   A.    No, it is my standard methodology to
18  portray a loss based on what I understand to be the
19  plaintiff's testimony at the trial. It is my
20  standard methodology to leave it to the jury to
21  assess the ultimate loss of percentage. But if
22  someone says, self-assesses themself at 50 percent,
23  it is not my job to second guess them. It is my
24  job to portray in numeric terms what I understand

47

1   will be their testimony at trial.

2          The same as if somebody had a wage loss
3   and said, look, I used to be a real estate agent
4   and do this. And now I can't get around in a car
5   and I can only do some accounting and I make about
6   $10 an hour, I will illustrate their testimony for
7   trial or at trial.

8       Q.  As it relates to your opinion on Mark
9   Siegel's loss of enjoyment of life -- I am using
10  Mark Siegel and then I will ask you if your
11  testimony would be the same for all of the others
12  so we don't have to go through it all six times --
13  but as it relates to your opinion on Mark Siegel's
14  loss of enjoyment of life, is it fair to say that
15  you are not offering an expert opinion that he has
16  a 50 percent loss of enjoyment in life?

17      A.  Correct.

18      Q.  And, similarly, is it fair to say that you
19  are not offering then an expert opinion that he has
20  any particular percentage loss of enjoyment of life
21  in any year?

22      A.  Correct, I am not assessing his specific
23  percentage loss but only the value of certain
24  specific percentage losses.

48

1  file, we will label that Exhibit 8.

2      Michael Berenbaum will be 9.

3      We will have someone Craig Baron be 10 and

4  Rebecca Baron be 11.

5      Judy Siegel will be 12, Mark 13.

6      And then I will refer to the two pages of notes

7  you just handed me as Exhibit 14.

8      Collectively, and again for the record,

9  Exhibit 14 will be two e-mails from Lynda Prior,

10  both on February 1, 2006, one at 11:26 a.m. and the

11  other at 10:15 a.m.

12              (Whereupon, SMITH Deposition

13              Exhibit Nos. 9, 10, 11, 12, 13,

14              and 14 were marked for

15              identification.)

16  BY MR. SCHWABER:

17      Q.   In terms of coming up with your number, we

18  have talked a lot about how you dealt with the

19  percentages but what about the actual dollar

20  values?  I read in your report some general

21  information you provide about how you do that but

22  as it relates to these specific six plaintiffs, how

23  did you arrive at dollar values?

24      A.   Okay.  Well, it is a three-step process.

62

1      One, we start with the statistically

2  average value of life.  It is true, irrespective of

3  whatever case we are working on, and I give some

4  background as to the literature that produces that

5  statistically average value.  And on, for

6  example -- which report do you have in front of

7  you?

8      Q.   I can look at the Mark Siegel report,

9  which will be Exhibit 13.

10     A.   Yeah, so, on page 4 of that report on

11  subparagraph 3, I indicate that the statistically

12  average value of life is $3.7 million.  That's true

13  for any case.

14     Q.   That's a statistic average --

15  statistically average value according to Smith

16  Economics Group, correct?  In other words, that's

17  not a published statistically average value from

18  some other entity?

19     A.   It actually is corroborated.  It is my

20  number, but the figure is corroborated by a

21  peer-reviewed study by Ted Miller, which

22  I also cite.

23     Q.   Okay. And the average values of life vary

24  greatly from entity to entity that deal with

63

1  Q. So in coming up with your average value or

2 your value for these six plaintiffs' lives in this

3 case, you used the same exact number for all six of

4 them, correct?

5  A. No, I used the same average value of life

6 throughout my career.

7  Q. So, again, for these six plaintiffs, you

8 used the same exact value for all six of them,

9 correct?

10  A. I use the exact same value everywhere all

11 the time.

12  Q. Including for these same six?

13  A. That's true.

14  Q. Do you believe that each of these six

15 plaintiffs' lives are valued exactly the same?

16  A. No, I didn't say that. I start in any

17 case with the same statistically average value of

18 life and then tailor it to each plaintiff.

19  Q. And how did you do that here?

20  A. The tailoring is done by life expectancy

21 as it is reported in the peer-reviewed literature,

22 that Miller article, again, I cite. And so that a

23 person with a longer remaining life expectancy will

24 have more enjoyment, people with less life

66

1   work. So I don't have a hard-and-fast rule. The
2   rule is help the jury understand the process.
3   That's the main rule.
4          That's the rule I followed, for example,
5   when I took Ms. Patack's estimate of a half a
6   percent documented in the interview and then in the
7   report said, here, ladies and gentlemen, here is a
8   1 percent loss because I figured that's a number
9   they could hear and deal with and increment or
10  decrement more easily. Believe it or not,
11  fractions are intimidating to some people.
12     Q.   Okay. So your opinion, just to summarize
13  -- and tell me if I am taking too much of a leap
14  treating all six the same. I don't think from what
15  I understand that I am. But you tell me if your
16  answer to this question would require you to
17  particularize.
18          Your opinion as to each of these six
19  plaintiffs in this case are limited to how a trier
20  of fact could quantify damages associated with loss
21  of enjoyment of life if that trier of fact were to
22  determine that there was a loss of enjoyment of
23  life, correct?
24     A.   I am not sure I followed that question.

73