# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

CARISA PAIR, individually and on                    PLAINTIFFS
behalf of the Estate of SHANNON LYNN PAIR

VS.                                    NO. 2001-3016

JOE TAYLOR and LEO JOURNAGAN                         DEFENDANTS
CONSTRUCTION COMPANY, INC

LEO JOURNAGAN CONSTRUCTION          THIRD-PARTY PLAINTIFF
COMPANY, INC.

VS.

TIME STRIPING, INC.                      THIRD PARTY DEFENDANT

LIBERTY MUTUAL INSURANCE COMPANY                INTERVENOR

### AFFIDAVIT OF DR. GARY R. ALBRECHT, Ph.D.

STATE OF _North Carolina_     )
                              )
COUNTY OF _Forsyth_           )

Gary R. Albrecht, Ph.D., being first duly sworn on oath, hereby deposes and says:

1.    My name is Gary R. Albrecht, Ph.D. I submit this affidavit in support of Plaintiff's Response to Defendant's Motion in Limine regarding hedonic damages. I have agreed to submit this affidavit to help the court understand the concept and applicability of hedonic damages in personal injury litigation.

2.    I received my Bachelors Degree in Economics and Philosophy from Tulane University in 1974. I received my Master's Degree in Economics from Indiana University in 1978 and my Ph.D. in Economics from Indiana University in 1986. I am currently a consulting economist and adjunct associate professor at Wake Forest University in Winston-Salem, North Carolina. I have done a substantial amount of research on econometric modeling of state economic models in both Kansas and Indiana. I am currently active as a forensic economist and publish regularly in the field of forensic economics. Attached to this affidavit is a copy of my full curriculum vitae.

3.    There is a consensus, although not unanimity, in the field of forensic economics that we can derive values for statistically average lives based on the scientific studies of the value of life reflected in "willingness to pay" literature. Like many other economists, I believe lost enjoyment of life damages in personal injury cases and wrongful death cases, including valuation of lost society and companionship, can be calculated with a reasonable degree of economic certainty.

4.    Hedonic calculations simply capture the value of lost enjoyment of life of a statistically average person as established by market analysis. Such analysis provides general statistics not substantially different from life expectancy tables, unemployment rates, projected work-life tables or estimated future net discount rates. Use of statistical averages to calculate damages is a basic tool of forensic economics. As with all economic calculations, calculation of the lost value of life is subject to some theoretical attack.

5.    Many estimations and calculations by economists cannot be replicated or validated like those in physical science areas, such as chemistry or medicine. By its nature, all economic analysis includes a human component subject to significant variability. For example, there is no retrospective test that would show that but for the injury suffered any particular injured child would have accomplished any specific level of education. Nonetheless, I know that economists are frequently asked to make assumptions regarding education to provide juries a basis for determining appropriate damage awards for injured children. Assumptions of this type and magnitude are regularly included in the calculations economists testify to in courtrooms.

6.    I am familiar with the criticism that the willingness to pay studies do not incorporate people's lack of absolute freedom to choose jobs and that other motivations impact the amounts people accept for risky jobs. It is undoubtedly true that each statistical study in the willingness to pay area reflects the knowledge and limitations of the people involved in those studies. Recognizing that fact for each study does not

EXHIBIT 21

invalidate the information provided to economists by the body of studies. Economists can and have evaluated the numerous studies of willingness to pay to determine way variances exists. For example, I am familiar with the article in *The Journal of Forensic Economics* in 1991, entitled "The Plausible Range of Value of Life - Red Herrings Among the Mackerel" by Ted R. Miller, Senior Research Economist at the Urban Institute in 1991. This article is a good example of an economist evaluating and adjusting studies to compensate for variables within those studies. Based on my knowledge of econometrics and statistics, I believe the Miller article is an economically proper analysis. This does not mean it is the only possible analysis. Nonetheless, I am unaware of any peer reviewed economic literature that disputes Miller's methodology.

7.      There are any variables in economic calculations that require economists to select from a wide universe of data before making a calculation. For example, there are innumerable government and industry studies regarding potential interests rates. In some settings testifying economists will simply take an average of some historical data regarding those rates. This methodology is widely accepted in the field. No economists would testify that the interest rate he or she applied using this technique was perfectly accurate to determine a future loss at a particular point in the distant future. The economists could only testify that it was that professional's best estimation based on the empirical data received. Similarly, when projecting the value of a business at some point in the future, an economist may attempt to determine the most appropriate interest rate to apply over a shorter time horizon. Making such selections is always subject to the criticism that the economist is simply eyeballing. This criticism ignores the fact that these economists are making professional judgments based on their knowledge of the economic data theory.

8.      I have addressed in the literature why the loss of a portion of the ability to enjoy ones life is incorporated in the market decisions that value the loss of one whole life. Because the calculation in the market is based on the whole loss as opposed to part of the loss, the willingness to pay studies provide a framework for determining lost value of life calculations. The willingness to pay studies evaluate the lost value of life in the marketplace, not in unusual or emotionally charged settings. The attacks on the theory that ignore the inherent valuation processes of the market and refer to the rescues of trapped people or playing Russian Roulette miss the point of the scholarship and knowledge in this area. It is precisely because the market studies reflect day to day behavior that they provide an accurate model.

9.      While intellectual differences exist among forensic economists regarding the calculation of hedonic damages, a substantial portion of such economists believe that willingness to pay literature provides an economically accurate basis from which the value society places on a statistically average person or relationship can be calculated. It is important for economists to understand the studies involved to insure the appropriate analysis.

10.      I am familiar with the work of economist Stan V. Smith. I have read and reviewed his book *Economic/Hedonic Damages: A Practice Book for Plaintiff and Defense Attorneys*. That book sets forth an economically appropriate method of calculating lost value of life damages that falls well within the range of accepted standards governing how economists conduct their research and reach their conclusions. The conclusions and methodology of Stan Smith's approach more than meets the criteria of good economics.

FURTHER AFFIANT SAITH NOT.

GARY R. ALBRECHT, Ph.D.

SUBSCRIBED AND SWORN to before me this 4 day of ~~February~~ March, 2002.

OFFICIAL SEAL
MICHELLE WILLIAMS
NOTARY PUBLIC-NORTH CAROLINA
COUNTY OF FORSYTH
My Commission Expires September 14, 2004

Notary Public for North Carolina
Residing at 916 W 4th St. W-S NC
Commission Expires Sept. 14, 2004

8325af81.doc

<u>CERTIFICATE OF SERVICE</u>

This is to certify that a true copy of the foregoing Affidavit of Dr. Gary R. Albrecht, Ph.D. was duly served on counsel of record at the address listed below by U.S. Mail, postage prepaid, this 25 day of January, 2000.

John J. Russell
Brown Law Firm, P.C.
P.O. Drawer 849
Billings, MT 59103-0849

JARUSSI & BISHOP

BY: _____
L. Randall Bishop

3

B. Newal Squyres
Kurt D. Holzer
HOLLAND & HART LLP
Suite 1400, West One Plaza
Post Office Box 2527
Boise, Idaho 83701
Telephone: (208) 342-5000

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

JAVIER C. TORRES and CYNTHIA G. )
TORRES, husband and wife individually, )
as a marital community, and as parents )   Case No. CIV95-0460 S-MHW
and heirs of ANDREW A. TORRES, )
deceased, )                                 AFFIDAVIT OF DR. GARY R.
                                        )   ALBRECHT, Ph.D.
                          Plaintiffs, )
                                        )
vs.                                     )
                                        )
GORDON TRUCKING )
INCORPORATED, an Oklahoma )
corporation; ROGER J. JOHNSON, an )
individual; and EDWIN E. HASKINS, an )
individual, )
                                        )
                          Defendants. )
_____

STATE OF NORTH CAROLINA )
                        ) ss.
County of Forsyth       )

GARY R. ALBRECHT Ph.D., being first duly sworn on oath, hereby deposes and says:

1.    My name is Gary R. Albrecht, Ph.D. I submit this affidavit in support of Plaintiffs' Opposition to Defendants' Motion to Exclude Testimony Regarding Hedonic

AFFIDAVIT OF DR. GARY R. ALBRECHT, Ph.D.- 1

Damages. I have agreed to submit this affidavit to help the court understand the concept and applicability of hedonic damages in personal injury litigation.

2.    I received my Bachelor's Degree in Economics and Philosophy from Tulane University in 1974. I received my Master' Degree in Economics from Indiana University in 1978 and my Ph.D. in Economics from Indiana University in 1986. I am currently a consulting economist and an adjunct associate professor at Wake Forest University in Winston-Salem North Carolina. I have done a substantial amount of research on econometric modeling of state economic models in both Kansas and Indiana. I am currently active as a forensic economist and publish regularly in the field of forensic economics. Attached to this affidavit is a copy of my full curriculum vitae.

3.    There is a consensus, although not unanimity, in the field of forensic economics that we can derive values for statistically average lives based on the scientific studies of the value of life reflected in "willingness to pay" literature. Like many other economists, I believe lost enjoyment of life damages in personal injury cases and wrongful death cases, including valuation of lost society and companionship, can be calculated with a reasonable degree of economic certainty.

4.    Hedonic calculations simply capture the value of lost enjoyment of life of a statistically average person as established by market analysis. Such analysis provides general statistics not substantially different from life expectancy tables, unemployment rates, projected work-life tables or estimated future net discount rates. Use of statistical averages to calculate damages is a basic tool of forensic economics. As with all economic calculations, calculation of the lost value of life is subject to some theoretical attack.

AFFIDAVIT OF DR. GARY R. ALBRECHT, Ph.D.- 2

5.    Many estimations and calculations by economists cannot be replicated or validated like those in physical science areas, such as chemistry or medicine. By its nature, all economic analysis includes a human component subject to significant variability. For example, there is no retrospective test that would show that but for the injury suffered any particular injured child would have accomplished any specific level of education. Nonetheless, I know that economists are frequently asked to make assumptions regarding education to provide juries a basis for determining appropriate damage awards for injured children. Assumptions of this type and magnitude are regularly included in the calculations economists testify to in courtrooms.

6.    I am familiar with the criticism that the willingness to pay studies do not incorporate people's lack of absolute freedom to choose jobs and that other motivations impact the amounts people accept for risky jobs. It is undoubtedly true that each statistical study in the willingness to pay area reflects the knowledge and limitations of the people involved in those studies. Recognizing that fact for each study does not invalidate the information provided to economists by the body of studies. Economists can and have evaluated the numerous studies of willingness to pay to determine why variances exist. For example, I am familiar with the article in *The Journal of Forensic Economics* in 1991, entitled "The Plausible Range of Value of Life - Red Herrings Among the Mackerel" by Ted R. Miller, Senior Research Economist at the Urban Institute in 1991. This article is a good example of an economist evaluating and adjusting studies to compensate for variables within those studies. Based on my knowledge of econometrics and statistics, I believe the Miller article is an economically proper analysis. This does not mean it is the only possible analysis. Nonetheless, I am unaware of any peer reviewed economic literature that disputes Miller's methodology.

AFFIDAVIT OF DR. GARY R. ALBRECHT, Ph.D.- 3

7.     There are many variables in economic calculations that require economists to select from a wide universe of data before making a calculation.  For example, there are innumerable government and industry studies regarding potential interest rates.  In some settings testifying economists will simply take an average of some historical data regarding those rates.  This methodology is widely accepted in the field.  No economist would testify that the interest rate he or she applied using this technique was perfectly accurate to determine a future loss at a particular point in the distant future.  The economist could only testify that it was that professional's best estimation based on the empirical data reviewed.  Similarly, when projecting the value of a business at some point in the future, an economist may attempt to determine the most appropriate interest rate to apply over a shorter time horizon.  Making such selections is always subject to the criticism that the economist is simply eyeballing.  This criticism ignores the fact that these economists are making professional judgments based on their knowledge of the economic data and theory.

8.     I have addressed in the literature why the loss of a portion of the ability to enjoy ones life is incorporated in the market decisions that value the loss of one whole life.  Because the calculation in the market is based on the whole loss as opposed to part of the loss, the willingness to pay studies provide a framework for determining lost value of life calculations.  The willingness to pay studies evaluate the lost value of life in the marketplace, not in unusual or emotionally charged settings.  The attacks on the theory that ignore the inherent valuation processes of the market and refer to rescues of trapped people or playing Russian Roulette miss the point of the scholarship and knowledge in this area.  It is precisely because the market studies reflect day to day behavior that they provide an accurate model.

AFFIDAVIT OF DR. GARY R. ALBRECHT, Ph.D.- 4

9.     While intellectual differences exist among forensic economists regarding the calculation of hedonic damages, a substantial portion of such economists believe the willingness to pay literature provides an economically accurate basis from which the value society places on a statistically average person or relationship can be calculated.  It is important for economists to understand the studies involved to insure the appropriate analysis.

10.     I am familiar with the work of economist Stan V. Smith.  I have read and reviewed his book *Economic/Hedonic Damages:  A Practice Book for Plaintiff and Defense Attorneys.*  That book sets forth an economically appropriate method of calculating lost value of life damages that falls well within the range of accepted standards governing how economists conduct their research and reach their conclusions.  The conclusions and methodology of Stan Smith's approach more than meets the criteria of good economics.

Further your Affiant sayeth naught.

GARY R. ALBRECHT, Ph.D.

SUBSCRIBED AND SWORN TO before me this _19_ day of February 1997.

Notary Public for North Carolina
Residing at _____
Commission Expires _8-22-2001_

AFFIDAVIT OF DR. GARY R. ALBRECHT, Ph.D.- 5

CURRICULUM VITAE

## Gary R. Albrecht, Ph.D.

*MAILING ADDRESSES:*

Post Office Box 15685
Winston-Salem, North Carolina 27113

Telephone: (336) 727-9435
Facsimile: (336) 722-9452

7350 South Tamiami Tr., #206
Sarasota, Florida 34231

Telephone: (941) 346-8529

Electronic Mail: albrechtgr@aol.com

*AREAS OF RESEARCH INTEREST:*

Forensic Economics
Economic Forecasting
Applied Econometrics

*EDUCATION:*

Ph.D., Economics, Indiana University, 1986
M.A., Economics, Indiana University, 1978
B.A., Economics and Philosophy, Tulane University, 1974

*EMPLOYMENT:*

1999-

CEO of Society of Litigation Economists, a not-for-profit organization dedicated
to insuring high standards in the application of economic principles to valuations.
The membership of the Society of Litigation Economists is limited to economists
who have demonstrated a high level of expertise in forensic economics.

1988-

President of Albrecht Economics, a firm specializing in calculating valuations.

1990-1999
  Adjunct Associate Professor, Department of Economics, Wake Forest University

1987-1989
  Assistant Professor, Department of Economics, Wake Forest University

1984-1987
  Director of Econometric Modeling and Research Scientist, Institute for Public Policy and Business Research, University of Kansas, Lawrence, Kansas. Main responsibility was the design and development of an econometric forecasting model for the state of Kansas. Other responsibilities included supervising impact studies, writing quarterly outlook monographs for publication in the *Kansas Business Review*, and, serving on the editorial board for the *Review*.

1978-1984
  Research Associate, Division of Research, School of Business, Indiana University, Bloomington, Indiana. Responsibilities included the development of and forecasting with state and sub-state econometric models, and, assistance in the generation of forecasts with a national econometric model.

1980-1981
  Lecturer, School of Business, Indiana University, Bloomington, Indiana.

1976-1978
  Associate Instructor, Department of Economics, Indiana University, Bloomington, Indiana.

*COURSES TAUGHT:*

  Econometrics
  Economic Forecasting
  Introductory Economics
  Regional Economics
  Statistics
  Microeconomics

*PUBLICATIONS:*

  "It's About Time: The Forensic Economic Evaluation," (with Kurt V. Krueger and John O. Ward) *Journal of Forensic Economics*, Vol. XI, No. 3, Fall 1998, pp. 203-213.

"Risk and Damage Awards: Short-Term Bonds Vs. Long-Term Bonds," *Journal of Legal Economics*, Vol. 7, No.1, Spring/Summer 1997, pp. 48-54.

"The Need to Use Risk-Free Discount Rates," *Journal of Legal Economics*, Vol. 7, No.1, Spring/Summer 1997, pp. 92-95.

"Economic Valuation of Life: A Cumulative Approach," in *The New Hedonics Primer for Economists and Attorneys*, 2nd Edition, John O. Ward, ed., Tucson, Arizona; Lawyers & Judges Publishing Co. 1996, pp. 171-175.

*Journal of Forensic Economics*, Volume VII, No. 3, Gary R. Albrecht, editor. Includes "Modeling Taxes in Personal Injury and Wrongful Death Award Calculations," pp. 1-4.

"The Application of the Hedonic Damages Concept to Wrongful Death and Personal Injury Litigation," *Journal of Forensic Economics*, Volume VII, No. 2, Spring/Summer 1994, pp. 143-150.

"Compensatory Damages and the Appropriate Discount Rate: Comment," *Journal of Forensic Economics*, Volume VI, No. 3, Fall 1993, pp. 271-272.

"The Role of Productivity and Prices in Forecasting Wage Rates," (with Kurt V. Krueger) *Journal of Forensic Economics*, Volume V, No. 3, Fall 1992, pp. 187-195.

"Issues Affecting the Calculated Value of Life," *Journal of Forensic Economics*, Volume V, No. 2, Spring/Summer 1992, pp. 97-104, and in *A Hedonics Primer for Economists and Attorneys*, John O. Ward, ed., Tucson, Arizona; Lawyers & Judges Publishing Co. 1992, pp. 197-205.

"Calculating the Value of a Closely Held Firm," *Journal of Legal Economics*, Volume I, No. 3, December 1991, pp. 1-4.

"Calculating the Lost Pleasure of Life Due to Injury," *TrialBriefs*, Volume 23, No. 3, Third Quarter, 1991, pp. 16-17.

"Forecasting the Earnings of a Partially Disabled Individual," *Journal of Legal Economics*, Volume I, No. 2, July 1991, pp. 50-57.

"The Valuation of a Closely Held Firm," *Trial Briefs*, Volume 22, No. 4, Fourth Quarter, 1990, pp. 37-39.

"The Valuation of a Closely Held Firm: Comment," *Journal of Forensic Economics*, Volume 3, No. 1, December, 1989, pp. 65-68.

"On the Derivation and Consistent Use of Growth and Discount Rates for Future Earnings," (with John C. Moorhouse), *Journal of Forensic Economics*, Volume 2, No. 3, August, 1989, pp. 95-102.

"The Kansas Economy," (with Anthony Redwood), in H. Flentje ed., *Kansas Policy Choices*, Lawrence, Kansas: University of Kansas Press, 1986.

"An Economic Perspective of Rate Suppression Legislation," (with Douglas Houston and Anthony Redwood), *Kansas Law Review*, Volume 33, No. 3, 1985.

"Kansas Exports and Economic Development," (with Shirley Sicilian and Kurt Krueger), *Kansas Business Review*, Fall, 1985.

"The Kansas Econometric Forecasting Model," *Kansas Business Review*, Fall, 1985.

"Long-Term Structural Changes in the Kansas Economy," (with Anthony Redwood and Daniel Petree), *Kansas Business Review*, Winter, 1984-1985.

"An Introduction to the Econometric Model of Indiana," (with R. L. Pfister), *Indiana Business Review*, February, 1981.

"Testing for Causality in Regional Econometric Models," (with R. Jeffery Green), *International Regional Science Review*, Winter, 1979.

*ACADEMIC PAPER PRESENTATIONS:*

"The Objective Science of Forensic Economics," presented at the Sixty-Eighth Annual Western Economic Association Conference, Lake Tahoe, June 22, 1993.

"Proof that Saving with Short-Term Bonds Minimizes Purchasing Power Fluctuation Risk," presented at the American Economic Association Conference, New Orleans, January 4, 1992.

"Income Taxes and Economic Loss Calculations," (with Kurt V. Krueger) presented at the Sixty-Sixth Annual Western Economic Association Conference, Seattle, June 30, 1991.

"The Adequacy of Proxy Variables in Forecasting Wage Rates," presented at the Sixty-Fifth Annual Western Economic Association Conference, San Diego, June 30, 1990.

"A Short-Run Employment Function When Adjustment Costs are Linear," presented at the Sixty-First Annual Western Economic Association Conference, San Francisco, July, 1986.

"Choosing Among Forecasted National Variables for Use as Inputs Into Regional Forecasting Models," (with R. Jeffery Green), presented at the Twenty-Seventh Annual Mountain-Plains Economic Conference, 1985.

*WORKING PAPER:*

"The Kansas Econometric Model," Institute for Public Policy and Business Research, The University of Kansas, July, 1987.

*AFFILIATIONS:*

American Academy of Economic and Financial Experts
American Arbitrators Association - Panel Member
American Economic Association
National Association of Forensic Economics

*REFERENCES:*

John C. Moorhouse, Professor
John H. Wood, R. J. Reynolds Professor
 Department of Economics
 Wake Forest University
 Winston-Salem, NC  27109

John O. Ward, Managing Editor
*Journal of Forensic Economics*
 & Chairman
Department of Economics
University of Missouri - Kansas City
Post Office Box 30067
Kansas City, MO  64112
(816) 235-2833

Robert D. Beam, Ph.D.
Economist

Professor of Economics
Department of Accounting, Finance, and Economics
University of Wisconsin-Superior
1800 Grand Ave.
Superior, WI 54880
(715) 394-8302
Fax: (715) 394-8277

### AFFIDAVIT

I hereby swear and affirm the following:

1. I am a Ph.D. in economics. My resume is attached.

2. I have calculated the loss of enjoyment of life in personal injury cases, based on peer-reviewed studies in the academic economic literature on Willingness-To-Pay to save statistical lives. These studies are based on what people are willing to pay to reduce the risk of death, and what workers are willing to accept as payment for accepting such risk on the job. This methodology has been widely accepted and published in the peer-reviewed economic literature for several decades in economic journals of the highest quality.

3. From my personal knowledge, many of my fellow economists nationwide also testify in court as expert witnesses using this basic methodology.

4. Loss of enjoyment of life damages in personal injury cases can be calculated with a reasonable degree of economic certainty. These estimates can provide valuable assistance to a jury in determining intangible losses for a given individual. An example of an acceptable method to calculate such damages can be found in Economic/Hedonic Damages: A Practice Book for Plaintiff and Defense Attorneys, and supplements thereto, by M.L. Brookshire and S.V. Smith, Anderson Publishing Co., Cinn., Ohio, 1990.

5. Disagreements among economists in the forensic field in this area regarding these calculations do not materially differ from the many disagreements that exist over methodologies in other areas of economic testimony, such as valuing businesses, calculating worklife for injured workers, estimating discount rates for present value purposes, etc, where diversity of expert economic opinion has long been accepted in courts of law.

Dated this 18th day of December, 1996

*Robert D Beam*
Robert D. Beam

SIGNED IN MY PRESENCE ON THIS DATE

*Lori D. Hughes*    12/18/96
NOTARY               DATE
Douglas County, Wisconsin
Commission Expires:  10/25/98

---

## CURRICULUM VITA

### ROBERT D. BEAM

POSITION:          Professor of Economics
                   Department of Accounting, Finance and Economics
                   University of Wisconsin-Superior

EDUCATION:         B.A., Economics, University of Cincinnati, 1968
                   M.A., Economics, University of Cincinnati, 1973
                   Ph.D., Economics, University of Cincinnati, 1979

PREVIOUS POSITIONS: Berea College, Berea, Kentucky, 1975-1977
                    Miami University, Oxford, Ohio, 1977-1979
                    University of Wisconsin-Superior, 1980-present

PROFESSIONAL ASSOCIATION MEMBERSHIPS:

                   American Economic Association
                   Midwest Economic Association
                   Atlantic Economic Society
                   Academy of Independent Scholars
                   Association for Integrative Studies
                   Social Science Education Consortium

PUBLICATIONS:

**BOOKS:**

The Logic of Organization, Alfred Kuhn and Robert D. Beam, Jossey-Bass Publishers, Inc., San Francisco, CA, 1982.

Intermediate Microeconomic Theory:  A Computer Spreadsheet Approach, Robert D. Beam and Michael Behr (manuscript in progress).

**MONOGRAPHS:**

Conference Proceedings on Building a Learning Society, Lawrence Senesh and Robert D. Beam, Old Dominion University Press, Norfolk, VA, 1985.

**ARTICLES:**

"Toward a Unified Social Science." The Study of Information: Interdisciplinary Messages, Fritz Machlup and Una Mansfield, eds., John Wiley and Sons, 1983.

"The Fragmentation of Knowledge:  An Obstacle to Its Full Utilization."  The Optimum Utilization of Knowledge:  Making Knowledge Serve Human Betterment, Kenneth Boulding and Lawrence Senesh, eds., Westview Press, 1983.

"Bridging The Interdisciplinary Gap:  A Unified Social Science Approach."  Academy Notes, December, 1983.

"The Case For Integrative Studies:  A System-Based, Social Science Approach."  Association For Integrative Studies Newsletter, November, 1982.

**PAPERS:**

"The Learning Society as a General Social System," presented at the American Association for the Advancement of Science, May, 1984.

"Society and Education in the Systems Age," presented at the Symposium on General and Liberal Studies, San Francisco, November, 1984.

"The Role of the Citizens' Alliance in Building a Learning Society," presented at the Conference on Building a Learning Society, Norfolk, VA, October, 1984.

"Translating Ideas Into Action Strategies For Building a Learning Society," presented at the American Association for the Advancement of Science, Los Angeles, May, 1985.

"Campus-Based Scholarly Works Journals:  A Medium For Interdisciplinarity?", presented at the Association For Integrative Studies meetings, October, 1986.

"Modeling Methods in Economic Theory:  A Computer Spreadsheet Approach," presented at the Midwest Economics Association meetings, April, 1987.

"Computerizing General Equilibrium:  A Pareto-Superior Approach to Economics Instruction?", presented at the Midwest Economic Association meetings, April, 1988.

"Internationalizing The Principles of Macroeconomics:  A Computer Spreadsheet Approach," presented to the Atlantic Economic Society, October, 1988.

"Using Functional Macro's to Simulate Market Processes in Principles of Macroeconomics Courses:  A Hypercard Demonstration," presented to the Midwest Economics Association, April, 1989.

"Calvinistic Origins of the American Dream," Faculty Dialogue, University of Wisconsin-Superior, April, 1989.

"A Framework For Unity in Social Science Education," an invited paper presented to members of the Social Science Education Consortium, Denver, Colorado, June, 1989.

"Integrating System Theory and Pedagogy Into Social Science Education," presented to members of the Social Science Education Consortium, Boulder, Colorado, June, 1990.

"Strategic Business Planning in Free Markets," an invited paper presented to business school faculty in the International School of Business at Rostov State University, Rostov-On-Don, Russia, December, 1991.

"Internationalizing the Principles of Microeconomic Theory:  A Computer Spreadsheet Approach," a paper presented to members of the Atlantic Economic Society in Nice, France, April, 1992.

"NAFTA:  Welfare Implications for Canada and the United States," a paper presented to members of the North American Economic and Finance Association, Montego Bay, Jamaica, W.I., August, 1993.

"A Web-Crawler's Guide to Forecasting Interest Rates and Monetary Policy," a paper presented to members of the Atlantic Economic Society, Paris, France, March 1996.

" A Comparative Study of Business Cycle Expansions: 1960 - 1996," a paper presented to members of the Superior, WI community, sponsored by M&I Bank, Superior branch, May, 1996.

"Epistemological Vs. Rhetorical Views on Economic Truth," a paper presented at the UW-Superior Symposium on "Truth in the Disciplines," May, 1996.

"Database Search Strategies For Forecasting Business Cycles," a paper presented to Business School faculty at the UW System Business Consortium Summer Institute, June, 1996.


**HONORS/AWARDS:**

Chancellor's Award for Excellence in Scholarly Activity, University of Wisconsin-Superior, 1983

Teacher of the Year Award, University of Wisconsin-Superior, 1988

Special Merit Awards for Teaching Excellence, 1984, 1986, 1989, 1990, 1992

Max Lavine Award for Scholarly Contributions to Contemporary Concerns, May, 1993.

**PREVIOUS CONSULTING ACTIVITIES:**

Provided consulting services to each of the following law firms. Services included preparation of economic loss estimates and reviews of estimates prepared by other economists.

1. Sukala v. American States Insurance Company, Fryberger, Buchanan, Smith & Frederick law offices, Duluth, MN, February 1995, testimony required.

2. Fraser Shipyards, Inc. v. Simon Aerials, Inc., Larry J. Peterson and Associates law office, Minneapolis, MN, September 1995, no deposition or testimony required.

3. Garner v. Meehan Seaway, Courtney Law Office, Duluth, MN, November 1995, no deposition or testimony required.

**CONSULTING FEE:** $100.00 per hour for research, preparation of reports, depositions and testimonies, $50.00 for travel time.

State of Louisiana:

Parish of Caddo:

## A F F I D A V I T

I hereby swear and affirm the following:

That I am Luvonia J. Casperson, Ph.D., am Chair of the Department of Economics and Finance at Louisiana State University at Shreveport and have taught Economics at LSU-S since 1975.  That I have been a member of the American Economics Association since 1972, and a member of the National Association of Forensic Economists since its inception in 1986.

1.) Further, that I currently serve as one of six vice presidents of the National Association of Forensic Economists, which is a sub-group of the American Economic Association comprised of more than 500 members.

2.) That I have calculated lost enjoyment of life (hedonic) damages, based upon a multitude of willingness to pay studies in the economic literature.  These studies value an American life based upon what workers and consumers are willing to pay to preserve (save) an American life.

3.) That from my personal knowledge, at least three of six vice presidents of the National Association of Forensic Economists currently estimate lost enjoyment of life damages.

4.) That lost enjoyment of life damages can be estimated with a reasonable degree of professional certainty.  Disagreements among forensic economists over specific aspects of such calculations do not differ from disagreements over other calculations long accepted in courts of law--such as the exact relationship between wage growth and discount rates in the estimation of lost earning capacity.

*Luvonia J. Casperson*

Luvonia J. Casperson, Ph.D.

Subscribed to and signed before me, this 4th day of December, 1991.

*Elizabeth G Doles*
Notary Public
ELIZABETH G. DOLES, Notary Public
Caddo Parish, Louisiana
My Commission is for Life

IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS
STATE OF MISSOURI

JULIA SHELTON,                     )
                                   )
              Plaintiff,           )
                                   )    Cause No. 575452
vs.                                )
                                   )    Team B
E.W. SZOKO, M.D., et al.,          )
                                   )
              Defendants.          )

## AFFIDAVIT IN SUPPORT OF PLAINTIFF'S
## EXPERT WITNESS STAN V. SMITH

COMES NOW Charles de Seve, who has a Ph.D. in Economics, along with an M.A. and B.A. from the State of University of New York at Albany and is President of American Economics Group, Inc. in Washington, D.C.

I have served as a consultant to government, industry and the legal profession in the areas of economic and statistical analysis, legal economics and computer modeling and simulation.

I have taught Economics at Rensselaer Polytechnic Institute, Russell Sage College, the State University of New York at Albany and Cornell University.

I am familiar with Stan V. Smith and the methodology he uses for calculating hedonic damages. This methodology is described in the book by Michael Brookshire and Stan V. Smith: "Economic/Hedonic Damages," 1990, Anderson Publishing Co. I use a similar method in the computer software which I have authored and which is used by economists to calculate hedonic loss. I have used this same methodology in testimony in the District of Columbia.

I believe this methodology to be reliable and sound and that it is regularly employed by economists who are experts in the field.

A copy of my Curriculum Vitae is attached to this Affidavit.

Dated this _16th_ day of May, 1991 in Washington, D.C.

_____
CHARLES de SEVE, PH.D.

STATE OF DISTRICT OF COLUMBIA
                                    ) SS.
CITY OF _____)

On this _16th_ day of May, 1991, before me, the undersigned Notary Public, personally appeared Charles de Seve, Ph.D. known to me to be the person whose name is subscribed to the within instrument and acknowledged that he executed the same for the purposes therein contained.

In witness whereof, I hereunto set my hand and official seal.

NOTARY PUBLIC Virginia L. Heckley
My Commission Expires February 14, 1993

My Commission Expires: _2/14/93_

# AFFIDAVIT

I hereby swear and affirm the following:

1.) That I am a business economist (Vita attached) and have been involved in court testimony for over 27 years.

2.) I currently serve as one of six vice presidents of the National Association of Forensic Economists, which is a sub-group of the American Economic Association comprised of more than 500 members.

3.) That I have calculated lost enjoyment of life (hedonic) damages, based upon a multitude of willingness to pay studies in the economic literature. These studies value an American life based upon what workers and consumers are willing to pay to preserve (save) an American life.

4.) That lost enjoyment of life damages can be estimated with a reasonable degree of professional certainty. The calculations, however, represent values of a statistical life and not the precise value for a given individual. The values can be used by the jury as a benchmark in placing a specific value on the life of the given individual.

5.) Disagreements among forensic economists over specific aspects of such calculations do not differ from disagreements over other calculations long accepted in courts of law--such as the exact relationship between wage growth and discount rates in the estimation of lost earning capacity.

Signed _____

(Everett Dillman, Ph.D)

12-2-91
Date

# NOTARY

SUBSCRIBED AND SWORN TO before me on this the *2nd* day of *December* , 1991.

_____
Notary Public in El Paso County, in the State of Texas

My Commission Expires: 4-22-93

IN THE CIRCUIT COURT IN AND FOR SARASOTA COUNTY, FLORIDA

DONALD and GEORGIA JOHANNES,

      Plaintiffs,

vs.                   Case No. 99-5785-CA-01

ANTHONY F. PERROTTA d/b/a
MAPLE LEAF MOTEL,

      Defendant.

_____

AFFIDAVIT

STATE OF FLORIDA
COUNTY OF SARASOTA

WOLFGANG FRANZ, being first duly sworn on oath, hereby deposes and says:

1.    My name is WOLFGANG FRANZ and I have testified previously regarding the subject of forensic economics.

2.    I received my Bachelors Degree in Economics from Central Washington University in 1965. I received my Ph.D. Degree in Economics from Washington State University in 1970. I am currently a consulting economist at Ellensburg, Washington. I have done a substantial amount of research on ~~econometric~~ *economic* modeling and have served as a consultant in the field of forensic economics. Attached to this Affidavit is a copy of my Curriculum Vitae.

3.    There is a consensus, although not uniformity, in the field of forensic economics that we can derive values for statistically average lives based on the scientific studies of the value of life reflected in "willingness to pay" literature. Like many other economists, I believe minimum estimates of loss of enjoyment of life damages in personal injury cases and wrongful death cases, including valuation of loss of society and companionship, can be calculated with a reasonable degree of economic certainty.

4.    Hedonic calculations simply capture the value of lost enjoyment of life of a statistically average person as established by market analysis. Such analysis provides general statistics not substantially different from life expectancy tables, unemployment rates, workers' average earnings and work life tables. Use of statistical averages to calculate damages is a basic tool of forensic economics. As with all economic calculations, calculations of the lost value of life is subject to some theoretical limitations.

5.    Many estimations and calculations by economists cannot be replicated or validated like those in physical science areas such as chemistry or medicine. By its nature, all economic analysis includes a human component subject to significant variability. For example, there is no retrospective laboratory test that would show that, but for the injuries suffered, any particular injured child would have accomplished any specific level of education. Nonetheless, economists are frequently asked to make hypothetical assumptions regarding education to provide juries a basis for determining appropriate damage awards for injured children. Assumptions of this type and magnitude are regularly included in the calculations economists testify to in courtrooms.

6.    I am familiar with the criticisms that the willingness to pay studies do not incorporate people's lack of absolute freedom to choose a job and that other motivations and economic variables impact the amounts of money people accept for risky jobs. It is undoubtedly true that each statistical study in the willingness to pay area reflects the knowledge and limitations

2

of the people involved in those studies. Recognizing that fact for each study does not invalidate the information provided to economists by these studies. Economists can and have evaluated the numerous studies of willingness to pay with respect to the economic variables included in these studies. For example, I am familiar with the article in the *Journal of Forensic Economics* in 1999 entitled "The Plausible Range of Value of Life - Red Herrings Among the Mackerel" by Ted R. Miller, Senior Research Economist at the Urban Institute in 1991. This article is an example of an economist evaluating and adjusting studies to compensate for inclusion of different variables within those studies. Based on my knowledge of economics and statistics, I believe the Miller article is an economically proper analysis. This does not mean it is the only possible analysis. Nonetheless, I am unaware of any peer reviewed economic literature that convincingly disputes Miller's methodology.

7.      There are many variables in economic calculations that require economists to select from a wide universe of data before making the tabulation. For example, there are innumerable government and industry studies regarding historical interest rates. In some settings, testifying economists will simply take an average of those historical data regarding those rates. This methodology is widely accepted in the field. No economist would testify that the interest rate he or she applied using this technique was perfectly accurate in determining the future loss at a particular point in the distant future. Economists could only testify that it was that professional's best estimation based on the empirical data reviewed. Similarly, when projecting the value of a business at some point in the future, an economist may attempt to determine the most appropriate

3

interest rate to apply over a time horizon. Making such selections is always subject to the criticism that the economist is simply eyeballing. This criticism ignores the fact that the economists are making professional judgments based on their knowledge of the extant economic data and economic theory.

8.      I have addressed in the literature why the loss of the ability to enjoy ones life incorporated in the market decisions that value the loss of one whole life. Because the calculation of the market is based on the loss of a whole life as opposed to part of the loss, the willingness pay literature provides a framework for determining loss value of life calculations. The willingness to pay studies evaluate the loss value of life in the market place, not in unusual emotionally charged settings. The attacks on economic theory that ignore the inherent valuation process of the market misunderstand the scholarship of scientific knowledge in this area. It is precisely because the market studies reflect day to day behavior that they provide an accurate model.

9.      While intellectual differences exist among forensic economists regarding the calculation of hedonic damages, a substantial portion of such economists believe the willingness to pay literature provides an economically accurate basis from which the value society places on a statistically average person or relationship can be calculated. The methodology used to compute hedonic values has a strong theoretical basis and empirical estimates emanate from scientific studies that use state-of-the-art statistical methods. It is important for economists to understand the methodology underlying these studies to ensure an appropriate analysis.

4

10.    I research and write in the field of hedonic damages. There are many economically appropriate methodologies for calculating loss value of life damages that fall well within the range of accepted standards governing how economists conduct their research and reach their conclusions. The conclusions and methodology of my own and many other economists approach and more than meets the criteria of good economics.

FURTHER, AFFIANT SAYETH NAUGHT.

By: WOLFGANG FRANZ
Professor Amertus of Economics
AMERITUS

STATE OF WA
COUNTY OF Kittitas

The foregoing instrument was acknowledged before me this 27 day of November , 2000, by Wolfgang Franz who is personally known to me.

Notary Public

Expiration 04-12-03

5

IN THE CIRCUIT COURT IN AND FOR SARASOTA COUNTY, FLORIDA

DONALD and GEORGIA JOHANNES,

    Plaintiffs,

vs.                       Case No. 99-5785-CA-01

ANTHONY F. PERROTTA d/b/a
MAPLE LEAF MOTEL,

    Defendant.

_____

## AFFDAVIT

STATE OF FLORIDA
COUNTY OF SARASOTA

    ROY F. GILBERT, being first duly sworn on oath, hereby deposes and says:

    1.    My name is ROY F. GILBERT and I have testified previously regarding the subject of forensic economics and hedonic damages.

    2.    I received my Bachelors Degree in Economics from Michigan State University in 1963. I received my Masters Degree in Economics from Michigan State University in 1966. I received my Ph.D. Degree in Economics from Michigan State University in 1969. I am currently a consulting economist and professor in the Department of Economics at Texas A&M University. I have done a substantial amount of research on econometric modeling and have served as a consultant in the field of forensic economics. Attached to this Affidavit is a copy of my Curriculum Vitae.

    3.    There is a consensus, although not uniformity, in the field of forensic economics that we can derive values for statistically average lives based on the scientific studies of the value of life reflected in "willingness to pay" literature. Like many other economists, I believe minimum estimates of loss of enjoyment of life damages in personal injury cases and wrongful death cases, including valuation of loss of society and companionship, can be calculated with a reasonable degree of economic certainty.

    4.    Hedonic calculations simply capture the value of lost enjoyment of life of a statistically average person as established by market analysis. Such analysis provides general statistics not substantially different from life expectancy tables, unemployment rates, workers' average earnings and work life tables. Use of statistical averages to calculate damages is a basic tool of forensic economics. As with all economic calculations, calculations of the lost value of life is subject to some theoretical limitations.

    5.    Many estimations and calculations by economists cannot be replicated or validated like those in physical science areas such as chemistry or medicine. By its nature, all economic analysis includes a human component subject to significant variability. For example, there is no retrospective laboratory test that would show that, but for the injuries suffered, any particular injured child would have accomplished any specific level of education. Nonetheless, economists are frequently asked to make hypothetical assumptions regarding education to provide juries a basis for determining appropriate damage awards for injured children. Assumptions of this type and magnitude are regularly included in the calculations economists testify to in courtrooms.

    6.    I am familiar with the criticisms that the willingness to pay studies do not incorporate people's lack of absolute freedom to choose a job and that other motivations and economic variables impact the amounts of money people accept for risky jobs. It is undoubtedly true that each statistical

2

study in the willingness to pay area reflects the knowledge and limitations of the people involved in those studies. Recognizing that fact for each study does not invalidate the information provided to economists by these studies. Economists can and have evaluated the numerous studies of willingness to pay with respect to the economic variables included in these studies. For example, I am familiar with the article in the *Journal of Forensic Economics* in 1999 entitled "The Plausible Range of Value of Life - Red Herrings Among the Mackerel" by Ted R. Miller, Senior Research Economist at the Urban Institute in 1991. This article is an example of an economist evaluating and adjusting studies to compensate for inclusion of different variables within those studies. Based on my knowledge of economics and statistics, I believe the Miller article is an economically proper analysis. This does not mean it is the only possible analysis. Nonetheless, I am unaware of any peer reviewed economic literature that convincingly disputes Miller's methodology.

7.    There are many variables in economic calculations that require economists to select from a wide universe of data before making the tabulation. For example, there are innumerable government and industry studies regarding historical interest rates. In some settings, testifying economists will simply take an average of those historical data regarding those rates. This methodology is widely accepted in the field. No economist would testify that the interest rate he or she applied using this technique was perfectly accurate in determining the future loss at a particular point in the distant future. Economists could only testify that it was that professional's best estimation based on the empirical data reviewed. Similarly, when projecting the value of a business at some point in the future, an economist may attempt to determine the most appropriate interest rate to apply over a time horizon. Making such selections is always subject to the criticism that the

3

economist is simply eyeballing. This criticism ignores the fact that the economists are making professional judgments based on their knowledge of the extant economic data and economic theory.

8.    I have addressed in the literature why the loss of the ability to enjoy ones life is incorporated in the market decisions that value the loss of one whole life. Because the calculation of the market is based on the loss of a whole life as opposed to part of the loss, the willingness to pay literature provides a framework for determining loss value of life calculations. The willingness to pay studies evaluate the loss value of life in the market place, not in unusual or emotionally charged settings. The attacks on economic theory that ignore the inherent valuation process of the market misunderstand the scholarship of scientific knowledge in this area. It is precisely because the market studies reflect day to day behavior that they provide an accurate model.

9.    While intellectual differences exist among forensic economists regarding the calculation of hedonic damages, a substantial portion of such economists believe the willingness to pay literature provides an economically accurate basis from which the value society places on a statistically average person or relationship can be calculated. The methodology used to compute hedonic values has a strong theoretical basis and empirical estimates emanate from scientific studies that use state-of-the-art statistical methods. It is important for economists to understand the methodology underlying these studies to ensure an appropriate analysis.

10.    I research and write in the field of hedonic damages. There are many economically appropriate methodologies for calculating loss value of life damages that fall well within the range of accepted standards governing how economists conduct their research and reach their conclusions.

4

The conclusions and methodology of my own and many other economists approach and more than meets the criteria of good economics.

FURTHER, AFFIANT SAYETH NAUGHT.

By: ROY F. GILBERT
Forensic Economist
Department of Economics
Texas A&M University

STATE OF TEXAS
COUNTY OF BRAZOS

The foregoing instrument was acknowledged before me this 28 day of *November*, 2000, by Roy F. Gilbert, who is personally known to me.

Timothy Johnson

2140 Kazmeier Plaza
Bryan, Texas 77802
Tel: (979) 846-4446

5

CONSULTING ECONOMISTS

ROY F. GILBERT, Ph.D.

JOHN W. ALLEN
ROY F. GILBERT

## AFFIDAVIT OF ROY F. GILBERT

I, Roy F. Gilbert, hereby swear and affirm the following:

1.    I hold a Ph.D. in economics.  My resume is attached.

2.    In the past I have computed the loss of enjoyment of life in numerous personal injury cases, based on peer-reviewed studies published in the academic literature on the Willingness-To-Pay to save statistical lives.  These studies are based on what people are willing to pay to reduce the risk of death, and what workers are willing to accept as payment for accepting such risk on the job.  This methodology has been widely accepted and published in the peer-reviewed economic literature for several decades in economic journals of the highest quality.

3.    From my personal knowledge, I know that many of my fellow economists nationwide also testify and appear as expert witnesses in forensic economics using this basic methodology.

4.    Loss of enjoyment of life damages can be calculated with a reasonable degree of economic certainty.  These estimates can provide valuable assistance to the court in determining intangible losses for a given individual.  An example of calculating such damages can be found in *Economic/Hedonic Damages: A practice Book for Plaintiff and Defense Attorneys.*

5.    Disagreements among forensic economists in this area regarding these calculations do not materially differ from the many disagreements that exist over methodologies in other areas of economic testimony, such as valuing businesses, calculating worklife expectancies for injured workers, estimating discount rates for present value purposes, etc., where diversity of expert economic opinion has long been accepted in courts of law.

Roy F. Gilbert

*VITA*

**ROY  F. GILBERT**

Address:        2114 Kazmeier Plaza
                Bryan, Texas  77802

Occupation:     Teacher and consultant

Title:          Associate Professor at Texas A&M University

Duties:         All activities of position as university professor
                including teaching and counseling students.

Education:      Ph.D., Michigan State University, 1969
                M.A., Michigan State University, 1966
                B.A., Michigan State University, 1963

Employment:     1973-      Associate Professor, Texas A&M
                1970-73    Assistant Professor, Texas A&M
                1968-70    Assistant Professor, Michigan State
                1967-68    Assistant Professor, Wayne State
                1966-67    Instructor, Michigan State

Other
Activities:

                Board of Editors: *Journal of Legal Economics*

                Editorial Referee: *Journal of The American Statistical Association*

                Editorial Referee: *Journal of Business & Economic Statistics*

                Editorial Referee: *Journal of Forensic Economics*

                Project Consultant: National Science Foundation

**Publications
and Papers:**

"Long Term and Short Term Changes in Earnings Profiles," *Journal of Forensic Economics,* Vol. 9, No. 2, 1996.

"The Below-Market Discount Rate Method vs. East Coast Black Magic," *Journal of Forensic Economics,* Vol. 9, No. 1, 1996.

"Projecting Personal Injury Losses With a Catch-up Model of Adjustments to the Worklife Cycle," presented at the 1995 Meetings of the Southern Economic Association.

"A Comment on the Use of Value of Life Estimates in Wrongful Death Litigation: A Reply," *Journal of Legal Economics,* Vol. 5, No. 2, Fall 1995.

"The Alleged Persistent Misapplication of Economics vs. The Economic Value of Life: A Comment," *Journal of Forensic Economics,* Vol. 8, No. 3, Fall 1995.

"A Reply to *The Application of Hedonic Models to Personal Injury Litigation: Comment,*" *Journal of Legal Economics,* Spring/Summer 1995, Vol. 5, No. 1.

"A Review of the Monte Carlo Evidence Concerning Hedonic Value of Life Estimates," *Journal of Forensic Economics,* Vol. 8, No. 2, Spring/Winter 1995.

"The Application of Hedonic Models to Personal Injury Litigation," *Journal of Legal Economics,* Vol. 4, No. 3, Winter, 1994.

"In Defense of the Application of Hedonic Models to Wrongful Death and Personal Injury Litigation," *Journal of Forensic Economics,* Volume 8, Number 1, 1995.

"Estimates of Earnings Growth Rates Based on Earnings Profiles," *Journal of Legal Economics,* Summer, Vol. 4, No. 2, Summer, 1994.

"How Economists Can Help in Litigation Involving Personal Injury, Death or Discrimination: Additional Comments and Suggestions for Analysis," *Journal of Legal Economics,* December, 1992.

"Forensic Discount Rates," *Journal of Legal Economics*, December, 1991.

"Estimating Personal Consumption of A Deceased Family Member," *Journal of Forensic Economics*, Spring/Summer, 1991.

"Stock Index Futures and Cash Market Volatility," *Financial Analysts Journal*, November/December 1989.

"Monte Carlo Methods: Their Role For Econometrics,"*Journal of The American Statistical Association*, September 1974.

"A Simple Econometric Model of The U.S. Economy in Disequilibrium," presented at the 1974 Meetings of The Western Economic Association.

"The Small Sample Properties of Some Statistics Used In Specification Error Tests," *Journal of The American Statistical Association*, March 1972.

"The Demand For Money: An Analysis of Specification Error," *Econometrica*, July 1970.

"Estimation of Seemingly Unrelated Regressions With Autoregressive Disturbances," *Journal of The American Statistical Association*, December 1970.

"Small Sample Properties of Seemingly Unrelated Regressions," *Journal of The American Statistical Association*, December 1968.

"The Economics of Labor Mobility: An Empirical Analysis," *Western Economic Journal*, June 1967.

"An Index of Interest Rates For Use In Macroeconomic Models," presented at The December 1969 Meetings of The Econometric Society.

"The Demand For Foreign Currency Holdings by European Banks," *Southern Economic Journal*, July 1971.

"The Demand For Money: An Analysis of Specification Errors," presented at the December 1970 Meetings of The Econometric Society.

"Estimation of Seemingly Unrelated Regressions with Auto-Regressive Disturbances," presented at the December 1968 Meetings of The Econometric Society.

"The Small Sample Properties of Some Statistics Used in Specification Error Tests," presented at the December 1968 Meetings of The Econometric Society.

"Alternative Estimators of Seemingly Unrelated Regressions," presented at the December 1967 Meetings of The Econometric Society.

"The Analysis Of Stock Market Volatility And The Relationship To Stock Index Futures," (Unpublished).

**Other Information:**

Fields of Specialization:
   Econometrics
   Economic Theory
   Forensic Economics

Member of:
   American Economic Association
   American Statistical Association
   Western Economic Association
   Southern Economic Association
   National Association of Forensic Economists
   American Academy of Economic and Financial Experts

**Past Consulting Activities For:**

   U.S. Department of Health and Welfare
   U.S. Department of Agriculture
   U.S. Department of Justice
   U.S. Department of Interior
   F.M.C. Corporation
   Jefferson Standard Life Insurance Company
   Saint Joseph Light & Power Company
   Wiley Publishing Company
   Court Administrator, Supreme Court of Michigan
   Selected Attorneys

- RESUME -

## AFFIDAVIT

hereby swear and affirm the following:

I am a Ph.D. in economics. My resume is attached.

I have calculated the loss of enjoyment of life in personal injury cases, based on peer-reviewed studies in the academic economic literature on Willingness-To-Pay to save statistical lives. These studies are based on what people are willing to pay to reduce the risk of death, and what workers are willing to accept as payment for accepting such risk on the job. This methodology has been widely accepted and published in the peer-reviewed economic literature for several decades in economic journals of the highest quality.

From my personal knowledge, many of my fellow economists nationwide also testify in court as expert witnesses using this basic methodology.

Loss of enjoyment of life damages in personal injury cases can be calculated with a reasonable degree of economic certainty. These estimates can provide valuable assistance to a jury in determining intangible losses for a given individual. An example of an acceptable method to calculate such damages can be found in _Economic/Hedonic Damages: A Practice Book for Plaintiff and Defense Attorneys_, and supplements thereto, by M. L. Brookshire and S. V. Smith, Anderson Publishing Co., Cinn., Ohio, 1990.

Disagreements among economists in the forensic field in this area regarding these calculations do not materially differ from the many disagreements that exist over methodologies in other areas of economic testimony, such as valuing businesses, calculating worklife for injured workers, estimating discount rates for present value purposes, etc, where diversity of expert economic opinion has long been accepted in courts of law.

ted this _18_ day of December, 1996.

_[signature]_ , Ph.D.

_[signature]_

LINDA M. SHEEHY, Notary Public
My Commission Expires March 20, 2001

---

Allan S. McCausland, Ph.D.                    Telephone: (603) 746-5820

**CURRENT POSITION:** Arbitrator/Economic Consultant

McCausland Economic Associates
834 Main Street, P.O. Box 248
Contoocook, New Hampshire 03229

McCausland Economic Associates is a consulting firm specializing in three areas:

~ Arbitration, Mediation and Fact-Finding Services
~ Analysis of Economic Damages and Expert Witness Work
~ Financial Consulting Services

**EDUCATION**

Ph.D. in Economics, Clark University, Worcester, Massachusetts
M.A. in Economics, Whittemore School of Business and Economics,
       University of New Hampshire, Durham, New Hampshire
B.A. with High Honors, American International College, Springfield, Massachusetts

**PROFESSIONAL ACTIVITY**

Active Arbitrator/Mediator/Fact-Finder in the Private and Public Sectors
Active Speaker/Panelist
Consultant to Law Firms
Financial Consultant
Registered Investment Advisor (1983-1990)
Professor of Economics and Finance (1969-1983)

**MEMBERSHIPS**

American Economic Association
Industrial Relations and Research Association
Eastern Economic Association
National Academy of Arbitrators
National Assocation of Business Economists
National Association of Forensic Economists
Northeast Business and Economic Association

**PANELS**

American Arbitration Association's National Panel of Labor Arbitrators
American Arbitration Association's Multiemployer Pension Plan Amendments Act Panel
Federal Mediation & Conciliation Service's National Roster of Arbitrators
New Hampshire Public Employee Board's List of Neutrals
Massachusetts Board of Conciliation and Arbitration
Vermont Public Employee Board's List of Neutrals
Numerous Individual Private & Public Collective Bargaining Agreements
Defense Logistic Agency's Grievance and EEO Panels (1984-1990)
FAA/NATCO-New England Region Panel of Arbitrators (1988-1993)

## HONORS

National Academy of Arbitrators
National Science Foundation Fellow
Omicron Delta Epsilon National Honor Society in Economics
Delta Mu Delta National Honor Society in Business Administration
Alpha Chi National Honor Society
Class Salutatorian (American International College)
Dean's List
Who's Who in American Colleges and Universities (1967)
Merit Faculty Award, New Hampshire College (1979-80)

## PRESENTATIONS (1980-Present)

-Proving & Litigating Business Value and Profits, New Hampshire Trial Lawyers Association, Civil & Family Law Seminar, March, 1996

-Just Cause in Arbitration Cases, Sixth Annual Public Sector Labor Seminar, Manchester, New Hampshire, September, 1995

-Arbitration of Teacher Disputes, New Hampshire/NEA Leadership Conference, North Conway, New Hampshire, July, 1995

-Make Whole Remedies: The Displaced Employee, National Academy of Arbitrators Forty-Eighth Annual meeting, San Francisco, California, May, 1995

-State and Local Economies, Taxes and Public Sector Bargaining, American Arbitration Association Conference, Bretton Woods, New Hampshire, July, 1994

-BLS Worklife Estimates: Not for Use in Personal Injury and/or Wrongful Death Litigations, Eastern Economic Association Meeting, Issues in Forensic Economics II, Boston, Massachusetts, March, 1994

-Arbitration to Avoid Litigation, Institute for Management Accounting, Manchester, New Hampshire, February, 1993

-Impact of the Economy & Health Issues on Labor/Management Relations, American Arbitration Association, Boston, Massachusetts, June, 1991

-Presenting an Arbitration Case, Advanced Arbitration Advocacy Conference, American Arbitration Association, Boston, Massachusetts, May, 1991

-Effective Preparation for Factfinding, American Arbitration Association Seminar, Fairlee, Vermont, September, 1990

-Factfinding: Presentation and Weight of Evidence, New Hampshire School Board Association Workshop, Bedford, New Hampshire, January, 1990

-Drug/Alcohol Testing and Impairment Issues, American Arbitration Association Conference, Boston, Massachusetts, December, 1989

-Arbitration and Mediation, New Hampshire/NEA Workshop, Hanover, New Hampshire, August, 1989

-Projecting Future Costs of Treatment, New Hampshire Bar Association-Continuing Legal Education Program Treating and Representing the Victims of Head Injury, Manchester, New Hampshire, April, 1989

-Promotional and Competency Testing, New England Regional Arbitration Conference, University of Massachusetts, Amherst, Massachusetts, May, 1988

-How to Effectively Utilize a Mediator, Impasse Resolution New Hampshire School Boards Association Labor Relations Workshop, Manchester, New Hampshire, January, 1988

## PRESENTATIONS (1980-Present) - Continued

-Arbitrability, Public Sector Labor Relations in New Hampshire, Public Employee Labor Relations Board Conference, State of New Hampshire Symposium, Manchester, New Hampshire, May, 1987

-Fundamental Monetary Cycle of Investments, Personal Financial Planning for Lawyers, The New Hampshire Bar Association 1986 Annual Meeting, Bretton Woods, New Hampshire, June, 1986

-Mediation to Fact-Finding, Regional meeting of UniServ Directors of the National Education Association, Kennebunk, Maine, May, 1985

-Exports, Imports and Jobs, Eastern Regional meeting of the National Academy of Arbitrators, April, 1984, and Western Massachusetts International Trade Association, Boston, Massachusetts, October, 1984

-Discussant, Equity Sharing to Promote Residential Sales, Northeast Business and Economic Association, Boston, Massachusetts, November, 1984

-Use of Economic Data in Factfinding, American Arbitration Association Conference, North Conway, New Hampshire, November, 1984

-Arbitration Workshop, American Arbitration Association Conference, Boston, Massachusetts, July, 1984

-Assessing Affirmative Action Progress, New England Business and Economic Association Conference, Hartford, Connecticut, November, 1982

-A Worksheet for Mediation, American Arbitration Association Conference, Manchester, New Hampshire, November, 1982

-Aspects of Evidence and Proof, American Arbitration Association Conference, Woodstock, Vermont, May, 1982

-Discussant, Effect of Government Policy on Employment and Income, Western Economic Association Conference, San Francisco, California, July, 1981

-Use and Mis-use of the Consumer Price Index in Collective Bargaining, New England Regional Utility Conference, North Conway, New Hampshire, June, 1981

-Forecasting Interest Rates, New Hampshire Society of Certified Public Accountants, Manchester, New Hampshire, April, 1981

-Use of Econometrics in Forecasting, New Hampshire Society of Certified Public Accountants, Manchester, New Hampshire, Fall 1980

LICATIONS

t Company and Paperworkers, Local 499, Commerce Clearing House, Inc.'s, "Labor Arbitration Awards" publication,
mber 6, 1996, 6428, Pages 8226-8230.

v & Harman Refining Division, Attleboro, MA and United Plant Guard Workers of America Local 541, The Bureau of National
rs, Inc.'s, "Labor Relations Reporter" publication, August 28, 1996, 106LA993-1056.

of Bedford, NH Police Department and State Employees Association of New Hampshire, The Bureau of National Affairs, Inc.'s,
r Relations Reporter" publication, August 21, 1996, 106LA967-970.

ay (NH) School District and Conway Education Association and Conway Education Support Personnel, NEA-New Hampshire,
ureau of National Affairs, Inc.'s, "Labor Relations Reporter" publication, May 29, 1996, 106 LA 385-448, and Commerce
ing House, Inc.'s, "Labor Arbitration Awards" publication, August 13, 1996, 6256, Pages 7331-7333.

Whole and Statutory Remedies: The Displaced Employee, Arbitration 1995: New Challenges and Expanding Responsibilities,
ureau of National Affairs, Inc., pages 191-205.

Worklife Estimates: Not for Use in Personal Injury and/or Wrongful Death Litigation, Maine Lawyers Review, Volume 3,
er 6, March 15, 1995

Cascade Corporation/United Paper Workers International, Local 900, Commerce Clearing House, Inc.'s, "Labor Arbitration
s" publication, October 18, 1994, 94-2 ARB]4483.

mack County Corrections Dept. and State Employees Association, The Bureau of National Affairs, Inc.'s, "Labor Relations
ter" publication, September 14, 1994, 102LA1088-1096.

orough County Commissioners [N.H.] and AFSCME Local 2715, The Bureau of National Affairs, Inc.'s, "Labor Relations
ter" publication, March 2, 1994, 101LA1033-1064, also published by Commerce Clearing House, "Labor Arbitration Awards"
ation, May 17, 1994, 94-1 ARB]4221.

International Security Services, Inc. and Guard Workers, Local 538, Commerce Clearing House, "Labor Arbitration Awards"
ation, October 26, 1993, 93-2 ARB]3504, also published by The Bureau of National Affairs, Inc.'s, "Labor Relations Reporter"
ber 1, 1993, 101LA441.

ay (NH) School District and Conway Education Association, American Arbitration Association's "Arbitration in the Schools"
ation, December 1, 1991.

ated Grocers of Maine and Teamsters Union, Local No. 340, Commerce Clearing House Inc.'s, "Labor Arbitration Awards"
ations, September 10, 1991, 91-2 ARB]8437.

Local 288 and City of Holyoke, Commerce Clearing House, "Labor Arbitration Awards" publication, March 12, 1991, 91-1
.121 and American Arbitration Association's "Labor Arbitration in Government" publication, May 15, 1991 Vol. 21 No. 5.

f Maine and Maine State Employees Association, Commerce Clearing House Inc.'s "Labor Arbitration Awards" publication,
r 30, 1990, 90-2 ARB]8521.

of Athol (MA) and International Brotherhood of Police Officers, Local 415, American Arbitration Association's "Labor
ition in Government" publication, September 15, 1988.

ner Recovery Corp. and Teamsters, Local 6393, Commerce Clearing House, Inc.'s "Labor Arbitration Awards" publication,
t 23, 1988.

nderry (NH) School District/AFSCME Council 93, Local 1801, American Arbitration Association's "Arbitration in the Schools"
ation, February 1, 1987.

mack (NH) School District/National Education Association-New
hire/Merrimack Educational Support Staff, Labor Relations Press' "Labor Arbitration Information System" publication, October
86.

PUBLICATIONS - Continued

Town of Goffstown (NH)/AFSCME Council 93, Local 2715, American Arbitration Association's "Labor Arbitration in the
Government" publication, April 15, 1986.

Boise Cascade Corporation/United Paperworkers International Union, Local 900, American Arbitration Association's "Summary of
Labor Arbitration Awards" publication, October 15, 1985.

North Smithfield (RI) School Committee/North Smithfield Association of Support Staff Personnel/National Education Association-
Rhode Island, American Arbitration Association's "Arbitration in the Schools" publication, September 1, 1985.

Boise Cascade Corporation/United Paperworkers International Union, Local 900, Commerce Clearing House, July 22, 1985.

Using Statistics to Assess Affirmative Action, Papers and Proceedings, New England Business and Economic Association, Fall 1982

Sex Discrimination: By Whom?, The Reporter, Fall 1981

The Ripple Effect (?) in Minimum Wage Legislation, Atlantic Economic Journal, Volume III, No. 4, page 96 (December 1979) (also
presented at the Atlantic International Economic Conference, Vienna, Austria, April 1979)

Minimum Wage Employment Effects in New England: 1950 through 1972, Papers and Proceedings, New England Business and
Economic Development Conference, Hartford, Connecticut, 1976

The Fair Labor Standards Amendments of 1975 (H.R. 10130), FAIR LABOR
STANDARDS AMENDMENTS OF 1975, Hearings before the Subcommittee on Labor Standards of the Committee on Education and
Labor, House of Representatives, Ninety-Fourth Congress, pages 246-248, November 1975.

PREVIOUS PROFESSIONAL EXPERIENCE

1983-Present            Arbitrator/Economic Consultant, McCausland Economic Associates

1974-1983              Professor Economics and Finance

                       New Hampshire College
                       Manchester, New Hampshire

                       Duties: Taught Investments, Security Analysis,
                       Labor Economics, Labor Relations and
                       Arbitration, Introduction to Economics.

1978-1983              Special Economic Consultant to Public Service
                       Company of New Hampshire for the development
                       of Labor Supply Availabilities for minorities
                       and for statistically assessing progress
                       in the Company's Affirmative Action Program.

1977-1978              Chairman:  Management Arts and Economic Sciences
                       Department, New Hampshire College

                       Duties: Supervised faculty, students and
                       curriculum development in the following
                       majors:  Economics, Finance, Fashion Merchandising,
                       Hotel/Resort Management, Marketing,
                       Retail Management, and Techno-Business.

1975-1980              Associate Consultant, New England Economic Project:
                       Aided in the development of a New England
                       Forecasting Model and advised the Directors in
                       policy decisions concerning the Project's
                       activities.

1974-1976              Adjunct Professor of Investments and Personal Finance,
                       Merrimack Valley Branch, University of New Hampshire,
                       Manchester, New Hampshire

                       Duties: Developed curriculum and taught Investments
                       and Personal Finance.

1969-1974              Assistant Professor of Economics and Finance

                       Coordinator:  Economics and Finance Area
                       New England College, Henniker, New Hampshire

                       Duties: Taught Investments, Labor Economics,
                       Labor Relations and Arbitration, Intermediate
                       Micro and Macro Economics, and Introduction to
                       Economics.

COURT APPEARANCES AS AN ECONOMIC EXPERT*

MAINE

Federal District Court of Maine, Portland and Bangor, Maine
       -- Business Lost Income and Sales, Business Valuations
       -- Economic Losses Resulting from Personal Injury, Defamation
          and Wrongful Discharge/Discrimination

State of Maine Superior Court:  Cumberland, Kennebec, Knox, Oxford and Sagadahoc Counties
       -- Business Valuations
       -- Economic Losses Resulting from Personal Injury

MASSACHUSETTS

Federal District Court of Massachusetts, Boston, Massachusetts
       -- Business Lost Income and Sales, Business Valuations
       -- Economic Losses Resulting from Personal Injury and Wrongful
          Discharge/Discrimination

State of Massachusetts Superior Courts:  Essex, Middlesex, Norfolk,
       Plymouth, Suffolk and Worcester Counties
       -- Economic Losses Resulting from Personal Injury
       -- Limited Partnership Valuations

NEW HAMPSHIRE

Federal District Court of New Hampshire, Concord, New Hampshire
       -- Business Lost Income and Sales, Business Valuations
       -- Economic Losses Resulting from Personal Injury, Wrongful
          Discharge/Discrimination and Wrongful Death

State of New Hampshire Superior Courts: Cheshire, Coos, Grafton, Hillsboro,
       Merrimack, Rockingham, Strafford, and Sullivan Counties
       -- Business Lost Income and Sales, Business Valuations
       -- Economic Losses Resulting from Personal Injury, Wrongful
          Death and Wrongful Discharge/Discrimination

VERMONT

State of Vermont Superior Court: Orange County
       -- Economic Losses Resulting from Wrongful Discharge

* This is a list of the courts in which I have testified. I have testified
in many of these courts numerous times on the same issues.

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

CARISA PAIR, individually and on                    PLAINTIFFS
behalf of the Estate of SHANNON LYNN PAIR

VS.                          NO. 2001-3016

JOE TAYLOR and LEO JOURNAGAN                    DEFENDANTS
CONSTRUCTION COMPANY, INC

LEO JOURNAGAN CONSTRUCTION              THIRD-PARTY PLAINTIFF
COMPANY, INC.

VS.

TIME STRIPING, INC.                     THIRD PARTY DEFENDANT

LIBERTY MUTUAL INSURANCE COMPANY                INTERVENOR

AFFIDAVIT OF DR. STEPHEN T. RILEY, Ph.D.

STATE OF ___California___ )
                          )
COUNTY OF ___San Diego___ )

Stephen T. Riley, Ph.D., being first duly sworn on oath, hereby deposes and says:

1.    My name is Stephen T. Riley, Ph.D. I submit this affidavit in support of Plaintiffs' Response to Motion in Limine regarding testimony of hedonic damages. I provide this affidavit to help this court understand why calculations of lost value of life damages are a proper area of economic testimony.

2.    I received my Bachelor's Degree in Economics and Business Administration from San Diego State University in 1961. I received a Master's Degree in Economics at the University of California Riverside in 1968. My areas of concentration were finance, quantitative methods and managerial economics. I received a Ph.D. in Economics of Education at the University of California Riverside and University of California Los Angeles in 1981.

3.    From 1969 to 1976, I was an assistant professor in economics at the University of Laverne. While there I taught economic theory, finance, statistics and managerial economics. In 1976 and 1977, I was a visiting professor in economics at the American College of Switzerland. I taught the same topics in that position. From 1978 to 1981, I was an assistant professor in economics and business administration at the College of Santa Fe. I continued to teach economic theory, finance, statistics and managerial economics. From 1981 to 1989, I was a tenured associate professor in economics at the College of Liberal Arts at the Rochester Institute of Technology in Rochester, New York. In addition, I was an associate professor of finance in the graduate school of business at the same institution. While at the Rochester Institute of Technology, I taught economics, intermediate micro and macro economics, labor economics, modeling and research methods in business and economics. From 1974 through 1976, I was the chairman of the Department of Economics at the University of Laverne. Since 1989, I have operated an economic consulting firm with offices in Carlsbad and Irvine, California.

4.    I am affiliated with the American Economic Association, the National Association of Business Economists, and the National Association of Forensic Economists. In addition to other areas of economics, I have lectured on litigation economics, the economics of lost earnings, the economics of damages, and on forensic economics. These lectures have been to various individuals as well as lawyers interested in the area of economic testimony for the courtroom. In addition, I have presented papers at the Eastern Economic Association International Conference as well as at the American Economic Association Conference and at conferences of the National Association of Forensic Economics.

5.    I am a professional economist. One of the areas I work in is forensic economics. In that area, economists project future values and current values of future losses in various settings arising from business, personal injury, property and other disputes.

6.    When an individual is injured or dies an economic loss is incurred both by that individual and those close to that individual. All economists would agree that the

EXHIBIT 22

enjoyment of life has an "economic value." Like many economists working in the field of economic forecasting, I believe that the lost enjoyment of life of an injured person or the lost society and companionship of survivors can be calculated with a reasonable degree of economic certainty. There is a large body of peer-reviewed research and literature that has developed in this area of economics. The underlying research, the theoretical basis of that research and the practical application of that research is widely accepted in the field of forensic economics.

7.      Any type of economic forecasting requires the forensic economist to take into consideration numerous variables. The economist must make selections of which assumptions to use, and in some cases which components of loss to use, to make a forecast. For example, when determining the present value of future losses, net discount rates can vary widely. A lower net discount rate will generate a higher present value. Different economists will choose different net discount rates for various reasons based on their professional estimations. It can be argued that not all economists use the same methodology for researching historical data nor do they all have a consistent approach for predicting future economic conditions. Therefore, if ten economists forecasts a future loss of earnings for the same individual, the present value of that loss might vary considerably from economists to economists. Nonetheless, each economist could have been applying a discount rate or other variables that would be widely considered within the realm of accepted standards applied by all economists to reach proper economic conclusions. Thus, economics is not a precise science but rather is the application of special understandings and knowledge to particular situations. Evaluating, selecting and applying various factors to a calculation is the essence of economic forecasting.

8.      Likewise, the task of valuing future earnings requires more analysis where an economist must estimate the future earning capacity of a young adult who lacks work experience. A wide range of values can be selected by the economist for the numerous variables involved, such as education, training, wage growth rates, discount factors, expected work-life, consumption factors and more. The numbers within these wide ranges of values can be supported by many economic studies or analyses. A good economists can make a selection for each variable or calculation and provide the rationale

for that selection. Whatever selections the economist makes, the number arrived at can only be a best forecast, not an absolute truth.

9.      There are many variables in economic calculations that require economists to select from a wide universe of data before making a calculation. For example, there are innumerable government and industry studies regarding potential interest rates. In some settings testifying economists will simply taken an average of some historical data regarding those rates. This methodology is widely accepted in the field. No economist would testify that the interest rate he or she applied using this technique was perfectly accurate to determine a future loss at a particular point in the distant future. The economist could only testify that it was that professional's best estimation based on the empirical data reviewed. Similarly, when projecting the value of a business at some point in the future, an economist may attempt to determine the most appropriate interest rate to apply over a shorter time horizon. Making such selections is always subject to the criticism that the economist is simply eyeballing. The criticism ignores the fact that these economists are making professional judgments based on their knowledge of the economic data and theory.

10.     Similar to the wide range of analyses discussed above, loss of enjoyment of life in injury and death cases is susceptible to calculation within a range of values. Based on my professional experience, training, and education, I believe the academic literature and theoretic discussions which focus on willingness to pay to save statistical lives provide a sound economic basis from which a trained economist can calculate the lost value of enjoyment of life or the lost society and companionship of a survivor in a death case. I know of numerous economists across the country who utilize this information in an appropriate manner to make such calculations.

11.     I am generally familiar with the body of peer-reviewed literature regarding hedonic damages. This body of literature is relatively large and contains some diverse viewpoints. Those diverse viewpoints, however, do not invalidate the calculations of hedonic damages based on the willingness to pay methodology. In fact, such calculations could be described as generally accepted in the field of forensic economics. Certainly they are accepted by a very substantial minority of the economic thinkers and perhaps

even a majority. Willingness to pay and value of life calculations are established enough to be a developed field of economics. This is shown by the less active amount of research currently being done in the field of economics. This is shown by the less active amount of research currently being done in the field today. Willingness to pay is an appropriate theoretical basis for calculating dollar figure losses in litigation arising from injury or death. Since the late 1970s, the willingness to pay, or risk reduction approach to valuing the loss of the value of living, has been the conventional methodology for making such calculations. It is the only widely accepted methodology. The foundations of the willingness to pay calculations of the value of life rests on four techniques of studying the relevant market: wage risk differential analysis, consumer behavior studies, contingent valuation studies, and federal agency standards. Of those methods, two-the wage risk differential and consumer behavior studies - provide the most relevant data. Economists generally agree that the others-contingent valuation and agency standards may be better described as producing data that validates or confirms that generated by the first two.

12. In general, when dealing with future losses, economists can only help a jury understand averages and how an individual's situation may be reflected in the market. Even past losses require the economists to make certain assumptions regarding events, which preclude the calculations from begin absolutely accurate. In this sense, hedonic calculations are no different from lost wage calculations or any other economic calculation. Not all variables can be incorporated into hedonic damages calculation. However, given the developed data, it is quite possible and proper to incorporate an individual's age and the relevant age of the person who has lost the companionship when doing such a calculation. However, it would be inappropriate for an economists to extrapolate such numbers to a more specific calculation that would inappropriate the nature of a particular relationship, wealth, religion, race, moral values, education, and the like into a hedonic loss calculation. There simply is not specific enough research to do so. This is the role of the jury. This does not indicated that the hedonic loss calculation is irrelevant, such a calculation provides the jury with a basis to evaluate the individual who is injured or the nature of the relationship in the case before it. Hedonic calculations

are not a be all and end all, but merely a tool to help with understanding of the world and to help a jury make rational determinations of the issues before it.

13. Economics is often thought of as a science because of what economists do is mathematical calculations. This view however, misses the fundamental nature of economics. Economic calculations cannot be science in the sense of unchallengeable knowledge. Mathematics, chemistry, physics, engineering and the like are less subject to the vagaries of human behavior. This results of experiments in those areas can be replicated. The same is not true for economics. Economic knowledge is the study of human behavior relating to production, calculation, distribution, and consumption of wealth. Wealth being used in the broadest possible sense. Economics offers a systematic view of the world based on observations and assessments of human behavior. A fundamental window to view that behavior is the market. Just as with estimating future discount rates, valuing businesses, determining lost earnings and lost earnings capacity, and numerous other calculations, hedonic calculations look to the future. Hedonic calculations are certainly part of the accepted system of economic knowledge and such calculations help economists, citizens, jurors and attorneys understand how people value their lives and the lives of others.

14. Criticizing hedonic calculations as being nothing more than a compilation of non-expert opinions is preposterous. All economic studies of the marketplace are subject to the exact same criticism. What a market does is determine value in the broadest sense. The "willingness to pay studies" simply give us one more example of market providing information helpful to the decision-maker in litigation.

15. I am familiar with the criticism that the willingness to pay studies do not incorporate people's lack of absolute freedoms to choose jobs and that other motivations impact the amounts people accept for risky jobs. There is no such thing as a perfect market. All practical analysis in economics is limited by the fact some external constraints exist that impact any analysis or study. To accept the criticism that there are external constraints as obviating the basic insight of a hedonic analysis, is to criticize every single economic assessment, calculation or study because all have inescapable constraints. Each statistical study in the willingness to pay area merely reflects the

knowledge, values, judgments, and decisions of the people involved in that study. Recognizing that fact for each study does not invalidate the information provided to economists by the body of studies. Evaluating and applying that information is the essence of the profession of economics. Economists can and have evaluated the numerous studies of willingness to pay to determine why variances exist. For example, I am familiar with the article in *The Journal of Forensic Economics* in 1991, entitled "The Plausible Range of Value of Life - Red Herrings Among the Mackerel" by Ted R. Miller, Senior Research Economist at the Urban Institute in 1991. In that article he evaluates and adjusts various studies to compensate for variables within those studies. Based on my knowledge of econometrics and statistics, I believe the Miller article is an economically proper analysis. This does not mean it is the only possible analysis. Nonetheless, I am unaware of any peer reviewed economic literature that disputes Miller's methodology.

16.    As a person familiar with the literature-theoretical, empirical and practical-surrounding hedonic damages, I am familiar with Stan V. Smith. I have read, reviewed and thought about his book entitled *Economic/Hedonic Damages: A Practice Book for Plaintiff and Defense Attorneys*. That book describes an accurate and proper method of calculating lost value of life as well as lost society and companionship damages. It is not the only possible methodology for calculating hedonic damages but the Smith methodology is more than supported by the peer-reviewed economic literature. The choices for valuations made over the course of Professor Smith's analysis are within accepted standards applied by all economists to reach economic conclusions. Application of that methodology would allow a calculation of hedonic damages to a reasonable degree of economic certainty.

17.    I am familiar with *The Journal of Forensic Economics* and *The Journal of Legal Economics*. These are high quality academic journals. The articles submitted to those journals are subject to peer-review prior to publication.

FURTHER AFFIANT SAITH NOT.

STEPHEN T. RILEY, Ph.D.

SUBSCRIBED AND SWORN to before me on this 27 day of February, 2002.

OFFICIAL SEAL
BENJAMIN WINNICK
NOTARY PUBLIC-CALIFORNIA
COMM. NO. 1345757
SAN DIEGO COUNTY
MY COMM. EXP. FEB. 18, 2006

Notary Public

Residing in San Diego County

Commission Expires Feb. 18, 2006

8325rtr06.doc

IN THE CIRCUIT COURT IN AND FOR SARASOTA COUNTY, FLORIDA

DONALD and GEORGIA JOHANNES,

    Plaintiffs,

vs.                   Case No. 99-5785-CA-01

ANTHONY F. PERROTTA d/b/a
MAPLE LEAF MOTEL,

    Defendant.

_____

## AFFIDAVIT

STATE OF FLORIDA
COUNTY OF SARASOTA

    ROGER SKURSKI, being first duly sworn on oath, hereby deposes and says:

    1.    My name is ROGER SKURSKI and I have testified [by way of Affidavit] previously regarding the subject of forensic economics and hedonic damages.

    2.    I received my Bachelors Degree in Agricultural Economics from Cornell University in 1964. I received my Masters Degree in Economics from the University of Wisconsin in 1967. I received my Ph. Degree in Economics from the University of Wisconsin in 1970. I am currently a consulting economist and Professor of Economics at the University of Notre Dame. I have done substantial amount of research and have served as a consultant in the fields of forensic economics for nearly thirty years. Attached to this Affidavit is a copy of my Curriculum Vitae.

    3.    Economic projections can only be calculated with a reasonable degree of economic certainty. A substantial number of forensic economists, including myself, believe that hedonic damage calculations for a statistical life can be calculated with a reasonable degree of economic certainty. It is my opinion, as an economist, that such computations can help juries understand the value of life in our society. Presentation of such calculations allows a jury to assess a particular loss against a benchmark based on market behavior.

    4.    Hedonic calculations capture the value of lost enjoyment of life of a statistically average person as derived by market analysis. Such analysis provides general statistics not substantially different from life expectancy tables, unemployment rates, projected work life tables or estimated future discount rates. Use of statistical averages to calculate damages is a basic tool of forensic economics. As with all economic calculations, calculations of the lost value of life is subject to some theoretical attack and data disagreements.

    5.    Many estimations and calculations by economists cannot be replicated or validated like those in physical science areas such as chemistry or medicine. By its nature, all economic analysis includes a human component subject to significant variability. For example, there is no retrospective tests that would show that but for the injuries suffered any particular injured child would have accomplished any specific level of education. Nonetheless, economists are frequently asked to make assumptions regarding education to provide jury's a basis for determining appropriate damage awards for injured children. Assumptions of this type and magnitude are regularly included in the calculations economists testify to in courtrooms.

    6.    I am familiar with the criticisms that the willingness to pay studies do not incorporate people's lack of absolute freedom to choose a job and that other motivations impact the amounts people accept for risky jobs. It is undoubtedly true that each statistical study in the willingness to pay area reflects the knowledge and limitations of the people involved in those

2

studies. Recognizing that fact for each study does not invalidate the information provided to economists by the body of studies. Economists can and have evaluated the numerous studies of willingness to pay to determine why variables exist. For example, I am familiar with the article in the *Journal of Forensic Economics* in 1999 entitled "The Plausible Range of Value of Life - Red Herrings Among the Mackerel" by Ted R. Miller, Senior Research Economist at the Urban Institute in 1991. This article is a good example of an economist evaluating and adjusting studies to compensate for variables within those studies. Based on my knowledge of economics and statistics, I believe the Miller article is an economically proper analysis. This does not mean it is the only possible analysis. Nonetheless, I am not aware of any peer-reviewed economic literature that disputes Miller's methodology.

7.    There are many variables in economic calculations that require economists to select from a wide universe of data before making the tabulation. For example, there are innumerable government and industry studies regarding potential interest rates. In some settings, testifying economists will employ an average of historical data regarding those rates. This methodology is widely accepted in the field. No economist would testify that the interest rate he or she applied using this technique would determine the future loss at a particular point in the distant future with perfect accuracy. Economists could only testify that it was that professional's best estimation based on the imperical data reviewed. Similarly, when projecting the value of a business at some point in the future, an economist may attempt to determine the most appropriate interest rate to apply over a time horizon. Making such selections is often subject to the criticism that the

economist is simply eyeballing. This criticism ignores the fact that the economists are making professional judgments based on their knowledge of the economic data and theory.

8.    The willingness to pay literature addresses why the loss of a portion of the ability to enjoy one's life is incorporated in the market decisions that value the loss of one whole life. Because the calculation and the market is based on the whole life as opposed to part of the loss, the willingness to pay provides a framework for determining loss value of life calculations. The willingness to pay studies evaluate the loss value of life in the market place, not in unusual or emotionally charged settings. The attacks on theory that ignore the inherent valuation process of the market and refer to rescues of trapped people or playing Russian Roulette, miss the point of the scholarship of knowledge in this area. It is precisely because the market studies reflect day to day behavior that they provide an appropriate standard or benchmark.

9.    While intellectual differences exist among forensic economists regarding the calculation of hedonic damages, a substantial portion of such economists believe the willingness to pay literature provides an economically accurate basis from which the value society places on a statistically average person or relationship can be calculated.

10.    I am familiar with the work of economist Stan V Smith. I have read and reviewed the book *Economics/Hedonic Damages: A Practice Book for Plaintiff and Defense Attorneys* authored by Michael Brookshire and Stan Smith. This book sets forth an economically appropriate method of calculating loss value of life damages that fall well within the range of accepted standards applied by economists to conduct their research and reach their conclusions.

FURTHER, AFFIANT SAYETH NAUGHT.

By: ROGER SKURSKI
Title: _Professor of Economics_

STATE OF _Indiana_
COUNTY OF _St. Joseph_

The foregoing instrument was acknowledged before me this 27th day of _November_, 2000, by _Roger Skurski_, who is personally known to me or who has produced _____ as identification.

Notary Public
Printed Name of Notary: _Cindy Swonger_
My Commission Expires: _6/25/01_

johannes\AFFIDAVIT.SKURSKI

5

L. Randall Bishop
Jarussi & Bishop
P.O. Box 3353
Billings, MT 59103-3353
Telephone: (406) 245-7555

Attorneys for Plaintiffs

MONTANA THIRTEENTH JUDICIAL DISTRICT COURT, YELLOWSTONE COUNTY

SANDRA FOSTER and JOSEPH )      Cause No. DV 98-837
FOSTER, individually and as parents )
and natural guardians of Andrew )
Foster and Kathryn Foster, )      Judge: Maurice R. Colberg, Jr.
                          )
            Plaintiffs, )
                          )      AFFIDAVIT OF
vs.                       )      DR. ROGER SKURSKI, Ph.D.
                          )
R.B.M., M.D. and DEACONESS )
BILLINGS CLINIC,          )
                          )
            Defendants. )

Roger Skurski, Ph.D., being first duly sworn on oath, hereby deposes and says:

1.    My name is Dr. Roger Skurski, Ph.D., and I have testified by way of affidavit previously regarding the subject of forensic economics and hedonic damages.

2.    Attached hereto is a sworn affidavit which I provided in the action entitled Torres v. Gordon Trucking Incorporated, Case No. CIV95-0460 S-MHW, in the United States District Court for the District of Idaho.

3.    The attached affidavit is a true and correct copy of my testimony in the Torres matter, and each of the statements set forth therein is true.

FURTHER AFFIANT SAYETH NOT.

DATED this 21st day of January, 2000.

_Roger Skurski_
Roger Skurski, Ph.D.

STATE OF INDIANA    )
                    ) ss.
County of St. Joseph )

Roger Skurski, Ph.D., being first duly sworn, deposes and says:

That he is the person named in the above-entitled action; that he has read the foregoing affidavit and knows the contents thereof; and that the matters and things therein stated are true of his own knowledge.

_Roger Skurski_
Roger Skurski, Ph.D.

Subscribed and sworn to before me this 21st day of January, 2000.

_Laurie A. Schierling_
Notary Public for the State of Indiana
Residing at Mosel, Co., Indiana
My commission expires: 4/28/2001

2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF SERVICE

This is to certify that a true copy of the foregoing Affidavit of Dr. Roger

Skurski, Ph.D. was duly served on counsel of record at the address listed below by

U.S. Mail, postage prepaid, this 25 day of January, 2000.

        John J. Russell
        Brown Law Firm, P.C.
        P.O. Drawer 849
        Billings, MT  59103-0849

        JARUSSI & BISHOP

        BY: _____
           L. Randall Bishop

3

B. Newal Squyres
Kurt D. Holzer
HOLLAND & HART LLP
Suite 1400, West One Plaza
Post Office Box 2527
Boise, Idaho 83701
Telephone: (208) 342-5000

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JAVIER C. TORRES and CYNTHIA G. TORRES, husband and wife individually, as a marital community, and as parents and heirs of ANDREW A. TORRES, deceased, | ) ) ) ) ) ) Case No. CIV95-0460 S-MHW ) ) AFFIDAVIT OF DR. ROGER ) SKURSKI, Ph.D. |
| Plaintiffs, | ) |
| vs. | ) ) ) |
| GORDON TRUCKING INCORPORATED, an Oklahoma corporation; ROGER J. JOHNSON, an individual; and EDWIN E. HASKINS, an individual, | ) ) ) ) ) ) |
| Defendants. | ) |

STATE OF INDIANA    )
                    ) ss.
County of _St. Joseph_ )

ROGER SKURSKI, Ph.D., being first duly sworn on oath, hereby deposes and says:

1.   My name is Dr. Roger Skurski, Ph.D. I submit this affidavit in support of Plaintiffs' Opposition to Defendants' Motion to Exclude Testimony Regarding Hedonic Damages.

AFFIDAVIT OF DR. ROGER SKURSKI, Ph.D.- 1

2.   I received my Bachelor's Degree in Agricultural Economics from Cornell University in 1964. I received my Master' Degree in Economics from the University of Wisconsin in 1967 and my Ph.D. in Economics from the University of Wisconsin in 1970. I have been teaching economics at the University of Notre Dame since 1968. I have been a Professor with the Department of Economics since 1984. I am currently an Associate Dean for the College of Arts and Letters and Director of the Center for Study of Contemporary Society. Attached to this Affidavit is a copy of my full curriculum vitae.

3.   One of my professional interests is the field of forensic economics. Forensic economists apply economic principles to project future values in business, personal injury, property and other disputes. Such economists provide economic opinions to decisionmakers in business, government, education and litigation. I am a member of the National Association of Forensic Economists. I have been a member of the editorial board for the Journal of Forensic Economists since 1988. I have also co-chaired program presentations for meetings of our organization.

4.   Forensic economists, in fact almost all economists, agree that enjoyment of life has an "economic value." When an individual suffers an injury or dies, an economic loss is incurred. I, like many economists, believe lost enjoyment of life damages in cases involving injury and death, including the elements of loss of society and companionship, can be calculated with a reasonable degree of economic certainty.

5.   I have calculated hedonic damages based on the economic studies in the relevant academic literature which focus on willingness-to pay to save statistical lives. These studies are based on what people are willing to pay to reduce the risk of death,

AFFIDAVIT OF DR. ROGER SKURSKI, Ph.D.- 2

and what workers are willing to accept as payment for accepting such risk on the job. This methodology has been widely accepted and published in peer reviewed economic journals for several decades. I know of numerous economists, both members and non-members of the National Association of Forensic Economists who regularly testify as expert witnesses using this basic method.

6.    Hedonic calculations simply measure these losses in economic terms based on studies of market behavior. As such, the analysis is based on the fundamental tool used by economists to understand the world: the market. Calculation of future interest rates, inflation rates, business values and innumerable other projections made by economists are also based on market analysis. Using market behavior to derive hedonic valuations is good economics.

7.    I am generally familiar with the large body of economic literature on hedonic damages. Calculations of hedonic damages based on the willingness to pay methodology are generally accepted in the field of forensic economics. This is not to say there are no conflicts in this field. There certainly are some intellectual differences among forensic economists regarding the calculation of hedonic damages. Nonetheless, at a minimum, a very substantial minority of the economic thinkers and analysts accept the willingness to pay methodology as an appropriate theoretical basis for calculating dollar figure losses in litigation arising from injury and death.

8.    The type of disagreements among forensic economists in the area of hedonic damages are not materially different from those that exist in other areas of economic testimony. For example, projected valuations of businesses or stockholdings

AFFIDAVIT OF DR. ROGER SKURSKI, Ph.D.- 3

are subject to a wide diversity of opinion arising from differences in the selection of discount rates, growth factors, and other components of the calculations.

9.    Economic estimations can only be calculated with a reasonable degree of economic certainty. A substantial number of forensic economists believe, and I agree, that hedonic damage calculations for a statistical life can be calculated with a reasonable degree of economic certainty. It is my opinion, as an economist, that these calculations can help juries understand the world and the value of life in our society. Presentation of these calculations to a jury allows it to assess a particular loss against a benchmark based on market behavior.

10.    Calculations of hedonic damages have their intellectual basis in Adam Smith's seminal work, *Wealth of Nations*. He was the first thinker to identify the concept of a wage premium differential. His initial idea was based on the concept of negative job characteristics. Nonetheless, the wage differential concept is the starting point for lost value of enjoyment of life calculations developed by later theoreticians, researchers and practitioners.

11.    The area of value of life calculations was one of very active study in economics in the 1970's and 1980's. It is now a more mature field and, because the basic body of knowledge is well-established, research comes out at a slower pace.

12.    I am familiar with Ted Miller's 1991 article in *The Journal of Forensic Economics* in 1991, entitled "The Plausible Range of Value of Life - Red Herrings Among the Mackerel." I have reviewed that article and believe the adjustments

AFFIDAVIT OF DR. ROGER SKURSKI, Ph.D.- 4

discussed and reviewed in that article are econometrically and statistically proper. I am unaware of any peer reviewed economic literature that disputes Miller's methodology.

13.    Economics generally may be better thought of as offering a jury insight based on "specialized knowledge" as opposed to "science." Calculations of hedonic damages are not and can never be "science" in the sense that chemistry, physics, medicine, engineering or the like are "sciences." This is true about all economic calculations. All economic knowledge arises from studies of human behavior relating to the production, distribution, consumption or calculation of wealth. Thus, although economics offers a systematized view of the world, it is based on assessments of human behavior. That behavior is reflected in the marketplace. Hedonic calculations fall within an accepted economic system for viewing the world and assessing human behavior.

14.    Given that future calculations are based on imperfect knowledge, it is not possible for an economist to unerringly state a given loss at a future time where even a single variable exists. Economists can, and do, provide an understanding of average individuals or experiences. Those averages can properly be used as part of the foundation for comparing a particular individual to a statistically "normal" individual. This provides a decisionmaker with a broader understanding of whatever issue is before it. This leads to better, more informed, decisions.

15.    Criticizing the empirical studies of willingness to pay as nothing more than surveys of opinions reflects a fundamental misunderstanding of economics and the market. All determinations of value reflect opinions in the marketplace. For example, the price of a particular car reflects the value placed on it in the market by willing buyers and willing sellers and incorporates their attitudes, tastes, biases, desires and all other

AFFIDAVIT OF DR. ROGER SKURSKI, Ph.D.- 5

relevant factors. Similarly, current market interest rates reflect an equilibrium between supply and demand for money and outside forces impacting those two matters. Supply and demand are driven by attitudes of buyers and sellers and subject to the exact same criticism that they are nothing more than a consensus of non experts. To say that an economist versed in the empirical and theoretical studies in the willingness to pay field has no greater understanding of the value society places on life than an average person is simply wrong. On the contrary, economic theory, methodology and statistics, can be used to provide a estimate of the value placed on life in contemporary American society to a reasonable economic certainty. Placing that knowledge and analysis before a jury provides it a tool and guide that goes well-beyond each member's ordinary everyday experience and knowledge.

16.    I am familiar with the work of economist Stan V. Smith. I have read and reviewed his book, co-authored by Dr. Michael Brookshire, *Economic/Hedonic Damages: A Practice Book for Plaintiff and Defense Attorneys.* That book sets forth an accepted method of calculating lost value of life damages as discussed above. Its economic assumptions and the models it uses for calculating damages are well within the accepted standards applied by economists to reach their conclusions.

Further your Affiant sayeth naught.

*Roger Skurski*
ROGER SKURSKI, Ph.D.

SUBSCRIBED AND SWORN TO before me this 27th day of February 1997.

*Arlene M. Vogt*
Notary Public for Indiana
Residing at St. Joseph County
Commission Expires 7-22-2003

AFFIDAVIT OF DR. ROGER SKURSKI, Ph.D.- 6

Arlene M. Vogt
Notary Public, State of Indiana
St Joseph County
My Commission Expires 07-22-2003

Curriculum Vitae

## ROGER SKURSKI

1996                                                                                                    2

**Present Positions:**  Professor of Economics
Associate Dean, College of Arts & Letters
Director, Center for the Study of Contemporary Society

**Office:**  137 O'Shaughnessy Hall
University of Notre Dame

**Mailing Address:**  Department of Economics
University of Notre Dame
Notre Dame, Indiana 46556

**Electronic Mail:**  roger.b.skurski.1@nd.edu     **FAX:**     (219) 631-7743

**Telephones:**  Office (219) 631-7016     Home:     (219) 232-2280

**Tax I.D. No:**  35-1696543

**Marital Status:**  Married - 3 children

## Academic Background:

B.S. with Distinction in Agricultural Economics, Cornell University, 1964
M.A. in Economics, University of Wisconsin, 1967
Certificate, Russian Area Studies, University of Wisconsin, 1968
Ph.D. in Economics, University of Wisconsin, 1970

## Fields of Interest:

Economic Policy, Comparative Economic Systems, Forensic Economics

## Teaching and Research Experience:

Project Assistant, Department of Agricultural Economics, University of Wisconsin: 1964-65
Teaching Assistant, Department of Economics, University of Wisconsin: 1965-66
Research Assistant, Department of Economics, University of Wisconsin: 1966-68
Assistant Professor, Department of Economics, University of Notre Dame: 1968-74
Associate Professor, Department of Economics, University of Notre Dame: 1974-84
Honorary Research Fellow, Centre for Russian and East European Studies,
    University of Birmingham, England: 1977-78
Professor, Department of Economics, University of Notre Dame: 1984-

## Administrative Experience, University of Notre Dame:

Director of Graduate Studies in Economics: 1971-83
Chairman, Department of Economics Summer Sessions: 1972-74
Associate Dean, College of Arts and Letters: 1983 -
Director, Center for the Study of Contemporary Society: 1985-

## Consulting:

Forensic Economics: 1971-
National Institute for Trial Advocacy: 1980-92

## Courses Taught:

Comparative Economic Systems
Current Policy Issues in the Socialist Tradition
Economics of Planning
Freshman Economics Seminar
Graduate Seminar in Public Sector Economics
Intermediate Microeconomic Theory
Principles of Economics
Problems in Political Economy
Problems of Capitalism
Seminar on Economic Justice
Soviet-type Economics
The Soviet Economic System

## Departmental Committees:

Interdisciplinary Committee: 1969-75
Admissions Committee: 1970-84
Financial Aid Committee: 1971-84
Graduate Program Committee: 1971-84
Budget Committee: 1974-75
Committee on Appointments and Promotions: 1974-77 and 1979-83

## College and University Service:

College Council: 1974-75 and 1983-
University Committee on Patents: 1974-77
American Association of University Professors: Chapter Treasurer: 1975-77
Urban Plunge Faculty Resource Person: 1978-
Academic Council: 1979-81
Academic Affirmative Action Committee: 1983-86
Editorial Board, University of Notre Dame Press: 1983-87
Center for Social Concerns, College of Arts and Letters Liaison: 1984-
University Committee on Computing and Information Services(UCCIS): 1985-
University Committee for Third World Relief: 1986-
University Task Force on Equipment for Educational Research: 1988-
University Staff Affirmative Action Committee: 1990-
College Strategic Planning Committee: 1991-
Executive Committee, University Committee on Computing and Information Services: 1991-
Human Resource Director's Advisory Group: 1994-
University Staff Classification Review Committee: 1996-

## Professional Committee and Board Membership:

Director, Reprint Clearinghouse, Association for Comparative Economic Studies: 1975-77
Contributor, Abstracts for Soviet and East European Economic Studies, Oxford University,
    Birmingham University Center for Russian and East European Studies and National
    Association for Soviet and East European Studies: 1977-78
Executive Committee of the Association for Comparative Economic Studies: 1980-1991
Executive Secretary, Association for Comparative Economic Studies: 1980-1991
Editorial Board, National Association of Economic Economics: 1988-
Charter Member, National Academy of Economic Arbitrators: 1989-
Program Co-chair, National Association of Forensic Economics: 1991
Secretary-Treasurer, National Academy of Economic Arbitrators: 1993-
Program Co-chair, National Association of Forensic Economics: 1996

Professional Association Memberships:

> American Economic Association
> Midwest Economic Association
> National Association of Forensic Economics
> Association for Comparative Economic Studies
> American Association of University Professors

Distinctions, Awards or Honors:

Undergraduate:

> New York State Regents College Scholarship: 1960-64
> Rochester Polish Peoples' Home Scholarship: 1960-64
> Cornell University Undergraduate Scholarship: 1963-64
> Phi Kappa Phi Honorary Society

Graduate:

> University of Wisconsin, Russian Area Studies Fellowship: 1965-66

Faculty:

> O'Brien Fund Grant, University of Notre Dame: 1971
> Honorary Research Fellowship, Russian Research Center, Harvard University: 1977-78
> Fulbright-Hays Faculty Research Abroad Award, Department of Health, Education and Welfare: 1977-78
> Soviet Studies Fellowship Alternate, American Council of Learned Societies: 1977-78
> US-USSR Senior Scholar Exchange Fellowship, International Research and Exchange Board: 1979
> Institute for International Studies, University of Notre Dame-Summer Research Grant: 1979
> Polish Institute of Arts and Sciences of America, Elected member: 1980
> Notre Dame Faculty Development Fellowship: Summer 1980

Publications:

Books

1. U.S. Trade in the Sixties and Seventies: Continuity and Change, ed. with Kenneth Jameson, (Lexington, Mass.: Heath, Lexington Books, 1974).
2. New Directions in Economic Justice, edited (Notre Dame: University of Notre Dame Press, 1983).
3a. Soviet Marketing and Economic Development (London: Macmillan and New York: St. Martin's, 1983).
3b. Soviet Marketing and Economic Development (Japanese Translation, 1991)
4. American Economic Policy: Problems and Prospects, ed. with Gar Alperovitz (Notre Dame: University of Notre Dame Press, 1984).

Journal Articles and Chapters in Books:

1. "Property Tax Assessment and Absentee Owners," with E. L. David. National Tax Journal December 1966, pp. 421-426.
2. "Property Tax Assessment and Absentee Owners," with E. L. David. Assessors Journal, July 1967, pp. 50-56.
3. "The Factor Proportions Problem in Soviet Internal Trade," Soviet Studies, January 1972, pp. 450-464.
4. "Wholesaling of Consumer Goods in the U.S.S.R.," Quarterly Review of Economics and Business, Spring 1972, pp. 53-67.
5. "The Buyer's Market and Soviet Consumer Goods Distribution," Slavic Review, December 1972, pp. 817-830.
6. "Trade with the Soviet Union and Eastern Europe," in Kenneth Jameson and Roger Skurski, eds., U.S. Trade in the Sixties and Seventies: Continuity and Change, Lexington, Mass.: Heath, Lexington Books, 1974, pp. 89-109.
7. "International Trade," with T. R. Swartz in The Study of Economics, Guilford, Conn.: Dushkin Publishing Group, 1976, pp. 350-373.
8. "Comparing Economic Systems," with T. R. Swartz in The Study of Economics, Guilford, Conn.: Dushkin Publishing Group, 1976, pp. 374-399.
9. "Economic Development in the Third World," with T. R. Swartz in The Study of Economics Guilford, Conn.: Dushkin Publishing Group, 1976, pp. 400-423.
10. "Productivity, Growth and Efficiency in Soviet Consumer Goods Distribution," Bulletin of the Association for Comparative Economic Studies, Fall 1976, pp. 79-109.
11. "Political Economy of U.S. - East European Trade," Sinteza, September/October, pp. 25-28.
12. "Soviet Trade and Services," Abstracts for Soviet and East European Economic Studies, January 1978, 9 pp.
13. "Soviet Trade and Services," Abstracts for Soviet and East European Economic Studies, September 1978, 9 pp.
14. "U.S. Economic Relations with the Soviet Union and Eastern Europe," Co-existence, April 1979, pp. 20-31.
15. "Socialism and the Consumer in the U.S.S.R.," Review of Radical Political Economics, Spring 1981, pp. 22-30.
16. "The Role of the Consumer in Soviet Economic Development," Soviet Union/Union Sovietique, Vol. 8 (1981), Pt. 2, pp. 252-266.
17. "The Soviet Economy," with R. W. Campbell, Collier's Encyclopedia, 1981, pp. 605-615.
18. "Trade and Integration in East Europe," Current History, November 1982, pp. 357-361, 386-388.
19. "An Evaluation of James Doyle's Future Economic Loss," Report for the Case File, Problems and Cases in Trial Advocacy, (Second Edition) National Institute for Trial Advocacy, 1982, pp. 91-117.
20. "Economic Policy: The Need for New Directions and a Progressive Response," in Gar Alperovitz and Roger Skurski, eds., American Economic Policy (Notre Dame: University of Notre Dame Press, 1984), pp. 3-13.
21. "Economic Report on Nathan Farrell" in Thomas F. Geraghty, Report for Advanced Case File, Anne Farrell et al. v. Strong Line Inc., et al., (Second Edition) National Institute for Trial Advocacy, 1987, pp. 99-119.
22. "Economic Analysis Report Re: Katherine Potter,"Report for the Case File, Problems and Cases in Trial Advocacy, (Revised Fourth Edition) National Institute for Trial Advocacy, 1992, pp. 61-77.

Book Reviews:

1. Review of Gur Ofer, The Service Sector in Soviet Economic Growth: A Comparative Study, Soviet Studies, October, 1974, pp. 618-620.
2. Review of Steven Rosefielde, Soviet International Trade in Heckscher-Ohlin Perspective: An Input-Output Study, Soviet Studies, October 1975, pp. 666-668.
3. Review of NATO Directorate of Economic Affairs, Economic Aspects of Life in the USSR, Association for Comparative Economic Studies Bulletin, 1976, XVIII (1) pp. 91-92.
4. Review of John Michael Montias, The Structure of Economic Systems, Southern Economic Review, July 1978, pp. 326-328.
5. Review of Raymond Hutchings, Soviet Science, Technology and Design, Slavonic and East European Review, July 1979, pp. 470-472.
6. Review of A. Coskum Samli, Marketing and Distribution Systems in Eastern Europe, Economic Journal, September 1980, pp. 703-704.
7. Review of Phillip Bryson, The Consumer Under Socialist Planning: The East German Case, Comparative Economic Studies, Fall 1987, pp. 115-117.
8. Review of A. D. Smith and D. M. W. N. Hitchens, Productivity in the Distributive Trades, Journal of Comparative Economics, December 1988, pp. 623-625.
9. Review of Peter Murrell, The Nature of Socialist Economies: Lessons from Eastern European Foreign Trade, Journal of Economic Literature, June 1992, pp. 940-942.

Lectures and Papers:

1. "U.S. Foreign Economic Policy Toward Eastern Europe," paper presented at the Fifth Annual Public Affairs Forum of Bethel College, October 1969.
2. "Wholesaling of Consumer Goods in the U.S.S.R.," paper presented at a joint session of the Association for Comparative Economics and Midwest Economics Association, April 1971.
3. "Grants as Sources of Inter-Regional Income Variation in the U.S.S.R.: Comment" presented at the Econometric Society Panel of the Allied Social Science Association, December 1971.
4. "U.S. Trade with the Soviet Union and Eastern Europe," presented at the Conference on Emerging International Trade Patterns of the U.S., University of Notre Dame, April, 1973.
5. "The Political Economy of East-West Trade," paper presented as part of the Current Economic Problems lecture series at Nazareth College, Kalamazoo, Michigan, October 1974.
6. "Productivity, Growth and Efficiency in Soviet Consumer Goods Distribution," paper presented at the annual meetings of the Southern Economic Association held in New Orleans, LA, November 1975.
7. "The Soviet World after Brezhnev," Panel presentation at the Midwest Slavic Conference, Chicago, May 1976.
8. Invited Participant, Sixth Annual Shell-Faculty Forum, University of Houston, January 1977.
9. "Productivity, Growth and Efficiency in Soviet Consumer Goods Distribution: Some Answers and Some Questions," paper presented to the General Seminar, Center or Russian and East European Studies, Birmingham University, England, November 1977.
10. "Socialism and the Consumer in the U.S.S.R.," Seminar presented to Sixth Annual Teachers' Conference on Russian Studies, Birmingham University, England, May 1978.

Lectures and Papers: (cont.)

11. "Shopping in the Soviet Union," Radio Interview, Birmingham Consumer Association Program on BBC Radio, Birmingham, May 1978.
12. "The Consumer in Soviet Economic Development," paper presented at the Conference on The Nature of the Soviet Union and Its Role in the World Today at the New School for Social Research, New York City, March, 1979.
13. "The Consumer in Soviet Economic Development," paper presented at the National Convention of American Association for the Advancement of Slavic Studies, New Haven, October 1979.
14. "An Overview of Alternative Economic Systems" and "An Overview of the Soviet Economic System," two lectures given to the Economic Seminar of the Board of Church and Society, Northern Indiana Conference, United Methodist Church, October 1979.
15. "The Role of the Consumer in Soviet Economic Development," paper delivered to the Research Seminar on Soviet and Polish Society at the Russian and East European Institute, Indiana University, Bloomington, December 1979.
16. "Retailing and Economic Development: The Soviet Experience," paper prepared for the Second World Congress on Soviet and East European Studies in Garmisch, Germany, October 1980.
17. "Retail Services and Economic Development in the Soviet Union" paper presented at the Midwest Economic Meetings in Louisville, KY, April 1981.
18. "The Consumer in the Economy of the 1980s" paper presented at the Midwest Slavic Conference in Champaign, IL, April 1981.
19. "The Political Economy of Economic Systems" lecture given at the Institute for Human Economic Ministries, Marion, VA, May 1982.
20. "Urban Plunge: An Economic Perspective," lecture given at the University of Notre Dame Urban Plunge Workshop, November 1984.
21. "The Big Tradeoff: Equality vs. Efficiency," presentation to the University of Notre Dame Core Course Workshop, November 1984.
22. "Current Events and Their Effects on the Economy," The Friends of the Notre Dame Library Faculty Forum Lecture, November 1984.
23. "Problems of Inefficiency in the Soviet Economy: The Causes and Possible Solutions," Discussant at Association for Comparative Economics Studies Panel at the Allied Social Sciences Association Meetings, Dallas, December 1984
24. "Economic Reform and Its Impact on the American Economy," Lecture to the Notre Dame Development Staff, Winter Meeting, February 1990.
25. "Everything you Might Want to Know About the Soviet Economy," Lecture, Forever Learning Institute, March 1990.
26. "Using Historical Averages or Trends in Forecasting: Pitfall and Solution," Discussant, National Association of Forensic Economics Session at the Allied Social Sciences Association Meetings, Boston, January 1994.
27. "Issues in Personal Injury Evaluations," Discussant, National Association of Forensic Economics Session at the Western Economics Association, International Meetings, Vancouver, June 1994.

L. Randall Bishop
Jarussi & Bishop
P.O. Box 3353
Billings, MT  59103-3353
Telephone:  (406) 245-7555

Attorneys for Plaintiffs

MONTANA THIRTEENTH JUDICIAL DISTRICT COURT, YELLOWSTONE COUNTY

SANDRA FOSTER and JOSEPH            )    Cause No. DV 98-837
FOSTER, individually and as parents )
and natural guardians of Andrew     )    Judge: Maurice R. Colberg, Jr.
Foster and Kathryn Foster,          )
                                    )
              Plaintiffs,           )
                                    )    AFFIDAVIT OF
vs.                                 )    DR. JOHN O. WARD, Ph.D.
                                    )
R.B.M., M.D. and DEACONESS          )
BILLINGS CLINIC,                    )
                                    )
              Defendants.           )

        John O. Ward, Ph.D., being first duly sworn on oath, hereby deposes and says:

        1.    My name is Dr. John O. Ward, Ph.D., and I have testified by way of affidavit previously regarding the subject of forensic economics and hedonic damages.

        2.    Attached hereto is a sworn affidavit which I provided in the action entitled Torres v. Gordon Trucking Incorporated, Case No. CIV95-0460 S-MHW, in the United States District Court for the District of Idaho.  I have AMENDED that AFFIDAVIT TO reflect any changes in my opinions since 1997.

        3.    The attached affidavit is a true and correct copy of my testimony in the Torres matter, and each of the statements set forth therein is true.

        FURTHER AFFIANT SAYETH NOT.

        DATED this 31 day of January, 2000.

                                        _____
                                        John O. Ward, Ph.D.

STATE OF KANSAS      )
                     ) ss.
County of _____ )

        John O. Ward, Ph.D., being first duly sworn, deposes and says:

        That he is the person named in the above-entitled action that he has read the foregoing affidavit and knows the contents thereof; and that the matters and things therein stated are true of his own knowledge.

                                        _____
                                        John O. Ward, Ph.D.

        Subscribed and sworn to before me this 31 day of January, 2000.

        HAVE SIGNATURE NOTARIZED

                                        _____
                                        Notary Public for the State of Kansas
                                        Residing at _____, Kansas
                                        My commission expires: _____

                                        KURT V. KRUEGER
                                        Notary Public - State of Kansas
                                        My Appt. Expires 1-7-01

                                        2

1

<u>CERTIFICATE OF SERVICE</u>

2

This is to certify that a true copy of the foregoing Affidavit of Dr. John O.

3

Ward, Ph.D. was duly served on counsel of record at the address listed below by

4

U.S. Mail, postage prepaid, this ____ day of January, 2000.

5

6
      John J. Russell
      Brown Law Firm, P.C.

7
      P.O. Drawer 849
      Billings, MT 59103-0849

8

9
             JARUSSI & BISHOP

10

11
             BY:

12
                 L. Randall Bishop

13

14

15

16

17

18

19

20

21

22

23

24

25

3

---

B. Newal Squyres
Kurt D. Holzer
HOLLAND & HART LLP
Suite 1400, West One Plaza
Post Office Box 2527
Boise, Idaho 83701
Telephone: (208) 342-5000

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JAVIER C. TORRES and CYNTHIA G. TORRES, husband and wife individually, as a marital community, and as parents and heirs of ANDREW A. TORRES, deceased, <br><br>                Plaintiffs, <br><br> vs. <br><br> GORDON TRUCKING INCORPORATED, an Oklahoma corporation; ROGER J. JOHNSON, an individual; and EDWIN E. HASKINS, an individual, <br><br>                Defendants. | Case No. CIV95-0460 S-MHW <br><br> AFFIDAVIT OF DR. JOHN O. WARD, Ph.D. |

STATE OF KANSAS     ) <br>                     ) ss.
County of _____   )

     JOHN O. WARD, Ph.D., being first duly sworn on oath, hereby deposes and says:

     1.   My name is Dr. John Orson Ward, Ph.D. I submit this affidavit in support

of Plaintiffs' Opposition to Defendants' Motion to Exclude Testimony Regarding

Hedonic Damages. I agreed to do so because there are misconceptions and inaccuracies

in reported decisions from courts regarding the calculation of hedonic damages. Because

AFFIDAVIT OF JOHN O. WARD, Ph.D.- 1

these estimations can be helpful to juries in determining losses in personal injury cases, I
believe it is important that this Court have the opportunity to fully understand this area
of economics and how it can assist a jury.

2.    I have a Bachelor's Degree in Economics from the University of Toledo
and a Master' Degree in Economics from the University of Toledo. I received my Ph.D.
in Economics from the University of Oklahoma in 1970. I have taken a wide variety of
post-doctorate programs from the National Science Foundation. I completed the
Harvard Institute for Educational Management in 1978. I have been involved with and
administered the College of Arts and Sciences at the University of Missouri-Kansas City
as an Associate Dean.

3.    I am chairman of the department and a full professor of Economics at the
University of Missouri-Kansas City. I am on the doctoral faculty for Ph.D. programs for
the University of Missouri system. I am general editor of the National Journal of
Forensic Economics which is published through the University of Missouri-Kansas City.
This Journal is a national publication distributed to all fifty states, as well as fourteen
countries. The Journal is the peer-reviewed publication of the National Association of
Forensic Economists. *None of my opinions derive from my positions*
*with the Journal of Forensic Economics of the National Association* (JOW)

4.    Forensic economics is the branch of the economic field which addresses
itself to the application of valuation principles to project future valuations. Forensic
economists apply economic principles to project future values in business, injury,
property and other disputes. Such economists provide economic opinions to
decisionmakers in business, government, and litigation.

AFFIDAVIT OF JOHN O. WARD, Ph.D.- 2

5.    I understand there are currently in excess of 800 members of the National
Association of Forensic Economists. I was president of the Association between 1986
and 1988.

6.    I am familiar with and have studied extensively concepts of hedonic, or lost
value of life, damages. I am co-editor with Thomas R. Ireland, Ph.D. of *The New
Hedonics Primer for Economists and Attorneys*, 2d ed. 1996. This book reviews many
of the legal and theoretical discussions surrounding the concept of hedonic damages. *(both positive*
*& negative)*
*(JOW)*

7.    I and a great number of other economists accept the willingness to pay
methodology as a legitimate and accurate basis for estimating losses in personal injury
litigation. Further, we accept the various studies performed in the 1970's and 1980's as
properly providing a foundation for making such calculations.

8.    Professional economists generally agree, and in fact may universally agree,
that enjoyment of life has an "economic value." When an individual suffers an injury or
dies, an economic loss is incurred. I, like many economists, believe lost enjoyment of life
damages in personal injury cases can be calculated with a reasonable degree of economic
certainty. Conceptually, hedonic damages are undoubtedly legitimate.

9.    Since the late 1970s, the willingness to pay, or a risk reduction approach to
valuing the loss of the value of living, has been the conventional methodology for making
such calculations. In fact, it is the only widely accepted methodology. The foundations
of the willingness to pay calculations of the value of life rest on four basic techniques:
wage risk differential analysis, consumer behavior studies, contingent valuation studies,
and federal agency standards. Of the four, the wage risk differential and consumer

AFFIDAVIT OF JOHN O. WARD, Ph.D.- 3

behavior studies provide the most relevant data. Speaking generally, contingent valuation and agency standards are more appropriately seen as validating data from the other methods.

10.  The calculation of hedonic damages arising from the willingness to pay methodology is generally accepted in the field of forensic economics. There certainly are some intellectual differences among forensic economists regarding these calculations. *and their relevance to Litigation* Nonetheless, at a minimum, a very substantial minority of the economic thinkers and analysts accept the willingness to pay methodology as an appropriate theoretical basis for *(JW)* calculating dollar figure losses in personal injury litigation.

11.  Economic estimation is an exercise in predicting the future. Thus, in most settings it is impossible for economists to predict specific future values. For this reason, part of the method of economics as a "science" is to provide a range of values for many calculations. These ranges generally recognize there are differences in individuals and economic activity over time. The type of disagreements among forensic economists in the area of hedonic damages are not materially different from differences among economists about methodologies applied in other areas where future damages are calculated. For example, the diversity of opinion regarding the analysis is like the diversity of opinion among economists regarding choice of discount rates or expected remaining worklife calculations.

12.  One of the primary scholars who has produced a significant amount of the research on the value of life using a wage differential methodology is W. Kip Viscusi, a Professor of Economics at Duke University in Durham, North Carolina. The methodologies in the research by Professor Viscusi, which I have reviewed, conform to standard methodologies of economic science. I believe the research is accurate and represents what Professor Viscusi claims it represents: a reasonably certain economic calculation of the lost value of life. *I have no idea of his thoughts concerning relevance of such calculations to litigation.* *(JW)*

13.  The concept of wage risk differentials was first brought forth by Adam Smith in his 1776 book, *Wealth of Nations*. This wage risk differential concept is a primary starting point for lost value of enjoyment of life calculations. The theoretical and empirical work in the area lost value of life damages since the 1960's are founded on Adam Smith's basic insight into the marketplace.

14.  I am familiar with the article published in *The Journal of Forensic Economics* in 1991, entitled "The Plausible Range of Value of Life - Red Herrings Among the Mackerel" by Ted R. Miller, Senior Research Economist at the Urban Institute in 1991. I have reviewed that article and believe the adjustments he made are fully in line with econometrically and statistically proper adjustments to adjust the biases and discrepancies in the various studies.

15.  I have read the opinion of Judge Shadur in *Ayers v. Robinson*. That is one of the court decisions that shows a misunderstanding of the economics underlying hedonic damages. In that opinion the Judge rejects the inherent valuation process going on when individuals make economic decisions in the marketplace. Many, and perhaps most, economists would agree that wage risk differentials represent an inherent calculation of the value of living in the marketplace. The wage risk differential studies, when analyzed, provide a remarkably small range of values for this calculation. The rejection of this concept in the *Ayers* opinion is not supported by any analysis. Further

AFFIDAVIT OF JOHN O. WARD, Ph.D.- 4

AFFIDAVIT OF JOHN O. WARD, Ph.D.- 5

Judge Shadur's characterization of the Miller article as "bogus" is, to my knowledge, wholly unsupported by any peer reviewed literature in six years since the article was published.

16.    I am familiar with the work of Stan Smith. I have reviewed his book *Economic/Hedonic Damages: A Practice Book for Plaintiff and Defense Attorneys.* That book sets forth an accepted method of calculating lost value of life damages that falls well within the range of accepted standards governing how economists conduct their research and reach their conclusions.

Further your Affiant sayeth naught.

_____
JOHN O. WARD, Ph.D.

SUBSCRIBED AND SWORN TO before me this 17 day of February 1997.

_____
Notary Public for Idaho
Residing at Boise, Idaho
Commission Expires

KURT V. KRUEGER
Notary Public - State of Kansas
My Appt. Expires 1-31-99

AFFIDAVIT OF JOHN O. WARD, Ph.D.- 6

ACADEMIC AND PROFESSIONAL
VITA
of
# John O. Ward, Ph.D.

**University Address**
51st & Rockhill
University of Missouri-Kansas City
Kansas City, MO 64110
(816) 235-1309, Fax: (816) 235-5263
e-mail: wardj@cctr.umkc.edu

**Consulting Address**
8340 Mission Rd., Ste. 235
Prairie Village, KS 66206
(913) 381-9420, Fax: (913) 648-5740
e-mail: ward@jowassoc.com

**Home Address**
11821 Washington
Kansas City, MO 64114
(816) 942-8355, Fax: (816) 943-1036

**Date of Birth:** 1/10/42
**Corporate ID#:** 43-1280174

## Educational Background

| | |
|---|---|
| 1979 | Institute for Educational Management, Harvard University |
| 1967-71 | University of Oklahoma, Ph.D., Economics |
| 1966-67 | University of Toledo, MA, Economics |
| 1965-66 | IBM Educational Center, Detroit, Systems Analysis |
| 1960-65 | University of Toledo, BA, Economics |

## Academic Positions

| | |
|---|---|
| 1992-Present | Chair, Department of Economics, UMKC |
| 1980-Present | Professor of Economics, UMKC |
| 1993-Present | Research Associate - Center for Economic Information |
| 1986-Present | Managing Editor, Journal of Forensic Economics |
| 1986-1987 | Interim Chair, Department of Communication Studies |
| 1978-1985 | Associate Dean, College of Arts & Sciences, UMKC |
| 1976-1979 | Chairman, Associate Professor, Department of Economics, UMKC, Assistant Professor , 1969-197 |
| 1975-1976 | Visiting Professor, Curso de Mestrado em Economia, (CAEN), Universidade Federal do Ceara, Fortaleza, Brazil |
| 1969-1975 | Assistant Professor, Department of Economics, UMKC |
| 1968-1969 | Teaching Assistant, Department of Economics, University of Oklahoma |

## Professional Positions

| | |
|---|---|
| 1976-Present | President, John O. Ward and Associates, Inc. An economic consulting firm providing comprehensive analysis in anti-trust, commercial, employment, personal injury, and death litigation. |

## Academic and Professional Organizations

National Association of Forensic Economists (Board Member, President 1986-1988)
Atlantic Economic Association
American Economic Association
Omicron Delta Epsilon (President, University of Oklahoma Chapter, 1968-1969;
Midwest Economic Association
American Association of University Professors
Missouri Valley Economic Association
Western Economic Association
Southwest Economic Association
American Academy of Economic Arbitrators (Board Member)

## Grants Funded and Submitted

American Epilepsy Assoc. Grant (with the CEI, K.U. Med Center & VA , 1994)
Weldon Spring Inter-Campus Grant (UMKC, UMC, UMR, UMSL), 1990
Weldon Spring Inter-Campus Grant with Tom Ireland (UMSL), 1989
Inter-American Association for Higher Education Travel Grant, 1984
Chancellor's Development Fund - Latin American Research, 1977
Analese Dos Aspectos Socio-Economicos Da Problema Nutricional Em Zonas Rurais E Urbanas De Baixa Renda No Nordeste. A grant proposal submitted to IPEA and the government of Brazil for a two year (1976-78) extensive survey of the nutritional status and the economic determinants of nutrition in northeast Brazil, Consultant.
An Examination of Nutritional Levels: The Determinants of Nutrition, and Nutritional Policy in Jalapa, Mexico, cooperative grant between IISES and UMKC—submitted to review by NSF, 1978. (Accepted, but not funded.)
Fiscal Co-Director: The Federal Response to the Fiscal Crisis in American Cities, U.S. Department of Commerce, 1978. (Accepted, $40,000.)
KCRCHE Faculty Development Award, 1974-1976
Latin American Teaching Fellowship Award - Visiting Professor, Tufts Univ. 1975
Research Award - Instituto de Pesquisa Economico e Social - Brazil, Argentina, 1976
Ford Foundation - Travel Award, CAPES Travel Award - Brazil, Argentina, 1976
University of Missouri Faculty Research Grant, 1976

Graduate Research Grant for Research in Mexico - University of Oklahoma, Thesis: "An Analytical Model for Evaluating Mexico's Participation in LAFTA," 1969

## Languages

| | |
|---|---|
| Portuguese | Read, speak limited |
| Spanish | Read |

## Scholarly Publications
(Articles, Book Chapters, Books & Monographs)

John O. Ward, "Defining the Basis of Decedents' Personal Consumption in Wrongful Death Litigation," in Assessing Family Loss in Wrongful Death Litigation: The Special Roles of Lost Services and Personal Consumption, ed. Thomas Ireland and Thomas Deperschmidt, Lawyers and Judges Publishing Company, projected publication May 1999.

Robert Thornton and John O. Ward, "The Economist in Tort Litigation," accepted, Journal of Economic Perspectives, vol. 131 (2), Spring 1999.

Kurt V. Krueger, Gary R. Albrecht, and John O. Ward, "It's About Time: The Forensic Economic Evaluation," accepted, The Journal of Forensic Economics, spring 1999.

John O. Ward, "The Standard of Reasonable Probability in Forensic Economics: A Comment," Litigation Economic Digest, vol. 3, no. 2, 1998.

Kurt V. Krueger and John O. Ward, The Dollar Value of a Day, Expectancy Data, Shawnee Mission, KS (1998).

John Ward and Thomas Ireland, Editors, A New Hedonics Primer for Economists and Attorneys, Tucson: Lawyers and Judges Publishing Company, 1996.

Thomas Ireland and John Ward, Valuing Children in Litigation: Family and Individual Loss Assessment, Tucson: Lawyers and Judges Publishing Company, 1995.

Thomas Ireland and John Ward, "The Investment Approach to Parental Loss in the Death of a Child: A Guide to Understanding Alternative Versions", Journal of Legal Economics, vol. 5 (3), Spring, 1996.

John O. Ward and Kurt V. Krueger, Establishing Damages in Catastrophic Injury Litigation, Tucson: Lawyers and Judges Publishing Company, July, 1994.

John O. Ward, "Hedonic Damages," in Boardwalk Seminar, New Jersey Association of Trial Lawyers, Atlantic City, March, 1994.

Thomas Ireland and John O. Ward, "Valuing the Life of a Child: Broadening the Investment Approach," Journal of Forensic Economics, 7 (2), Spring/Summer, 1994.

John O. Ward and Gerald Olson, "Forensic Economics: The Development and Outlook for the Field," in Litigation Economics, edited by Patrick A. Gaughan and Robert J. Thornton, Greenwich, Conn., JAI Press, 1993.

John O. Ward, Editor, A Hedonics Primer for Economists and Attorneys, Tucson: Lawyers and Judges Publishing Co., August, 1992.

John O. Ward, "The Tort Reform Movement of the 1990's," Proceedings of the Accessing Private Lands Conference, Ohio State University: Columbus, 1992.

John Ward, "Hedonic Damages: A Review of the Debate," Missouri Lawyers Weekly, June, 1992.

John Ward, "Tort Reform in the 1990's - A New Direction," The Journal of the Missouri Bar, October, 1992.

John Ward, "The Brazilian Miracle Revisited: A Case Study," Major Issues in Global Development, A.J. Kondonassis, editor, University of Oklahoma Press: Norman, 1991.

"Replacement Cost Valuation of Production by Homemakers: Conceptual Questions and Measurement Problems," with Tom Ireland, Journal of Forensic Economics, Vol. IV, No. 3, Fall, 1991, also in Assessing Family Loss in Wrongful Death Litigation: The Special Roles of Lost Services and Personal Consumption, ed. by Thomas Ireland and Thomas Depperschmidt. Tucson: Lawyers and Judges Publishing Co., 1999.

John Ward, et al, "The Catastrophic Injury Case: Establishing Damages," Missouri Lawyers Weekly, December 16, 1991.

John Ward, et al, "Literature Relevant to the Valuation of Household Services," Journal of Forensic Economics, Vol. IV, No. 3, Fall, 1991.

John Ward, "Economic Issues in Personal Injury and Wrongful Death Litigation," Proof of Personal Injury Damages in Kansas, PES: Eau Claire, WI, 1990., and 1992.

John Ward, "Reflections on Economic Loss in the Death of a Child," Journal of Forensic Economics, Vol. III, No. 2, Fall, 1990.

John O. Ward, "Human Capital Theory and Economic Loss in the Death of a Child," Journal of Forensic Economics, Vol. II, No. 1, October, 1988.

John O. Ward, "Origins of the Tort Reform Movement," Contemporary Policy Issues, Vol. VI, No. 3, July 1988.

John O. Ward and Gerald Olson, "Forensic Economics: A Perspective and an agenda for Research," Journal of Forensic Economics, Vol. I, No. 1, September, 1987.

John O. Ward, "Economic Loss in Injury and Death Litigation," Journal of Economics, vol. 12, March 6, 1986.

John O. Ward, ed., The Economist in Injury and Death Litigation, UMKC Law School: Kansas City, 1983.

F.E. Wagner and John O. Ward, "Urbanization and Migration in Brazil," The American Journal of Economics and Sociology, Vol. 39, No. 2, 1980.

John O. Ward and David Amoni, "Diets of Urban Migrants in Northeast Brazil: An Economic Analysis," Nutrition Reports International, Vol. 21, No. 1, January, 1980.

John O. Ward and Gerald W. Olson, "Income Taxes, the Supreme Court and Economic Loss in Injury and Death," Trial, Summer, 1981.

John O. Ward and John Sanders, "Nutritional Determinants and Migration in the Brazilian Northeast," Journal of Economic Development and Cultural Change, Vol. 29, No. 1, October, 1980. Also published in Brazil, Revista Economica do Nordeste, Vol. 11, No. 2, Abr/Jun, 1980.

John O. Ward, "The Economist in Personal Injury and Wrongful Death Litigation," Trial, Vol. 15, No. 11, November, 1979.

John O. Ward, "Remarks: The Causes of Mexico's Devaluation of the Peso," Journal of Economics, Vol. 3, 1977.

John O. Ward and John Sanders, "Nutricao, Renda e Tecnologia Nova Para Pequenas Agricutores No Nordeste Brasileiro: Algumas Inter Relacoes e Sugestoes de Politicos," Revista Economica Rural (Brasilia), Vol. 16, No. 3, Jul/Set, 1978.

John O. Ward and Agamemnon T. Almeida, "Nota Sobre Metodologia de Pesquisa em Economia De Nutricao," Seminario Sobre Nutricao, Associacao Nacional de Centros de Pos Graduacao em Economia, Brasilia, 1976.

John O. Ward and Agamemnon T. Almeida, "Nutricao, Renda e Tamanho da Familia: Um Exame da Situacao Nutricional em Caninde, Ceara," Revista Economica do Nordeste, Vol. 8, No. 1, 1977.

John O. Ward, "Some Remarks on the Approximation of the Production Effects Resulting form the Formation of LAFTA," The American Economist, Vol. 19, No. 2, 1975.

John O. Ward and F.E. Wagner, "Commodity Agreements, Economic Rent, and the U.S.," Journal of Economics, No. 1, 1975.

L.K. Hubbell, Gerald Olson, John Ward and S.D. Ramenofsky, Alternative Sources of Finance for Municipal Services, University of Missouri-Urban Observatory, 1973.

John O. Ward, "Analytical Model for Examining Mexico's Participation in LAFTA." (Monograph) Secretaria de Industria y Comercio, Mexico, D.F., 1972.

**Book Reviews**

James E. Anderson, Public Policy Making, in The American Economist, Vol. 1, No. 2, Fall, 1977.

Yujiro Hayami, A Century of Agricultural Growth in Japan: Its Relevance to Asian Studies, in The American Economist, Vol. 22, No. 1, Fall, 1978.

Fritz Machlup, A History of thought on Economic Integration, in Journal of Economics, Vol. 4, August, 1978.

**Abstracts**

John O. Ward and John H. Sanders, "Nutritional Determinants and Migration in Northeast Brazil," Sociological Abstracts and Specialized Reprint Collection, University of North Carolina, 1981.

John O. Ward and David Amoni, "Diet Efficiency in Northeast Brazil," in Nutrition Planning, Vol. 2, No. 1, 1979.

John O. Ward and F.E. Wagner, "Japanese Imperialism in Latin America," in Nebraska Journal of Economics and Business, Vol. 4, 1973.

**Significant Citations**

Citations of publications in Forensic Economics—220 citations in 145 articles and books.

Citation as benchmark research—A Survey of Agricultural Economics Literature, Vol. 4., Lee Martin, Editor, Published by the University of Minnesota Press for the American Economics Association, 1993.

Citation—Handbook of Development Economics, Vol.1, Edited by Hollis Chenery and T.N. Srinivasan, New Holland Press, 1988.

**Presentations at Academic and Professional Meetings and Conventions**

"New Issues in Calculating Damages in Medical Malpractice Litigation," UMKC CLE, 1998 Medical Malpractice Seminar, September 18, 1998.

"Establishing Damages in Commercial, Employment, and Personal Injury Litigation," program moderator, UMKC Law School, Kansas City, MO, November 14, 1997.

"Discrimination: Statistical Proofs & Damages," Employment Litigation Program, UMKC Law School, Kansas City, MO, November 13, 1997.

"Valuing Damages/Risk Assessment," Heartland Labor and Employment Institute, UMKC Law School, Kansas City, MO, October 23-24, 1997.

"Estimating Economic Damages as a Result of Diminished Productivity in Work and Non-Work Time", with John O. Ward and Gary R. Albrecht. Session at 72nd Annual Western Economic Association International Conference, Seattle, July 1997.

"The Fallacy of Fairness & the Plight of Prediction in Discounting Future Dollars," American Economic Association, San Francisco, CA, January 1996.

"Evaluating Damages in Catastrophic Injury Litigation," program moderator and presenter, University of Missouri-Kansas City Law School, 1994 & 1995, Marriot Pavilion, St. Louis, Adams Mark, Kansas City.

"What is Measured When Calculating Expected Earnings," with Kurt Krueger, American Economic Association, Anaheim, CA, January, 1993.

"Disclosure in Forensic Economic Testimony," panel, Western Economic Association, Lake Tahoe, June 1993.

"A Unified Theory of Human Capital Investment," with Tom Ireland at the American Economic Association Meetings, New Orleans, January 1992.

"The Tort Reform Movement of the 1990's," Lands Conference, Ohio State University, April 1992.

"Calculating Economic Loss in Business Litigation," UMKC Continuing Legal Education, September 1989.

"Calculating Damages in Complex Business Litigation," Kansas City Metropolitan Bar Association, September 1990.

"Economic damages in Death Torts," Missouri Association of Trial Attorneys, February 1990.

"Human Resource Evaluation and the Life of a Child," Western Economic Association, Chicago, July 1989.

"Valuing Contributions in the Household Sector," with Tom Ireland (UMSL), Allied Social Science Association, New York, 1988.

"Forensic Economics: Origins and Perspectives," Missouri Valley Economics Association, 1987.

"The Tort Reform Movement in Economic Interpretation," Western Economic Association, Vancouver, 1986.

"Brazil's Miracle Revisited," Latin American Studies Association, Boston, November 1986.

"The Methodologies of Projecting Economic Loss in Litigation: Recent Conflicts," Missouri Valley Economic Association, March 1986.

"Economic Loss in Death/Injury Litigation: Methodological Conflicts," Atlantic Economic Association, Rome, 1985.

"The Economics of Structured Settlements," University of Missouri-Kansas City Legal Continuing Education, September 1984.

"Computer Utilization in Higher Education," Inter-American Association for Higher Education, Washington, D.C., 1984.

"The Economic Determinants of World Hunger," World Conference on Social Economics, Fresno, CA, December 1983.

"The Economist in Law," University of Missouri-Kansas City Continuing Legal Education, chaired by John O. Ward, March 1983.

"The Economics of Malnutrition," Atlantic Economic Association, London, August 1981.

"The President's Commission on World Hunger," Third World Conference, Omaha 1980.

"Malnutrition and Economics," Western Social Science Association, Albuquerque, New Mexico, April 1978.

"The Economist as Expert Witness: Trial Demonstration," Missouri Association of Trial attorneys and the University of Missouri-Columbia, November 1979.

"Human Resource Use in Developing Countries," Third World Conference, Omaha, 1979.

"The Economist in Personal Injury and Death Litigation," to a seminar of Continuing Legal Education, "The Effective Use of an Economist in Complex Legal Matters," chaired by John O. Ward, 1979.

"Human Resource Use in Northeast Brazil," to the Economics and Agricultural Economics Faculty of the University of Missouri-Columbia, 1978.

"Nutrition Policy in Latin America," Third World Conference, University of Nebraska-Omaha, 1978.

"Urbanization and Migration in Latin America: The Case of Brazil," with F.E. Wagner, Tri-University Conference on Urbanization in the Americas, Kansas City, 1978.

"Economics and Law," to the Annual Meeting of the Missouri Association of Trial Attorneys, Tan-Tar-A, June 1978.

"Wendell Gordon's Interpretation of Latin America's Economic Development," Western Social Science Association, Denver, April 1978.

Discussant: Southwest Economics Association Convention, Houston, TX, April 1978.

"Malnutrition and Economic Development," The Institute for Advanced Economic and Social Investigations, Jalapa, Mexico, 1977.

"Nutrition, Income and New Technology for Small Farmers," with John Sanders, Brazilian Society of Rural Economists Convention, Vicosa, Brazil, 1977.

"Remarks, the Causes for Mexico's Devaluation," the Missouri Valley Economics Association Convention, 1977.

"Urban-Rural Nutrition in LDC's," Southwestern Economic Association Convention, Los Angeles, 1977.

"Nota Sobre Methodologia De Pesquisa em Economia Da Nutricao," with A.T. Almeida, Seminario Sobre Nutricao, ANPEC, Brasilia, Brazil, 1976.

"Nutricao, Renda e Tamanho Da Familia," with A.T. Almeida, Encontro Anual, ANPEC, Garanhuns, Brazil, 1975.

Respondent: "Um Modelo de Balanco Comerical Com Aplicacoes Ao Caso Brasileiro," by Alfonso Censo Pastore, et al., at the III Encontro Anual of the Associacio Nacional De Control De Pos-Graduacao Em Economia (ANPEC), Garanhuns, Brazil, 1975.

"Commodity Cartels, Economic Rent, and the United States," with F.E. Wagner, Missouri Valley Economics Association Convention, St. Louis, 1974.

"The International Economy in 1974," to the Annual UMKC Business School Management Conference, 1974.

"German Imperialism in Africa," with F.E. Wagner, Missouri Valley Economic Association Convention, Kansas City, 1973.

"Japanese Imperialism in Latin America," with F.E. Wagner, Midwestern Economic Association Convention, Chicago, 1973.

"A Comparative Study of Ph.D.'s in Economics Granted by American Universities," Southwestern Social Science Convention, Houston, TX, 1969.

## Consulting Experience

| | |
|---|---|
| 1972-1973 | Urban Observatory |
| 1972 | Department of Labor |
| 1972-1973 | Kirschner Association, Departments of Commerce and Defence |
| 1974 | Environmental Research and Development Foundation |
| 1975 | Government of Brazil (IPEA) |
| 1976-Present | Regional and national law firms (320 firms in 10 states) |
| 1997-Present | Center for Economic Information, UMKC |

John O. Ward & Associates, Inc., was established in 1976 as an economic consulting firm offering expert analysis and testimony in personal injury and death torts, employment discrimination litigation and commercial damages litigation. The firm consists of four consulting economists, support staff, and additional consultants for life care planning and financial management. Dr. John Ward, as principal economist of the firm, has given expert testimony in the aforementioned areas in federal and/or state courts in Kansas, Missouri, Iowa, Nebraska, Oklahoma, Illinois, California, South Carolina, Tennessee, and Louisiana and has served as a consultant to firms in over twenty states. During the past 20 years, Dr. Ward has testified in over one thousand cases by deposition and/or courtroom appearance. The client list for John O. Ward & Associates includes over 500 attorneys, representing both plaintiffs and defendants.

## Editorial Reviews

Reviewer: *Contemporary Economic Issues, Economic Development and Cultural Change, The American Economist, The Journal of Economics, The Kentucky Journal of Economics,* Prentice Hall Publishers, 1987, Houghton Mifflin Publishers (reviewed Latin American Economic Books, 1973-1975.)

## Graduate Involvement

Ph.D. Thesis Committees:
Currently serving on four committees and directing two students.
Recent Past Students:
Jennifer Golec, Economics
Mutaz Nabulsi, Economics
Lester Townsend, Economics
Willadee Gillin, Economics
Dale Krueger, Educational Administration
Tom Carroll, General Education

## Courses Taught

Graduate and undergraduate: Economic Development, Research Methods, International Economics, Law and Economics, Human Resource Economics, Microeconomics, Investment Analysis.

## University Service (since 1990)

Member, Presidential Advisory Committee for Academic Leadership, 1999
Member, University Senate Budget Committee, 1999
Chair, Athletic Director Search Committee, 1998-1999
Member, University of Missouri Department Leadership Task Force, 1998-1999
Chairman, Arts & Sciences Curriculum Committee, 1997-present
Chairman, Intercollegiate Athletic Committee, UMKC, 1993-present
Member, UMKC Promotion and Tenure Committee, 1995-present
Member, University of Missouri Administrative Review Board, 1994-95
President, Campus Athletic Committee, 1990
Chair, Bernardin Fund Committee, 1994-present
Member, University Senate, 1977-1979, 1993-1997
Board Member, UMKC Athletic Corporation, 1987 - 1994
Member, U-Wide Agricultural Programs Evaluation Committee, 1993
Member, Campus Space Committee, 1990
UMKC Faculty Representative to the NCAA
Ten Dean's Search Committees

## Community Service

Co-Chair, Academic Planning Committee, Mayors' Summit on NAFTA, 1997-1998
Co-Chair, Development of NAFTA Website for the I-35/I-29 Region, Mayor Cleaver's Office, 1997-1998
Member and Subcommittee Chair, Missouri Legislative State Commission on Global Warming, 1990
Member, Missouri Legislative and Executive Task Force on the Liability Insurance Industry and Tort Reform, 1987-1988
Over 200 presentations to area business and community groups on economic topics for the College of Arts and Sciences Visiting Professor Program and Visiting Scholar Program
Numerous television interviews and programs on economic topics
Numerous newspaper interviews on economic topics and guest editorial writer for the Kansas City Star

MELVILLE Z. WOLFSON, Ph.D.

FORENSIC ECONOMICS

ng Address:
0 O'Keefe Avenue
ite 200
w Orleans, La. 70113

Telephones:
(504) 581-7130
FAX: 581-7133
885-3696

CURRICULUM VITAE

## Affidavit

The undersigned does hereby swear and affirm the following:

1. The enclosed resume includes the academic degrees of Doctor of Philosophy in Economics (University of Illinois-Urbana) and Juris Doctor (Tulane University School of Law).

2. Testimony regarding the estimation and calculation of loss of the capacity to enjoy life this writer has offered in jurisdictions in Louisiana and Mississippi. Illustrations of calculation of these losses include references to peer-reviewed studies in the academic economic literature on Willingness-To-Pay to save statistical lives. These studies are based on what people are willing to pay to reduce the risk of death, and what workers are willing to accept as payment for accepting such risk on the job. This methodology is one widely accepted and has been published in peer-reviewed literature for several decades in economic journals of the highest quality. The method is one of several economists might utilize in an effort to assist fact finders in deliberating their own calculus of this element of damage.

3. Based on this method and generally accepted economic principles central to the utilization of others, economists can assist fact finders in calculating loss of enjoyment of life damages in personal injury cases with a reasonable degree of economic certainty. This function can provide valuable assistance in determining intangible losses for a given individual. An example of this method can be found in Economic/Hedonic Damages: A Practice Book for Plaintiff and Defense Attorneys, and supplements, by M. L. Brookshire and S. V. Smith, Anderson Publishing Co., Cinn., Ohio, 1990.

4. Disagreements among economists in the forensic field in this area regarding these calculations do not materially differ from the many disagreements that exist over methodologies in other areas of economic testimony, such as valuing businesses, calculating worklife for injured workers, estimating discount rates for present value purposes, etc., where diversity of expert economic opinion has long been accepted in courts of law.

Dated this 18 day of December, 1996.

_Melville Z. Wolfson, Ph.D., J.D._

PERSONAL
  NAME:            Melville Z. Wolfson
  ADDRESS:         4628 Taft Park
                   Metairie, Louisiana 70002
  PHONE:           504-581-7130 (O)
                   504-888-4296 (H)
  DATE OF BIRTH:   August 15, 1941
  MARITAL STATUS:  Widower, 3 children

EDUCATION
  • Isidore Newman School, New Orleans, Louisiana (1959)
  • B.S., cum laude, (Business), LSU in New Orleans (1963)
  • M.S., (Labor Economics), University of Illinois (1964)
  • Ph.D., (Economics, Finance), University of Illinois (1971)
  • J.D., Tulane University (1973)

EXPERIENCE
  • University of Illinois Teaching Assistant (1964-1965)
  • University of New Orleans (1967— ), currently Associate Professor

COURSES
  Statistics, Labor Economics, Collective Bargaining, Graduate Business Research, Corporate Finance, Finance, Money and Banking, Graduate Macro Economics, Theory (representative courses).

PROFESSIONAL
  • National Association of Forensic Economists (Charter Member)
  • American Academy of Financial and Economic Experts (Charter Member)
  • National Association of Economic Arbitrators
  • Various Economic Associations: American, Southern, Southwest, Louisiana

EDITORIAL
  • Editorial Board, Journal of Legal Economics
  • Reviewer, Journal of Legal Economics, Journal of Forensic Economics

CONSULTING
  Qualified: Labor Economist, Forensic Economist, Statistician, Real Estate Expert, Valuation of Business and Business Loss.

TESTIMONY AND ACCEPTED
  Federal and State Courts: Louisiana, Mississippi, Alabama, Florida, South Carolina, Tennessee, Texas, and Federal Courts in New York and California.