## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MARK A. SIEGEL,** *et al.,* | ) | |
| | ) | |
| *Plaintiffs/ Counter-Defendants,* | ) | |
| | ) | **Civil Action No. 05-1717 (JGP)** |
| **v.** | ) | |
| | ) | |
| **RIDGEWELL'S, INC.** | ) | |
| | ) | |
| *Defendant/ Counter-Plaintiff.* | ) | |
| | ) | |

### PLAINTIFFS' MEMORANDUM OF LAW IN
### SUPPORT OF MOTION FOR SUMMARY JUDGMENT

#### STATEMENT OF FACTS

This is a case of a leading Washington, D.C., caterer (Ridgewell's, Inc.) that has been garnering large profits from its advertised capacity to provide food that satisfies Jewish dietary requirements (*kashrut*). Through a representative who was, according to her representations, totally familiar with these requirements, Ridgewell's marketed to a bride's parents its ability to satisfy their requirements for a wedding reception meeting their needed kosher requirements. After the contract was signed and the initial payments were made, Ridgewell's exhibited total disdain for the religious needs of the wedding reception and dinner, and either deliberately or with reckless abandon failed to provide the product it had promised. The undisputed evidence establishes the plaintiffs' right to a judgment on liability under the District of Columbia Consumer Protection Procedures Act, D.C. Code §§ 28-3901 *et seq.*

The bride's parents ("the Siegels") contracted with Ridgewell's for a wedding reception and dinner. It is undisputed that Ridgewell's representative, Ms. Toby Nann, was told that the

Siegel's prospective in-laws ("the Barons") followed Jewish dietary laws, and that it was important to the Siegels that certain basic principles of these rules be followed in the wedding reception and dinner (J. Siegel Dep. Tr. pp. 83-91; Nann Dep. Tr. p. 31). Ms. Nann represented to the plaintiffs that she was familiar with Jewish dietary laws because she had been a "mashgiach" (a supervisor of compliance with Jewish dietary laws) for the Conservative Jewish rabbinical organization in the Washington area (Nann Dep. Tr. pp. 24-27).

The Siegels have testified in their depositions that in discussions with Ms. Nann, they made it clear that the food at the reception and dinner was to meet the religious dietary standards of their future in-laws, and that the word "kosher" was used by Ms. Nann repeatedly to describe that standard (M. Siegel Dep. Tr. pp. 26-28, 41, 58-59, 95-96, 100-103; C. Baron Dep. Tr. pp. 43-48, 78-90; J. Siegel Dep. Tr. pp. 83-91). Ms. Nann, in her deposition testimony, denied that the event was to be "kosher" and insisted that "this was going to be a kosher-style event" (Nann Dep. Tr. p. 73) or an event that she called "a semi-kosher wedding" (Nann Dep. Tr. p. 125). Ridgewell's has claimed that plaintiffs knew that the food at the event was not strictly kosher because it was to be cooked in Ridgewell's kitchen. Ridgewell's has admitted in its answer and Ms. Nann has acknowledged, however, that Ridgewell's assured the plaintiffs that only kosher meat was to be used, that there were to be no dairy products and no shrimp (Nann. Dep. Tr. pp. 85, 124).

In addition, although the contract that the plaintiffs signed stated that the "Sushi Station" was to have sushi that was "Made to Order" and was to contain only "yellow fin tuna," "salmon," and "crisp veggie assortment" (First Amended Complaint, Exhibit 1, p. 2), Ridgewell's contracted out the preparation of the sushi platter. It is undisputed that the sushi platter contained shrimp, which is commonly known to be non-kosher and highly offensive to

the Jewish dietary laws. The deposition testimony of the sushi vendor (Mummert Dep. Tr. pp. 21-22, 36-37) and the affidavit of a chef who was a guest at the wedding (Seigal Aff. ¶ 8)  also establish beyond dispute that the sushi platter contained patently non-kosher eel and octopus.

The rabbis who testified by deposition – including Ridgewell's expert rabbi – agree that shrimp is "clearly outside of the bounds of" what is considered kosher and is comparable (in that regard) to pork.  (Rabbi W. Rudolph Dep. Tr. pp. 85-88; Rabbi J. Wohlberg Dep. Tr. pp. 116-117)  In addition, Rabbi Leonard Gordon noted that serving shrimp at a wedding that is represented to be kosher is a "dramatic" and "alienating" violation that "casts a pall on the entire event" and can destroy the expected joy and harmony of the event as well as the family's memories of the event.  (Rabbi L. Gordon Dep. Tr. pp. 127-129)  The presence of shrimp on the sushi platter seriously disrupted the wedding reception and was very disturbing to the immediate families of both bride and groom. The plaintiffs' deposition testimony graphically portrays the damaging consequences of this violation on the effects and memories of the wedding. (R. Baron Dep. Tr. pp. 22-24, 51-53; M. Siegel Dep. Tr. pp. 153-155; C. Baron Dep. Tr. pp. 153-154, 156-157; J. Siegel Dep. Tr. pp. 92-101.)

It is undisputed that Ridgewell's was, at the very least, careless in its management of the event and permitted patently non-kosher foods to be served. The following facts are totally beyond dispute:

*First,* the sushi station was not "Made To Order" as had been promised in the written contract.

*Second,* Ridgewell's employees failed to give correct instructions to the sushi vendor. The vendor was never told to omit shrimp, eel, and octopus from the sushi platter. The only

instruction given to the sushi vendor was to avoid "pork" – a food that is never found in sushi (Mummert Dep. Tr. 51; Nann Dep. Tr. p. 76-77).

*Third,* the chefs who prepared the *hors d'oeuvres* served at the wedding reception were not told that *only* kosher meat was to be used for their dishes (Keener Dep. Tr. pp. 90-94). It is probable that non-kosher meat was included in various dishes served to guests at the reception (Keener Dep. Tr. pp. 77-81).

There are factual disputes over other alleged violations of the agreed commitment to abide by the requested and agreed-upon standard of *kashrut* and over the extent to which Ms. Nann represented that she understood this standard and promised that the event would be "kosher" within that standard. On these other factual questions, a jury will decide whether to believe the Siegels' sworn version of what Ms. Nann promised them with regard to the food to be served at the reception and dinner or whether to believe Ms. Nann. A jury will also decide whether Ridgewell's violated other commitments regarding the food such as the assurance that there would be no dairy served at the event and that all the meat served would be kosher meat.

For purposes of the present motion for summary judgment at this juncture of the case, we assume *arguendo* that the Siegels were promised only a "kosher-style" reception and dinner. It is undisputed, however, that, as Ridgewell's admitted and Ms. Nann acknowledged in her deposition, "there should be no shrimp" at such an event (Nann Dep. Tr. p. 74). Ridgewell's also acknowledged that no dairy products were to be served at this event. (Def. Answer to First Amended Comp., ¶ 13; Nann Dep. Tr. p. 85.) It is also undisputed that the shrimp station was not "Made To Order" but was contracted out to Sushi USA. These undisputed violations of the agreement between the Siegel's and Ridgewell's – which may have been negligent – impose civil liability on Ridgewell's under the District of Columbia Consumer Protection Procedures

Act, D.C. Code §§ 28-3901 to 28-3911 and under D.C. contract and tort law. Hence summary

judgment should be entered for the plaintiffs on the issue of liability. The amount of damages

will remain for decision by a jury.

**ARGUMENT**

**I.**

**THE DC CONSUMER PROTECTION
PROCEDURES ACT IMPOSES LIABILITY
FOR A MERCHANT'S FAILURE TO COMPLY WITH
REPRESENTATIONS IT HAS MADE TO CONSUMERS**

"The Consumer Protection Procedures Act is a comprehensive statute designed to provide

procedures and remedies for a broad spectrum of practices which injure consumers." *District*

*Cablevision, L.P. v. Bassin*, 828 A.2d 714, 722-23 (D.C. 2003), *quoting Atwater v. District of*

*Columbia Department of Consumer & Regulatory Affairs*, 566 A.2d 462, 465 (D.C. 1989).

Section 28-3905(k) establishes a private right of action for any person seeking relief because of

an illegal trade practice. "Trade practice" is defined as "any act which does or would create,

alter, repair, furnish, make available, provide information about, or, directly or indirectly, solicit

or offer for or effectuate, a sale, lease or transfer, of consumer goods or services." D.C. Code §

28-3901(a)(6). It plainly covers the kind of representations made here – *i.e.*, that sushi at a

reception would be "made to order" and that it would not contain a patently non-kosher

ingredient such as shrimp.

    The plaintiffs in the instant action were "consumers" within the definition of the Act.

They purchased, received, or provided the economic demand for the defendant's goods and

services – specifically, the defendant's catering provided at the Baron-Siegel wedding reception

– as is required by D.C. Code § 28-3901(2). Ridgewell's made several false representations and

5

omissions relating to a "trade practice" of providing food that would meet certain religious needs in violation of the CPPA. These representations grew out of an "entrepreneurial motive" and a desire to generate a substantial fee for services to be performed. Ridgewell's sought to maximize its profits by representing to potential customers that it could do kosher catering, and it represented to the Siegels that Ridgewell's would be able to cater an event that was at least, for purposes of this motion, "kosher-style" or "semi-kosher."

Ridgewell's failed to adhere to the representation it made for commercial reasons to its consumers – the Siegels, their daughter, and her groom – because of conduct by its employees that was, at best, negligent and may have been reckless or deliberate. The CPPA was designed to prevent a merchant like Ridgewell's from ensnaring consumers like the Siegels with promises that it would comply in whole or in part with the Jewish dietary laws and then ignoring those laws and strictures of conscience and religious belief and providing a wedding reception that embarrassed the parties to the wedding and severely offended their guests and the in-laws with whom the Siegels were seeking to cement a lifetime friendship.

## II.

### RIDGEWELL'S VIOLATED FIVE SUBSECTIONS OF THE DC CONSUMER PROTECTION PROCEDURES ACT

Section 28-3904 of the District of Columbia Code enumerates the specific acts that constitute violations. It provides, in part:

> It shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to:
>
> (a) represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have;

6

(b) represent that the person has a sponsorship, approval, status, affiliation, certification, or connection that the person does not have . . .

* * *

(d) represent that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another;

(e) misrepresent as to a material fact which has a tendency to mislead;

(f) fail to state a material fact if such failure tends to mislead . . .

Ridgewell's violated all five of the subsections quoted above in the catering that it did at the Corcoran during the Siegel-Baron wedding.

*First* is subsection (a). Even accepting Ms. Nann's testimony and Ridgewell's version of the relevant events (which is in serious dispute) Ridgewell's represented that food served at the reception would be "kosher-style" or "semi-kosher." This was a misrepresentation regarding the "characteristics, ingredients, [and] uses" of the food Ridgewell's provided to the Siegels.

*Second* is subsection (b). Ridgewell's represented to the Siegels through Ms. Nann's statements to them regarding her prior experience and knowledge that Ridgewell's had a "status" or "affiliation" relevant to their needs that it, in fact, did not have – *i.e.,* expertise in, and concern for, the Jewish dietary laws. In actual fact, Ms. Nann and Ridgewell's exhibited ignorance, contempt, and disregard for the conscientious religious convictions of guests at the Siegel-Baron wedding. They failed to take the minimal steps necessary to prevent shrimp, eel, and octopus from being served at the Siegel-Baron wedding reception. They failed to take the minimal steps needed to insure that their chefs would use only kosher meat in preparing the *hors d'oeuvres*. They failed, according to the testimony of the Siegels, to prevent cream cheese from being served at the same time that meat was being served. These could all have been prevented had

Ms. Nann taken the modest steps expected of her with the status and affiliation she purportedly had – that of a "mashgiach" for the local Conservative rabbis. The callous attitude of Ridgewell's toward observance of *kashrut* was epitomized by its President's statement during his deposition that violating the laws of *kashrut* by providing shrimp was "no different" than using paprika when a customer did not want paprika on his food (Keon Dep. Tr. pp. 90-91).

*Third* is subsection (d). Ridgewell's represented to its purchasers – the Siegels, their daughter, and their son-in-law and to other consumers such as Dr. Berenbaum – that the foods it would be serving at the Siegel-Baron wedding were "of particular standard" and "quality" – *i.e.*, that the foods did not violate the Jewish dietary laws (*kashrut)*. In fact, the foods provided at the wedding were, in the terms of subsection (d), "of another" standard and quality – they were totally offensive to the principles of *kashrut*. Any person familiar to any degree with the Jewish dietary laws – as Ridgewell's purported to be because of its "Kosher Division" – knows that shrimp, eel, and octopus are not kosher "standard and quality."

*Fourth* is subsection (e). Through its agent Toby Nann, Ridgewell's misrepresented the ingredients of the sushi platter and represented to the Siegels and their guests that the only seafood in the sushi would be "Yellow Fin Tuna" and "salmon." Ridgewell's knew that this was a representation of a "material fact," and the misrepresentation of that fact had "a tendency to mislead" the Siegels into believing that Ridgewell's would provide a menu that would satisfy the religious convictions of the Baron family. That misrepresentation did, in fact, induce the Siegels to purchase Ridgewell's services for their daughter's wedding.

*Fifth*, is subsection (f). Ridgewell's failed to state several "material facts," and these failures misled the Siegels into purchasing their catering services. Ridgewell's failed to state that instead of stationing a sushi chef at the reception and making the sushi to order (as was promised

8

by the "Made To Order" caption in the contract) or even preparing the sushi in Ridgewell's own kitchen, Ridgewell's intended to contract out to a sushi vendor the preparation of the sushi platter. This concealed intention resulted in the preparation of a sushi platter that devastated the kosher-observant guests at the Siegel-Baron wedding and did serious damage to the relationship between the Siegel and Baron families and to the participants' memories of the wedding. Ridgewell's also failed to state that it would take no precautions against the use of non-kosher foods, including non-kosher meats, by Ridgewell's own chefs in their preparation of the *hors d'oeuvres*. In fact, the instructions given to Ridgewell's chefs, as explained by Mr. David Keener, Ridgewell's Corporate Chef, rendered it possible and maybe even likely that they would use non-kosher meat in preparing *hors d'oeuvres*. (Keener Dep. Tr. pp. 77-81, 90-94.)

The above are discrete violations of the D.C. Consumer Protection Procedures Act. There can be no doubt, on the basis of now-established undisputed facts, that Ridgewell's violated the Act in multiple ways. Summary judgment against Ridgewell's on the issue of liability under the Act is, therefore, required.

### III.

### THE D.C. ACT PROTECTS CONSUMERS AGAINST MERCHANTS WHO NEGLIGENTLY, ALBEIT "UNINTENTIONALLY," MISREPRESENT THE PRODUCT THEY SELL

Ridgewell's will doubtless claim that it cannot be held liable under the D.C. Consumer Protection Procedures Act ("CPPA") because the evidence does not establish indisputably that it made an *intentional* misrepresentation. It will argue that the only actionable misrepresentations under the CPPA are intentional misrepresentations.

In fact, the District of Columbia Court of Appeals has not read such a limitation into the statute. In March 2006, the court said in *Caulfield v. Stark*, 893 A.2d 970, 976 (D.C. 2006) (emphasis original), that "we did not address whether the CPPA also embraces claims of *unintentional* misrepresentation," and the court held that "unintentional misrepresentation under the CPPA is still an open question." 893 A.2d at 977.

At this stage of the proceeding, we cannot allege or prove that Ridgewell's misrepresentation was intentional. The evidence does establish, however, that it was plainly negligent, careless, and reckless. In this respect, the conduct of the defendant in this case was far more culpable than the record-keeping failure of the doctor who was a defendant in *Caulfield v. Stark*. The basis for the jury's and trial judge's determinations in that case was virtually absolute liability for any consequence of inadequate record-keeping. The District of Columbia Court of Appeals reversed a judgment for the plaintiff in *Caulfield* on the ground that "a reasonable juror could only find a 'good faith medical response' to the Caulfield's 'subjective complaints,' not a misrepresentation or omission having a tendency to mislead." 893 A.2d at 979. And the *Caulfield* court observed that the language of the CPPA does not appear to support any distinction between different kinds of misrepresentations. *See* 893 A.2d at 979, n. 11.

Ridgewell's misrepresentations conveyed to consumers an intention on Ridgewell's part to protect against use of non-kosher ingredients – an intention that Ridgewell's totally failed to implement. This is, therefore, not a case of innocent unintentional misrepresentations to which a plaintiff is seeking to impose absolute liability. On the present undisputed record, it is a case of gross negligence and carelessness for which a commercial merchant would be held liable under the provisions of the CPPA.

Nor is this a case like *Dorn v. McTigue*, 121 F. Supp. 2d 17 (D.D.C. 2000), 157 F. Supp. 2d 37 (D.D.C. 2001), in which Judge Urbina said that "the plaintiff's unintentional-misrepresentation claim falls outside the scope of the CPPA *as it applies to the physician-patient relationship.*" 121 F. Supp. 2d at 20 (emphasis added). *Dorn v. McTigue* concerned a medical malpractice claim, and Judge Urbina's conclusion was limited to that context – which has generated much dispute under the consumer-protection laws of other jurisdictions. *See, e.g., Darviris v. Petros*, 812 N.E.2d 1188, 1193 (Mass. 2004) ("As appellate courts in other jurisdictions have concluded, consumer protection statutes may be applied to the entrepreneurial and business aspects of providing medical services, for example, advertising and billing, even though those statutes do not reach medical malpractice claims.")

Unlike medical malpractice, the misleading sale of foods by caterers has no separate body of law. Liability for misrepresentations by caterers in the District of Columbia is governed by the CPPA. The language of the Act and its remedial purpose do not warrant any limitation of the reach of the law – particularly not in a case of gross negligence.

Finally, other jurisdictions have applied local consumer-protection laws to cases of negligent misrepresentation outside the medical-malpractice area. *See, e.g., South Atlantic Ltd. Partnership of Tennessee, LP v. Stroud*, 284 F.3d 518, 541 (4th Cir. 2002) ("As a rule, misrepresentations, even negligent misrepresentations, are sufficient for an act to qualify as an unfair or deceptive trade practice.") That Fourth Circuit decision concerned liability under North Carolina's equivalent of the District of Columbia's CPPA. By the same token, there is liability in this case for Ridgewell's negligent misrepresentations.

## IV.

### THE PLAINTIFFS' CLAIMS UNDER
### COMMON-LAW CONTRACT AND TORT
### THEORIES ARE COVERED BY THE CPPA

While the enumerated CPPA violations included in § 28-3904 are sufficient to compel

summary judgment in favor of the plaintiffs, the list is not exclusive. "Trade practices that

violate other laws, including the common law, also fall within the purview of the CPPA."

*District Cablevision, L.P. v. Bassin*, 828 A.2d 714, 723 (D.C. 2003); D.C. Code § 28-3905(b)(2).

This subsection makes all CPPA remedies available to consumers who establish their common-

law claims. Thus, in addition to the enumerated CPPA violations discussed above, each

violation of the common law constitutes an independent violation of the CPPA. Accordingly,

each of the plaintiffs' common-law claims entitles them to CPPA remedies including treble

damages, attorneys' fees, punitive damages, injunctive relief, and any other relief the Court

deems proper. § 28-3905(k).

When preparing the sushi, Ridgewell's failed to follow the explicit list of acceptable fish

included in its contract with the Siegels. (*See* First Amended Complaint, Exhibit 1, p. 2) When

Ridgewell's provided shrimp with the sushi in violation of the understanding with the Siegels

that only kosher fish (specifically tuna and salmon) would be served, Ridgewell's breached its

contract with the Siegels. This breach constitutes an independent violation of the CPPA.

Similarly, Ridgewell's committed a battery on Dr. Michael Berenbaum, a guest at the

wedding. In *Sowell v. Hyatt Corp.*, 623 A.2d 1221 (D.C. 1993), the plaintiffs sued Hyatt after

Mrs. Sowell discovered a worm in a plate of rice while dining at the restaurant. The plaintiffs'

claims were based not on a battery theory, but on negligence and breach of warranty. The Court

of Appeals found that despite the fact that the plaintiff could not state with certainty that she had

12

eaten a worm, her ingestion of food that was served with the worm sufficed to establish a
physical impact.  623 A.2d at 1223.  This reasoning similarly applies to the facts regarding Dr.
Berenbaum's battery claim and constitutes an independent violation of the CPPA.


V.

**SUMMARY JUDGMENT SHOULD BE
ENTERED FOR THE PLAINTIFFS
ON RIDGEWELL'S COUNTERCLAIMS**

The three counter-claims filed by Ridgewell's plainly lack merit and should be dismissed
at this juncture. The first counter-claim ("Count I") seeks recovery for the amount that would
have been due to Ridgewell's if it has engaged in no misrepresentation and had fulfilled its
contract. For reasons previously elaborated in this Memorandum, Ridgewell's failed to perform
and, in fact, inflicted great damage on the plaintiffs. This counterclaim must, therefore, be
dismissed.

The second counterclaim ("Count II") alleges that plaintiff Mark Siegel called
Ridgewell's a "bunch of morons" on the evening of the disastrous reception that Ridgewell's
provided and that this statement was allegedly defamatory. In fact, the statement was an
expression of opinion made directly to Ridgewell's and cannot be the basis of a defamation
claim.

Nor can the allegation made by Mr. Siegel that Ridgewell's employees were "trying to
steal his wine" be the basis for a defamation claim. The allegation was entirely true. As is
disclosed by the testimony given during the depositions of Mr. Siegel and Mr. Baron (C. Baron
Dep. Tr. pp. 121-124; M. Siegel Dep. Tr. pp. 178-181), cases of wine purchased by the Siegels

that were not consumed during the evening were found in a secreted hidden location. It was reasonable for Mr. Siegel to infer that Ridgewell's employees were trying to steal his wine.

Finally, the third counter-claim ("Count III") alleges only that Mr. Siegel "caused other consumers in this community to question Ridgewell's abilities to provide Kosher catering service." In light of Mr. Siegel's experience with Ridgewell's, there is substantial reason to question Ridgewell's "abilities" in this respect. Rather than being sued civilly for questioning these "abilities," Mr. Siegel deserves commendation if he has raised questions in this regard.

In any event, the allegation is too general and imprecise to give rise to any civil liability. It should be dismissed.

## CONCLUSION

For the foregoing reasons, summary judgment should be entered for the plaintiffs on the issue of liability and Ridgewell's counterclaims should be dismissed.

Dated: October 30, 2006

                                           /s/ Nathan Lewin
NATHAN LEWIN (DC BAR NO. 38299)
ALYZA D. LEWIN (DC BAR NO. 445506)
LEWIN & LEWIN, LLP
1828 L Street, N.W., Suite 901
Washington, D.C. 20036
(202) 828-1000

*Attorneys for the Plaintiffs-Counter-Defendants*