Case 1:05-cv-01717-RJL    VIDEOTAPED DEPOSITION OF JUDITH SIEGEL    Page 1 of 36
Document 54-7    CONDUCTED ON TUESDAY, MARCH 21, 2006    Filed 10/30/2006

1 (Pages 1 to 4)

**Page 1**

1     IN THE UNITED STATES DISTRICT COURT
2         FOR THE DISTRICT OF COLUMBIA
3
4     ------------------------------x
5     MARK A. SIEGEL, et al.,      *
6     Plaintiffs        *   Case No.
7     v.                *   1:05CV01717
8     RIDGEWELLS, INC.,            *
9     Defendant/Counter-Plaintiff *
10    ------------------------------x
11
12    Videotaped Deposition of JUDITH SIEGEL,
13        in her individual capacity
14
15        Washington, D.C.
16
17    Tuesday, March 21, 2006
18            9:41 a.m.
19    Job No.:  1-72961
20    Pages:  1 - 146
21    Reported by:  Vicky J. Stallsworth, RMR, CRR
22

**Page 2**

1       Deposition of JUDITH SIEGEL, in her individual
2   capacity, held at the Law Offices of:
3
4
5
6   WILEY, REIN & FIELDING
7   1776 K Street, N.W.
8   Washington, D.C. 20006
9   (202) 719-7000
10
11
12
13       Pursuant to Notice, before Vicky J. Stallsworth,
14   Registered Merit Reporter, Certified Realtime Reporter
15   and Notary Public of the District of Columbia.
16
17
18
19
20
21
22

**Page 3**

1           A P P E A R A N C E S
2
3   ON BEHALF OF THE PLAINTIFFS:
4       NATHAN LEWIN, ESQUIRE
5       ALYZA D. LEWIN, ESQUIRE
6       LEWIN & LEWIN, LLP
7       1828 L Street, N.W.
8       Washington, D.C. 20036
9       (202) 828-1000
10
11  ON BEHALF OF THE DEFENDANT/COUNTER-PLAINTIFF:
12      JEFF SCHWABER, ESQUIRE
13      Stein, Sperling, Bennett, De Jong,
14      Driscoll & Greenfeig, P.C.
15      25 West Middle Lane
16      Rockville, Maryland 20850
17      (301) 340-2020
18
19  ALSO PRESENT:
20      Scott Forman, Videographer
21
22

**Page 4**

1           C O N T E N T S
2
3   EXAMINATION OF JUDITH SIEGEL          PAGE
4       By Mr. Schwaber          6
5
6
7
8           E X H I B I T S
9         (Retained by Counsel.)
10  J. SIEGEL DEPOSITION EXHIBITS          PAGE
11  1   Defendant's Second Demanded Notice of
12      Intention to Take Oral Deposition
13      Duces Tecum of Judith S. Siegel      5
14  2   Documents produced by Judith Siegel      5
15
16
17
18
19
20
21
22

Case 1:05-cv-01717-RJL VIDEOTAPED DEPOSITION OF JUDITH SIEGEL Filed 07/30/2006 Page 2 of 36
CONDUCTED ON TUESDAY, MARCH 21, 2006

2 (Pages 5 to 8)

5

1       PROCEEDINGS
2       - - - - - -
3       (Judith Siegel Exhibit Nos. 1 and 2
4   were marked for identification.)
5       THE VIDEO OPERATOR: Here begins tape
6   number 1 in the deposition of Judith Siegel in the
7   matter of Mark A. Siegel, et al., versus
8   Ridgewells, Inc., pending in the US District Court
9   for the District of Columbia, case
10  number 1:05CV01717.
11      Today's date is March 21st, 2006. The
12  time is 9:41 a.m.
13      The video operator today is Scott
14  Forman of LAD Reporting. This video deposition is
15  taking place at the office of Wiley, Rein &
16  Fielding, 1776 K Street, Northwest, Washington
17  D.C.
18      Would the counsel please identify
19  themselves and state whom they represent.
20      MR. SCHWABER: Jeff Schwaber for
21  Ridgewells, Inc.
22      MR. LEWIN: Nathan Lewin and Alyza

6

1   Lewin of Lewin & Lewin, for the plaintiffs.
2       THE VIDEO OPERATOR: The court
3   reporter today is Vicky Stallsworth of LAD
4   Reporting. Would the reporter please swear in the
5   witness.
6   Whereupon,
7       JUDITH SIEGEL
8   was called as a witness, and, having first been
9   duly sworn, was examined and testified as follows:
10      THE VIDEO OPERATOR: Please begin.
11      EXAMINATION
12  BY MR. SCHWABER:
13      Q   Good morning, Ms. Siegel.
14      A   Good morning.
15      Q   I introduced myself off the record.
16  But on the record, I'm Jeff Schwaber and I'm with
17  the law firm of Stein Sperling in Rockville,
18  Maryland, and we represent Ridgewells in the
19  lawsuit that you and other plaintiffs have brought
20  in this case.
21      And I'm here today to take your
22  deposition. Have you ever had your deposition

7

1   taken before?
2       A   No.
3       Q   Okay. I imagine you've discussed the
4   process with your counsel. So at the risk of
5   repeating something you may have already heard,
6   I'll just give you a quick summary of the ground
7   rules as -- as I use them.
8       You've been sworn in here. And there
9   is a verbatim transcript being made of everything
10  that's being said by anyone in here today. Your
11  testimony is under oath. It is to be treated as
12  testimony. And particularly since you're a party
13  in the case, it can be used in this case as if it
14  were stated in the courtroom. So despite the
15  relative informality of the setting, it's as if
16  it's in a courtroom. And the testimony can be
17  used in that context.
18      There is a video transcription being
19  made as well. And that also will be usable at the
20  trial in this action.
21      I'm going to ask you a series of
22  questions to get at some information you may or

8

1   may not have relating to the facts and
2   circumstances surrounding this dispute. And if
3   you don't know the answer to a question I'm asking
4   you, tell me you don't know. If you don't
5   remember, tell me that. If you don't understand
6   what I'm asking you, tell me that.
7       If you answer my question, I'm going
8   to assume that you do understand what it was I was
9   asking you.
10      I will ask you to let me finish my
11  question, even if you know where I'm going, before
12  you begin your answer so the court reporter
13  doesn't have to figure out how to type both of us
14  speaking at the same time. And I'll try to do the
15  same with you when you answer.
16      Your counsel may object to questions I
17  ask you. If there is an objection lodged by your
18  counsel, let him or her, I'm not sure who is going
19  to be defending the deposition, complete their
20  objection. And let the lawyers finish any
21  discussion they have about it. And then you can
22  go ahead and answer the question. After that, the

Case 1:05-cv-01717-RJL VIDEOTAPED DEPOSITION OF JUDITH SIEGEL Page 3 of 36
Document 54-7 Filed 10/30/2006
CONDUCTED ON TUESDAY, MARCH 21, 2006

3 (Pages 9 to 12)

9

1 objections are for purposes of the lawyers to deal
2 with later, unless there's an instruction by your
3 counsel not to answer a particular question.
4     I don't anticipate that, given the
5 questions I'm going to ask you, but if it happens,
6 then you should follow your lawyer's instruction
7 and we will deal with that as we need to.
8     Don't answer with finger pointing or
9 head gesturing that would require the court
10 reporter to interpret what you're trying to say.
11 I need you to answer with words. And I don't
12 anticipate we will be very long here today.
13     And I'll certainly take a break after
14 a period of time. But if you need a break before
15 I've taken one, just let me know. I'll be happy
16 to accommodate that. The only time it's generally
17 inappropriate to take a break is while a question
18 is pending.
19     But if there is something you feel you
20 need to ask your lawyer to know about how to
21 answer, just let me know that and we'll deal with
22 it when it comes up.

10

1     Do you have any questions before we
2 get into substance?
3     A   Huh-uh. No, I don't.
4     Q   Okay. Let me start by showing you
5 what I've had marked as Judith Siegel Exhibit 1.
6 And that is the defendant's second demanded notice
7 of intention to take oral deposition duces tecum
8 of Judith S. Siegel, the notice of your deposition
9 for today in this case.
10     Have you seen this document before?
11     A   Yes, I have.
12     Q   Okay. And did you review the list of
13 information that the notice covered and documents
14 that it asked you to produce?
15     A   Yes, I did.
16     Q   Okay. And my understanding is that,
17 while you've produced certain documents, most of
18 the responsive documents have already been
19 produced through your husband. Is that your
20 understanding as well?
21     A   I'm sorry. All of the documents that
22 I know of have been produced either by my husband

11

1 or myself.
2     Q   Okay.
3     A   You said most. I'm reacting to most.
4 Everything that I know of has been produced.
5     Q   Okay. My question was, prior to what
6 you're producing today -- strike that. Let me ask
7 it a different way.
8     What you're producing today are the
9 only responsive documents that you're aware of
10 that have not already been produced?
11     MRS. LEWIN: This is the credit card.
12     THE WITNESS: Yes, yes.
13 BY MR. SCHWABER:
14     Q   Let me show you what I've had marked
15 as Judith Siegel Exhibit 2. Just take a quick
16 look through those pages to confirm they're what
17 you think they are. I'm going to ask you about
18 them in a minute.
19     But is Judith Siegel Exhibit 2 the
20 only documents you have to produce today?
21     A   Yes.
22     Q   And is it your understanding that

12

1 those are the only documents responsive to any of
2 the requests in Judith Siegel Exhibit 1 that have
3 not already been produced in this action?
4     A   Yes.
5     Q   Okay. And the responsive documents
6 that have previously been produced were produced
7 by your husband or your daughter and son-in-law or
8 some combination?
9     A   And myself.
10     Q   Okay. You mean you participated in
11 the gathering of documents?
12     MRS. LEWIN: I think --
13     THE WITNESS: I'm sorry. I'm
14 confused.
15 BY MR. SCHWABER:
16     Q   The confusion is simply that the first
17 formal request for you to produce anything is now.
18 So when you say you produced them previously, you
19 mean you handed them over to counsel.
20     A   Exactly.
21     Q   Okay. Is there anything on the list
22 that's Exhibit 1, and if you need to take a moment

13

1  to review it, that's fine, that you believe exists
2  but you were unable to locate?
3      A    No. Everything that I -- everything
4  on the list that I had was -- has been produced.
5      Q    Okay. And is there anything on the
6  list that you believe existed at one point but was
7  destroyed?
8      A    No. I saved all the E-mails, and I
9  gave copies of those to my attorneys.
10     Q    Okay. So there's nothing in your
11 search that you said, I can't find --
12     A    No.
13     Q    -- such and such?
14         There is a gentleman by the name of
15 Stan Smith who submitted an expert report in this
16 case?
17     A    Yes.
18     Q    In his report, he mentioned an
19 interview with you. Do you recall being
20 interviewed by Mr. Smith?
21     A    No. I was interviewed by his
22 assistant.

14

1      Q    Okay. Who is that?
2      A    I'm sorry. I don't remember her name.
3  It was a young woman.
4      Q    And was it in person or by phone?
5      A    By phone.
6      Q    How long ago was that?
7      A    I don't recall. It's on the date. I
8  have it in the file at home. But it's, I think,
9  recorded whatever date they've recorded.
10     Q    Okay. And about how long was that
11 conversation?
12     A    Maybe 20 minutes.
13     Q    Okay. Have you ever met Mr. Smith?
14     A    No.
15     Q    Have you ever met his assistant?
16     A    Not in person.
17     Q    Okay. And it was just the one phone
18 call?
19     A    Two phone calls. She called first and
20 then we made an appointment to speak later that
21 morning.
22     Q    Was the first call just logistical?

15

1      A    She called and introduced herself. I
2  was busy at my job. I also wanted to check with
3  one of the Lewins about the phone call. So I
4  said, can we agree to talk in an hour or something
5  like that? And then we spoke later the same
6  morning.
7      Q    Okay. So the substance of what you
8  told her, in terms of the wedding and related
9  issues, all came in the second call?
10     A    Correct.
11     Q    Did you keep any notes of that
12 conversation?
13     A    I don't think so. No.
14     Q    And did you ever see, other than the
15 final report that was produced to us, did you ever
16 see any notes or recording of that conversation?
17     A    No.
18     Q    Was it -- is it your understanding
19 that the conversation was recorded?
20     A    I don't know. I don't -- I don't
21 recall.
22     Q    Nobody told you it was being recorded?

16

1      A    I don't recall.
2      Q    Okay. You're currently employed?
3      A    I am.
4      Q    And what's your job?
5      A    I work at the State Department.
6      Q    What's your job there?
7      A    My title is Deputy Coordinator, Bureau
8  of International Information Programs.
9      Q    Can you give me a brief description of
10 what your job is?
11     A    The bureau that I work in handles
12 public diplomacy. That's the activities -- some
13 of the activities of the State Department abroad
14 to talk about American policy, to present American
15 policy and information about American society.
16 And I supervise a program of sending American
17 speakers abroad, doing electronic speaker
18 programs, that would be digital video.
19         I supervise an international Web site
20 for foreign audiences. I oversee print
21 publications and electronic publications and
22 reference services.

Case 1:05-cv-01717-RJL    Document 34-7    Filed 10/30/2006    Page 5 of 36
VIDEOTAPED DEPOSITION OF JUDITH SIEGEL
CONDUCTED ON TUESDAY, MARCH 21, 2006

5 (Pages 17 to 20)

---

**17**

1  Q  Okay. How many people work under you?
2  A  I think, at last count, 103.
3  Q  And how many of those are direct
4  reports to you?
5  A  Ten.
6  Q  How many children do you have?
7  A  Three living children.
8  Q  And remind me, if you would, where
9  Rebecca is in the order.
10  A  She's our middle surviving child.
11  Q  And how old are her siblings?
12  A  Her brother Bob is 35. And her sister
13  Sarah is 25.
14  Q  Are either of them married?
15  A  Bob is married, Robert.
16  Q  And where does he live?
17  A  New Canaan, Connecticut.
18  Q  How long has he been married?
19  A  Since January 2001.
20  Q  Where was that wedding?
21  A  In New York City at the New York
22  Athletic Club.

---

**18**

1  Q  What role did you and your husband
2  play in that wedding?
3  A  Not much of a role at all. Bob and
4  his wife Rona handled the wedding, I would say,
5  almost entirely. I had no role that I recall in
6  planning it.
7  Q  Okay. And from a financial
8  standpoint, did -- did his wife's parents sponsor
9  the wedding?
10  A  No. They — Bob and Rona sponsored
11  the wedding. We gave them a — some money toward
12  the wedding. But primarily they sponsored it.
13  Q  And when you gave them money, you
14  didn't deal with vendors?
15  A  No. Not at all.
16  Q  Okay. Was there any component of the
17  wedding or the festivities surrounding it where
18  you were involved in actual — an actual hosting
19  role?
20  A  I believe we hosted the rehearsal
21  dinner, which would have been — the wedding was a
22  Saturday night. The rehearsal dinner was a Friday

---

**19**

1  night. And I believe -- and we sponsored that.
2  Q  And where was that?
3  A  At a restaurant in New York. I don't
4  recall the name. They actually arranged for the
5  dinner. They made all the arrangements. We just
6  paid for it.
7  Q  So you literally would have just cut a
8  check to the restaurant? That was your role?
9  A  Either to the restaurant or possibly
10  to their wedding planner. But, yes, we cut a
11  check. That's it. They did everything else. My
12  husband arranged for the flowers. He came up —
13  my husband, I believe did the flower arrangements.
14  That day he bought some flowers and put them on
15  the tables. But that was the first time that we
16  saw the venue.
17  Q  Okay. And I'm sorry, what is Bob's
18  wife's name?
19  A  Rona, R-O-N-A.
20  Q  Her maiden name?
21  A  Moore, M-O-O-R-E.
22  Q  And where is she from?

---

**20**

1  A  She grew up in different parts of the
2  country. Her father has passed away. Her mother
3  is living and lives in Texas. But Rona grew —
4  Rona's father had jobs all around the country.
5  Q  Is Rona Jewish?
6  A  Yes.
7  Q  Did she grow up Jewish?
8  A  No.
9  Q  Okay. Did she convert around the time
10  of the marriage?
11  A  Yes.
12  Q  Was it a Jewish wedding ceremony?
13  A  Yes.
14  Q  The rehearsal dinner, was the food
15  kosher?
16  A  No.
17  Q  Were there -- you said it was on a
18  Friday night. Were there any religious components
19  to that evening?
20  A  We blessed the challah.
21  Q  At the restaurant?
22  A  Yes.

---

21

1  Q  And was there a candle lighting?
2  A  I don't recall.
3  Q  Okay. Anything else you can recall
4  that had any religious components to that meal,
5  other than blessing challah?
6  A  No.
7  Q  Do you remember what the menu was?
8  A  No.
9  Q  And Sarah is not married?
10  A  Right.
11  Q  And where does Sarah live?
12  A  Boston.
13  Q  Describe, if you would, kind of in a
14  big picture sense, what your role was in Rebecca's
15  wedding?
16  A  My personal role?
17  Q  Yeah. And when I say in her wedding,
18  I mean the events surrounding her wedding,
19  generally.
20  A  It's a very broad question. My
21  husband and I are very close. We — Rebecca was
22  dating Craig. And we -- it seemed like the

22

1  relationship was going in the direction of
2  marriage. There was sort of joking about that and
3  hinting about that.
4  My husband began, before their
5  engagement, in consultation with Rebecca, just
6  talking about possible venues. We knew that, if
7  Rebecca — we knew that when Rebecca got married,
8  she wanted to be married in Washington, D.C., even
9  though she lived in New York, because that was her
10  home, where she had been raised.
11  I was sort of a third party to those
12  conversations. You know, as Mark did the research
13  about venues, he would talk about them to me.
14  They — Craig told us, I believe, on
15  Memorial Day weekend 2004, we were at the beach
16  together. We have a vacation house. And Rebecca
17  was out shopping. And Craig approached me and
18  Mark, in effect, to ask for Rebecca's hand. And
19  he told us that the — I don't know whether he had
20  a ring yet. But that he would present the ring to
21  her as a surprise in a few weeks. And that was to
22  be — at the time, Rebecca's sister Sarah was

23

1  living in Atlanta but moving to Boston, to
2  Cambridge.
3  And he wanted to time the engagement
4  to Sarah's trip north so that the whole family
5  could be there after the surprise. So I guess I
6  knew at the end of May that this was coming.
7  They got engaged mid June, a few weeks
8  later. At that point, plans really began to gear
9  up. Rebecca wanted a spring Washington wedding.
10  So that would have been, you know, however many
11  months hence, four — about 9 months hence, which
12  is not such a long time to plan a big event.
13  Shortly after the engagement, the
14  kids, Craig and Rebecca, came down to look at some
15  of the venues that Mark had researched. I went
16  along with them to look at those places.
17  When they got to the Corcoran, they —
18  I think Craig said, this is it. This is the place
19  where we want to have our wedding. I hadn't been
20  there — I had there, obviously, as an art museum
21  and some other events. But I hadn't been there to
22  research it for the wedding. I believe that Mark

24

1  had visited it. So that was that.
2  We then needed to make — we, meaning
3  the entire family, needed to make a bunch of other
4  arrangements.
5  Rebecca, as the bride, was pretty much
6  in the lead with all the pieces of it. The
7  pieces, obviously, were flowers and music and that
8  sort of thing. One of the pieces was a caterer,
9  because the Corcoran, you know, you need to bring
10  in a caterer. And Mark had done some research
11  about that. And we knew that we needed to have a
12  kosher wedding because Craig and his family were
13  kosher. Rebecca had become kosher at that point.
14  Q  Were they living together at that
15  point?
16  A  Yes, they were. She was in the
17  process of becoming kosher. Craig's family was
18  kosher. And Rebecca had committed to having a
19  kosher household when they were married.
20  So I knew that we needed a kosher
21  caterer. And we — we pursued that. We pursued
22  getting a caterer. And Rebecca and Mark and Craig

25

1  pursued some of the other pieces of it.
2      Q   Okay. I appreciate that. That was
3  helpful. Let me back you up to a couple of things
4  you said. The search for venues, you said Mark
5  took the lead. Is that -- was there some
6  particular reason or is that just something that
7  naturally she gravitates towards?
8      A   Well, no. Someone needed to take the
9  lead. And it had to be someone in Washington.
10  Rebecca and Craig didn't live in Washington.
11     Q   I mean as between you and your
12  husband?
13     A   Oh, no. There was no particular
14  reason. We're both very busy people. He tends to
15  do, for his work, he tends to be involved in more
16  events than I would be. If I'm involved in an
17  event, it would be in the Franklin room at the
18  State Department. So we didn't own spaces or
19  anything. It was just something that was easy for
20  him to do. He had time and he did it, you know.
21     Q   Okay. Among the venues that you
22  collectively were looking at before you described

26

1  the decision at the Corcoran, which sounds like,
2  as soon as they walked in, they liked the
3  Corcoran?
4      A   They thought -- yes.
5      Q   Were there synagogues in the mix?
6      A   I would say probably that Adas Israel
7  was in the mix because we were members of Adas
8  Israel, and --
9          MR. LEWIN: Do you know to how to
10  spell that? A-D-A-S, I-S-R-A-E-L.
11         THE WITNESS: Rebecca was familiar
12  with Adas Israel. She had gone through religious
13  school there. Her -- the luncheon for her bat
14  mitzvah was there. She attends high holy day
15  services with us every year there. She considers
16  it her family synagogue. So we always knew that
17  that was a possibility, I guess.
18  BY MR. SCHWABER:
19     Q   Okay.
20     A   We didn't visit it. We didn't need
21  to.
22     Q   That one, you knew the setup there?

27

1      A   We knew the set up, yeah.
2      Q   Is it fair to say that if you had
3  chosen a synagogue venue, the only one in
4  consideration was Adas?
5      A   Absolutely.
6      Q   Do you remember any of the other
7  venues?
8      A   Yes. We visited the Museum for Women
9  in the Arts, I think it's called, on New York
10  Avenue. Then there was another venue, that I
11  can't remember the name, it's sort of a -- the
12  grand lobby of an office building that's actually
13  kind of near this office. It was not open when we
14  came but we were able to see it because it had
15  glass walls. Then we went to the Corcoran on the
16  same day.
17     Q   Did you narrow your choices, other
18  than Adas to venues for which you could bring in
19  your own caterer, or was that not a factor?
20     A   No. As I recall, the factor was the
21  number of people that could be accommodated
22  because we knew that it would be a relatively

28

1  large number of people. And so that was the
2  consideration. Finding the space that they liked.
3      Q   Okay. So is it fair to say you never
4  looked -- you never narrowed your choices to
5  venues that could accommodate a kosher caterer?
6          MR. LEWIN: Objection.
7          THE WITNESS: Well, we had to -- I'm
8  sorry.
9          MR. LEWIN: Go ahead. I just said
10  objection to the form of that question.
11         THE WITNESS: We had to have a kosher
12  caterer. We -- the wedding, as I said, we knew
13  that the -- we needed to have a kosher wedding.
14  That the -- so....
15  BY MR. SCHWABER:
16     Q   When you -- when you say you needed to
17  have a kosher wedding, what -- I guess what I'm
18  getting at, my question was inartful, is, for
19  example, you could go to the Hilton or a place
20  like that and order, through their catering, dairy
21  products or products that don't -- you know, that
22  don't include unkosher meat or don't include

29

1  shellfish. I use that by way of example.
2      Were you willing to consider venues
3  that had nonkosher caterers, knowing that you
4  would need to menu accommodations? Or were you
5  requiring a kosher caterer?
6      A   We were putting together a wedding
7  that would be kosher. And we wanted the wedding
8  in a beautiful Washington space. As I recall,
9  there was not much interest in a hotel. We wanted
10 an architecturally beautiful memorable Washington
11 space. Obviously, as I said, it was given that we
12 were having a kosher wedding. If there was some
13 space that -- we were having a kosher wedding.
14 There was no problem. The Corcoran, when Mark
15 approached the Corcoran, they gave him a list of
16 kosher caterers that they -- that had used their
17 space.
18     Q   Okay.
19     A   So they had had kosher weddings there.
20 From the -- I knew that early on when Mark told me
21 about the Corcoran. It was not an issue.
22     Q   Was it an issue in the selection of

30

1  vendors that they would have to be willing to
2  accommodate a kosher wedding?
3      A   Food vendors?
4      Q   No. Venues?
5      A   Venues, yes. But the --
6      Q   In the interviewing, so to speak --
7      A   Yes. But the list that we were
8  considering, that all was -- we knew that from the
9  first contact, that they could accommodate a
10 kosher wedding.
11     Q   How did you know that?
12     A   Well, with Ridgewells -- with, rather,
13 the Corcoran, Mark told me. As I said, he would
14 do this research and we would chat about it at
15 night, I can't remember the day. And he told me
16 that -- I remember he told me that the Corcoran --
17 I think the verb he used was "uses" or "allows"
18 maybe he said allows -- three kosher caterers.
19 And he told me that before the engagement. I knew
20 that.
21     Q   Okay. Now getting back to what you
22 had told me in your answer about your role,

31

1  generally.
2      A   Uh-huh.
3      Q   You told me, we knew we needed to have
4  a kosher wedding.
5      A   Uh-huh.
6      Q   How did you come to know that?
7      A   Well, as I said, Craig's family is
8  kosher. And a wedding is -- a marriage is -- we
9  are a very Jewish family and family is very
10 important to us. And a marriage, ideally, is the
11 combination of two families forming a larger
12 family. So there was never any question in our
13 minds that -- it's a question of respect, that the
14 wedding would be a kosher wedding because Craig
15 came from a kosher family.
16     Q   Okay. What I'm getting at is -- is
17 the specifics of the decision to make it kosher.
18 Did Craig or Rebecca tell you they needed that?
19 Or is it something you and Mark came to on your
20 own?
21     A   Well both.
22     Q   Was it spoken or unspoken?

32

1      A   Both. I mean it was unspoken and it
2  became spoken. When Rebecca -- when it was clear
3  that the relationship was serious and would likely
4  lead to marriage, I can recall sitting in our
5  kitchen with Rebecca, she was in Washington for
6  some reason, and talking about the kind of wedding
7  she wanted to have. And one of us said, of course
8  it will be kosher. And we all said, of course.
9      Q   Okay. So prior to this -- the
10 engagement scenario you described --
11     A   The formal engagement, yes.
12     Q   The formal engagement or even the
13 asking for your hand discussion --
14     A   Right.
15     Q   -- at the beach, is when you would
16 have had that discussion?
17     A   Yes.
18     Q   So you knew and your husband knew and
19 Rebecca and Craig knew from prior to the
20 engagement that it was kind of a given that it
21 would be a kosher wedding?
22     A   Absolutely.

33

1    Q    All right. And other than the phrase
2  or the concept of a kosher wedding, were there any
3  more specifics discussed about what that meant?
4    A    I'm recalling at that conversation we
5  talked about -- we talked a bit about did that --
6  did that mean that we would have a fish dinner,
7  meaning salmon dinner. Or did we want a
8  combination, you know, meat and salmon. We talked
9  a bit about menu, you know, what you could serve,
10  you know, at a kosher wedding.
11    But, you know, the rules were given.
12  We understood. Mark and I were both raised in
13  strictly kosher homes. There was a long period --
14  some period in my life when I kept a kosher home.
15  And I understood what -- what kosher meant and
16  what a kosher wedding meant.
17    Q    Now, as I understand it, and I -- my
18  recollection of your husband's testimony when I
19  took his deposition was that, when you, in a time
20  earlier in your life, where you kept a kosher
21  home --
22    A    Yes.

34

1    Q    -- you and your husband,
2  collectively, with your family?
3    A    Uh-huh.
4    Q    You had two sets of dishes?
5    A    Correct --
6    Q    Actually --
7    A    Well, I --
8    Q    -- he described four sets of dishes.
9    A    Exactly.
10    Q    Two for Passover --
11    A    Really five sets because we had -- we
12  had fancy dishes for non-Passover. But, yes we
13  had multiple sets of dishes.
14    Q    So you had separate dishes for meat
15  and for dairy products?
16    A    Right.
17    Q    And that was something -- is that
18  something you considered that you needed to do in
19  order to have a kosher wedding, at any point?
20    MR. LEWIN: Objection. I'm objecting
21  to the form of the question. You can answer it if
22  you understand it.

35

1    THE WITNESS: To have separate meat
2  and dinner dishes at the wedding?
3  BY MR. SCHWABER:
4    Q    Yeah. Did that -- did that ever
5  get -- did you ever think about that?
6    A    No. We -- we understood what we
7  needed to have to have a kosher wedding. We --
8  the -- the -- we needed kosher food at the
9  wedding.
10    Q    Okay. Separate and apart from the
11  food, my question was, did you ever consider, as
12  you had when you kept kosher in your home --
13    A    Uh-huh.
14    Q    -- that keeping kosher for some people
15  would necessitate -- or may necessitate using only
16  kosher dishes?
17    A    That wasn't the case for the kosher
18  guests at our wedding. They had -- the kosher --
19  the guests at our wedding who were kosher, who we
20  knew kept kosher at home, as Mark and I did, but
21  ate in restaurants and simply ate kosher food in
22  those restaurants.

36

1    For example, ordering salmon or
2  something like that for dinner, but not meat. And
3  that was the -- the kashruth of our guests at the
4  wedding, so that wasn't necessary for us to
5  consider.
6    MR. LEWIN: Kashruth is spelled
7  K-A-S-H-R-U-T-H.
8  BY MR. SCHWABER:
9    Q    So is your answer that you didn't
10  consider it?
11    A    No, we didn't.
12    Q    Okay.
13    A    We didn't need to.
14    Q    And did you know all of the specific
15  religious requirements of Craig's family and their
16  guests?
17    A    We had been with Craig's parents,
18  sister, brother-in-law, grandfather in a number of
19  restaurant settings. So we knew their practices.
20  All of the guests, no, we did not know all of the
21  guests. I knew the kosher practices of some of my
22  friends and of Craig's family. And that is the

**37**

1 kosher that we had contracted for.
2    Q    Okay. You understand from your
3 upbringing and your background that certain
4 people, regardless of who came to the wedding that
5 you hosted, certain people observe a level of
6 kashruth that would allow them only to eat off of
7 kosher dishes, correct?
8    A    Certain people, yes.
9    Q    Okay. Or to have food cooked in
10 kosher pots and pans?
11    A    Yes.
12    Q    And in a kosher oven?
13    A    Right.
14    Q    And as I understand your testimony,
15 you made a conscious decision that that level of
16 kashruth was not required for the event you were
17 hosting; is that correct?
18    A    No. We made a conscious decision to
19 seek and contract for the level — to seek and
20 contract for a kosher wedding in the terms that
21 Craig's family practiced kashruth and that I had
22 practiced kashruth and that my parents and

**38**

1 grandparents had practiced kashruth. And it was a
2 very serious, conscious, deliberate way of life
3 that I was raised in, with rigorous rules, that we
4 contracted for in this wedding.
5    Q    And please understand my question is
6 not intended to denigrate that in any respect.
7    A    All right.
8    Q    But simply to understand the
9 distinction in your thought process. You --
10 strike that. With the knowledge that you have
11 from your background, your religious education,
12 and your prior kosher home, about a level of
13 keeping kosher that would require separate dishes.
14    A    Uh-huh.
15    Q    You and your husband consciously
16 decided that you didn't need that for the event
17 that you were hosting here, given the level of
18 observance of the guests coming. Is that a fair
19 statement?
20    A    We contracted for what we needed, is a
21 fair statement.
22    Q    Okay. And does the contract set forth

**39**

1 .what you needed?
2    A    It does.
3    Q    Okay. Now in choosing --
4    A    The complete contract does. All the
5 documents together do, yes, set forth what we
6 needed.
7    Q    Okay. Choosing a caterer to
8 accommodate what you needed from a kosher
9 standpoint --
10    A    Uh-huh.
11    Q    -- as I understand your testimony
12 about the level you needed, is it fair to say that
13 it didn't have to be a kosher caterer, as long as
14 they could accommodate your needs of not serving
15 unkosher products?
16       MR. LEWIN: Objection. Go ahead.
17 Answer the question.
18       THE WITNESS: I don't understand the
19 question.
20 BY MR. SCHWABER:
21    Q    I recognize you -- you made a decision
22 to serve meat at the wedding.

**40**

1    A    Kosher meat.
2    Q    Right. I know that from looking at
3 the menu. But let me ask you to assume with me
4 that you had decided to just serve salmon. Okay.
5 Could you have chosen an unkosher caterer at that
6 point, given the level of kashruth that you
7 needed?
8       MR. LEWIN: Objection.
9 BY MR. SCHWABER:
10    Q    If you and your daughter and your
11 husband and your son-in-law had chosen salmon for
12 the main course?
13       MR. LEWIN: Objection. Go ahead and
14 answer it.
15       THE WITNESS: And there would be no
16 other meat or fish but salmon?
17 BY MR. SCHWABER:
18    Q    Well, no -- no meat. I mean, let's
19 say there was — yeah. No shellfish and no meat.
20 There would be salmon and dairy products served.
21    A    Well, that would be a dairy wedding.
22 But I suppose that would have been all right.

41

1    Q    To use a nonkosher caterer?
2    A    I don't know what a nonkosher caterer
3  is.
4    Q    You've been to many events through
5  your job and other, right?
6    A    When we contracted for this, we had a
7  number of documents about Ridgewells being a
8  kosher caterer. I had one from my synagogue. And
9  I had -- Mark was told by the Corcoran that there
10  were three kosher caterers who had worked at the
11  Corcoran. So we were contracting with a kosher
12  caterer. We would not have considered contracting
13  with anyone that had not been -- flagged itself,
14  so to speak, presented itself as a kosher caterer.
15         When I went to Ridgewells the first
16  time, Mark had been dealing with them to begin
17  with, I was presented as dealing with their kosher
18  division.
19         When I called Ridgewells to speak to
20  Toby Nann, I misplaced her direct number, I got
21  the number on the web. And I called Ridgewells
22  and I said, "kosher division, please". And they

42

1  connected me to Toby Nann. So I was — from my
2  point of view, I was dealing with a kosher
3  caterer.
4    Q    All right. You may not have
5  understood my question. I wasn't asking about
6  Ridgewells. What I was asking is, again,
7  operating under the assumption that you chose a
8  dairy wedding with --
9    A    I would be fine with a kosher caterer.
10    Q    You would have?
11    A    Yes.
12    Q    Why is that?
13    A    I — we wanted a kosher wedding. We
14  wanted to contract for a kosher caterer. We were
15  dealing with a kosher family. We were respecting
16  kosher rules.
17         One of my closest friends is a rabbi
18  and is kosher and he was going to be there. And
19  that was what we wanted. I didn't want to — I
20  didn't want to have to deal with — I wouldn't
21  have wanted to have to deal with making special
22  arrangements for special — certain people. So I

43

1  wanted to deal with a kosher caterer.
2    Q    But what kind of arrangements would
3  you have had to make with a dairy wedding with
4  salmon being served?
5    A    I've been at events where two
6  different kinds of meals are served for the kosher
7  guests and nonkosher guests. That was not an
8  option.
9    Q    I'm saying -- you mean you might have
10  had guests even at the dairy meal with salmon
11  being served that wouldn't have been comfortable
12  eating --
13    A    I don't know. I'm getting confused by
14  this line of questioning. I'm sorry.
15    Q    I'll try to break it down. Forget the
16  menu you actually used, okay?
17    A    Uh-huh.
18    Q    And my question is: Assume a dairy
19  wedding --
20    A    Uh-huh.
21    Q    -- with salmon being served.
22    A    Right.

44

1    Q    Your testimony is you still would have
2  required a kosher caterer?
3    A    I suppose the dairy wedding with
4  salmon would have been okay, but we weren't
5  considering that kind of wedding at all.
6    Q    It would have been okay to use a
7  nonkosher caterer?
8    A    I supposed, but we didn't consider a
9  wedding with that kind of menu. We knew we wanted
10  to have meat, et cetera.
11    Q    Now who first contacted Ridgewells, as
12  between you and your husband?
13    A    My husband did.
14    Q    And he spoke to someone at Ridgewells
15  without you, the first conversation?
16    A    Correct.
17    Q    And was that by telephone, as you
18  understand it?
19    A    I believe so.
20    Q    And did he have more than one
21  conversation before you first contacted
22  Ridgewells?

45

1    A    Well, he contacted Ridgewells two
2 different times. He contacted Ridgewells sometime
3 around the engagement, probably right after the
4 engagement. He contacted some other caterers,
5 too. And as I think has been raised in other
6 depositions, or you may know, we -- we opted -- we
7 pursued discussions with a caterer named Sue
8 Fischer for a while. And for baffling kinds of
9 reasons, the contract never materialized. And
10 time was going by. And I, in particular, felt
11 pressured by not having a caterer. And I said
12 that we needed to have a signed contract.
13    So Mark had contacted -- as I said, he
14 had contacted Ridgewells earlier, I guess a few
15 months earlier. So as I recall, he called them
16 back at some point to, you know, pursue a
17 contract.
18    Q    Do you recall if you got a proposal
19 from Ridgewells in the first round before you
20 decided on Sue Fischer?
21    A    I didn't see one. I don't know
22 whether Mark did.

46

1    Q    Do you recall -- you recall Ridgewells
2 was one of the candidates before you decided on
3 Sue Fischer?
4    A    Ridgewells was one of, as I recall,
5 three caterers that the Corcoran, three kosher
6 caterers that the Corcoran said could work there.
7    Q    Do you remember the third?
8    A    The third, I don't remember their
9 name. As I recall, they were in New Jersey. And
10 they trucked the food down. And we didn't want it
11 to take a long trip. You know, we wanted it to be
12 prepared locally. So we didn't consider them.
13    Q    Was it Foremost?
14    A    I really don't remember.
15    Q    The -- so you eliminated the New
16 Jersey one, just based on geography.
17    A    I think the New Jersey one came up in
18 the second round. But, yes, we never considered
19 it.
20    Q    In the first round, do you recall if
21 it was just the two that you took seriously?
22    A    Yes.

47

1    Q    Ridgewells and --
2    A    Yes.
3    Q    It was?
4    A    I don't think we took Ridgewells that
5 seriously. We -- we -- we had heard good things
6 about Sue Fischer and we wanted to -- we wanted to
7 work with Sue Fischer.
8    Q    Was there something about Ridgewells
9 that you didn't like?
10    A    Me, personally?
11    Q    Or Mark, as he described it.
12    A    Well, me personally, of the two, you
13 know, we go to a fair number of events in
14 Washington, et cetera. I had been to a number of
15 Sue Fischer events. We -- we go to Ridgewells
16 events. And, frankly, Sue Fischer had kind of a
17 more contemporary, varied kosher menu.
18 Ridgewells, in my mind, is more of a, you know,
19 traditional kind of place. And we were looking
20 for, you know, for something a little edgier, I
21 suppose, in a -- in a kosher menu.
22    Q    So you had been to Ridgewells events

48

1 before?
2    A    Yeah.
3    Q    Including nonkosher events?
4    A    I think -- yeah. Uh-huh.
5    Q    Okay. Did you express to your husband
6 your preference for Sue Fischer at the get-go?
7    A    Yes.
8    Q    But he called both?
9    A    Well, it depends when you define at
10 the get-go. I think everything happened in a
11 pretty compressed amount of time after the
12 engagement. And we're probably talking about a
13 day, you know. He called -- I think he placed
14 calls to both. And I told him consistently that I
15 wanted to work with Sue Fischer in any event.
16    Q    Okay.
17    A    That I, you know, I just knew it was
18 what I wanted.
19    Q    Did --
20    A    It was up -- it was going to be up to
21 the kids, in any event. It wasn't our decision.
22 They were -- they were going to ultimately choose.

13 (Pages 49 to 52)



49

1    Q    Ultimately, there was a consensus
2  reached to go with Sue Fischer?
3    A    Uh-huh.
4    Q    Is that a yes?
5    A    That's a yes. I'm sorry.
6    Q    Okay. And Ridgewells' price, do you
7  recall it had been substantially higher?
8    A    I don't recall.
9    Q    Okay. Do you recall Ridgewells
10  providing you with a quote for a kosher wedding
11  through their kosher kitchen with a mashgiach?
12    A    Mark had that conversation. That --
13  that was not a consideration for me. I -- it
14  would not have been a consideration. I wanted to
15  go with Sue Fischer because of the kind of food
16  she produced.
17    Q    Regardless of the reasons, my question
18  went more to: Do you recall that issue coming up?
19  Did Mark tell you?
20    A    Mark -- Mark -- when Mark had the
21  preliminary conversations, I believe he got very
22  approximate prices. Those prices wouldn't have

50

1  meant much to me because, you know, I'm pretty
2  familiar with events. And I knew that ultimately
3  it was going to come down to what we chose, in
4  terms of the individual things on the menu.
5      And the catering was one piece of what
6  was going to be a pretty expensive event. So it
7  was not a primary consideration for me. He
8  mentioned it, but that's not why we went to Sue
9  Fischer.
10    Q    Okay. What do you recall about what
11  he mentioned?
12    A    He mentioned that Ridgewells' press --
13  price was X dollars per head. And Sue Fischer's
14  was Y dollars. I can't remember how much. Sue
15  Fischer's, as I recall, was less, but that's not
16  why we went to Sue Fischer. That's not why I
17  wanted to go to Sue Fischer at all.
18    Q    Okay. Do you recall him telling you
19  that Ridgewells price included their kosher
20  kitchen and a mashgiach?
21    A    No.
22    Q    It may have happened. You just don't

51

1  recall one way or the other?
2    A    He didn't -- I don't recall.
3    Q    Okay.
4    A    I don't think he told me that. We
5  were just assuming that we were talking -- we were
6  looking at two kosher options.
7    Q    Okay. So you assumed that it was with
8  the mashgiach in the kosher division?
9    A    I didn't think about it.
10    MR. LEWIN: Objection.
11    MR. SCHWABER: Okay.
12    THE WITNESS: I'm sorry.
13    MR. LEWIN: I'm saying objection to
14  his question of what you assumed. That's all.
15    THE WITNESS: I -- I didn't assume
16  anything. I knew, as I've said before, we knew
17  what we needed vis-a-vis kosher, and each one of
18  them would provide it.
19  BY MR. SCHWABER:
20    Q    Okay. You said you had been to
21  nonkosher Ridgewells events in the past?
22    A    Uh-huh.

52

1    Q    Is that a yes?
2    A    Yes. That's a yes. I'm sorry.
3    Q    And you -- had you also been to kosher
4  Ridgewells events. Do you recall?
5    A    I don't know. I go to a lot of Jewish
6  events and I don't ask who the caterer is, so I
7  don't know.
8    Q    Okay. I think you told me before, if
9  I heard you right, that you recall having been to
10  Sue Fischer kosher events before.
11    A    Sue Fischer events, yes.
12    Q    Okay. Now Sue Fischer also has kosher
13  and nonkosher events; is that your understanding?
14    A    I don't know.
15    MR. LEWIN: Objection.
16    THE WITNESS: I -- I don't know. I
17  was dealing with her in her kosher -- I've been --
18  the events that I've been to that was Sue
19  Fischer's, one of them I can recall was at Adas
20  Israel. So it was kosher.
21  BY MR. SCHWABER:
22    Q    Do you recall ever being to a Sue

Case 1:05-cv-01717-RJL    Document 54-2    Filed 01/30/2006    Page 14 of 36
VIDEOTAPED DEPOSITION (Filed 01/30/2006)
CONDUCTED ON TUESDAY, MARCH 21, 2006

14 (Pages 53 to 56)

53

1    Fischer event that you assume was not kosher?
2    A    No.
3    Q    Okay.  Did you know that Sue Fischer
4    offers nonkosher catering services?
5    A    I don't know.  No, I didn't know that.
6    Q    Sitting here today, you still don't
7    know that?
8    A    No.
9    Q    Okay.  You know Ridgewells does,
10    though?
11    A    Of course, yes.
12    Q    Okay.  So you knew that in engaging
13    Ridgewells, you'd have the option of nonkosher or
14    kosher, correct?
15    A    We were dealing --
16        MR. LEWIN:  Objection.  Go ahead and
17    answer the question.
18        THE WITNESS:  We were dealing only
19    with the kosher division.  So it was not a
20    consideration to engage nonkosher Ridgewells.  We
21    wouldn't have -- as I said, we would not have
22    engaged any nonkosher caterer.

54

1    BY MR. SCHWABER:
2    Q    Well, my question was:  You know that
3    Ridgewells can do both kosher and nonkosher?
4    A    Yes.  But we were doing kosher.
5    Q    So you knew that, in engaging
6    Ridgewells, you have to specifically engage
7    kosher, as opposed to a caterer that's only
8    kosher, correct?
9        MR. LEWIN:  Objection.
10    BY MR. SCHWABER:
11    Q    Is that right?
12    A    We did engage kosher at Ridgewells.
13    Q    You understand from your background
14    that there are some caterers that are strictly
15    kosher all the time, that's all they do, right?
16    A    Yes.
17    Q    Okay.  And with Ridgewells, you knew
18    that you had to specifically elect kosher with
19    Ridgewells or else you would get nonkosher, right?
20    A    That's right.  That's why we engaged
21    kosher with Ridgewells.
22    Q    Okay.

55

1    A    We dealt with the kosher division.
2    The first thing I discussed with Ridgewells was
3    the kosher need.
4    Q    Did -- did you look at the contract
5    documents in this case before they were signed?
6    A    Yes.
7    Q    Did it -- did you ever consider the
8    need to include a specification that you were
9    getting kosher catering from Ridgewells?
10    A    No, because I was dealing with the
11    kosher division.  And we had been -- we discussed
12    in great detail what the kosher needs was.  As you
13    see, when we were billed at the end, we were
14    billed for kosher meat.  So Ridgewells understood
15    what our needs were.
16    Q    My question was --
17    A    I thought they understood.  Obviously,
18    they didn't, by serving shellfish.
19    Q    Okay.  My question has to do with, not
20    the end, but prior to contracting, when you
21    reviewed the contract, what was your purpose in
22    reviewing it?

56

1        MR. LEWIN:  Objection to the question.
2    What was your purpose in reviewing the contract?
3        MR. SCHWABER:  That was my question.
4        MR. LEWIN:  I'm confused.  If you can
5    answer that question, go ahead.  What was your
6    purpose in reviewing the contract?
7        THE WITNESS:  I don't know.
8    BY MR. SCHWABER:
9    Q    You remember reviewing it before it
10    was signed?
11    A    Uh-huh.
12    Q    Is that a yes?
13    A    Yes.  I'm sorry.
14    Q    And why did you review it?
15    A    You always review a contract to make
16    sure it has what you need.
17    Q    Okay.  And the contract that you
18    reviewed didn't even say the word kosher, correct?
19    A    It didn't need to.  I was dealing with
20    the kosher division.  I had met with Toby and
21    talked about our kosher needs that she said she
22    doubtless could accommodate.  There was -- I was

57

1    dealing with Ridgewells, which I thought was a
2    reputable company. And I was dealing with the
3    kosher division.
4         Not only had the Corcoran recommended
5    Ridgewells as a kosher caterer, but it was on a
6    listing from my synagogue as one of the acceptable
7    kosher caterers.
8         I met with Toby specifically to talk
9    about our kosher needs. The fact that it would be
10   kosher was a given because I was dealing with what
11   had been presented as the kosher division.
12   Q    My question had to do with -- it was a
13   simpler question than that. I think it calls for
14   a yes or no.
15        Do you recall that the contract that
16   you reviewed before it was signed didn't mention
17   either kosher or kosher division anywhere on it?
18   A    I have noticed that since, yes.
19   Q    Okay. But that didn't concern you at
20   the time?
21        MR. LEWIN: Objection to the word
22   "concern".

58

1    BY MR. SCHWABER:
2    Q    Is that a fair statement? It didn't
3    concern you to the point of deciding not --
4         MR. LEWIN: I mean the record is
5    clear, the contract does not have the word kosher.
6         MR. SCHWABER: I'm asking --
7         MR. LEWIN: You've asked the witness
8    whether -- you know, whether the word is in there.
9    And the witness has said no, the word is not in
10   there.
11        MR. SCHWABER: I'm asking her --
12        MR. LEWIN: I don't understand what
13   your question is right now.
14        MR. SCHWABER: Well, I'll try to
15   repeat it then.
16        MR. LEWIN: Okay.
17   BY MR. SCHWABER:
18   Q    My question is, the absence of the
19   word kosher or the word kosher division from the
20   contract --
21   A    Uh-huh.
22   Q    -- did not concern you prior to

59

1    signing it? Is that a fair statement?
2    A    It's a fair statement because I was
3    dealing with the kosher division. So I didn't
4    think it needed to.
5    Q    Okay.
6    A    And I was dealing with what I thought
7    was a reputable company.
8    Q    Okay. And a company that, at the time
9    you were deciding whether to sign that contract,
10   you knew does unkosher catering as well as kosher
11   catering, correct? You knew that then?
12   A    Correct. But I was dealing with the
13   kosher division.
14   Q    Did -- let me take you back to the
15   time that you started to describe where Sue
16   Fischer, who you thought you were going to be
17   using, ultimately it came to a decision where you
18   weren't going to use her. How did that come
19   about?
20   A    We went to Sue Fischer's offices or
21   business in Virginia with Craig and Rebecca,
22   possibly on the same weekend that we looked at

60

1    venues, I'm not sure. But they came down.
2         And we met with her. She presented a
3    menu that they liked. We decided to proceed with
4    her. We began, then, to receive, you know, menus
5    to make the decision that would lead to a
6    contract. At that time, I think Mark was
7    primarily dealing with her.
8         And I guess at some point we were
9    waiting for a contract. And she just didn't send
10   it to us. I think -- as I said, she was dealing
11   primarily with Mark. But I can recall talking to
12   her on occasion. Mark and I, as I said, are both
13   pretty busy.
14        And as I recall, it was becoming kind
15   of frustrating that we were not -- we didn't
16   seal -- we had signed, I believe with the
17   Corcoran. And we -- I certainly was getting
18   frustrated that that piece of it hadn't been
19   settled. So maybe I began calling her.
20        And she said, well I'm busy, I have an
21   event this weekend. I'll get you the contract in
22   a few days. Don't worry about it. I've penciled

Case 1:05-cv-01717-RJL   Document 54-7   Filed 10/30/2006   Page 16 of 36
VIDEOTAPED DEPOSITION OF QUINN SIMPSON
CONDUCTED ON TUESDAY, MARCH 21, 2006

16 (Pages 61 to 64)

61

1  in the date, that sort of thing. And it dragged
2  on for quite a while. And then I sort of took
3  over dealing with her. And at one point -- I
4  believe, you have this in the record -- at one
5  point Mark drafted something just to have her
6  sign, you know, his sort of nonlegal contract,
7  just to pin it down. And she just never produced
8  a contract.
9       I talked to her at great length. And
10 she promised -- at one point I asked her to send
11 me a fax confirming the date. We did get that.
12 But it was never an actual contract.
13      So as I said, after a few months of
14 just not receiving -- and our relations with her
15 were fine. Everything seemed fine except we just
16 didn't have a contract in hand.
17      So eventually we felt compelled to
18 pursue other options. And Mark, who had called --
19 as I said, Mark had called Ridgewells originally,
20 called Ridgewells. Again, that was really, at
21 that point, our only option, given that the
22 Corcoran had given us three places and one was in

62

1  New Jersey, we didn't want to do that.
2       So we sort of abandoned the Sue
3  Fischer thing. I think I called her and said, you
4  know, thanks very much but, you know, we can't
5  wait any longer.
6       And then at some point a few weeks
7  later, as I recall, she called Mark and explained.
8  My impression was that she felt some sense of
9  guilt or something for having sort of dragged us
10 along and explained that she was in some issue.
11 It was Sue Fischer for Windows. I think the
12 company was called Windows. I'm not sure who owns
13 the company. But she explained, I think as I
14 recall, that she was leaving the company and she
15 couldn't arrange for a contract. So she explained
16 what had happened. And at that point, he was
17 already in discussions with Ridgewells.
18      Q    At the point that you guys decided to
19 kind of cut bait, so to speak --
20      A    Uh-huh.
21      Q    -- and move back to discussions with
22 Ridgewells, Sue Fischer was still telling you she

63

1  was on board to do the wedding? She just hadn't
2  presented a contract?
3       A    Right.
4            MR. LEWIN: Objection.
5  BY MR. SCHWABER:
6       Q    Okay. And why was that of concern to
7  you?
8       A    It was -- why was it of concern to me?
9  We were having an event with at least 250 people.
10 And I didn't have a firm commitment in hand for a
11 caterer. I had only a -- sort of an oral
12 commitment. That was not -- you know, that was
13 not enough for us.
14      Q    So the signed -- the absence of the
15 signed writing is what mattered to you?
16      A    I suppose so, yes.
17      Q    Okay. And the oral commitment, even
18 from a woman that you thought was reputable,
19 wasn't good enough?
20      A    Not after a few months of waiting, no.
21      Q    Okay. So then you decided to go back
22 to Ridgewells. Was that the only -- the only

64

1  first stop, so to speak, after the decision to
2  leave Sue Fischer? Or were you looking at more
3  than Ridgewells then?
4       A    The only other thing that was going on
5  is, I buy some of our food at Shalom Kosher
6  supermarket on University Boulevard, and they have
7  a catering division. I forget what it's called.
8  It's a different name.
9       Q    Signature.
10      A    Signature. There's a restaurant
11 there, too. And one of the owners, Larry, is
12 someone I've seen at events, et cetera. And while
13 Mark was having these, you know, preliminary new
14 discussions -- discussions again with Ridgewells,
15 I was in the store one day and I asked Larry
16 whether -- you know. And he had not done the
17 Corcoran. But he was interested in the doing the
18 Corcoran. The Corcoran, as I recall, was --
19 either didn't allow people who hadn't, you know,
20 been trained to work there or whatever. So he was
21 not on their list.
22      Mark approached the Corcoran about

---

65

1   that. And they were not enthusiastic, as I
2   recall, about allowing him in.
3       In any event, we talked to Rebecca
4   about it at the time, as I recall. And she -- the
5   Corcoran is a kind of challenging space. And she
6   didn't want someone who hadn't worked there
7   before. So we didn't pursue Larry. We didn't
8   pursue Shalom or Signature any further.
9       Q   Okay.
10      A   But that's the only conversation I
11  recall having.
12      Q   Okay. And then was it Mark who took
13  the lead on repursuing Ridgewells?
14      A   Correct.
15      Q   And did you play any role in that?
16      A   I don't think so until -- I don't
17  think I spoke to or met anyone at Ridgewells until
18  we went over there one night before we signed the
19  contract. And I met Toby Nann that night. It was
20  after work. I don't believe I spoke with her or
21  dealt with them before that. I think Mark set up
22  the appointment.

---

66

1       Q   And was it just you and Mark and Toby?
2       A   Correct.
3       Q   Okay. And what was the purpose of
4   that meeting?
5       A   Well, we were -- you know, I wanted to
6   meet her. I wanted to discuss -- we wanted to
7   discuss, you know, the food options, et cetera.
8   We wanted to get a sense of her -- of the -- you
9   know, before we signed -- before we, you know,
10  committed to Ridgewells.
11      Q   Had a contract been presented to you
12  prior to that meeting?
13      A   I don't recall.
14      Q   Do you recall if you were reviewing a
15  contract at that meeting?
16      A   I don't -- we weren't -- I don't know
17  if we were reviewing contract. We certainly
18  reviewed food options. And we reviewed menus. We
19  had -- there were menu document -- Ridgewells'
20  menu documents there that we reviewed and she had
21  some foods for us to taste there.
22      Q   Okay. But you don't know whether the

---

67

1   contract was in existence yet or not?
2       A   I can't recall.
3       Q   Do you recall --
4       A   I think it wasn't. I think it wasn't.
5   Because in reviewing the documents, getting ready
6   for today, there's an E-mail to me where Toby
7   says, I'm sorry I didn't get you the contract.
8   I've been busy or something like that. So I guess
9   it wasn't.
10      Q   Okay. The -- do you recall, prior to
11  that meeting you just described, a discussion with
12  your husband where he told you words to the effect
13  of, it looks like Ridgewells can do this for us
14  without a mashgiach and without the kosher dishes?
15      A   I don't think he used those words.
16  He -- I think I understand what you're trying to
17  say. I think he said, Ridgewells has the option
18  we need.
19      Q   And this was in the second go round --
20      A   Right.
21      Q   -- the after the Sue Fischer?
22      A   Right. Right.

---

68

1       Q   Okay. And was that over the
2   telephone?
3       A   Yeah. I think.
4       Q   And in what context?
5       A   Well, we were -- when we didn't have
6   the contract from Sue, and we were feeling
7   pressured to have a contract, and he said he would
8   call Ridgewells back. I said, fine. We didn't
9   really have any other option. As I said, they
10  were the only one we could use at the Corcoran.
11      I -- I recall that he called me at the
12  office. And he said: Good news. Ridgewells has
13  what we need in any event.
14      Q   All right. And --
15      A   And they were -- and that they were
16  available for the date. That was one of our
17  concerns.
18      Q   Okay. Other than, obviously, making
19  sure they were still available for that date, what
20  did you gather him to be saying when he said they
21  have the option you need? Or did he explain that
22  to you?

---

Case 1:05-cv-01717-RJL VIDEOTAPED DEPOSITION of Document 39-7 Filed 07/03/2006 Page 18 of 36
CONDUCTED ON TUESDAY, MARCH 21, 2006

18 (Pages 69 to 72)

69

1    A    Well, that -- that they could do the
2 kosher wedding that we needed. The kosher meat
3 and, you know, and the nondairy wedding that we
4 needed.
5    Q    Okay. Was it -- did you first come to
6 understand at that point in the process that you
7 would be using Ridgewells' nonkosher dishes?
8    A    I understood that. I understood that
9 we were working with Ridgewells' kosher division
10 because of the various documents that Mark had
11 pulled together. You know, we had this, like a
12 wedding notebook. And that it was the kind of
13 kosher we needed.
14       And the reason it was good news was
15 that it was a little bit less expensive than the
16 other option. But if the other option had been
17 the only thing available, that's what we would
18 have done.
19    Q    When you say "the other option", what
20 do you mean?
21    A    An option that had supposedly kosher
22 dishes.

70

1    Q    And a mashgiach?
2    A    And I suppose and a mashgiach. I --
3 well -- mashgiach didn't come up in those
4 conversations. I can't agree with that. The
5 first time I heard the word mashgiach was from
6 Toby.
7       MR. LEWIN: Mashgiach,
8 M-A-S-H-G-I-A-C-H.
9       THE WITNESS: I don't recall
10 discussing mashgiach until we melt Toby.
11 BY MR. SCHWABER:
12    Q    You knew, prior to meeting Toby, what
13 a mashgiach was?
14    A    Of course, yes.
15    Q    Okay. And what's your understanding
16 of what a mashgiach is?
17    A    A mashgiach comes prior to -- in my
18 experience, comes prior to -- at some point prior
19 to the time that the food is served. It's been
20 prepared. It hasn't been served. And -- and
21 looks at it.
22       It doesn't -- I don't think a

71

1 mashgiach has like a formal official religious
2 function.
3    Q    What's the -- what is the function of
4 the mashgiach?
5    A    To look at the food. I mean to -- to
6 look at the food in terms of kosher laws.
7    Q    To make sure it's kosher?
8    A    I -- yes.
9    Q    Okay. And so my question -- my prior
10 question I think went more to timing. And maybe I
11 didn't ask it clearly. But your -- it was after
12 you left the Sue Fischer option, and you were,
13 once again, through your husband, discussing with
14 Ridgewells doing the wedding --
15    A    Uh-huh.
16    Q    -- that you first learned of the
17 possibility of using Ridgewells for the wedding
18 but without the kosher dishes?
19    A    I think so, yes. Yes.
20    Q    Okay. And you agreed to that?
21    A    Yeah. That's what we needed. We
22 needed kosher food.

72

1    Q    Okay. And the contract -- or the menu
2 that you picked specified no dairy products?
3    A    Correct.
4    Q    And why is that?
5    A    Because we were having a kosher
6 wedding and we needed a kosher wedding. And you
7 don't serve dairy with meat at a kosher event.
8    Q    Okay. Could you have served dairy
9 with the dessert?
10    A    No. Of course not. It was a kosher
11 event. We pursued desserts and only kosher
12 desserts. If you look at the notes, we -- we
13 reviewed only kosher options.
14    Q    Well, there's kosher desserts that
15 have dairy in them?
16    A    Right. And one of them is strawberry
17 shortcake. I was reviewing the notes. At first
18 she said strawberry shortcake. I said, strawberry
19 shortcake, how can you do that? And she said it
20 was with some kind of, you know, nondairy thing.
21 But she said it was difficult to do. We didn't
22 want it anyway.

Case 1:05-cv-01717-RJL VIDEOTAPED DEPOSITION OF JUDITH REGAL Document 56-3 Filed 10/30/2006 Page 19 of 36
CONDUCTED ON TUESDAY, MARCH 21, 2006

19 (Pages 73 to 76)

73

1    Q    Okay.  Now, getting back to a
2    mashgiach, in your understanding, and let me
3    digress a little further, I took the liberty of
4    asking you about your religious -- or assuming
5    your religious background.  Can you describe for
6    me your Jewish education from childhood on up.
7        A    Sure.  I went -- I grew up in
8    Brooklyn.  I went to -- which is a very Jewish
9    place with a lot of wide Jewish practice.  I grew
10   up in a kosher home.  Both of my -- luckily, my
11   four grandparents were living well into my teens.
12   They lived in kosher homes.  I had the privilege
13   of knowing my great grandparents, who were quite
14   observant.
15            I went to, we call, the Talmud Torah,
16   I believe starting in second or third grade,
17   through about sixth grade.  I went for 4 years.
18   It was not the custom in conservative Jewish
19   synagogues in Brooklyn, then, for girls to be bat
20   mitzvahed.  That was considered -- it just wasn't
21   done.  So I wasn't bat mitzvahed, but that's
22   because it was considered something that reformed

74

1    Jews did.  I was raised as a conservative Jew.  It
2    would have been almost, you know, sacrilegious to
3    have a bat mitzvah.
4            MR. LEWIN:  Two terms.  One is Talmud
5    Torah.  T-A-L-M-U-D.  Torah, T-O-R-A-H.  Bat
6    Mitzvah is B-A-T, M-I-T-Z-V-A-H.
7            THE WITNESS:  When I moved at age 13
8    from one neighborhood in Brooklyn to another, we
9    joined a new synagogue.  And it was, at that time,
10   a very famous rabbi, Rabbi Besdin was our -- Rabbi
11   Abraham Besdin was our rabbi.  He conducted, in
12   his home, one night a week, a sort of, you know,
13   teen program about Jewish practice.  I attended
14   that.  I was raised very Jewishly.  I lived a very
15   Jewish life.
16            We raised our children Jewishly.
17   We've been members of a synagogue since we moved
18   to this area, first Sherry take fill en, then Adas
19   Israel.
20            You know, my children all were bar and
21   bat mitzvah, went to what we call now Hebrew
22   School at Adas Israel.  Is that responsive?

75

1    BY MR. SCHWABER:
2        Q    Yes.  Yes.
3        A    We practiced the Jewish holidays as a
4    family.
5            MR. LEWIN:  Besdin is B-E-S-D-I-N.
6    Abraham Besdin.  Shaare Tefila, I think, is
7    S-H-A-A-R-E.
8            THE WITNESS:  Correct.
9            MR. LEWIN:  T-E-F-I-L-A.
10           THE WITNESS:  Correct.  It's in Silver
11   Spring.
12   BY MR. SCHWABER:
13       Q    The decision you had earlier in your
14   family life to keep a kosher home, as between you
15   and Mark, did one of you need that more than the
16   other?
17       A    No.  I think it was -- it was a joint
18   decision.
19       Q    Based on both of your upbringings?
20       A    Correct.  Based on both of our values.
21       Q    Okay.  What do you mean by that?
22       A    It was something that was important to

76

1    us at the time.  It was -- when you say based on
2    our upbringing, it was something that we were used
3    to, but it was a deliberate, active decision on
4    our parts as a family.
5        Q    Okay.  And when you say "based on your
6    values", can I assume from that you mean a value
7    you placed on traditional Jewish observance?
8        A    At the time, yes.
9        Q    Okay.  You've told me a couple of
10   times that what you needed for the wedding is a
11   level that was consistent with your son-in-law's
12   family's needs, your friends' needs and your
13   general needs of the people that observed kashruth
14   that you were bringing to the wedding?
15       A    Correct.  That I knew of, yes.
16       Q    Okay.  You -- and you recognized that
17   those needs were less strict, from a religious
18   observance standpoint, than the needs you at one
19   point practiced --
20       A    No.
21       Q    -- in your family?
22       A    That's not correct.

Case 1:05-cv-01717-RJL   Document 54-7   Filed 10/30/2006   Page 20 of 36
VIDEOTAPED DEPOSITION OF JONATHAN POLLARD
CONDUCTED ON TUESDAY, MARCH 21, 2006

20 (Pages 77 to 80)

77

1    Q    That's not correct?
2    A    That's not correct, no.
3    Q    At all points in your life, did you
4    eat off of unkosher dishes?
5    A    Out of the household -- out of the
6    home I did.
7    Q    Okay. But in the home you didn't?
8    A    Correct.
9    Q    And is there a reason, in your mind,
10   for the distinction between how you -- how you
11   observed your kashruth in the home and out of the
12   home?
13   A    Is there a reason?
14   Q    I mean, how you did you decide to
15   observe it differently?
16   A    It wasn't a decision. This is the way
17   that my parents and my in-laws and my
18   grandparents, actually, practiced kashruth, which
19   was something that was a very, very serious thing
20   in our family life. I would be taken from
21   Brooklyn to the city. My grandmother would --
22   well, one grandmother would take me to downtown

78

1    Brooklyn to lunch. And my other grandmother would
2    take me to the city, in Manhattan and we would eat
3    in places like Horn and Hardart, in those days in
4    New York, it was the automat. And I would eat,
5    like my grandparents would eat only dairy. But
6    the plates I knew — I mean, I would see nonkosher
7    meat being served.
8         It's not something my — my family
9    would never eat nonkosher meat out of the house
10   but they would eat off these dishes. In later
11   years, my father would eat a hamburger out of the
12   house.
13        But it was just the way I was raised.
14   It was that the home was, my — my approach was
15   that the home is sanctified in its way. And we
16   had an observance, a level of observance for
17   outside the home. And it — it is not an
18   inconsistency to me because it's — I've known it
19   for my whole life.
20        It's also something that's utterly the
21   practice of my kosher friends. Friends who
22   were — who were at the wedding. I know that I

79

1    have lunch with them and they eat fish or eggs or
2    something like that on plates that are not
3    strictly kosher.
4    Q    Do you have friends or know anybody
5    that keeps a kosher home and yet will eat unkosher
6    meat out of the house?
7    A    Yes. As I just said, my father did.
8    Q    Okay.
9    A    In his later years.
10   Q    How about in your life now, people you
11   know who do that.
12   A    My kosher friends, no.
13   Q    Okay.
14   A    I mean -- no. I mean, I can't recall.
15   I don't know.
16   Q    Did your father ever eat shellfish?
17   A    No.
18   Q    Out of the house?
19   A    Never.
20   Q    Or pig products?
21   A    Never.
22   Q    Okay. When you kept the kosher home

80

1    in your adult life --
2    A    Yes.
3    Q    -- did you eat unkosher meat out of
4    the house?
5    A    I did, yes.
6    Q    Okay. Did you eat shellfish out of
7    the house?
8    A    I suppose, yes.
9    Q    Okay. But only brought kosher
10   products into your house?
11   A    Correct.
12   Q    Why don't we take a short break here.
13        MR. LEWIN: How much longer do you
14   think you'll be here?
15        MR. SCHWABER: We'll be done before
16   noon.
17        MR. LEWIN: Before noon.
18        THE VIDEO OPERATOR: We're going off
19   the record. The time is 10:53 a.m.
20        (Recess.)
21        THE VIDEO OPERATOR: We are back on
22   the record. The time is 11:13 a.m.

Case 1:05-cv-01717-RJL    Document 45-7    Filed 10/20/2006    Page 21 of 36
VIDEO DEPOSITION OF JUDITH SIEGEL
CONDUCTED ON TUESDAY, MARCH 21, 2006

21 (Pages 81 to 84)

81

BY MR. SCHWABER:

Q    Ms. Siegel, before we broke, we were talking about the circumstances that led to you ultimately engaging Ridgewells to provide the catering. So you told me about your first meeting with Toby, which was to go over menus. And you believed, I think --

A    No. That was not the purpose of the meeting. It wasn't -- she had menus there. But the purpose, as I recall, was to meet her and to discuss our needs. And most specifically, this is to discuss our kosher needs.

Q    Okay.

A    That was my purpose.

Q    Okay. And the meeting was just the three of you. And it was, I think your recollection was, sometime prior to the contract being signed.

A    It was prior to the contract. I would not have signed a contract until I had been assured that -- we had been assured that Ridgewells' kosher division could provide what we

82

needed.

Q    And I think you also testified from your review of some documents in preparation for today that your recollection is that it was prior to you even seeing the contract?

A    I think so, yes.

Q    Okay.

A    I'm not certain about that. The concern at the time was what kosher food -- what approach could be provided. As I said, we liked the idea of Sue Fischer because she could provide a kosher wedding with sort of, you know, more nouveau food.

But our concern was to have a kosher wedding using a caterer that the Corcoran accepted. And that's why we're -- we met with Toby to talk about whether that could be satisfied, our needs.

Q    Why is it that you didn't pay for the rabbinical supervision or the kosher plates?

A    We didn't need it, in terms of our -- our kashruth, as I said.

83

Q    But it would have given you some assurance that there couldn't be the kind of foul-up that wound up happening?

A    It was inconceivable to me, looking back on it now, it remains inconceivable to me that dealing with a unit that -- that presented itself as Ridgewells' kosher division, when I called Ridgewells and I said "kosher division", they would connect me to Toby.

She would say "Toby Nann". She actually used a different name at one point, Silverstein. But then my notes say she that was Toby Nann. Where we had a meeting, where the first thing we met, we shook hands. We were not expecting to have food there. But as a surprise, she had some food for us.

And the first thing I said to her is, let me explain our kosher needs. I recall clearly that that was the first thing I said to Toby. Up to that point, I think Mark -- I don't think I had spoken to her.

And I explained that we needed kosher

84

food. I explained what we meant by that. And she said -- and I remember it vividly. She said, I understand completely. I grew up in Long Island.

I understood that to mean that she understood the practice of kashruth from my childhood and that the Barons practiced, that's what that meant to me. I grew up in Long Island and I was a mashgiach at Ohr Kodesh.

MR. LEWIN:  O-H-R, K-O-D-E-S-H.

THE WITNESS:  And I knew Ohr Kodesh because Michael Baron, actually, who is one of the plaintiffs, attended Ohr Kodesh. I attended his wedding at Ohr Kodesh. Our daughter Sarah attended nursery school at Ohr Kodesh.

Ohr Kodesh is a traditional, conservative synagogue. At the time that my daughter attended Sunday school there, we were nonetheless members of Adas. The reason we were members at Adas was because Adas allowed women in a minyan, M-I-N-Y-A-N. Minyan is the assemblance of Jews that constitutes enough people to have a religious service.

Case 1:05-cv-01717-RJL Document 56-7 Filed 10/30/2006 Page 22 of 36
VIDEOTAPED DEPOSITION OF JUDITH SIEGEL
CONDUCTED ON TUESDAY, MARCH 21, 2006

22 (Pages 85 to 88)

85

1    And Ohr Kodesh was so traditional that
2  women were not allowed in a minyan at that time.
3    So when she said Ohr Kodesh, I was a
4  mashgiach at Ohr Kodesh, to me, she was telling me
5  she understood what kosher meant.
6    At that meeting, the main thing we
7  discussed was what the kosher options were that
8  could be provided.
9    One of the things that she had us
10  taste was a hot dog wrapped in pastry. And that's
11  something that I happen to serve when I entertain.
12  I happen to serve Hebrew National because I like
13  the way it tastes, now, in my home. I didn't like
14  the way this hot dog tasted. I said oh, you know,
15  I don't -- I don't like this hot dog, you know.
16  Can you -- she says, well that's the only kosher
17  one we use.
18    I said, can't you get Hebrew National?
19  And she said oh, well, you know, I would just have
20  to buy it in a grocery store. It would be, you
21  know, it would be very expensive.
22    As it turned out, we never pursued

86

1  that because the kids didn't want those hot dogs.
2  She gave us a brochure of Ridgewells'
3  hors d'oeuvres, talking about what options we
4  could have, I suppose.
5    We knew that we weren't going to
6  decide until much later what the hors d'oeuvres
7  would be. But she was going to construct the
8  contract, as I recall, with like four different
9  kinds of hors d'oeuvres or different kinds of
10  stations or whatever.
11    And when I -- when I reviewed the
12  selections, she said, oh, I can't do that in
13  kosher. Oh, I can do that in kosher.
14    And the kinds of things we're talking
15  about, for example, at one point if you look at
16  the notes, the menu went through a variety of
17  iterations. We signed a contract but then we kept
18  changing the menu over the months or considering
19  different things.
20    And one of them was a Mediterranean
21  bar or something. It may have been in the
22  original contract, where she said -- it said

87

1  sausage and salami, which she ultimately dropped.
2  And in the conversation about dropping it, she
3  said, you know what, the kosher sausage doesn't
4  taste good.
5    The one thing that Toby and I talked
6  about consistently from the first meeting through
7  the last was kosher, kosher, kosher. It was the
8  subject of every conversation we had. Because the
9  conversations that we had were about various menu
10  options.
11    And it was a given that it was kosher.
12  We were dealing with Ridgewells, what presented
13  itself as Ridgewells' kosher division.
14    When I met Julie Staley, which was
15  close to the ceremony, who I understood to be
16  Toby's supervisor, we had a walk-through at the
17  Corcoran and I met Julie. And I stood at the
18  sidelines. I wasn't really needed. They were
19  doing logistics or something.
20    What I discussed with Julie Staley was
21  the need for a kosher wedding. And Julie Staley,
22  I -- you know, I said, are you Jewish or

88

1  something? She was talking about it. She said,
2  no, I've learned about all this since I have run
3  the kosher division. She said that to me. It was
4  a week or two before the wedding, when we had a
5  walk-through, whatever the date was.
6    She told me that she ran the kosher
7  division. That was the main thing I discussed
8  with anyone was kosher, kosher, kosher.
9  BY MR. SCHWABER:
10    Q    Ms. Siegel, I know from listening to
11  you that you have a lot that you want to say. I
12  need you to try to just focus on my questions.
13    A    Sure.
14    Q    If you will. My question was much
15  more narrow.
16    A    Sure.
17    Q    My question was, you knew at the time
18  you entered into the contract with Ridgewells that
19  they had the option of strictly kosher, which I'll
20  define as there's separate dishes, there's
21  separate pots and pans and a mashgiach. And --
22  and you were knew that you were not electing that

Case 1:05-cv-01717-RJL VIDEOTAPED DEPOSITION OF JON DIVENS Document 54-3 Filed 09/20/2006 Page 23 of 36
CONDUCTED ON TUESDAY, MARCH 21, 2006

23 (Pages 89 to 92)

89

1  option --
2      A   I was electing -- I'm sorry.
3      Q   -- and my question is:  Why is it
4  that -- why is it that you didn't elect that
5  option?
6      A   I didn't need to because they
7  presented me with a contract that had the kosher
8  that we needed.  That was the kosher practice of
9  everyone there whom I knew.
10     Q   And you're saying that's from the
11 contract that you agreed to sign that gave you
12 that comfort?
13     A   No, I -- two things gave me the
14 comfort.  I was dealing -- three things gave me
15 the comfort, obviously mistakenly.
16         One was I was dealing with Ridgewells,
17 which was a company that I thought had some
18 responsibility and that was a responsible company.
19 Okay.  That was proved to be wrong.
20         I was dealing with what presented
21 itself as Ridgewells' kosher division.  That was
22 the second thing that gave me the comfort.

90

1          And the -- four things, actually.  The
2  third thing was extensive conversations with Toby
3  Nann, where she provided repeated reassurance that
4  she understood that -- our kosher needs.  Okay.
5          And the fourth thing was a specific
6  contract that outlined, if you look at the line
7  for sushi, it doesn't say:  For example, salmon,
8  tuna and vegetarian.
9          It says:  Salmon, tuna and vegetarian.
10 That's what we signed.
11         As far as the kosher meat, in
12 retrospect, I'm sorry that I didn't have her write
13 kosher meat.  But obviously she knew we wanted
14 kosher meat.  Right after the wedding we were
15 billed for kosher meat.  Where did that come from?
16 She knew we needed kosher meat.  She knew we had
17 contracted for kosher meat.
18         I was told by Julie and Toby that I
19 was dealing with Ridgewells' kosher division.  I
20 had a document from the Corcoran that said
21 Ridgewells, that I was dealing with.  I have also
22 a document that I got from my synagogue, Adas

91

1  Israel, when I was looking -- was pursuing kosher
2  options for both the brunch and to help the
3  Barons, who were arranging for a rehearsal dinner
4  because they were at a distance.  I asked Adas for
5  kosher options and on their list was Ridgewells.
6  That's who I was dealing with.  Mark met Julie
7  before, I think, or spoke to Julie before.
8          So no, I didn't need that.  I was
9  getting what I needed in terms of kosher.  And I
10 was reassured by Toby again and again.  From the
11 beginning, the first thing she said to me is, I
12 understand your kosher needs.
13     Q   Do you believe Hebrew National hot
14 dogs are kosher?
15     A   I do.  But that's not why I use them.
16 I use them because I like the way they taste.  But
17 yeah, I believe they're kosher.  And therefore I
18 believe they could have been used at the wedding
19 if we wanted kosher, yeah.
20     Q   Okay.  Ridgewells did the wedding.
21 And the first time that you became aware of a
22 problem with what was being served, can you

92

1  describe that to me.
2      A   Oh, yes, I can.  I can describe it to
3  you now.  And I can describe it to you probably,
4  if I'm cognizant, on my death bed.  Because it was
5  probably the second worst moment of my life.  So I
6  can describe it very vividly.
7          We had had a long day, a wonderful
8  day, a joyous day.  We had our hair done at the
9  house.  And we had photographers.  And we left in
10 a van and we got to the Corcoran.  And there were
11 photographs.  And then there was a beautiful
12 ketubah signing.  And there was the most beautiful
13 wedding ceremony I've ever seen.
14         And I stood on the bimah, holding my
15 husband's hand, watching my eldest daughter in a
16 traditional ceremony, wishing that my grandparents
17 and my parents could be there, connecting to the
18 whole thing, to my life, to my traditions, to my
19 family.  It was a perfect ceremony.  Performed my
20 dear rabbi, who is my friend and my mentor.
21         And I can't ever remember ever being
22 happier in my life when I walked off that bimah.

93

1    And then it was just time -- I'm not a
2 crier, by the way. It was time to celebrate this
3 joyous moment. This was a -- going to be a very
4 special moment in my life.
5    And the ceremony was on the first
6 floor of the Corcoran. And we walked up a
7 staircase that turned. There was a mid level.
8 And we walked to the top. And the sushi display
9 was out there. I remember noticing it. I had
10 discussed the sushi endlessly with Toby Nann.
11    At the tasting just before the wedding
12 I commented that there wasn't much variety in what
13 she offered. This is not the first time I met
14 her, but at the formal testing. And she said,
15 that's all we can do in a kosher wedding, quote.
16    So I looked at the sushi. It was the
17 first thing that was there. It actually struck me
18 as not being as big as she had represented. It
19 didn't bother me even slightly, the size of it. I
20 euphoric. Rebecca was not there. Her dress had a
21 long train that had to be adjusted. She was off
22 having it adjusted.

94

1    People -- we were among the first
2 people to come up, because we marched out. And
3 that was the idea.
4    I was sort of standing nearby, and
5 near Baron -- the Jewish expression, machatonim,
6 it's hard to explain -- in-laws.
7    MR. LEWIN: M-E-C-H-A-T-O-N-I-M.
8    THE WITNESS: Okay. -- came over to
9 me. She had a very agitated look on her face,
10 when moments before she had been as euphoric as I
11 been. We had lit candles together on the bimah,
12 jointly, as the mother of the couple. I hope
13 you've seen how beautiful the ceremony was, if you
14 looked at the video. But it was downhill from
15 there.
16    And she said to me. Judy, there is
17 shrimp in the sushi bar. And I had arranged
18 endlessly with Toby about what there would be,
19 kosher, kosher, kosher. No variety in the fish.
20 Kosher. Contract said.
21    I said, no, Anita. I didn't even look
22 at it. I said, no, Anita there can't be shrimp in

95

1 the sushi. She said, look at the sushi. And I
2 looked at it and I saw stuff that was white and
3 pink. And I thought it was that stuff that you
4 buy in the super mat -- market. I call it fake
5 crab meat. It's made out of haddock or something
6 like that. I don't know whether it has a "K" on
7 it or not. But it's made only with acceptable
8 kosher fish. And my mother used to make something
9 called mock shrimp out of flounder. I said, no,
10 no, that's -- that's mock shrimp, that, you know,
11 it's kosher, the sushi is kosher.
12    And she said, well, then -- she said,
13 will you taste it? I don't know why she said
14 taste it. But she said, taste it. Which was not
15 a problem for me because I eat shellfish.
16    And I tasted it. And I said, oh my
17 God, it is shrimp. And somehow Mark was nearby, I
18 think. I know I said -- I got to Mark. But I
19 think he was nearby because people were still
20 coming upstairs. It wasn't that crowded yet. And
21 I go, Mark, there's shrimp in the sushi tray. I
22 said, come look at this. And he -- I can picture

96

1 what he did with his body. It was like a cartoon.
2 He flung his hands out, and he said, I'll go
3 downstairs and get Toby.
4    And he was away like a shot, walking
5 against a crowd coming upstairs. And at some
6 point soon after, it seemed forever to me, but
7 people tell me it was pretty soon. I was upset
8 beyond words. The wedding had been ruined, okay.
9    At some point, I guess some people
10 came and took away that tray and replaced it with
11 something else, you know, a complete tray.
12    Now you'll see in the notes that I had
13 extensive -- one of my concerns in my endless
14 discussions with Toby was that we not run out of
15 sushi, we not run out of food. For whatever
16 reason, I think knowing there was a large
17 contingent of Rebecca's friends, I thought sushi
18 was going to be a very popular thing, compared to
19 other things.
20    The other things were ordered -- Craig
21 had said the Long Island people would like this
22 and that. I knew that people would like sushi.

Case 1:05-cv-01717-RJL VIDEOTAPED DEPOSITION OF JUDITH COHEN Filed 10/30/2006 Page 25 of 36
CONDUCTED ON TUESDAY, MARCH 21, 2006

25 (Pages 97 to 100)

97

1    So I -- I said to Toby, a number of times, I don't
2    care about money, which I didn't. The whole thing
3    was really expensive. We had the resources to do
4    what we needed to do. Money was not a concern to
5    me at any point in this whole operation. I mean,
6    obviously, I didn't want to overspend, but it was
7    not a primary concern.
8         I had said to Toby, make sure we don't
9    run out of sushi. I don't care if you throw it
10   away. Just have a lot of sushi there. And,
11   actually, at the end, we -- we did run out of
12   sushi but that -- that's not particularly
13   relevant.
14        So they brought another -- I guess
15   they had these complete trays that fit onto this
16   display thing and at some point they brought this
17   tray and they replaced it and I went off into a
18   corner and I was -- I think of myself as a pretty
19   hearty person. But I was trembling. I was upset.
20   There were a few friends of mine standing there.
21   And I said, did you see what just happened? You
22   know. And I explained what happened.

98

1         And one of my concerns -- I had a very
2    major concern at the time, because a large number
3    of the people who were there were guests of the
4    Barons. And I knew from my childhood, I knew from
5    my grandparents, et cetera, that some of these
6    people, if they found out that shrimp was there,
7    wouldn't eat. And that was confirmed when Craig's
8    sister, Michelle, who is kosher in the way that
9    the Barons are, as I understand Anita and Bill,
10   said, you understand that there are people here
11   now who can't eat.
12   BY MR. SCHWABER:
13   Q    She said that to you?
14   A    Yes, she did. And I said, I
15   understand that, Michelle.
16        So I had a terrible conflict which I
17   have not resolved to this day-- it's something
18   that belongs in the New York Times ethicist --
19   about whether to make known that this had
20   happened, out of respect for the guests for whom I
21   had procured a kosher event, or what I thought was
22   a kosher event, or to just let it go and go on

99

1    with the celebration that was going to be one of
2    the milestones of my life.
3         And I actually, at some point later,
4    we had another issue, as other depositions have
5    told, there was -- cream cheese was served, also
6    in violation of the contract. The contract called
7    for black bread and salmon with capers. And when
8    the kids fixed on that hors d'oeuvre, I talked to
9    Toby afterward, and I said, it's kind of dry. Can
10   we put some margarine on it or something? And she
11   said, margarine wouldn't be good. Trust me, it
12   will be delicious. It's very moist salmon, or
13   something like that.
14        So somewhat -- a few -- at some point
15   after the sushi incident, a good deal after the
16   sushi incident, Mark came over to me. And he
17   said, you're not going to believe this. They
18   served cream cheese with the smoked salmon. And I
19   go -- I said -- I threw up my hands or something.
20        And just by chance -- this was a
21   passed hors d'oeuvre. It wasn't on a tray. And
22   the passed hors d'oeuvres were not always that

100

1    easy to get because, you know, there was a crowd
2    and stuff.
3         Just by chance, someone with this tray
4    of this salmon passed by just at that moment. And
5    I said, may I have one of those? And I looked at
6    it. And I said, what is it? And she said, salmon
7    and cream cheese. And I tasted it and it was
8    cream cheese. And the contract had said, salmon
9    on bread with capers.
10        So, you know, that was the second
11   thing that happened. I said something, you know,
12   I don't know where Mark was. But when I saw him
13   again, I said, I give up. This is hopeless. I
14   don't know what was wrong with Toby. We had this
15   discussion endlessly. We even talked about that
16   there was no spread on the bread.
17   Q    Let me get you back to the -- I think
18   what you described as an ethics conflict, if I'm
19   remembering --
20   A    For me, yes.
21   Q    Where you felt torn between, after
22   Michelle said to you what she did.

Case 1:05-cv-01717-RJL   Document 54-3   Filed 10/30/2006   Page 26 of 36
VIDEOTAPED DEPOSITION OF JUDY SHESOL
CONDUCTED ON TUESDAY, MARCH 21, 2006

26 (Pages 101 to 104)

101

1    A    Right.
2    Q    And after you know from your
3  grandparents and so on, do you tell the guests at
4  the wedding, who may now have a problem eating --
5    A    Right.
6    Q    -- or do you not tell them and hope
7  they can enjoy?
8    A    Right.
9    Q    And I think you said something, I
10  don't want to put words in your mouth, like you
11  still haven't resolved that fully to this day.
12    A    What I should have done at that
13  moment, but I do know that the word spread. And I
14  did -- it was hard to look, it was a big event. I
15  was told afterward that there are some people who
16  didn't eat.
17    Q    You decided, I take it, not to spread
18  the word yourself.
19    A    To get a megaphone and get a
20  microphone and spread the word. I mean, I was
21  neither denying it or spreading it. It was -- it
22  was -- actually, at some point shortly after that,

102

1  our rabbi passed by. I was talking to Julie
2  Staley. And I told our rabbi what happened.
3    And I said, are you going to stay or
4  go? And he said he -- that he was going to stay.
5    Q    And what did he tell you?
6    A    I don't recall. He looked very
7  troubled. I was very troubled to tell him what
8  had happened.
9    Q    Did you tell him -- this may be an
10  unfair question. But did you tell him because you
11  were seeking some wisdom or some guidance or did
12  you tell him out of a compulsion to let him know
13  what he might be eating?
14    A    I don't -- I don't know why I told
15  him. He's someone with whom I'm very close. I
16  was standing with Julie Staley. There was another
17  issue. The food didn't go super well, in terms of
18  the kosher. I had gone over it with Toby a number
19  of times.
20    I wanted bread on the table as soon as
21  people got to the dinner thing. My father,
22  unfortunately, passed away in 2002. So he wasn't

103

1  there. But I knew that when he went to events
2  like that, he was hungry when he got to the table.
3  And I wanted the bread to be there, primarily for
4  the older people. And there was no bread on the
5  table.
6    So I went down -- and I had gone over
7  that with Toby a number of times. And I went down
8  to ask for the bread. I was quite upset when I
9  went down. I was pretty irritated at Toby's
10  irresponsibility. At Ridgewells'
11  irresponsibility.
12    So I went down to talk about the bread
13  and when I came up the stairs, this was like a few
14  levels down, it was in the basement. Julie Staley
15  was standing at the entrance. There was no one
16  else there.
17    And I said -- I remember saying to
18  Julie, do you understand what a big deal this is?
19  And she said, I do. And she said something to the
20  effect that there's nothing we can do to fix it
21  now. I hope you know how sorry we are. She also
22  said to me, we'll call you on Monday, which

104

1  Ridgewells did not do.
2    And as I was having this -- Julie
3  was -- was a civil person who I think, compared
4  with Toby and certainly compared with what I heard
5  about Ridgewells afterward, was respectful to us
6  about what had happened.
7    One of the things that makes me very
8  upset about all this is the disrespect that
9  Ridgewells showed us about this mistake they had
10  made. And at that point, when I was standing with
11  Julie, our rabbi happened to be passed by. I
12  don't know whether he had been to the restroom or
13  what.
14    So I didn't -- I neither sought him
15  out nor, you know, I just told him. I told him
16  because he is someone who is close to me.
17    Q    Fair enough. On the night of the
18  wedding, after the problem first arose --
19    A    Right.
20    Q    -- did you confront both Julie and
21  Toby or did you limit your communications to Julie
22  that night, about this problem?

Case 1:05-cv-01717-RJL   VIDEOTAPED DEPOSITION OF DANIEL L   Filed 01/30/2006   Page 27 of 36
CONDUCTED ON TUESDAY, MARCH 21, 2006

27 (Pages 105 to 108)

105

1    A    Which problem? The sushi? The cream
2    cheese? The bread? The butter that they had down
3    there?
4    Q    Any problems you had with Ridgewells
5    that night after the discovery of the shrimp.
6    A    I -- Toby, as I said, was sort of in
7    the basement. I certainly went down about the
8    bread --
9    Q    To Toby?
10   A    -- which was later. Because the
11   cocktails were on like a mezzanine level. So I
12   would have discovered that there was no bread sort
13   of at the end of the cocktail hour. So I
14   certainly went down and saw Toby then.
15           I think I saw her once before then. I
16   don't know whether it was about the salmon. But I
17   believe that that was the second time. But
18   Toby -- I was very angry with Toby. I said, how
19   could you do this?
20   Q    That was that night, you said?
21   A    Oh, yes. She was in the kitchen. I
22   said, how could you do this, Toby? How could this

106

1    happen? She said, I'm so sorry. I don't know.
2    I'm so sorry.
3    Q    Did you believe her?
4    A    Yeah --
5           MR. LEWIN: Objection. Go ahead,
6    answer.
7           THE WITNESS: I believe that she's
8    sorry.
9    BY MR. SCHWABER:
10   Q    I mean, did she seem genuinely sorry
11   to you, from your angle?
12   A    I don't know what genuinely sorry
13   means. The wedding had been ruined, as far as I
14   was concerned. She seemed sorry but she had been
15   was completely irresponsible. So, you know, did I
16   believe her, it wasn't important to believe her or
17   not.
18   Q    There was nothing she could do?
19   A    Nothing she could -- I'm sorry, finish
20   your sentence.
21   Q    It wasn't important to believe whether
22   she was sorry because it didn't matter to you one

107

1    way or another whether she was sorry?
2           MR. LEWIN: Objection the form of the
3    question. Answer it if you can.
4           THE WITNESS: Look, at this point, my
5    daughter's wedding had been ruined. Something
6    that was, you know, a major life event. My
7    daughter, at the point -- I know that at the point
8    I saw Toby, I had already seen Rebecca. And I
9    knew how Rebecca felt.
10          And I had already, you know, seen how
11   upset Anita was. I had seen how upset Michelle
12   was, Craig's sister.
13          So it didn't matter to me one way or
14   another. I mean, what I was concerned about was
15   that this event had been ruined. But I wasn't
16   particularly concerned with Toby Nann's feelings.
17   BY MR. SCHWABER:
18   Q    I'm not -- my -- my question goes more
19   to something you said a couple of minutes ago
20   where you felt -- you expressed what sounded to me
21   like anger about disrespect you feel --
22   A    Yes.

108

1    Q    -- Ridgewells accorded you about what
2    happened.
3    A    Yes.
4    Q    And you singled out Julie as not being
5    in that category.
6    A    Correct. That's correct.
7    Q    So I'm trying to get at what led you
8    to that conclusion that Ridgewells disrespected
9    you or your feelings on this.
10   A    Sure. A number of things. One is, as
11   I said, the primary focus of my -- the focus of my
12   discussions with Toby from the time that I met
13   her, straight through, were the food that could be
14   served at this kosher wedding that we contracted
15   for.
16          If you look at the notes, you see
17   when -- originally we weren't going to have
18   dessert. Originally we were going to have just
19   cake. And she told us, by the way, that the cake
20   was not made with any dairy. You know, that's the
21   level of discussion we had.
22          And when we went for the tasting, I'm

109

1  getting out of order here, when we went for the
2  final tasting, I think it was in late February,
3  she gave us a few cakes to taste. They wanted
4  another chocolate cake. And Toby said, we can't
5  make the kind that you want kosher.
6         So we only discussed kosher. There
7  wasn't any conversation that I had with Toby where
8  the issue of kosher did not arise. Because we
9  were negotiating different kinds of hors
10 d'oeuvres. We were negotiating what to have at
11 the various things.
12        So I knew beyond — and she told me
13 she worked for — you know, she worked for the
14 kosher division. She was — she understood what
15 we needed, et cetera.
16        I had not met Julie except once before
17 that. I think the very — and I say this — you
18 asked me earlier how many people I supervised.
19 It's hard to supervise 103 people or 10 direct
20 hires or whatever. But in my work, the bottom
21 line is, I am responsible for what goes on in my
22 office. And that means a duty of care. That

110

1  means you can — you can check me out on Google
2  and look at the publications that I supervise.
3  You can be assured that any publication that's on
4  the Internet that has my name on it has been
5  reviewed by me.
6         I think, given Toby proudly telling me
7  she understood what we needed and that she had
8  been a mashgiach, that's the first thing she ever
9  said to me, suggested that it was reasonable for
10 me to think she would look at the sushi before she
11 served it.
12        I think that would be reasonable. I
13 think — I think — I think that absence of duty
14 of care was disrespectful to the traditions of the
15 parents of the groom. She knew — she knew why we
16 were having this kosher wedding. And it was for
17 Craig's family. She knew that. We told her that.
18 And I think it was disrespectful to be careless
19 about what she served.
20        I think that what happened afterward,
21 Julie said you'll be hearing from us on Monday.
22 Obviously Mark and I were terribly upset about

111

1  this afterward.
2         Rebecca and Craig left for their
3  honeymoon, I think, Sunday night. And — no, I'm
4  sorry. They left very first thing Monday morning.
5  We had supper together Sunday night. But we
6  didn't — we didn't — we tried not to talk too
7  much about what happened.
8         At this point, one of the things that
9  you want from an event is lifetime memories.
10 Those were ruined for my daughter. Okay. They
11 were ruined for Craig, when I read his deposition.
12        So I wanted them to go off on their
13 honeymoon, whatever. We talked about it a little
14 bit. But Mark and I talked privately. Afterward
15 Julie had said, we will be phoning you on Monday.
16        We go off to work on Monday. Mark, I
17 think, took them to the airport. I don't think I
18 did. And I guess I called him mid-afternoon. Did
19 they call? Did they call? Didn't call. And so
20 Monday night. Did they call? Did they call?
21        That's disrespectful. That's very
22 disrespectful. When Julie had said, we can't make

112

1  this up to you, we can't fix it, but we'll call
2  you Monday. I expected — reasonably expected an
3  apology. I expected them to say, what can we do
4  to fix this?
5         Instead, what Mark got was deeply
6  disrespectful, dismissive — I found it
7  disrespectful to the Jewish tradition, frankly,
8  that an organization would flag itself as being a
9  able to provide a kosher wedding, that the
10 person — the other part of the contract was Toby,
11 said she understood what we needed and she
12 understood kosher.
13        And then when that didn't happen, they
14 didn't have the respect for my daughter, for my
15 values, for my traditions, for what I had
16 contracted for, to say, we're sorry. How can we
17 fix this? Mark had to call them.
18    Q    Did you hear or observe, at any point,
19 your husband lose his temper at the wedding?
20    A    Absolutely.
21    Q    And did you hear him use curse words
22 and swear words —

Case 1:05-cv-01717-RJL   VIDEOTAPED DEPOSITION OF MICHAEL SOSTEK   Filed 01/30/2008   Page 29 of 36
CONDUCTED ON TUESDAY, MARCH 21, 2006

29 (Pages 113 to 116)

113

1    A    No, but he told me --
2    Q    Let me -- let me just finish the
3  question.
4    A    I'm sorry.
5    Q    -- curse words and swear words, did
6  you either hear him use them or hear of him using
7  them with Ridgewells' employees?
8    A    He told me that he did and I did, too,
9  when I went down the second or third time.
10   Q    Can you --
11   A    I -- I used the word that I'm not --
12  you know, that I don't ordinarily use.
13   Q    What was that word?
14   A    It was an F word. I said what the
15  blank is going on here. I had been down there
16  repeatedly. I said, how many times did I ask that
17  there be bread on the table? It was about the
18  bread issue. I said, what the blank is going on
19  here? You know -- all right. Yeah. I'm sorry.
20       But he told me, you know, he was
21  obviously very upset. When Mark gets upset, his
22  face turns bright red. When I told him that there

114

1  was shrimp in the sushi tray, it was like a
2  Stephen Spielberg cartoon or something. His face
3  instantly turned bright red.
4    Q    So it wouldn't surprise you if he lit
5  into some of the staff?
6    A    If he --
7        MR. LEWIN: Objection to the form of
8  the question. But go ahead and answer it.
9        THE WITNESS: I don't know what you
10  mean by "lit into". If he was upset with the
11  staff, no, it would not surprise me at all, in the
12  circumstances.
13  BY MR. SCHWABER:
14   Q    Not upset with. But verbally
15  confrontational?
16   A    I don't -- I -- I didn't hear what he
17  said, so I can't care. I don't know. I don't
18  know. Confrontational is your word.
19   Q    You described him, as someone who
20  knows him very well, that when he gets upset, his
21  face gets red?
22   A    Gets red, yes.

115

1    Q    And so I'm asking you, you understand
2  that Ridgewells has contended in this case that he
3  was very verbally abusive.
4    A    I understand that.
5    Q    You've --
6    A    I didn't witness that.
7    Q    Okay. Would it surprise you if he
8  was?
9        MR. LEWIN: Objection to the form of
10  the question. But go ahead, answer it.
11       THE WITNESS: It would not surprise me
12  if Mark, when he confronted Toby with the fact
13  that shrimp -- at that point we know about shrimp.
14  We later learned about eel and octopus -- was
15  extremely upset with Toby. That would not
16  surprise me. In fact, it's something that I would
17  expect him to be, given what this event meant to
18  him in two respects.
19       One is in terms of his relationship
20  with his eldest daughter, how much planning and --
21  how much time, attention, care he put into every
22  detail of this event, not for the sake of the

116

1  event itself, because it was celebrating something
2  very important to him. No, it wouldn't surprise
3  me if he was very upset with Toby. I would expect
4  him to be.
5  BY MR. SCHWABER:
6    Q    My question was broader than Toby.
7  The allegation is also that -- concern verbal
8  conduct towards other Ridgewells staff.
9    A    I don't know. I know nothing about
10  it. I don't know anything about it.
11   Q    Would that have surprised you?
12       MR. LEWIN: Objection to the form of
13  the question of whether that would have surprised
14  her. Answer it if you can. I object to the
15  question.
16       THE WITNESS: I -- I assume that -- I
17  assume that Mark was upset when he went downstairs
18  to talk to Toby. I don't know about other staff.
19  I thought he was talking to Toby. Toby was our
20  contact, not other -- Toby and Julie were the --
21  of the people who were there that night from
22  Ridgewells, we knew Toby and Julie. We -- I

Case 1:05-cv-01717-RJL   Document 147   Filed 10/30/2006   Page 30 of 36
VIDEOTAPED DEPOSITION OF JULIANNE MICHELLE DALESSIO
CONDUCTED ON TUESDAY, MARCH 21, 2006

30 (Pages 117 to 120)

117

1  didn't know any other staff. I had met Julie
2  once. I had met Toby three times before then.
3  BY MR. SCHWABER:
4      Q    You described at least one
5  conversation with Julie where she apologized.
6      A    At the event, yes.
7      Q    And you thought she was sincere.
8      A    Yeah, I think she was sincere.
9      Q    And you described Toby apologizing in
10 a way you believed, at the event?
11     A    I don't know what you mean by
12 believed. The two circumstances were entirely
13 different. When I saw Julie, she was standing and
14 not doing anything. When I went down -- when I
15 saw Toby. I wasn't that interested in seeing
16 Toby. I was interested in fixing the wedding. I
17 didn't want to see Toby at all, actually.
18         But the absence of the bread prompted
19 me to go downstairs. I think, as I said, I also
20 went down for the salmon. But when I went down
21 for the bread, Toby was busy. I mean Toby --
22 Julie was not busy when I talked to her. She was

118

1  just standing there.
2         When I went down to see Toby about the
3  bread, that would have been at the point in the
4  event where she was organizing the serving of the
5  meat and -- I guess salad was the first course.
6  So she was doing something. She was in the back
7  of the kitchen. She was -- she was busy. I was
8  standing at the door. And in a loud voice, I
9  said, Toby where the F is the bread? Because we
10 had discussed the bread endlessly.
11        I had called her the week before. I
12 said, I want to go over this thing one more time.
13 I had gone over every step in the wedding. So
14 this is going to happen then. So the hors
15 d'oeuvres are going to end now. So the salad will
16 be served when. So the bread will be on the
17 table. We had gone over this. We had rehearsed
18 it.
19        I put together events, et cetera, you
20 know, as a government official. And I know that
21 you time it, you know. And I had gone over with
22 that.

119

1         And one of the things I had sort of
2  hammered about was, let's please have the bread on
3  the table. There were a bunch of elderly people
4  there. We had arranged during the cocktail -- we
5  paid some extra, actually, to the Corcoran to have
6  a bunch of tables and chairs put sort of in the
7  back because there were enough older people that I
8  was concerned about them. Craig's grandfather,
9  most particularly. He's a wonderfully dear
10 person.
11        And I thought about them. I thought
12 about my dad. And I said, let's have bread on the
13 table because they're probably going to be sitting
14 and not running around. So that -- so she knew
15 about the bread and I went down about the bread.
16 It wasn't -- with Julie I had a longer
17 conversation. With Toby, my goal was to get the
18 bread on the table.
19     Q    And did she?
20     A    Intermittently. You know, eventually
21 it was on all the tables. She did send people up
22 with the bread, yeah.

120

1      Q    Okay.
2      A    I -- you know, I think so. Yeah.
3      Q    My question about the apologies from
4  the two of them, you indicated when I was asking
5  you on the question of your feelings of disrespect
6  by Ridgewells, one thing you said that would have
7  mattered to you is, you would have expected an
8  apology.
9      A    Yes. From Ridgewells corporate.
10     Q    Okay. So in addition to what you
11 heard at the wedding from the two people who were
12 running it for Ridgewells?
13     A    Those, as far as I was concerned, were
14 not -- I was most concerned -- I remain most
15 concerned about an apology to the Barons, which,
16 as far as I know, didn't happen that night.
17        And either of those, I'm sorry, and
18 we're so sorry this happened, and you know we're
19 so sorry, you know, I wouldn't call that an
20 apology. They expressed they were sorry. To me,
21 an apology would be what actually, you know, we
22 asked for in some documents through our attorneys.

Case 1:05-cv-01717-RJL   Document 54-7   Filed 10/30/2006   Page 31 of 36
VIDEOTAPED DEPOSITION OF JOAN BARON COLL
CONDUCTED ON TUESDAY, MARCH 21, 2006

31 (Pages 121 to 124)

121

1    My biggest concern was not only to --
2  to hear that Ridgewells apologize for what
3  happened, but more importantly for Ridgewells,
4  which is presenting itself as someone who can do a
5  kosher wedding as we understand it, to tell us
6  what steps would be put in place that this
7  wouldn't happen again.
8    I don't think -- you know, I don't
9  think Toby wanted this to happen. But I would
10  like to know -- the same thing as I'm telling you
11  in my work, okay. We have a thing in my office.
12  We do it every 2 or 3 weeks when something isn't
13  perfect. Lessons learned.
14    Let's sit down. If something doesn't
15  go well in my office, I don't lose it, you know.
16  I just say, all right, let's sit down, guys, when
17  this is all over, let's do a lesson learned. So
18  the next time the Spanish version goes up in time.
19  Or the next time. Whatever.
20    We didn't -- Mark didn't get that at
21  all from Ridgewells. What he got was -- was
22  dismissive disrespect.

122

1  Q   Would it have satisfied you if you got
2  from Ridgewells an indication that they would
3  apologize to the Barons and that they would sit
4  with Toby, do whatever lessons learned was
5  necessary -- I don't mean to single out Toby --
6  but sit among themselves and make sure they felt
7  they had appropriate safeguards in place?
8    MR. LEWIN: Okay. Objection to that
9  question. I mean, in terms of form and obviously
10  in terms of relevance and admissibility,
11  ultimately. I mean, of course that's all
12  preserved. But I just want to make sure that
13  there's no question about the fact that "would you
14  have been satisfied" is not a permissible inquiry.
15    But you can -- if she can answer it,
16  let her answer it.
17    THE WITNESS: Do you mean then or now?
18  BY MR. SCHWABER:
19  Q   Let's take them one at a time. Start
20  with then.
21  A   There's me and there's Mark and
22  there's Rebecca and there's Craig. Those were the

123

1  four people who were discussing this at the time.
2  You didn't ask me this, but I'll tell you that
3  when I got the draft contract from Toby, I faxed
4  it to everybody. Everybody looked at it, you
5  know. It was -- and we all understood it to be
6  kosher because Toby said it was kosher and she was
7  a mashgiach.
8    So I can't answer because, if that had
9  happened at the time, I would have first talked to
10  Mark. I assume it would have been presented by
11  Mark because he was dealing with Ridgewells. And
12  then we would have discussed our positions.
13    And then I know exactly what we would
14  have done. We've been married a very long time.
15  Is we would have said, we need to talk to the
16  kids, meaning Rebecca and Craig. Then we would
17  have said who should -- you know, we would have, I
18  think, called Rebecca first because she's our
19  daughter, you know, we know her better. We love
20  Craig like a son.
21    And we would have said, do you want to
22  call Rebecca or should I call Rebecca? And one of

124

1  us would have called Rebecca, probably in the
2  morning, at work, because we would have wanted to
3  talk to her sort of one on one and then have her
4  decide how to proceed.
5    So I -- I can't answer that without
6  saying, I would have consulted -- I would have
7  consulted with those three people.
8  Q   And that obviously didn't happen,
9  given the circumstances, right?
10  A   Because they didn't apologize. They
11  blew them off. I mean, they were disrespectful.
12  Q   Did you review the letter before it
13  was sent, that was sent on your behalf by
14  Mr. Lewin?
15  A   In August, this summer?
16  Q   Yes.
17  A   Yes, I did.
18  Q   So were you part of the -- were you
19  the one or part of a team that approved it?
20  A   It was a team of four. We were on
21  vacation at the time. We were at the beach.
22  Q   Reviewed it together?

Case 1:05-cv-01717-RJL VIDEO DEPOSITION OF JUDITH SIEGEL Filed 10/30/2006 Page 32 of 36
CONDUCTED ON TUESDAY, MARCH 21, 2006

32 (Pages 125 to 128)

125

1    A    Yeah. And I got it -- and I couldn't
2    print it out. It was just -- I saw it on the
3    computer screen. And I don't know. We were in
4    and out of the house. And I remember saying to
5    Mark, did you talk to Rebecca? What does Rebecca
6    think of it, et cetera. But definitely all four
7    of us would have looked at the letter.
8        MR. LEWIN: I'm going to object again.
9    A, form. B, relevance and admissibility. And C,
10   to the extent, Jeff, you start getting into sort
11   of attorney/client --
12       MR. SCHWABER: I'm not going to --
13       MR. LEWIN: -- discussions. I --
14   BY MR. SCHWABER:
15       Q    I'll caution you, in case it's not
16   clear from my question, I'm not asking you about
17   any communications you had with either of your
18   counsel. Okay.
19       The -- you understood the letter to
20   present demands that were described as
21   nonnegotiable demands?
22       A    I saw what it said, yes.

126

1        Q    And did you intend to present them as
2    nonnegotiable demands, was that your purpose in
3    communicating with Ridgewells?
4        MR. LEWIN: Okay. Again, I object on
5    the same grounds previously --
6    BY MR. SCHWABER:
7        Q    I'm not asking about your
8    communications with your lawyer.
9        MR. LEWIN: But what -- the letter
10   speaks for itself. I'm not sure what you mean,
11   did you intend --
12   BY MR. SCHWABER:
13       Q    I'm not asking you what the letter
14   says. I asked you if you recalled what the letter
15   says. You told me, yes.
16       A    Yes.
17       Q    And now I'm asking you, was it your
18   purpose, and you, yourself, to communicate to
19   Ridgewells, a set of nonnegotiable demands?
20       MR. LEWIN: If that's what the letter
21   says, I don't know what -- what the question is
22   whether that was her purpose.

127

1        THE WITNESS: Yeah, it was part of the
2    letter.
3    BY MR. SCHWABER:
4        Q    So the answer is, yes, it was your
5    purpose to tell Ridgewells these demands were
6    nonnegotiable; is that your testimony?
7        A    I can't answer the question. I'm
8    sorry. If I could talk to, you know, to --
9        MR. LEWIN: I mean, the letter -- the
10   letter speaks for itself. Are you asking her
11   whether her personal purpose was --
12   BY MR. SCHWABER:
13       Q    That's what -- I'm only asking about
14   your purpose. My question to you is: Was it your
15   purpose to have your counsel tell Ridgewells that
16   your demands here for what could be done to
17   resolve this matter were nonnegotiable?
18       A    My purpose was to have my counsel try
19   to fix a very difficult situation. And I
20   understood the letter to be the best legal way to
21   do that, not having -- not having gotten any
22   remote satisfaction informally. If you call that

128

1    formal, from Ridgewells.
2        Q    At the time you sent the letter,
3    nothing short of what was in there would have
4    satisfied you?
5        MR. LEWIN: Well, that's what the
6    letter says.
7        THE WITNESS: That's what the letter
8    says.
9    BY MR. SCHWABER:
10       Q    Is that what you feel?
11       A    What I --
12       Q    I'm not asking what the letter said.
13   I'm asking about Judith Siegel. At the time
14   you -- that letter was sent on your behalf,
15   nothing short of what was in it would have
16   satisfied you?
17       MR. LEWIN: Here, at this point
18   already, Jeff, I'm going to, A, object and tell
19   her that anything -- an answer to that question, I
20   think, would impede on the attorney/client
21   privilege. You're asking whether she personally
22   agrees with what her attorney has said. I don't

Case 1:05-cv-01717-RJL   VIDEOTAPED DEPOSITION OF DOUGLAS MCNEIL   Filed 10/30/2006   Page 33 of 36
CONDUCTED ON TUESDAY, MARCH 21, 2006

33 (Pages 129 to 132)

129

1 think that that's a proper question. I'm going to
2 instruct her not to answer.
3 BY MR. SCHWABER:
4    Q   I'm not asking you that. So let me
5 clarify my question. I'm asking about your
6 emotional state, your personal feelings, not
7 whether a release would have been signed or
8 anything legal.
9       I'm asking you if anything short of
10 what was communicated to my client by your
11 attorney would have satisfied you?
12    A   At that -- personally, I'm one of four
13 people.
14    Q   Right.
15    A   Personally, something short of -- some
16 of the things short, not the apology part, but
17 some of the things short of that letter probably
18 would have satisfied me. But we were much further
19 along, given that Ridgewells was so dismissive.
20    Q   Okay. Have you ever seen any --
21 sought any therapy or counseling or medication as
22 a result of the wedding incident?

130

1    A   No.
2    Q   Have you ever considered it?
3    A   No.
4    Q   Do you believe you need it?
5    A   No.
6    Q   Okay. You had some concerns about
7 Toby Nann's general capabilities prior to the
8 night of the wedding, correct?
9    A   No. I personally? No. My kids did.
10 But I -- my dealings with her seemed okay.
11 Obviously after the wedding, I have profound
12 questions about her capabilities. But before
13 that, my dealings with her were okay.
14    Q   How long have you known the Lewins?
15    A   Since about the time the letter was --
16 well, I didn't -- I hadn't met you then, I think
17 Mark
18    Q   Is your first -- your first
19 interaction with the Lewins in the context of this
20 litigation?
21    A   Yes.
22    Q   Okay. Let me just, in our last

131

1 minute, and keep that time in mind, just tell me
2 what it is you brought me as Exhibit 2. What is
3 this?
4    A   That -- that is my annual -- my
5 Merrill Lynch brokerage account is linked to a
6 debit card. And we used the debit card for major
7 purchases. And what we did for the wedding was
8 put a chunk of money into that account and just
9 sort of draw it down for the wedding. And these
10 are some wedding expenses that went through
11 Merrill Lynch.
12    Q   And what is the last page of the
13 exhibit?
14    A   The last page, Alyza showed me this
15 morning, but I -- I saw it in my notes -- Alyza
16 Lewin, I'm sorry. I saw it last night when I was
17 going over my notes again. It's the -- I guess I
18 gave this to the Lewins when they asked me for all
19 my documents.
20       It's the cover page -- it's my office
21 cover fax thing. And there was a -- one of these
22 yellow Post-it notes on it. I guess I had the

132

1 number for Ridgewells. This would have been one
2 of those times when I didn't call Toby directly,
3 when I would say "kosher division, please" and my
4 note about the cost of pastrami, which I can
5 explain if you like, and the cookies.
6    Q   I don't -- I don't need you to explain
7 that. We're going to lose the video. What I
8 would like to do, I don't need him to change the
9 tape. Just in the interest of time, what I'm
10 going to do is show you a few pages I've marked to
11 see if you can identify the handwriting as your
12 own.
13    A   Sure.
14    Q   And we can just keep going on the
15 record without the video for this.
16       (The following was reported on the
17       stenographic record only:)
18 BY MR. SCHWABER:
19    Q   I'm showing you now, from what was
20 marked collectively as Mark Siegel Exhibit 3, and
21 I'll represent to you that we marked collectively
22 what your husband produced at the time of his

133

1    deposition.
2        Okay.  I've put yellow tabs at the
3    bottom of pages.  Take them one at a time.  Read
4    me the page number so we have it for the record
5    and tell me if it's your handwriting on the page.
6        A    Page 000005.  This is my handwriting.
7        Q    And do you -- it has a series of
8    numbers.  Do you recall what this was about?
9        A    Looking at it, I do.  Obviously -- and
10   given the date -- okay.  Here is what it is.  I
11   had -- I obviously wrote -- the subject of this
12   E-mail is an office matter.  But I must have
13   needed a piece of paper or something.  Sue Fischer
14   must have called me back or something.
15        And I'm just taking random notes of
16   the -- in a conversation with Sue Fischer, as I
17   discussed earlier, in the getting the contract
18   ready.
19        Q    Okay.  So these all relate to the Sue
20   Fischer deal?
21        A    No.  But on the bottom where I write
22   parking and brunch, my guess is that I was trying

134

1    to figure out, in my head -- I was beginning to
2    work on how much would this whole event cost us
3    and the context for that would have been how much
4    money do I have to move to Merrill Lynch or sell
5    stock or something like that.  I was like doing a
6    running budget.
7        Q    Okay.  Go to the next yellow tab, if
8    you will, and read me the page number.
9        MR. LEWIN:  You don't have to read all
10   the zeros.
11        THE WITNESS:  Okay.  Ninety-three.
12   BY MR. SCHWABER:
13        Q    Is that --
14        MRS. LEWIN:  What number is that?
15        MR. SCHWABER:  Ninety-three.
16   BY MR. SCHWABER:
17        Q    Is that all your handwriting?
18        A    Yes, it is.
19        Q    Okay.  And are these just general
20   notes you were taking during a session to discuss
21   the menu?
22        A    And they're also notes about kids'

135

1    meals.  And obviously some things going on here
2    with my father's cousin where I added an address.
3    I had a wedding file that was sort of at the back
4    of my desk.  And I would just -- I'm very busy at
5    work.  So I would just grab a pen when something
6    came up and write it down.  So it's a bunch of
7    different things at once.  But this stuff is
8    discussions with Toby about appetizers -- hors
9    d'oeuvres.
10        Q    When you say "this stuff", you're
11   pointing to the right hand margin of the page?
12        A    Right.
13        Q    So that was all from one conversation?
14        A    I don't know if it was from one
15   conversation.  But it was from conversations.
16        Q    But as I understand your testimony,
17   tell me if I'm getting it right, the various
18   handwriting notes on the page, although they're
19   all yours, are not necessarily either one subject
20   matter or taken at one time --
21        A    Right.
22        Q    -- is that correct?

136

1        A    That's right.
2        Q    Okay.  Go to the next one.  What's the
3    page number?
4        A    117.
5        Q    Are those all your handwriting notes?
6        A    No.  This -- this -- this is Sue.  I
7    can explain this note.  This is Sue Fischer.
8        Q    Okay.
9        A    And this is mine.
10        Q    So the handwriting above the signature
11   Sue is Sue Fischer.
12        A    Correct.
13        Q    And everything below the signature Sue
14   is yours?
15        A    Correct.
16        Q    Now there's also some circled notes
17   and some numbers in the top left section of the
18   document, whose are those, if you know?
19        A    That's my handwriting.  I have no idea
20   what Thursday, 11/4, 10:00 a.m. means.  Oh, that
21   may be -- I don't know what it means.
22        Q    Okay.  And then the numbers in the

Case 1:05-cv-01717-RJL   VIDEOTAPED DEPOSITION OF   Document 56-7   Filed 10/30/2006   Page 35 of 36
CONDUCTED ON TUESDAY, MARCH 21, 2006

35 (Pages 137 to 140)

---

137

1  margin?
2      A   These numbers?
3      Q   Yeah. Is that yours or Sue's; do you
4  know?
5      A   That's my handwriting. And, again,
6  I'm keeping a running thing as expenses come to
7  me, I see a wrote "callig", that must be the cost
8  of a calligrapher. I don't know what 13,000 is.
9  Maybe that's the Corcoran. I don't know what
10  2,000 is. 13,000 must be the Corcoran. 40,000 is
11  in my head for catering.
12      Q   Okay. Is that a budget you had set
13  for catering?
14      A   No. We didn't set a particular
15  budget. As I said, it was going to cost what it
16  was going to cost.
17      Q   So is that 40,000 you think something
18  you got from your discussions with Sue?
19      A   Correct. Probably.
20      Q   All right. Go to the last yellow tab
21  in that stack.
22          MR. LEWIN: The number.

---

138

1          THE WITNESS: Sorry. 121.
2  BY MR. SCHWABER:
3      Q   And what is that?
4      A   This to me looks like Mark's
5  handwriting. It's definitely not mine.
6      Q   Okay. So none of the writing on that
7  is yours?
8      A   No.
9      Q   And other than reading it and trying
10  to speculate, do you have any idea what that is?
11      A   Well, I recognize the name Tom Keon at
12  the top. I think he's the guy from Ridgewells who
13  was so dismissive to Mark. The other two names, I
14  don't recognize, but given the phone numbers,
15  they're probably at Ridgewells.
16      Q   I don't need to you to speculate. I'm
17  just wondering, do you know anything about that
18  document?
19      A   No.
20      Q   Okay. Let me show you two other
21  pages. I'll start with page 135, Bates page 135
22  which is from Craig Baron Exhibit 2, also

---

139

1  documents produced in this case by the plaintiffs.
2  These were produced by Mr. or Ms. Baron. I don't
3  remember which.
4          What I want you to do on 135 is just
5  confirm that that's your E-mail.
6      A   Yeah. It looks like my E-mail.
7      Q   Okay. Go to the second yellow tab.
8  And what page number is that?
9      A   208.
10      Q   Is that also an E-mail from you?
11      A   No. It's from Craig to me. The
12  other -- yeah. Let me that sure I got the other
13  one right. The other one is from me to Craig.
14  This one is from Craig to me.
15      Q   I'm looking at the top here.
16      A   Oh, this is Siegel -- yeah. It's a
17  chain.
18      Q   It looks like it's an E-mail chain.
19      A   Okay.
20      Q   But is that your correct E-mail
21  address and do you acknowledge that that
22  document --

---

140

1      A   Let me see.
2      Q   -- reflects communications between you
3  and Craig?
4      A   That's my correct E-mail address.
5      Q   Do you recall, generally, these
6  communications?
7      A   It looks plausible. I don't remember
8  what the bartender issue was. But this looks
9  plausible to me.
10      Q   Okay. Let me just double-check my
11  notes very quickly, and I think we're done.
12          I think I just have two more cleanup
13  questions.
14          You yourself didn't personally observe
15  or eat octopus or eel at the wedding, did you?
16      A   I didn't observe it. I might have
17  eaten it.
18      Q   You don't know if you ate it?
19      A   I don't know if I ate it.
20      Q   Okay. And my second --
21      A   But it was there. I mean, my friends
22  told me it was there.

Case 1:05-cv-01717-RJL  Document 15-7  Filed 10/20/2006  Page 36 of 36
VIDEOTAPED DEPOSITION OF JUDITH SIEGEL
CONDUCTED ON TUESDAY, MARCH 21, 2006

36 (Pages 141 to 144)

141

1  Q  Okay. My second follow-up question is
2  the -- or just on what you just said, the only
3  knowledge you have of it being there is what
4  people told you?
5  **A  But it was a number of people who told**
6  **me.**
7  Q  But the only knowledge is what others
8  told you; is that a fair statement?
9  **A  Correct. The shrimp for sure was**
10  **there.**
11  Q  And in terms of prior litigation, have
12  you ever been involved in a lawsuit before this
13  one?
14  **A  No.**
15  Q  And when I say involved, I'm including
16  either as a plaintiff, a defendant or even a
17  witness.
18  **A  No. I've been on a jury, but I**
19  **haven't been.**
20  Q  Okay. I have nothing further. I
21  appreciate your time.
22  **A  Okay.**

142

1  **(Whereupon, signature having not be**
2  **waived, the deposition was concluded**
3  **at 12:09 p.m.)**
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

143

1  ACKNOWLEDGEMENT OF DEPONENT
2  I, JUDITH SIEGEL, do hereby acknowledge that
3  I have read and examined the foregoing testimony,
4  and the same is a true, correct, and complete
5  transcription of the testimony given by me, and
6  any corrections appear on the attached Errata
7  sheet signed by me.
8
9
10  _____    _____
11  (DATE)              (SIGNATURE)
12
13
14
15
16
17
18
19
20
21
22

144

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2  I, Vicky J. Stallsworth, Registered Merit
3  Reporter, Certified Realtime Reporter, the officer
4  before whom the foregoing proceedings were taken,
5  do hereby certify that the foregoing transcript is
6  a true and correct record of the proceedings; that
7  said proceedings were taken by me stenographically
8  and thereafter reduced to typewriting under my
9  supervision; and that I am neither counsel for,
10  related to, nor employed by any of the parties to
11  this case and have no interest, financial or
12  otherwise, in its outcome.
13  IN WITNESS WHEREOF, I have hereunto set my
14  hand and affixed my notarial seal this 2nd day of
15  April, 2006.
16
17  My commission expires:
18  August 14, 2007
19
20  _____
21  NOTARY PUBLIC IN AND FOR THE
22  DISTRICT OF COLUMBIA