1 (Pages 1 to 4)

**1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF COLUMBIA
 3   -----------------------------x
 4   MARK A. SIEGEL, et al.,      )
 5             Plaintiffs, )
 6   v.                ) Case No.
 7   RIDGEWELLS, INC.,            ) 1:05CV01717
 8   Defendant/Counter-Plaintiff )
 9   -----------------------------x
10      Videotaped Deposition of MARK A. SIEGEL
11             Washington, D.C.
12          Thursday, January 19, 2006
13               9:36 a.m.
14
15
16
17
18
19
20   Job No.: 1-70181
21   Pages 1 - 226
22   Reported By:  Joan V. Cain
```

**2**

```
 1      Videotaped Deposition of MARK A. SIEGEL, held
 2   at the law offices of:
 3
 4        WILEY REIN & FIELDING
 5        1776 K Street, Northwest
 6        Washington, D.C. 20006
 7        (202) 719-7000
 8
 9      Pursuant to Notice, before Joan V. Cain,
10   Certified Court Reporter and Notary Public in and
11   for the District of Columbia.
12
```

**3**

```
 1           A P P E A R A N C E S
 2
 3   ON BEHALF OF PLAINTIFF:
 4      NATHAN LEWIN, ESQUIRE
 5      ALYZA D. LEWIN, ESQUIRE
 6      LEWIN & LEWIN, LLP
 7      Suite 901
 8      1828 L Street, Northwest
 9      Washington, D.C. 20036
10      Telephone: (202) 828-1000
11
12
13   ON BEHALF OF DEFENDANTS/COUNTER-PLAINTIFF:
14      JEFF SCHWABER, ESQUIRE
15      IVONNE CORSINO-LINDLEY, ESQUIRE
16      STEIN, SPERLING, BENNETT, DE JONG,
17      DRISCOLL & GREENFEIG, P.C.
18      25 West Middle Lane
19      Rockville, Maryland 20850
20      Telephone: (301) 340-2020
21
22
```

**4**

```
 1      A P P E A R A N C E S  C O N T I N U E D
 2
 3   ALSO PRESENT:
 4      Cali Day, videographer
 5
 6           C O N T E N T S
 7
 8   EXAMINATION OF MARK A. SIEGEL         PAGE
 9      By Mr. Schwaber            6
10
11           E X H I B I T S
12          (Retained by Counsel.)
13   SIEGEL DEPOSITION EXHIBITS          PAGE
14    1  Notice of Deposition        10
15    2  First Amended Complaint        74
16    3  Mrs. Siegel's Notes and Documents   202
17    4  Contract Signed by Mrs. Siegel    220
18    5  Final Invoice from Ridgewells     220
19
20
21
22
```

2 (Pages 5 to 8)

**5**

1      PROCEEDINGS
2        THE VIDEOGRAPHER: Here begins tape
3   number 1 in the deposition of Mark A. Siegel, in the
4   matter of Mark A. Siegel, et al., v. Ridgewells,
5   Incorporated, in the United States District Court
6   for the District of Columbia, case
7   number 1:05CV01717.
8        Today's date is January 19th, 2006. The
9   time is 9:36 a.m. The video operator today is
10  Cali Day of LAD Reporting & Digital Videography.
11  This video deposition is taking place at the office
12  of Wiley Rein & Fielding, 1776 K Street, Northwest,
13  Washington, DC 20006, and was noticed by Jeffrey M.
14  Schwaber, counsel for the defendant.
15       Would the counsel please identify
16  themselves and state whom they represent.
17       MR. SCHWABER: I'm Jeff Schwaber. And with
18  me is Ivonne Lindley, and we represent Ridgewells,
19  Incorporated.
20       MR. LEWIN: I'm Nathan Lewin of Lewin &
21  Lewin. With me is Alyza Lewin of the same firm, and
22  we represent the plaintiffs in this action.

**6**

1        THE VIDEOGRAPHER: The court reporter today
2   is Joan Cain of LAD Reporting.
3        Would the reporter please swear in the
4   witness.
5        MARK A. SIEGEL
6   having been sworn, testified as follows:
7   EXAMINATION BY COUNSEL FOR DEFENDANT AND
8   COUNTER-PLAINTIFF
9   BY MR. SCHWABER:
10  Q   Good morning, Mr. Siegel.
11  A   Good morning.
12  Q   Please state your full name and your home
13  and business address.
14  A   Mark Alan Siegel. Home, 2134 Leroy Place,
15  Northwest, Washington, DC 20008; business, New
16  Century Financial Corporation, 816 Connecticut
17  Avenue, Northwest, Washington, D.C. 20006.
18  Q   And what is New Century Financial
19  Corporation?
20  A   It's the ninth largest mortgage lender in
21  America.
22  Q   What is your position with that company?

**7**

1   A   Vice president, government affairs.
2   Q   Okay. Have you had your deposition taken
3   before?
4   A   No, I don't believe so. Not a deposition.
5   Q   All right. Let me just go through, at the
6   risk of repeating something you may have heard from
7   your counsel, some of the procedures for today
8   before we get into substance. You've been sworn in.
9   Your testimony here is under oath. In that regard,
10  despite the relative informality of the proceeding,
11  it has the same force and effect as if you're
12  stating the testimony in a courtroom.
13       I'll be asking you questions today.
14  Everything that is said here when we're on the
15  record is being transcribed verbatim by the court
16  reporter. And there is a video record being made as
17  well. The video is just on you, but the written
18  transcription will include the words of everybody.
19  A   Mm-hmm.
20  Q   You'll have an opportunity, through your
21  counsel, to review that to the extent you avail
22  yourself of that opportunity. And that will be

**8**

1   explained to you later. And the deposition can be
2   used in this case for a variety of purposes.
3        There will be times where your counsel may
4   object to a question I ask you. If that happens,
5   let him finish the objection. And unless he
6   instructs you not to answer the question, once the
7   lawyers are finished talking, you can go ahead and
8   answer the question to the best of your ability. If
9   your counsel does instruct you not to answer a
10  particular question, you should follow his
11  instructions.
12  A   Okay.
13  Q   The process, in order for the court
14  reporter to have an accurate transcription, I need
15  you to let me finish my questions, even if you know
16  where I'm going, before you begin your answer.
17  A   Okay.
18  Q   And I'll try to do the same with your
19  responses. And if you don't know the answer to a
20  question I'm asking you, tell me you don't know. If
21  you don't understand what I'm asking you, tell me
22  that. If you didn't hear what I asked you, tell me

9

1    that.  And I'll try to repeat it or rephrase it.
2        We will take breaks periodically.  But in
3    the event you want to break before I have asked for
4    one or your counsel's asked for one, just let me
5    know and we'll accommodate that.  The only time it's
6    typically inappropriate to take a break is while a
7    question's pending.
8        A   Mm-hmm.
9        Q   And of course, if there's something you're
10   not sure if you should be answering and you need to
11   consult with your counsel, let me know that.  And
12   we'll deal with it if it comes up.
13       Final instruction I'll give you is to
14   answer with words rather than head gestures or
15   finger point or anything that will require the court
16   reporter to try to interpret your meaning --
17       A   Okay.
18       Q   -- which she's not permitted to do.
19       A   Okay.
20       Q   Does that make sense to you?
21       A   Sure does.
22       Q   Do you understand the instructions?

10

1        A   I do.
2        Q   Do you have any questions?
3        A   No, I don't.
4        Q   Okay.
5        MR. SCHWABER:  Let me have marked as --
6    we'll call this Mark Siegel 1.  And the depositions
7    today will be listed that way.  Defendant's Amended
8    Notice of Intention to take the oral deposition
9    duces tecum of Mark A. Siegel.
10       (Mark Siegel Deposition Exhibit 1 was
11   marked for identification and was retained by
12   counsel.)
13   BY MR. SCHWABER:
14       Q   Mr. Siegel, I've put before you what I've
15   had marked as Mark Siegel Exhibit 1.  Have you seen
16   that document before?
17       A   I have.
18       Q   Okay.  And this document is your notice for
19   your deposition today.  It includes, on pages 2 and
20   3, a listing of 15 categories of documents you were
21   requested to bring with you here today.  Have you
22   brought those documents with you?

11

1        A   Yes.
2        Q   And can I take a look at them now?
3        Okay.  I'm not going to -- I'll go through
4    all of them at a break.  But let's just go off the
5    record briefly, and let me skim through these.
6        THE VIDEOGRAPHER:  We are going off the
7    record.  The time is 9:41 a.m.
8        (Recess.)
9        THE VIDEOGRAPHER:  We are back on the
10   record.  The time is 9:47 a.m.
11       MR. LEWIN:  Let the record reflect that in
12   response to 15 numbered paragraphs on pages 2 to --
13   2 and 3 of the Amended Notice of Deposition, we've
14   provided to Mr. Schwaber, pages -- what?
15       How are they numbered?
16       MR. SCHWABER:  Appears to be 1 through 123.
17       MR. LEWIN:  1 -- they're Bates-stamped 1
18   through 123.
19       MR. SCHWABER:  Okay.
20   BY MR. SCHWABER:
21       Q   Mr. Siegel, I will ask you some questions
22   about some of these documents after we take a short

12

1    break in a little while.  But in terms of what was
2    produced, did you review the categories 1 through 15
3    in your Notice of Deposition?
4        A   I did.
5        Q   And the documents that are produced are in
6    response to those specific categories?
7        A   Yes.
8        Q   Are there any documents that you believe
9    exist that -- for whatever reason, including because
10   you couldn't find them or you didn't have a chance
11   to get them or any other reason, that you believe
12   exists that are responsive to these requests that
13   have not been produced?
14       A   The -- the only material that I couldn't
15   retrieve were -- I thought that possibly on my AOL
16   account, there might have been some e-mails between
17   me and Ridgewells.  But I was unable to get them
18   from AOL.  They're -- they're deleted and lost,
19   if -- if they existed.  I'm sorry.
20       MS. LEWIN:  If I can just add, I think that
21   the requests for Craig and Rebecca are the same.
22   We've asked them to now search the documents that

4 (Pages 13 to 16)

13

1  are in their possession. So there may be documents
2  that they find in their possession that are
3  responsive that Mr. Siegel doesn't have. I just
4  want to make sure that --
5      MR. SCHWABER: Okay. That's what -- I -- I
6  was going to get at that next. But I think I
7  understand.
8  BY MR. SCHWABER:
9      Q   So in other words, the -- the work you did
10  to produce documents 1 through 123 -- and I don't
11  want you to divulge communications with your
12  counsel. But is this just your work or yours and
13  your wife's work?
14     A   My wife -- my wife and I put that together.
15     Q   Okay. So there are four other plaintiffs
16  in this case including Michael Berenbaum, Melissa
17  Patek, and your daughter and son-in-law?
18     A   Yes.
19     Q   There were requests propounded on some of
20  those. But these documents were only gathered by
21  you and your wife?
22     A   That's correct.

14

1      Q   And do you believe, sitting here today,
2  that there are documents responsive to these
3  requests that are in the possession of your daughter
4  that you don't have?
5      A   She -- she -- my daughter dealt with some
6  vendors. I think you asked for documents of
7  vendors, contracts, and music, florists, things like
8  that. She dealt with them directly. So I believe
9  she has those documents. I don't know anything
10  else.
11     Q   Would she have been the contracting party
12  with those vendors?
13     A   I believe so, yes.
14     Q   Okay.
15     MR. LEWIN: Just to clarify, this is a
16  matter of technical point. I mean, that -- those
17  would not be documents that would be subject to the
18  definition on pages 2 and 3 because they're not in
19  Mark's possession, custody, or control but the
20  possession, custody, or control of the other
21  witnesses. So I think you said, "Are they documents
22  as described in 2 and 3 that he does not have?" But

15

1  I think this is the whole universe of the documents
2  defined on pages 2 and 3 of the notice. There may
3  be similar documents that are in the possession,
4  custody, control of others. That's all.
5      MR. SCHWABER: So -- fair enough.
6  BY MR. SCHWABER:
7      Q   So as far as your search and gathering, the
8  only category of documents that you believe existed
9  at one point that you haven't produced is the
10  possibility that you had some documents on an AOL
11  account that were since deleted, and AOL is telling
12  you they can't retrieve them?
13     A   Right. Exactly.
14     Q   Okay. And are there any categories of
15  documents requested in items 1 through 15 that you
16  believe exists but that you chose not to produce for
17  any reason?
18     A   No.
19     Q   Do you yourself keep kosher?
20     A   No.
21     Q   And both inside the home and outside the
22  home, you don't keep kosher; is that correct?

16

1      A   We no longer keep kosher inside the home.
2  We did at one -- at one point in our marriage.
3      Q   Okay. Well, approximately how long has it
4  been since you kept kosher inside your home?
5      A   I know exactly. Since -- since
6  December 1974.
7      Q   Okay. And was there some -- how do you
8  recall that date?
9      A   It was -- we kept kosher until our youngest
10  son was killed in an automobile accident. And then,
11  sort of, religion didn't -- we got out of touch with
12  religion for a few years.
13     Q   Okay. And the -- and from that date to
14  now, you've never, at any point, kept a kosher at
15  home?
16     A   We -- no. We don't have two separate
17  dishes and things like that. We have -- buy kosher
18  poultry and -- and things like that. But we -- we
19  don't -- we don't have two sets of dishes, if that's
20  what you mean. But we keep -- we -- the meat that
21  we buy is -- is kosher.
22     Q   And until December of 1974, did you keep

17

1   two sets of dishes?
2       A   Yes.
3       Q   Okay.  And did you -- you separated your
4   dairy products from meat products?
5       A   I did.
6       Q   And since that time, you don't?
7       A   That's correct.
8       Q   Okay.  Did you ever have any formal Jewish
9   education?
10      A   Yes.
11      Q   Can you describe it for me?
12      A   I -- for 8 years, I went to Hebrew school.
13  I also took Hebrew as a modern language in junior
14  high school.  And high school, had Bar Mitzvah.
15  Went to an Orthodox synagogue growing up in -- at
16  home.
17      Q   Where was that?
18      A   In Brooklyn, New York.  And we belonged to
19  conservative synagogues.  We were married by
20  conservative rabbi, and we've been going to
21  conservative synagogues since we've been married.
22      Q   What was the Orthodox synagogue you

18

1   belonged to in Brooklyn?
2       A   Rishon LeZion.
3           MR. LEWIN:  How do you spell that,
4   R-i-s-h-o-n, L-e-z-i-o-n?
5       A   Yeah.  Just like that.  A town that
6   produces wine in Israel.
7   BY MR. SCHWABER:
8       Q   And did you -- who was the rabbi of that
9   congregation while you were a member?
10      A   I happen to know the answer.  Gilbert
11  Steinberg.  It's very long time ago.
12      Q   Do you know if Mr. Steinberg is still
13  living?
14      A   I would guess he's dead.  He was an old man
15  at the time.
16      Q   Okay.  And when did you leave Brooklyn?
17      A   In 1967.
18      Q   Come to Washington?
19      A   To go to Northwest University.
20      Q   Okay.  And when did you graduate
21  Northwestern?
22      A   I got my master's degree from Northwestern

19

1   in -- in '68 and my Ph.D. from Northwestern in '72.
2       Q   And what's the field of your Ph.D.?
3       A   Political science.
4       Q   And how about your master's?
5       A   Political science.
6       Q   Okay.  And so in 1972, you finished your
7   graduate studies?
8       A   Yes.
9       Q   And then what did you do?
10      A   Actually, at the end of '71, I came to
11  Washington as a congressional fellow and worked for
12  Hubert Humphrey, Senator Hubert Humphrey, for a year
13  till November -- yeah, that was from November '71 to
14  November '72 -- no, till September '72.  I'm sorry.
15      Q   Okay.  And then what?
16      A   I returned -- we returned to Chicago, where
17  I was an assistant professor at Loyola University.
18      Q   In political science?
19      A   Yes.
20      Q   Till when?
21      A   Till January of 1973.
22      Q   And then what?

20

1       A   I was hired by the Democratic National
2   Committee, first, as specialist to the chairman,
3   then executive officer, then executive director.
4       Q   What year did you become executive
5   director?
6       A   '74, I believe.
7       Q   And how long were you with the DNC?
8       A   Through January of 1977.
9       Q   And at the time you left, you were still
10  executive director?
11      A   Yes.
12      Q   Okay.  And then what'd you do in '77?
13      A   Deputy assistant to the President,
14  President Jimmy Carter.
15      Q   Deputy assistant in what capacity?
16      A   It was -- it was a broad portfolio.  I was
17  working -- I was a deputy to the only person who had
18  a title of assistant to the President, which was not
19  a -- a designated -- a portfolio.  And he later
20  became chief of staff.
21      Q   Who is that?
22      A   His name is Hamilton Jordan.

Case 1:05-cv-01717-RJL    VIDEOTAPED DEPOSITION OF MARK A. SIEGEL    Page 6 of 56
Document 84-8    Filed 03/30/2006
CONDUCTED ON THURSDAY, JANUARY 19, 2006

6 (Pages 21 to 24)

21

1    Q    And then how long were you with the Carter
2    Administration?
3    A    Through March of 1978.
4    Q    And then what'd you do?
5    A    After I resigned from the White House, I
6    opened up -- first, I -- I did some lectures around
7    the country. And in July of 1977, I opened up --
8         MR. LEWIN: '77 or '78?
9    BY MR. SCHWABER:
10    Q    You said you left the White House in March
11    of --
12    A    I'm sorry. '78. In -- in July of -- of
13    1978, I opened up my own firm, a domestic lobbying
14    firm.
15    Q    And what was the name of that firm?
16    A    Mark A. Siegel & Associates, Incorporated.
17    Q    Any particular issues or was it just
18    generally domestic?
19    A    My first client was the largest producer of
20    ethanol in the country. And I did -- I had many
21    different kinds of clients: some -- some schools,
22    some cities, some corporations.

22

1    Q    And how long were you running Mark A.
2    Siegel & Associates?
3    A    Right through 2001. I'm trying to think
4    when -- yeah, right through October of 2001.
5    Q    And did you close Mark Siegel & Associates
6    at that time?
7    A    I did.
8    Q    And what did you do in October of 2001?
9    A    I -- I also -- I opened -- I had another --
10    another firm that dealt with international work,
11    which was simultaneous to the Mark A. Siegel &
12    Associates.
13    Q    So you were doing both works professionally
14    but through different corporate entities?
15    A    Yes.
16    Q    And what was the name of the international?
17    A    International Public Strategies,
18    Incorporated.
19    Q    Same office location?
20    A    Yes.
21    Q    What was that address?
22    A    They were -- okay. First, 400 North

23

1    Capitol Street, and then 1030 15th Street, then 2120
2    P Street.
3    Q    Northwest?
4    A    Yes. All -- all northwest.
5    Q    And did you close both entities, Mark A.
6    Siegel & Associates and International Public
7    Strategies, in October 2001?
8    A    Yes.
9    Q    And then what did you do?
10    A    I became chief of staff to Congressman
11    Steve Israel, Second Congressional District of New
12    York.
13    Q    Okay. How long did you have that title?
14    A    Through May of 2004.
15    Q    And what'd you do in May of 2004?
16    A    I -- on June 1st, I -- I joined New Century
17    Financial Corporation as vice president for
18    government affairs and opened their Washington
19    office.
20    Q    You have the same title today?
21    A    Yes.
22    Q    How many are in the Washington office?

24

1    A    There are two full-time employees and a
2    paid intern.
3    Q    Okay. Do you -- did you believe, as of the
4    morning, let's say, of your daughter's wedding that
5    your daughter's wedding was to be a kosher affair?
6    A    I believe that all the food was going to be
7    kosher. And it was going to be parve. What was
8    going to -- no dairy products would be served.
9         MR. LEWIN: Parve, P-a-r-v-e.
10    A    We had worked out all the details and made
11    sure that -- that that was the case, that all food
12    would be kosher and nothing would have any dairy
13    products.
14    BY MR. SCHWABER:
15    Q    If you were standing at the door to the
16    Corcoran as a guest -- as a guest arrived -- let's
17    say, half an hour before the wedding was to begin,
18    an early guest arrived. And the guest said to you,
19    "Is this a kosher wedding?" What would your answer
20    be?
21    A    I would have said, All of the food is
22    kosher, and all the food is parve. And that was the

25

1  level of Kashruth that I was comfortable with. And
2  I — I believed all my guests would be since my
3  rabbi, for instance, ate at my home, ate in
4  restaurants. Others — others who are observant
5  also ate at restaurants. And I thought this was the
6  level of Kashruth that was satisfactory to me and
7  would be satisfactory to my guests.
8      Q   So you would have put those qualifiers on
9  it? You wouldn't have said yes to the question of,
10 "Is this a kosher wedding?"
11      MR. LEWIN: Objection. Go ahead. Go
12 ahead.
13      A   I — I would have said that — that the
14 food is — kosher, yeah.
15 BY MR. SCHWABER:
16      Q   So if — if I was a guest and I'd asked
17 you — and you didn't know how I kept — what kind
18 of home I kept — and I said, "Mark, is this a
19 kosher wedding?" would your answer have included the
20 qualifiers, or would you have said yes?
21      A   I — I would have said, "The food is kosher
22 and parve."

26

1      Q   And what if I said, "What about the
2  ingredients that were used in the food?"
3      A   Kosher and parve.
4      Q   Okay. So was it your belief that all of
5  the ingredients used had — were kosher ingredients?
6      A   I was assured of that.
7      Q   And what specifically were you assured of?
8      A   That everything — all the food, all the
9  meat products would be kosher meat, that all the
10 fish would be nonshellfish, and that there would be
11 no milk products of any kind — no cheese, no
12 butter, no milk in anything including the cake,
13 including the — the cream that was served at the —
14 with coffee. We worked that out in — in very, very
15 careful detail.
16      Q   Okay. And getting back to the
17 ingredients —
18      MR. LEWIN: I object to the term — the use
19 of the word "ingredients." Do you want to define
20 that some more? You're talking about, you know,
21 spices and things like that, or —
22 BY MR. SCHWABER:

27

1      Q   Spices and things like that. In other
2  words, by — my definition of ingredients that I'll
3  ask you to understand is, as opposed to the finished
4  product that is served to the guests, the things
5  that go into it. So the — the molasses and the
6  spices and the ketchups and those kinds of things
7  that go into the sauces.
8      Did you — did you have an understanding as
9  to whether those ingredients needed to be certified
10 as kosher?
11      A   Toby Nann, who was the person that I was
12 working with, told me specifically that she had been
13 a mashgiach or kodesh; that she knows what to do and
14 that everything would be perfect. And I checked out
15 the fact that she had, in fact, been mashgiach or
16 kodesh with —
17      MR. LEWIN: Mashgiach is M-a-s-h-g-i-a-c-h.
18      A   Check — check out that she had been
19 mashgiach, and she was, in fact — had been in that
20 capacity. And she assured me everything — that she
21 knows what to do, and everything would be perfect.
22 She said that many times.

28

1  BY MR. SCHWABER:
2      Q   Okay. You may have misunderstood my
3  question, or I might not have phrased it correctly.
4  Regardless of Toby Nann's credentials, my question
5  was, Did you have an understanding or an expectation
6  that, for example — I'll make up an ingredient,
7  cranberry sauce.
8      A   Yes.
9      Q   That cranberry sauce, that the package
10 would have a particular certification on it?
11      A   When — when Toby Nann and — and my wife,
12 in particular, were — were picking orders, for
13 instance, Toby Nann would indicate which hors
14 d'oeuvres they could do kosher and which they
15 couldn't. They went through a — a long list. And
16 only some of the hors d'oeuvres could be done
17 kosher. And those were the only hors d'oeuvres
18 we've ordered. So yes, that was our expectation.
19      Q   You ordered the wine?
20      A   I did.
21      Q   And I have the listing here.
22      A   Yes.

29

1    Q   But do you recall what wine you ordered?
2    A   Chateau Margot was the -- was the red wine.
3  I don't remember. There was a Perseco. There was a
4  French champagne, and there was a white wine.
5    Q   Were those kosher wines?
6    A   No.  I mean, I -- the only time I ever use
7  kosher wines is -- is on Passover.  And I don't know
8  any of the guests at my wedding who drank only
9  kosher wine.  Certainly, the -- the rabbi who came
10 to my house many times would always drink wine.  And
11 that was the level of -- that was the level of
12 Kashruth that -- that we observed.
13   Q   So it was your expectation that you were
14 going to not buy kosher wine?
15       MR. LEWIN:  Object to the form of that
16 question.
17 BY MR. SCHWABER:
18   Q   I'll rephrase the question.  It was a poor
19 question.  You specifically arranged to purchase the
20 wine yourself and not through Ridgewells, correct?
21   A   Correct.
22   Q   And Ridgewells could have purchased the

30

1  wine for you had you elected to do that?
2    A   Correct, I assume.
3    Q   Okay.
4    A   I assume.
5    Q   And you elected to purchase wine without
6  regard to it being a kosher product, correct?
7    A   I purchased the -- the same kind of wine
8  that I used at my children's events in our
9  synagogue.  We never used kosher wine at that -- in
10 our synagogue.  And this is the level -- I didn't
11 know any of my guests who insisted on drinking
12 kosher wine.  I certainly never drank kosher wine.
13 I bought the kind of wine that I thought would be a
14 good wine.
15   Q   And you elected to purchase -- you elected
16 to purchase the wine without regard to whether it
17 was a kosher product, correct?
18       MR. LEWIN:  I'll object to the form of that
19 question.  You say "without regard."  I think the
20 witness has said that he drank non-kosher wine, and
21 he purchased non-kosher wine for the event.
22       MR. SCHWABER:  I understand that.

31

1  BY MR. SCHWABER:
2    Q   I'm not -- I'm -- I'm not asking you at
3  this point to justify it or not.  I'm simply asking
4  what I believe is a yes-or-no question.
5        In your selection of wine, you did not
6  concern yourself with whether it had a kosher label,
7  correct?
8    A   Correct.
9    Q   Okay.  The dishes -- or strike that.
10       You knew at all times that Ridgewells
11 catering business, among other things, has
12 non-kosher foods, correct?
13   A   Yes.
14   Q   And you knew that -- so you knew
15 Ridgewells, as a catering establishment, was not
16 strictly kosher for all purposes?
17   A   Correct.
18   Q   And did you understand that the dishes
19 being used at the wedding you were hosting were
20 kosher dishes or non-kosher dishes?
21   A   I -- I -- I knew that the dishes were not
22 separate kosher dishes, but we didn't have separate

32

1  kosher dishes in our home.  We didn't have separate
2  kosher dishes in restaurants.  And I knew every one
3  of my guests, including my rabbi, ate in my home and
4  ate in -- on dishes at restaurants that were not --
5  were -- were not kosher dishes.  And that was the
6  level of Kashruth that we were comfortable with.  We
7  wanted kosher food and parve food.
8    Q   Mr. Siegel, the -- what I'm trying to do is
9  ask you some questions that are narrowly tailored.
10 And my sense is, you're explaining your reasons for
11 an answer.  I may ask you at times, why did you do
12 it that way, in which case I'll ask you for your
13 reasons.  But otherwise, I'm just asking you what, I
14 think, are yes-or-no questions at this point.  So
15 I'll ask you to listen to my question and see if you
16 can answer it that way.  If you can't, then so be
17 it.
18       The dishes that were used to serve the
19 guests at your wedding, you understood, in advance
20 of the wedding, that those dishes would have been
21 unkosher dishes, correct?
22   A   Yes.

33

1    Q   And you understood that on those dishes
2  could have been pork products the day before,
3  correct?
4    A   And the dishes had been washed in washing
5  machines and -- and boiled and, to me, kosherized,
6  but yes.
7    Q   Okay. You, at one time in your home, had
8  separate dishes?
9    A   At one time.
10   Q   And then stopped having separate dishes?
11   A   Yes.
12   Q   And you did that without delving too deeply
13 into the reasons based on a belief that you weren't
14 going to adhere to the same level of religion as you
15 had previously?
16      MR. LEWIN:  Object to the introduction of
17 that question. If you want to ask a question, ask
18 it. But I think there was an introductory --
19      MR. SCHWABER:  Fair enough.
20 BY MR. SCHWABER:
21   Q   The reason you went from -- or at the time
22 you went from using two sets of dishes in your house

34

1  to using only one set, you knew that in so doing,
2  you would not be adhering to the same strictness of
3  Jewish religious observance, correct?
4    A   Yes.
5    Q   Okay. So you understood a distinction
6  between having separate dishes and not regardless of
7  how clean the dishes are?
8    A   Yes.
9    Q   And you -- the dishes you were using for
10 the guests at your daughter's wedding, you knew,
11 could have had shrimp on them as recently as the day
12 before, correct?
13   A   Yes. Since you want me to answer only yes
14 and no, yes.
15   Q   Well, I don't want you to -- I want you to
16 answer the way you feel you need to answer. I'm not
17 trying to restrict your answer to my question.
18   A   As I said, if my -- if my own rabbi ate on
19 plates in restaurants or at my home that might have
20 had unkosher food on them and that was acceptable to
21 him, I -- I had no problem thinking it was
22 acceptable to the guests at my wedding.

35

1    Q   Okay. Did you inform any of the guests at
2  your wedding that the dishes being used were not
3  kosher dishes?
4    A   No.
5    Q   How do you know Michael Berenbaum?
6    A   Michael is a very old and close friend of
7  both my wife and I for many years.
8    Q   Okay. So as it relates to lists of
9  invitees, was he on your list as opposed to your
10 daughter's?
11   A   Yes.
12   Q   He was a friend of yours?
13   A   Yes.
14   Q   Okay. And Melissa Patek, his wife?
15   A   Correct.
16   Q   And does Michael Berenbaum keep separate
17 dishes in his home?
18   A   Yes.
19   Q   Did you ever discuss with Michael Berenbaum
20 before your daughter's wedding the fact that the
21 dishes you were going to be using to serve him at
22 the wedding were not kosher dishes?

36

1    A   I'm not sure.
2    Q   Okay.
3    A   But Michael, again, ate in my home many,
4  many times on dishes that he knew were not kosher
5  dishes.
6    Q   Okay. Do you know if Michael Berenbaum has
7  ever eaten shrimp knowingly?
8       MR. LEWIN:  I object to -- go ahead.
9  Answer it.
10   A   Michael would never, knowingly, eat shrimp.
11 BY MR. SCHWABER:
12   Q   Do you know if he ever has?
13   A   No.
14   Q   Do you know if Melissa Patek has eaten
15 shrimp knowingly?
16   A   I don't know. I don't -- I meant, Melissa
17 is married to Michael. I -- I -- I've not known
18 Melissa all my life. I've known Michael almost all
19 my life.
20   Q   Did you know that Melissa didn't keep
21 kosher before they were married?
22   A   I think I did, yes. Now that you mention

Case 1:05-cv-01717-RJL VIDEOTAPED DEPOSITION OF MARK A. SIEGEL Page 10 of 56
Document 54-8 Filed 10/30/2006
CONDUCTED ON THURSDAY, JANUARY 19, 2006

10 (Pages 37 to 40)

37

1  it, yes. And when they got married, she -- she kept
2  a kosher home.
3    Q   The officiating rabbi at your daughter's
4  wedding, when -- well, you've told me a few times
5  your rabbi. Is that the same person?
6    A   Yes.
7    Q   And who is that?
8    A   Jeffrey Wohlberg.
9    Q   And did you tell Mr. Wohlberg --
10     MR. LEWIN: Rabbi Wohlberg.
11  BY MR. SCHWABER:
12    Q   I'm sorry. Did -- did you tell Rabbi
13  Wohlberg before the wedding that the dishes that
14  were being used were not kosher dishes?
15    A   I told the rabbi that the food was kosher
16  and parve.
17    Q   Did you talk to him about the dishes?
18    A   No.
19    Q   You understood from your conversations with
20  Toby Nann before you contracted with Ridgewells that
21  Ridgewells has an option of serving food on kosher
22  dishes, correct?

38

1    A   Yes.
2    Q   And you specifically declined that option?
3    A   It was not the level of Kashruth that --
4  that I wanted for the wedding. I thought it was
5  necessary for the wedding or that my guests at the
6  wedding observed. Again, everyone at the wedding,
7  as far as I know, eats out in restaurants. Kosher
8  food, possibly fish, but always eats in restaurants.
9  And many of them have eaten in my home. And that
10  was the level of Kashruth that we wanted. And
11  that's what we thought we were getting.
12     MR. SCHWABER: Madam Court Reporter, can
13  you read back my last question?
14     (The reporter read the record as
15  requested.)
16  BY MR. SCHWABER:
17    Q   Did you understand that question?
18    A   Yes.
19    Q   You specifically declined the option,
20  correct?
21    A   Yes.
22    Q   Okay. Do you know what a mashgiach is?

39

1    A   Yes.
2    Q   What is a mashgiach?
3    A   That would be a rabbinical supervisor.
4    Q   And what is your understanding of the
5  purpose of a mashgiach as it relates to food?
6    A   To make sure that all the food that's
7  served is kosher and prepared in a kosher kitchen.
8    Q   Would you agree with the following
9  statement: In order to be able to certify an event
10  as kosher, a mashgiach is required?
11     MR. LEWIN: Objection. Go ahead. Answer
12  the question. That's objection to the form of the
13  question.
14    A   My level of Kashruth is kosher food and
15  parve food. The person I was dealing with at
16  Ridgewells said that she had been a mashgiach, and
17  she would make our wedding perfect. I relied on it.
18  My wife relied on it. My daughter relied on it. My
19  son-in-law relied on it. We thought we were getting
20  kosher and parve food, and we didn't get it.
21  BY MR. SCHWABER:
22    Q   Mr. Siegel, you're going to have ample

40

1  opportunity in this case to articulate your
2  position. Right now, I need you to answer my
3  questions. So let me try that question again.
4     MR. SCHWABER: Can you read back my last
5  question?
6     (The reporter read the record as
7  requested.)
8     MR. LEWIN: Again, I object to the form of
9  the question. Certify for whom? Certify? I mean,
10  you're making -- you're making -- you're presenting
11  the witness with a statement. And the form of the
12  question is clearly objectionable. You say "in
13  order to certify." Certify for a Catholic priest?
14  I mean, for whom are you certifying this?
15     MR. SCHWABER: Counsel, I -- I heard your
16  objection. You can object. And I asked the witness
17  if he agrees with this statement.
18     MR. LEWIN: All right.
19    A   Would you repeat it again?
20  BY MR. SCHWABER:
21    Q   In order to be able to certify an event as
22  kosher, a mashgiach is needed?

41

1     A    A -- a mashgiach like Toby Nann who -- who
2    told me everything would be perfect.
3     Q    Okay.  So is it your understanding that
4    Toby Nann was serving as the mashgiach at your
5    wedding -- at your daughter's wedding?
6     A    It was my understanding, she would make
7    sure that all the food was kosher and parve.  And
8    she would make sure it was perfect.
9     Q    Is it your understanding that Toby Nann was
10   serving as the mashgiach at your daughter's wedding?
11    A    She volunteered that she was a mashgiach to
12   reassure, I said, everything would be perfect.
13    Q    She volunteered that she had been a
14   mashgiach in a prior job, correct?
15    A    Yes.
16    Q    My question was, In this job, the wedding
17   of your daughter, was it your understanding that
18   Toby Nann was serving as the mashgiach at that
19   wedding?
20    A    No.
21    Q    Okay.  Would you agree that you did not
22   have a mashgiach at that wedding?

42

1   :  A    Yes.
2     Q    And in order to call that a kosher wedding,
3    in your opinion -- I'm only asking about your
4    opinion.  In order to call that a kosher wedding,
5    would a mashgiach have been needed?
6     A    My level of Kashruth, if the food is kosher
7    and if the food is parve, that is kosher to us.
8    Maybe not to you, but it's -- it's kosher to us and
9    to the people in my community.
10    Q    And when you say "if the food is kosher and
11   parve," you mean regardless of the plates it's
12   served on, correct?
13    A    As I said, anyone who can eat in a
14   restaurant could eat at that wedding comfortably
15   because the food was to be kosher and parve.
16    Q    And your definition of the food being
17   kosher, as you define it --
18    A    Yes, exactly, in my definition.
19    Q    -- would mean that it doesn't matter what
20   plates it's served on, correct?
21    A    Kosher meat, kosher poultry, and nondairy
22   products.

43

1     Q    Kosher poultry and nondairy products served
2    on unkosher plates would be kosher in your
3    definition?
4        MR. LEWIN:  I object to the description of
5    unkosher plates.
6    BY MR. SCHWABER:
7     Q    Kosher -- kosher meat served on plates that
8    had been used for non-kosher food would be kosher,
9    according to your definition?
10    A    The food?  Yes, the food would be kosher.
11    Q    Okay.  Kosher meat cooked in ovens that
12   have cooked pork, would that kosher meat stay
13   kosher?
14    A    By my level of Kashruth, that -- that meat
15   is kosher meat.
16    Q    And by your level of Kashruth, that's the
17   level that you had an expectation of for the guests
18   at your daughter's wedding, correct?
19    A    And -- and the expectation that I was
20   receiving from Ridgewells, yes.
21    Q    Okay.  And your expectation was that the
22   event would remain kosher even with non-kosher wine

44

1    being served?
2     A    Yes.
3     Q    And --
4     A    By my level of Kashruth and my guests'
5    level of Kashruth, yes.
6     Q    There was prayer on the bread at your
7    daughter's wedding dinner, correct?
8     A    Yes.
9     Q    Just let me finish the question before you
10   answer.  There was a prayer on the bread, correct?
11    A    Yes.
12    Q    And that prayer is called the Motzi?
13    A    Yes.
14        MR. SCHWABER:  That's M-o-t-z-i.
15   BY MR. SCHWABER:
16    Q    And the Motzi took place just before the
17   sit-down portion of the affair, correct?
18    A    Yes.
19    Q    Or I guess as the sit-down began?
20    A    Yes.
21    Q    And so all the hors d'oeuvres were served
22   prior to the Motzi?

12 (Pages 45 to 48)

45

1    A    Yes.
2    Q    And the hors d'oeuvres included finger
3    rolls, correct?
4    A    Yes.
5    Q    And black bread?
6    A    Yes.
7    Q    Okay.  Did you have any expectation that
8    any of your guests would have a problem being served
9    rolls prior to the Motzi?
10    A    No.  If they had a problem, I guess they
11    wouldn't have eaten them.
12    Q    Okay.  And the wedding was on a Saturday
13    night, correct?
14    A    Correct.
15    Q    What month?
16    A    April.
17    Q    Do you know what time the Sabbath ended
18    that night?
19    A    Rabbi Wohlberg coordinated that.  And --
20    and -- and actually, the ceremony started at -- at
21    7:35 because he couldn't -- he couldn't travel from
22    his home until the Sabbath had ended.  And so I

46

1    don't know the exact time.  It was probably about
2    7:00 or 6:55 that the sun went down because he
3    managed to get to the Corcoran about 7:15 or 7:20.
4    Q    Okay.  And when did you start serving
5    anything to your guests?
6    A    We started serving food to our guests at
7    the beginning of the reception, 8:10.  When they
8    came in, they were offered water.
9    Q    Okay.  You understood that some of the food
10    being prepared for your guests was being cooked
11    during the Sabbath, correct?
12    A    Yes.
13    Q    And did that present any problem to you in
14    terms of your expectations of the level of kosher
15    observance for the wedding?
16        MR. LEWIN:  Objection to the form.  Any
17    problem to the expectations, it's --
18        MR. SCHWABER:  I'll -- I'll rephrase.
19    BY MR. SCHWABER:
20    Q    Did -- did you have any concerns about
21    serving any of your guests food that had been cooked
22    on the Sabbath?

47

1    A    No.
2    Q    Did you tell your rabbi that you were
3    serving him food that had been cooked on the
4    Sabbath?
5    A    Never was discussed.
6    Q    Okay.  But your rabbi told you that he
7    couldn't leave his house to travel until after the
8    Sabbath ended?
9    A    Yes.
10    Q    You were originally presented with a
11    proposal from Ridgewells that included the cost
12    associated with having a strictly kosher wedding,
13    correct?
14    A    Yes.
15    Q    And how is it that they came to present you
16    with that?  Is that what you asked for?
17    A    There were three kosher caterers that the
18    Corcoran would allow to work at the Corcoran.  And
19    Ridgewells was one of them.
20    Q    You contacted Ridgewells first?
21    A    I contacted two simultaneously.
22    Q    Ridgewells was one of those?

48

1    A    Yes.
2    Q    And who was the other?
3    A    Windows.
4    Q    Okay.  And you understand that Windows,
5    similar to Ridgewells, serves unkosher food, or did
6    you not have that understanding?
7    A    Ridgewells has a -- Windows has a -- a
8    kosher division headed by June Fischer, who did --
9    did a lot of catering.  And yes, I know that Windows
10    also has non -- a non-kosher division.  But I also
11    knew they had a kosher division --
12    Q    Okay.
13    A    -- and was told that by our synagogue.  We
14    were told -- we were told that Ridgewells had a
15    kosher division by our synagogue.
16    Q    So at the time you went searching for
17    caterer, you had already picked the location for the
18    wedding?
19    A    That's correct.
20    Q    So you had to go with somebody that the
21    Corcoran would allow in?
22    A    Yes.

49

1   Q   And the list of caterers that offer a
2   kosher option that the Corcoran would allow in was
3   only two?
4   A   There was a third, we were told, in New
5   Jersey. And we didn't want to have to deal with a
6   caterer that brought in food from New Jersey.
7   Q   Was it Foremost?
8   A   I -- I don't know if -- I don't remember
9   the name.
10  Q   Okay. The --
11  A   I'm not sure I was ever told the name.
12  Q   Okay. The -- so you contacted Windows.
13  And you said June Fischer -- is it Sue Fischer?
14  A   Sue -- I'm sorry. June Fischer's on the
15  Democratic National Committee. That's a mistake.
16  Q   So you contacted Windows, and you contacted
17  Ridgewells essentially simultaneously?
18  A   Simultaneously, yeah.
19  Q   And what did you tell them?
20  A   That our daughter was getting married on
21  June 6th, and we wanted kosher --
22      MS. LEWIN: April.

50

1   A   April 6th. April -- April 6th. And
2   that -- that -- and that we wanted kosher. And they
3   were recommended by the -- by the Corcoran.
4   BY MR. SCHWABER:
5   Q   Okay. And you solicited a contract from
6   each of them or a proposal?
7   A   A -- a proposal, yes.
8   Q   And did you get a proposal from both?
9   A   Yes.
10  Q   I haven't studied these in detail. But the
11  documents you brought today, would that include the
12  Windows' proposal?
13  A   I -- I don't know. I don't -- there --
14  there -- there are some notes in there that my wife
15  took with prices. And I -- I don't know if it's on
16  Windows' stationery. But that's -- that was the
17  Windows' discussion.
18  Q   Okay. And the contact --
19  A   I don't -- I don't recall. I mean, there
20  could have been -- this is with the AOL account.
21  And there could have been an e-mail from Windows and
22  from Ridgewells. I just don't have those, if they

51

1   did exist.
2   Q   Do you recall as between you and your wife
3   who first contacted Ridgewells?
4   A   I initially contacted both.
5   Q   Okay. And for Ridgewells, how -- how did
6   you make the first contact?
7   A   I called Ridgewells and asked for their
8   kosher division and was transferred to Toby Nann or
9   Toby Nann's voice mail. I don't recall.
10  Q   Okay. And whether it was on that call or
11  soon thereafter, you started talking with Toby?
12  A   I had one conversation, yes.
13  Q   Telephonic?
14  A   Yes.
15  Q   And that's where you told her the date and
16  that you were doing it at the Corcoran and that you
17  wanted a kosher affair?
18  A   Yeah. I asked if they were -- if they were
19  available and -- and to submit a proposal.
20  Q   And you told her it was -- you wanted her
21  to submit a proposal for a kosher affair?
22  A   Yes.

52

1   Q   And you were specific about that?
2   A   Kosher, yes.
3   Q   Okay. And did you ever consider a strictly
4   kosher caterer as of that time?
5   A   A strictly kosher caterer?
6   Q   My definition of strictly kosher caterer is
7   a caterer that only offers the option of kosher
8   food?
9   A   I think somewhat later, we considered
10  Shalom, which I think is a strictly kosher caterer.
11  Q   Okay. But as of the first conversation you
12  had with Toby Nann, had you considered using a
13  caterer that only does kosher?
14  A   I -- I believe the kosher division of
15  Windows is separate in all respects. The Sue
16  Fischer division of -- of -- of Windows was strictly
17  kosher.
18  Q   Okay. And you knew that Ridgewells didn't
19  have a separate, in all effects, kosher division,
20  correct?
21  A   Yes.
22  Q   And so -- but you asked Ms. Nann to give

53

1    you a proposal for kosher?
2        A   Right.
3        Q   And she did that, right?
4        A   She did. I don't know when -- I don't
5    recall when she responded or in what form. I would
6    think it would have been an e-mail. But again, I
7    don't have it.
8        Q   But you rejected that proposal?
9        A   We -- my wife was quite taken with -- with
10   Sue Fischer, her reputation. And that was always my
11   wife's first choice. And the proposal was a better
12   proposal in every respect. And my -- my wife wanted
13   to go with -- with Windows.
14       Q   When you say "the proposal was a better
15   proposal," you mean the Windows' proposal was a
16   better proposal than the Ridgewells' proposal?
17       A   Correct.
18       Q   And you got them essentially
19   simultaneously?
20       A   Approximately at the same time.
21       Q   Okay. Did you agree with your wife's
22   assessment?

54

1        A   Yes.
2        Q   And so you rejected Ridgewells?
3        A   Yes.
4        Q   And Ridgewells' proposal to you that you
5    rejected was for their kosher option, including
6    cooking in a kosher facility, using separate dishes,
7    and having a mashgiach for all purposes, correct?
8        A   Yes.
9        Q   And there were charges associated with
10   that?
11       A   Yes.
12       Q   Add-ons to their contract?
13       A   I don't know if it was ever presented as an
14   add-on. I think it was presented as a -- as a
15   per-person charge.
16       Q   But you understood you'd be paying for the
17   mashgiach, right?
18           MR. LEWIN: Objection to the form of that
19   question. Paying for the mashgiach? I mean, he --
20   the witness has testified there would be additional
21   charges.
22   BY MR. SCHWABER:

55

1        Q   Did you understand, among those additional
2    charges, there would be an additional charge to have
3    the mashgiach?
4        A   I think both proposals that we received had
5    an all-inclusive per-person price. I didn't know
6    anything about additional charges. I thought
7    everything was included in -- in those estimates.
8        Q   Do you recall -- I'll show you in a little
9    while the Ridgewells contract format that you
10   ultimately signed. But do you recall it has price
11   line items?
12       A   No, I don't. I thought we signed basically
13   a very complicated menu that, at the very end, had a
14   signature line.
15       Q   Do you recall, for example, a line item in
16   the contract you ultimately signed for $500 for
17   kosher meat?
18       A   There was no such line item.
19           MR. LEWIN: Object to the form of the
20   question too because I don't think there's any
21   evidence at all that Mr. Siegel signed any contract.
22           MR. SCHWABER: Fair enough.

56

1    BY MR. SCHWABER:
2        Q   I'll wait till I show you the contract.
3    But so you understood, whether it was specifically
4    for a mashgiach or not, that there would be extra
5    charges associated with a kosher affair?
6        A   Yes.
7        Q   And you rejected that proposal?
8        A   We accepted the proposal from Windows. It
9    was a better proposal in every respect.
10       Q   And you rejected the Ridgewells one?
11       A   Yes.
12           MR. LEWIN: Object to the form of the
13   question. "Rejected." I mean, I don't think the
14   witness has testified that he rejected anything.
15       A   I --
16   BY MR. SCHWABER:
17       Q   The -- what happened next? In other words,
18   you've told me now that you accepted a Windows'
19   contract. We're obviously here because you used --
20       A   A proposal.
21       Q   A proposal. We're obviously here because
22   you used Ridgewells. So how did that come about?

57

1    A   My wife did all the discussions with —
2    with caterers. And she got into a — a long
3    discussion, dialogue with — with Sue Fischer. We
4    went to Sue Fischer's shop. We did a tasting. We
5    agreed to a menu. We gave them our credit card for
6    the deposit. And weeks passed and we never got a
7    contract and no charges were ever taken out of our
8    credit card.
9         And my wife became concerned, and she
10   called Sue Fischer. And Sue Fischer said that she
11   was having computer problems or things and that it
12   would be forthcoming. And that went on for several
13   weeks. And my wife felt that this was getting
14   problematic in terms of time and didn't understand
15   what the issue was. And I — we agreed that — that
16   I would call Sue Fischer and ask for her to produce
17   a contract or that we weren't going to use her
18   services.
19        And she didn't produce her contract.
20   And — and I called her and I said that we weren't
21   going to be using her services. And she said, "I
22   understand." And then the next day or the day after

58

1    that, she called me and explained the circumstances
2    that led to this — to this problem. And it was an
3    internal Windows' issue. And she thought she owed
4    me an explanation.
5     Q   Okay. And do you recall approximately when
6    that was that you had the discussion that led you to
7    conclude you're not using Windows anymore?
8     A   I'll just ballpark October, but I'm — I'm
9    not — I'm not really sure.
10    Q   So that would have been October '04?
11    A   Yes.
12    Q   And what'd you do then?
13    A   I called — I called Ridgewells and asked
14   for the kosher division and was put through to Toby.
15   I either got her directly or got her voice mail.
16   But in any case, we spoke. I told her what had
17   happened. I asked her if — if the date was still
18   available for — for — for Ridgewells because we'd
19   like to talk to them, and she said, "Yes."
20        And then she volunteered that — that there
21   was another option that they could provide, which
22   would be kosher food and parve food, but not — I

59

1    don't know if she used the term "bells and
2    whistles," but not all the extra things. And I
3    said, "That is" — I said, "I — we should have been
4    talking about that all along because that's the
5    level that I always wanted: kosher food and parve
6    food." And I said, "That's great." And I told my
7    wife that. And then we went to see Toby, and she
8    had prepared a little tasting of food for us. And
9    she sat down with my wife, and they started to work
10   out menus — of kosher menus, kosher entrees, kosher
11   hors d'oeuvres. And she made it clear to my wife
12   which Ridgewells could do kosher and which couldn't
13   be done kosher. And we — we entered into — my
14   wife entered into a contract, or at least, we
15   thought it was a contract. It was a — a long
16   careful delineated menu with charges at the bottom
17   and a sign-in sheet. And my wife signed that.
18    Q   The discussion about another option that
19   Ridgewells could provide, that came about because
20   you told her you didn't want to go with the kosher
21   option she had presented to you?
22    A   No. Actually, that's not right.

60

1     Q   How did -- how did another option come up?
2     A   She put it on -- she put it on the table.
3    I mean, she brought it up when I called her and
4    asked her if the date was available. And she said,
5    "You know, there is another option. We could do
6    kosher food and parve food and not have the separate
7    kitchen."
8         And I said, "That -- that is exactly the
9    level of Kashruths that I wanted. That's perfect."
10    Q   When you rejected Ridgewells the first
11   time, did you tell her that you didn't want to pay
12   for the kosher option that she had presented?
13        MR. LEWIN: Objection again to the use of
14   the word "rejected." The witness has not testified
15   that he rejected anything. He said he chose the
16   other option, not that he rejected anything. So I
17   object to the use of that word in the question.
18   BY MR. SCHWABER:
19    Q   I believe the witness did say that, but the
20   record will speak for itself.
21        In any respect, the -- the discussion about
22   another option arose because Toby knew that you were

61

1  interested in another option, right?
2      A  I never asked for another option.  When I
3  called Toby, it was to talk about that -- that --
4  the proposal.  I mean, we were revisiting the issue.
5  She is the one who mentioned another option.
6      Q  Was it out of the blue?
7      A  Yeah, actually, it was out of the blue.
8  And we had -- I guess she knew that we had gone
9  with -- with the other caterer because it was a
10  better proposal in all respects, including a better
11  price.  And maybe she put that on the table because
12  this would make it a more competitive price.  But
13  she definitely put it on the table herself.  I
14  didn't ask for that option.
15      Q  So if Toby --
16      A  And when I called my wife and told her
17  there was an option, she was surprised.  And we both
18  thought it was terrific because that's the level of
19  Kashruth that we thought would be good for the
20  wedding.
21      Q  So the level of Kashruth that you were
22  looking for -- Kashruth is K-a-s-h-r-u-t-h.  The

62

1  level of Kashruth that you were looking for was a
2  level consistent with your personal observance?
3      A  And the observance of the -- what I thought
4  was the observance of -- of the guests and my
5  community and my friends and my observant friends
6  and my rabbi and my rabbi friends, yes.
7      Q  Would you agree that of the approximately
8  240 guests -- is that how many there were?
9      A  (Nodding.)
10      Q  Is that a yes?
11      A  Yes.  I'm sorry.
12      Q  Okay.  Of the approximately 240 guests,
13  that there were a wide array of levels of Jewish
14  religious observance among the guests -- among the
15  Jewish guests?
16      A  To the best of my knowledge, there were no
17  Orthodox Jews.  There were many non-Jews.  There
18  were reformed and conservative Jews.  But there was
19  no one there, as far as I know, that was Orthodox.
20      Q  And as it relates to levels of observance
21  of Kashruth, can we agree that among your Jewish
22  guests, there were myriad levels?

63

1      MR. LEWIN:  Object to the form.
2  BY MR. LEWIN:
3      Q  You can answer.
4      MR. LEWIN:  Go ahead.  Answer if you can
5  understand it.
6      A  As far as we knew, every one of our
7  guests -- every one of our Jewish guests would eat
8  in our home and would eat in restaurants.
9  BY MR. SCHWABER:
10      Q  Had everyone of the Jewish guests at the
11  wedding eaten in your home?
12      A  Not everyone.
13      Q  Okay.  If I presented you with a list of
14  the guests at your wedding, could you go through
15  that list and identify the level of observance of
16  Kashruth of each guest?
17      A  Of the guests that I knew -- yeah, of my
18  friends, of my family, and of my -- my daughter's
19  in-law's family that I knew.  Some of their friends,
20  I didn't know.  I know they belonged to a
21  conservative synagogue.
22      Q  Okay.  So is it, at least, conceivable to

64

1  you that there were guests at your wedding whose
2  level of observance of Kashruth included only eating
3  at places where there were kosher dishes?
4      MR. LEWIN:  Objection to the form.
5  Conceivable?  I object to the form of the question.
6  BY MR. SCHWABER:
7      Q  You can answer.
8      MR. LEWIN:  Go ahead.  Answer the question
9  if you can.
10      A  Excuse me?
11      MR. LEWIN:  Answer the question if you can.
12      A  I don't know how to answer the question.  I
13  mean, I didn't --
14  BY MR. SCHWABER:
15      Q  Sitting here today, is that conceivable to
16  you that there was a guest at your wedding --
17      A  Of course.  Anything's conceivable.
18      Q  When I say "conceivable," I mean, is it
19  fair to say that you can't state with certainty that
20  any of the guests at your daughter's wedding --
21  strike that.
22      Is it fair to say that you cannot state

Case 1:05-cv-01717-RJL VIDEOTAPED DEPOSITION OF MARK GEIGEL Document 54-8 Filed 03/30/2006 Page 17 of 56
CONDUCTED ON THURSDAY, JANUARY 19, 2006

17 (Pages 65 to 68)

65

1   with certainty here today that none of the guests at
2   your daughter's wedding require separate dishes as
3   part of their observance of Kashruth?
4        MR. LEWIN: Objection to the form. Go
5   ahead and answer it if you can.
6        A    Can you repeat it?
7   BY MR. SCHWABER:
8        Q    Is it fair to say that you cannot state
9   with certainty here today --
10       A    That's a triple negative.
11       Q    Can you state with certainty here today
12  that none of the guests at your daughter's wedding
13  only eat on kosher -- on dishes that have been
14  maintained in a strictly kosher fashion?
15       MR. LEWIN: And I've got my objection. And
16  you can answer the question if you can.
17       A    Obviously not with certainly, but there
18  were no Orthodox Jews. There was no one there
19  wearing a Kippah. So I would be very surprised if
20  that level of Kashruth applied to guests at our
21  wedding. But it's conceivable.
22  BY MR. SCHWABER:

66

1        Q    Okay. And you have not done any follow-up
2   analysis of that point at any time between the
3   wedding and today; is that correct?
4        A    Yes.
5        Q    So in other words --
6        MR. LEWIN: I just want to call your
7   attention to one thing. You just -- no one there
8   wearing a Kippah at the wedding?
9        THE WITNESS: Well, they wore a Kippah
10  during the ceremony.
11       MR. LEWIN: Oh, okay.
12       THE WITNESS: But there were no Orthodox
13  people there that wear Kippah all the time.
14       MR. LEWIN: All the time. Okay. I just
15  wanted to make that clear.
16  BY MR. SCHWABER:
17       Q    The -- so the level of Kashruth that you
18  were looking to contract for with Ridgewells in this
19  instance was a level that you cannot state was
20  satisfactory to every guest at your wedding?
21       MR. LEWIN: Objection. Go ahead and answer
22  it if you can.

67

1   BY MR. SCHWABER:
2        Q    Is that a fair statement?
3        A    With certainty, I can't -- yeah, I can't
4   state with absolute certainty. I mean, as I said,
5   as far as I know, everyone at that wedding eats out
6   in restaurants. And if they eat out in restaurants,
7   they're eating on dishes that are not necessarily
8   segregated kosher dishes. So that would be
9   consistent.
10       Q    Your daughter had a list of invitees to her
11  wedding, correct?
12       A    Yes.
13       Q    And similarly your son-in-law?
14       A    Yes.
15       Q    And your son-in-law's parents?
16       A    Yeah. I -- yeah, my daughter and my
17  son-in-law had a list together and their -- their --
18  his parents had a list of invitees, friends and
19  family.
20       Q    Okay. So there were essentially three
21  lists --
22       A    Yeah.

68

1        Q    -- a list from you and your wife --
2        A    Right.
3        Q    -- a list from your daughter and future
4   son-in-law --
5        A    Right.
6        Q    -- and a list from your son-in-law's
7   parents?
8        A    Correct.
9        Q    And you and your wife were the hosts, so
10  you sent out invitations to all three lists?
11       A    Yes.
12       Q    There are people on the lists, other than
13  your own, that you didn't know at any time prior to
14  the wedding, right?
15       A    Yes.
16       Q    There are people on both of the lists,
17  other than your own, that you haven't spoken to
18  since the wedding. Would that be a fair statement?
19       A    Yes.
20       Q    So would it be fair to say that there are
21  people on the lists, other than your own, whose
22  level of observance of Kashruth you don't have any

Case 1:05-cv-01717-RJL  VIDEOTAPED DEPOSITION OF MARK SIEGEL  Page 18 of 56
Document 34-8 Filed 03/30/2006
CONDUCTED ON THURSDAY, JANUARY 19, 2006

18 (Pages 69 to 72)

69

1  idea about?
2      MR. LEWIN: Objection.
3  BY MR. SCHWABER:
4      Q   Would that be a fair statement?
5      A   All of Rebecca's and Craig's friends, I
6  know their level. It's conceivable that there are
7  some people in Craig's family -- Craig's family's
8  friends who I am not aware of. But again, they
9  belong to a conservative synagogue in Long Island.
10  And we've gone out with their friends and with them.
11  And they've all eaten in restaurants. So I just
12  don't know. You're asking me questions that I can't
13  answer.
14      Q   Well, I think you can answer my question.
15  Maybe I didn't ask it properly. My question is, Is
16  it fair to say you don't know the level of
17  observance of Kashruth of everybody at the wedding?
18      A   Yes.
19      Q   Okay. And is it similarly fair to say,
20  therefore, that you didn't factor in the level of
21  observance of Kashruth of every guest at your
22  wedding in determining what level you would have at

70

1  your wedding?
2      MR. LEWIN: Objection.
3  BY MR. SCHWABER:
4      Q   By "your wedding," I mean, your daughter's
5  wedding, obviously.
6      MR. LEWIN: Objection.
7  BY MR. SCHWABER:
8      Q   You can answer.
9      MR. LEWIN: Factor in -- I think the
10  witness has testified that he did factor in what he
11  thought were the observances of the guests at the
12  wedding.
13  BY MR. SCHWABER:
14      Q   Mr. Siegel, I'm not talking generally. I'm
15  talking specifically. In light of your testimony a
16  moment ago that you don't know the level of
17  observance of every guest at the wedding, what I'm
18  asking you is, Is it fair to say that you didn't
19  factor in every single guest's level of observance
20  in deciding how kosher to make the wedding?
21      A   The key factor was the two rabbis that were
22  going to be there. And they both had eaten in our

71

1  home. And we both had gone to restaurants with them
2  many times. And they were satisfied with that. And
3  that was the level -- that was the level that we
4  were aiming for.
5      Q   So you've told me you did factor in your
6  sense of the religious needs of the two rabbis?
7      A   Yes.
8      Q   Okay. And I gather, from materials I've
9  looked at, that you factored in the religious needs
10  of your son-in-law's parents?
11      A   Again, the same standard. We have eaten
12  out in restaurants many, many times with them.
13  They've eaten in our home.
14      Q   Okay. So you factored in a level of
15  Kashruth that would be satisfactory to them?
16      A   Well, as I said, they had eaten in our home
17  kosher food on our plates prepared in our kitchen,
18  as had both rabbis who were at the wedding. So that
19  was -- yes, that was factored in.
20      Q   And did you tell your son-in-law's parents
21  in advance of the wedding that these would not be
22  the kosher dishes that Ridgewells has available?

72

1      A   I had no discussions with my son-in-law's
2  parents about the details of the wedding.
3      Q   Okay. So is it -- so is the answer to my
4  question, no, you did not tell them?
5      A   I, myself, did not.
6      Q   Okay. And you're not aware of anyone who
7  did, right?
8      A   I -- I'm not aware.
9      Q   Okay. And now getting back to my question
10  about the level of observance of Kashruth of every
11  guest at the wedding, you've told me about some
12  guests whose level of observance you factored in.
13  I'm now asking you, Did you factor in the level of
14  Jewish dietary observance of every guest at your
15  wedding?
16      MR. LEWIN: Objection to the word "factor
17  in."
18  BY MR. SCHWABER:
19      Q   In making your decision as to how kosher to
20  make the wedding, did you factor in the level of
21  observance of Kashruth of every guest?
22      A   I didn't know every guest, so I guess I

Case 1:05-cv-01717-RJL VIDEOTAPED DEPOSITION OF MARK SIEGEL Document 46-2 Filed 03/30/2006 Page 19 of 56
CONDUCTED ON THURSDAY, JANUARY 19, 2006

19 (Pages 73 to 76)

73

1 couldn't, in your terms, factor in every guest. But
2 certainly, every guest that I knew and the level of
3 in my community and my synagogue.
4     Q    Okay. And you do -- from your background,
5 your personal background and your educational
6 background, you understand that there are Jews out
7 there that will only eat on kosher dishes?
8     A    I understand there are Jews out there that
9 will only eat on kosher dishes. I don't believe any
10 of those people were at the wedding, to the best of
11 my knowledge.
12     Q    But you don't know that?
13     A    Not for certainty.
14     Q    Okay. The --
15         MR. SCHWABER: You know what, let's take a
16 short break here.
17         MR. LEWIN: Sure.
18         THE VIDEOGRAPHER: We are going off the
19 record. The time is 10:49 a.m.
20         (Recess.)
21         THE VIDEOGRAPHER: We are back on the
22 record. The time is 11:23 a.m.

74

1         MR. SCHWABER: Let me have marked as
2 Exhibit 2 the -- well, actually, I'll save that for
3 afterwards.
4         Let me -- well, we'll do it now in the
5 interest of time. I'll mark as Exhibit 2 the first
6 amended complaint for compensatory and punitive
7 damages in this case.
8         (Mark Siegel Deposition Exhibit 2 was
9 marked for identification and was retained by
10 counsel.)
11 BY MR. SCHWABER:
12     Q    Mr. Siegel, I'm showing you what I've had
13 marked as Exhibit 2, which is the complaint, the
14 most current complaint filed on your behalf as well
15 as the behalf of other plaintiffs in this case.
16 Have you read these documents before?
17     A    I'm actually not sure. Okay.
18     Q    You've now leafed through it. Did that
19 refresh your recollection as to whether you've seen
20 it before?
21     A    Yeah. I know I've seen it before because
22 it has the reference to Michael and Melissa on it.

75

1 And so I knew I had seen this document.
2     Q    Okay. And I can proffer to you that this
3 is the version that adds them as plaintiffs in this
4 case and the only such version that's been filed.
5 So does that confirm for you that you reviewed this
6 document before?
7     A    Yes.
8     Q    Okay. And did you review it to confirm its
9 accuracy before it was filed?
10     A    Yes.
11     Q    Okay. I'm going to ask you about some
12 specific contentions within the body of the
13 complaint.
14     A    Okay.
15     Q    Paragraph -- go to numbered paragraph 10,
16 which is on page 3.
17     A    Yes.
18     Q    This is the paragraph describing
19 Mr. Berenbaum and Ms. Patek. And it says that,
20 "They would not, for reasons of religious
21 observance, eat shrimp, octopus, or eel, but who may
22 have eaten sushi containing shrimp, octopus, or

76

1 eel." Do you know that either Mr. Berenbaum or
2 Ms. Patek did, in fact, eat shrimp, octopus, or eel
3 at your daughter's wedding?
4     A    No. Michael indicated to me that he ate
5 sushi. And he knows what shrimp and octopus look
6 like. But he doesn't know what eel looks like. So
7 he doesn't know if he ate eel or didn't eat eel.
8     Q    So Michael Berenbaum told you his belief is
9 that he did not eat any shrimp, correct?
10     A    Yes.
11     Q    And he told you his belief is that he did
12 not eat any octopus?
13     A    Yes.
14     Q    And he told you that he wouldn't know if he
15 had eaten eel based on the look of the sushi?
16     A    Yeah.
17     Q    Okay. And did Melissa Patek tell you
18 anything?
19     A    No.
20     Q    Did Michael tell you anything about what
21 Melissa ate?
22     A    Just that she ate sushi.

Case 1:05-cv-01717-RJL   Document 61-4   Filed 03/30/2006   Page 20 of 56
VIDEOTAPED DEPOSITION OF MARC PACHTER DANIEL
CONDUCTED ON THURSDAY, JANUARY 19, 2006

20 (Pages 77 to 80)

77

1    Q   Okay. And there was plenty of sushi that's
2  not at issue in this case, correct?
3        MR. LEWIN: Objection.
4  BY MR. SCHWABER:
5    Q   Plenty is a -- the wrong term.
6    A   There was nonshellfish on the sushi.
7    Q   So there was sushi that was eaten by, at
8  least, some of your guests that you have no problem
9  with, correct?
10    A   The -- the sushi that we contracted for,
11  the tuna and the vegetable sushi, yes, I have no
12  problem with.
13    Q   Okay. And so you don't know, sitting here
14  today, whether Melissa Patek ate any of what I'll
15  describe as the offending sushi. Is that a fair
16  statement?
17    A   Yes. And I think, that's what it says
18  here, that they may have --
19    Q   Okay. And you don't know --
20    A   -- that they did.
21    Q   And to be clear with my questions because
22  that one I just asked about Melissa. You don't

78

1  know, sitting here today, whether Michael Berenbaum
2  ate any offending sushi?
3    A   I know that he ate sushi, and I know that
4  he told me he may have eaten eel because he doesn't
5  know what eel looks like.
6    Q   Okay. So he doesn't know that he ate eel.
7  He just can't rule it out, correct?
8    A   Yes.
9    Q   But he does rule out shrimp and octopus?
10    A   Yes.
11    Q   Okay. And the -- where you say -- or --
12  and when I say "you" here, I understand that you
13  didn't -- you probably didn't draft these
14  paragraphs --
15    A   Okay.
16    Q   -- that I'm referring to you because it was
17  filed on your behalf. Do you understand that?
18    A   Yes.
19    Q   Okay. So in that same paragraph 10,
20  there's an allegation beginning about halfway down
21  that paragraph, "Michael Berenbaum and Melissa Patek
22  were told" -- do you see where I'm reading?

79

1    A   Oh, "were told," yes. I have that.
2    Q   "Michael Berenbaum and Melissa Patek were
3  told that the food served at the reception and at
4  the dinner meal would not have non-kosher components
5  such as shrimp, eel, or octopus." Who told them
6  that?
7    A   I told Michael that the food was kosher. I
8  don't know about Melissa.
9    Q   Okay. So you're not aware of anyone who
10  told Melissa anything about the food. Is that a
11  fair statement?
12    A   I did not. I don't know if anyone else
13  did. I assume Michael did.
14    Q   Okay. But that's just a guess?
15    A   They're married.
16    Q   So it is just a guess?
17    A   It's a guess.
18    Q   Okay. And what specifically did you tell
19  Michael about the food? In other words, did you
20  specifically talk to him about shrimp, octopus, or
21  eel before the wedding?
22    A   No. I told him that -- you know, that --

80

1  he's a very close friend. And we were talking to
2  him about, you know, what we were picking out for --
3  for the food and the entree options and the kosher
4  meat and the salmon. And that we want to have
5  sushi, but it was going to be all-kosher sushi. And
6  may have been more specific about, you know, tuna,
7  salmon, California rolls. I don't recall. But I
8  told him it was going to be very elaborate. But it
9  was going to be kosher sushi.
10    Q   Okay. Did you have California rolls?
11    A   We were supposed to have California rolls.
12  After the initial moment -- first moment of the
13  reception when this incident was discovered, I,
14  frankly, don't -- I didn't -- I don't know at any
15  point what was served. I didn't eat anything at
16  that point. I didn't go to any stations. I was
17  dealing with -- with this crisis. And I only had
18  one hors d'oeuvre the whole evening at the very end.
19    Q   Okay. So -- but as far as what you were
20  contracting for, you were expecting to have
21  California rolls?
22    A   Well, I don't know if it was called

81

1  California rolls.  They were -- they were -- that
2  phony crab, avocado, cucumber.
3      Q    Okay.  So you expected to have a roll that
4  included imitation crab?
5      A    That's right.
6      Q    Okay.  And did you have any expectations as
7  to the labeling on the imitation crab product?
8          MR. LEWIN:  Objection.  Labeling where?
9  BY MR. SCHWABER:
10     Q    Imitation crab is -- comes out of a jar or
11 a container of some kind, correct?
12         MR. LEWIN:  Does the witness know that?  I
13 don't know.
14     A    I don't know.  Yeah, I assume it comes in
15 some kind of package.
16 BY MR. SCHWABER:
17     Q    Okay.  And my question is, Did you have
18 any -- well, let's start with, Did you have any
19 discussions with anyone about the package containing
20 the imitation crab specifically?
21     A    I was assured by Toby Nann that everything
22 that would be in that sushi would be kosher.  And

82

1  that's the only discussion I had about that.
2      Q    Okay.  Did you have any concerns about
3  whether any of your guests might not eat an
4  imitation crab product?
5      A    As I previously said, I don't believe that
6  anyone there was -- was Orthodox.  Everyone
7  travelled to the -- to the wedding, for instance,
8  which was just at the break of Sabbath.  They came
9  by car.  They travelled on the Sabbath.  So I
10 don't -- I just -- I would be very surprised if
11 anyone would be concerned about the details of the
12 packaging as long as the food was nonshellfish and
13 the meat and poultry was kosher.
14     Q    Okay.  Did Michael and Melissa travel on
15 Sabbath?
16     A    They -- he doesn't.  I know he doesn't.
17 They walked to the -- I'm trying to think where they
18 were.  I don't know.  I'm sorry.  I don't know.
19     Q    Okay.  Now, it goes on to state, still
20 within paragraph 10 but at the top of page 4,
21 "Michael Berenbaum and Melissa Patek have
22 experienced emotional distress and anxiety over the

83

1  likelihood that they consumed food that was not
2  kosher."  Do you personally have any knowledge of
3  that fact?
4      A    From Michael.
5      Q    Okay.  None directly from Melissa?
6      A    I haven't spoken to Melissa.
7      Q    Okay.  And did Michael tell you -- I'm
8  going to ask you what he told you in a minute.  But
9  did he speak in just about himself, or did he also
10 speak to you about Melissa?
11     A    I don't recall.
12     Q    Okay.  What do you recall about what he
13 said on this subject?
14     A    He said that he had never eaten non-kosher
15 food in his life and he -- he certainly hopes he
16 didn't.  It would be very upsetting to him if he
17 did.
18     Q    Okay.  So --
19     A    And he knew that I was upset that he was
20 upset.  And he was trying to comfort me.
21     Q    Did -- but he -- as we sit here today, is
22 it your impression that Mr. Berenbaum doesn't know

84

1  one way or another whether he ate anything unkosher?
2      A    Rabbi Berenbaum does not -- knows he ate
3  sushi and doesn't know what -- what kind of sushi he
4  ate.
5      Q    Okay.  And in paragraph 11, there is a
6  contention that -- the last sentence of paragraph 11
7  reads, "Defendant Ridgewells, Inc. maintained a,
8  quote, kosher catering division, end quote,
9  employing, among others, Toby Nann, Dina Silnicky,
10 (phonetic) and Julie Staley."
11         What's your basis for the contention that
12 Ridgewells maintained a kosher catering division?
13     A    In the -- the Jewish Community website
14 listed Ridgewells as a kosher caterer.  Corcoran
15 told us it was a kosher caterer.  When I called, I
16 asked for the kosher division and was put through to
17 Toby Nann.  I don't know who Dina Silnicky is.  But
18 Toby Nann and Julie Staley are two people that we
19 worked with.
20         I know that my wife talked to Julie at some
21 length a couple of weeks before the wedding when we
22 were positioning the stations at the Corcoran.  And

85

1  they got into a pleasant discussion about how a
2  gentile girl got to work in the kosher division,
3  kosher events. And that's about it.
4     Q   When you were first soliciting proposals
5  from Sue Fischer and from Ridgewells, did you tell
6  either or both of those establishments that you were
7  soliciting from the others as well?
8     A   I believe so.
9     Q   Okay. And when you decided to go with Sue
10 Fischer instead of Ridgewells, initially, did you
11 communicate to Ridgewells that you had decided to go
12 with Sue Fischer?
13    A   I did.
14    Q   Okay. And when you got back in touch with
15 Toby Nann after the Sue Fischer thing didn't pan
16 out --
17    A   Right.
18    Q   -- did you tell her that the Sue Fischer
19 thing didn't pan out?
20    A   I explained what happened, yes.
21    Q   Okay. So at that point, she knew you were
22 coming to her because it didn't work out with the

86

1  other one?
2     A   She knew that that -- that Sue Fischer was
3  the first choice.
4     Q   Okay. And is it your contention that in
5  that conversation, knowing Sue Fischer was now out
6  of play, that she gratuitously volunteered another
7  option on kosher food?
8     A   I don't know about gratuitously. She --
9  she just said we were having a very good positive
10 conversation about the dates and when we could come
11 in and talk to her. And she said, "You know, there
12 is another option." And she explained it.
13       And I said that -- I said, "What's the
14 other option?"
15       She explained it. She said, "Be kosher --
16 the food will be kosher and not dairy. But you
17 know, we wouldn't have the dishes and things like
18 that."
19       And I said, "That would be fine. Let me
20 talk to Judy." Then I called my wife, who was
21 surprised. I didn't even know that was an option.
22    Q   Okay. At any point in the history of your

87

1  communications with Toby, prior to her describing
2  that other option to you or mentioning that other
3  option to you, do you recall saying to her you
4  didn't want to pay for a mashgiach?
5     A   I don't recall that.
6     Q   Okay. If Toby were to testify that you
7  told her that you didn't want to pay for a mashgiach
8  and that's why she presented you with this option,
9  is it your testimony here today that that may or may
10 not be true?
11    A   No. I mean --
12       MR. LEWIN: Objection. Objection. Before
13 you answer that, let me just note my objection to
14 the form of that question.
15    A   When she proffered this suggestion, this
16 option, I know that the discussion of a mashgiach
17 did not come up in that conversation.
18 BY MR. SCHWABER:
19    Q   My question is broader than that
20 conversation. My question is, Do you know whether,
21 at any time leading up to that conversation, you had
22 told Toby that you did not want to pay for a

88

1  mashgiach?
2     A   It's inconceivable that I said that because
3  I was having a mashgiach with Sue Fischer. It's
4  inconceivable. When I called back -- called back
5  to -- to Toby, that was -- I was calling back to
6  have a kosher event. And she -- and I wouldn't have
7  said that about paying for a mashgiach. I think
8  that subject came up later on possibly. And I
9  didn't quite understand its context of talking about
10 a mashgiach when -- why would there be rabbinical
11 supervision if the dishes weren't segregated and all
12 of that. But that's the -- that's my recollection
13 of conversations with -- with Toby.
14       My wife is the person who really dealt with
15 Toby in much more detail. And I don't know what
16 kind of -- what conversation they may have had on
17 that subject. But it's inconceivable that I would
18 have said to her, "I don't want to pay for a
19 mashgiach."
20    Q   Okay. Now, with Sue Fischer, you were
21 paying for a mashgiach?
22    A   Well, it was -- they have a whole -- it was

89

1    a whole kosher event and that — the mashgiach did
2    not come up in the Sue Fischer discussion.  We never
3    got a formal proposal that had things broken down.
4    But it was — I assumed it was going — it was going
5    to have rabbinical supervision.  So — but it
6    never — it was never broken down.  It never came
7    up.  I was never asked if I wanted a mashgiach.
8    That was not an option.
9        Q    Okay.
10       A    It was the full package.
11       Q    You understood that the event you were
12   going to get from Sue Fischer had a higher level of
13   Kashruth than the event you were contracting to get
14   from Ridgewells.  Is that a fair statement?
15       A    I — I understood that they each were going
16   to have the same level of Kashruth.  When I came
17   back to Ridgewells, it was for a formal kosher
18   event.  So when I came back to her, it was after
19   the — the Sue Fischer Windows' kosher event thing
20   fell apart.  And I came to Ridgewells for a kosher
21   event.  And only at that time did Toby put this
22   other option on the table, which satisfied my level

90

1    of Kashruth.
2        Q    I understand.  So maybe my question was
3    inartful because I'm asking about what ultimately
4    you contracted for with Ridgewells, not what you
5    thought about initially.
6        A    Okay.
7        Q    Okay.  So after the other option was on the
8    table and ultimately you accepted it —
9        A    Yes.
10       Q    — you understood that the option that you
11   accepted with Ridgewells had a lesser level of
12   Kashruth than the option you had planned to get from
13   Windows.  Is that a fair statement?
14       A    Yes.  But a level that I was comfortable
15   with.
16       Q    Okay.  Do you — do you — are you familiar
17   with the word "treif"?
18       A    Yes.
19           MR. LEWIN:  T-r-e-i-f.
20   BY MR. SCHWABER:
21       Q    And treif is a Yiddish term.  What do you
22   understand treif to mean?

91

1        A    Non-kosher food.
2        Q    Okay.  And so if I were to give you two
3    words, one is kosher and the other is treif, is
4    there a third alternative as you understand
5    religious dietary observance as defined by Jewish
6    law?
7            MR. LEWIN:  Objection to the form of the
8    question.  But go ahead and answer it.
9        A    To me, food is kosher or it's treif.
10   BY MR. SCHWABER:
11       Q    Fair enough.
12       A    Meat — I go and buy kosher meat or I don't
13   buy kosher meat.  I have tuna or I have shrimp.
14   They're — those are the two categories: kosher and
15   not kosher.
16       Q    So there's only two, kosher or treif,
17   correct?
18       A    To me, yeah.
19       Q    Okay.  Paragraph 12 says, "Plaintiff Mark
20   Siegel and Judy Siegel contacted Defendants' kosher
21   catering division when their daughter Rebecca became
22   engaged to Craig Berenbaum, whose family and many

92

1    close relatives maintaining kosher diet because of
2    religious observance of Jewish dietary laws."
3        A    Yes.
4        Q    And that was your understanding from
5    discussions with your daughter and your future
6    son-in-law?
7        A    With my son-in-law, yes.
8        Q    Okay.  So these family and close relatives
9    were not necessarily all people you knew before the
10   wedding?
11       A    Correct.
12       Q    And in fact, some of them, you didn't know?
13       A    Correct.
14       Q    But you were told secondhand, without
15   talking to them, that they maintained a kosher diet?
16       A    At — at home, yes.
17       Q    Were you told what they do out of the home?
18       A    Well, I was told that everybody ate in
19   restaurants.
20       Q    Okay.
21       A    And not necessarily kosher restaurants.
22       Q    Okay.  So in other words, treif

Case 1:05-cv-01717-RJL   Document 29-8   Filed 03/30/2006   Page 24 of 56
VIDEOTAPED DEPOSITION OF MARK SIEGEL
CONDUCTED ON THURSDAY, JANUARY 19, 2006

24 (Pages 93 to 96)

93

1  restaurants?  Would that be a fair statement?
2      A    Restaurants where non-kosher food was
3  served.
4      MR. SCHWABER:  Okay.  I think -- my request
5  is, we take our early lunch break now.
6      THE VIDEOGRAPHER:  This marks the end of
7  Tape 1 in the deposition of Mr. Siegel.  We are
8  going off the record.  The time is 11:46 a.m.
9          (Whereupon, at 11:46 a.m., the
10  above-entitled matter was recessed until 1:32 p.m.)
11      THE VIDEOGRAPHER:  This marks the beginning
12  of Tape 2 in the deposition of Mr. Siegel.  We are
13  back on the record.  The time is 1:32 p.m.
14      CONTINUED EXAMINATION BY COUNSEL FOR
15      DEFENDANT AND COUNTER-PLAINTIFF
16  BY MR. SCHWABER:
17      Q    Mr. Siegel, before we took the lunch break,
18  we were going through certain allegations in the
19  complaint, which was marked as Exhibit 2.  I'm going
20  to have you pull that back out, and we'll keep going
21  through it.  We were -- we left off just before
22  paragraph 13.  Let me turn you to paragraph 13.

94

1          This paragraph begins with an allegation
2  that you and your wife explicitly requested that the
3  reception and wedding dinner for your daughter
4  Rebecca's wedding be kosher and not have any
5  non-kosher foods.  Do you recall making such an
6  explicit request?
7      A    Yes.
8      Q    Okay.  And you've described that to me here
9  today, correct?
10      A    Yes.
11      Q    Is there anything about -- is there any
12  request, other than what you've mentioned so far
13  today, that you made in that regard?
14      MR. LEWIN:  I'll object to that.  I don't
15  recall -- I don't know whether the witness recalls
16  what -- do you want to refer -- refresh his
17  recollection or mine to specifically -- you're
18  talking about -- I mean --
19  BY MR. SCHWABER:
20      Q    Well, you've told me about communications
21  you had with Toby Nann.  Let's start with that.  Did
22  you make request of anyone, other than Ms. Nann,

95

1  that the wedding be kosher and not have any
2  non-kosher foods?
3      A    I don't believe I spoke to any other
4  individuals other than Toby Nann.
5      Q    Okay.  And do you believe that both you and
6  your wife each explicitly requested that the wedding
7  be kosher and not have any non-kosher foods?
8      A    Yes.  And included in kosher, meaning
9  "parve," not kosher food and nondairy food.
10      Q    Okay.  Let's look at the second sentence of
11  paragraph 13.  That reads, "They explicitly asked
12  that the meat and poultry served at the reception
13  and dinner be kosher and that no dairy product be
14  served at the reception or the meal to conform with
15  Jewish dietary laws and that no shellfish or
16  non-kosher fish be served as hors d'oeuvres at the
17  reception."  Do you recall making each of those
18  explicit requests?
19      A    Yes.
20      Q    Okay.  And let me break it down just to
21  make sure we're clear.  We've talked about meat
22  already.  Do you specifically recall requesting that

96

1  the poultry served be kosher?
2      A    Absolutely.  We went through -- we talked
3  about duck.  We talked about turkey.  At one point,
4  we were talking about various kinds of sausages,
5  chicken sausages.  And all of those things were to
6  be kosher.  And if they couldn't be kosher, we
7  weren't going to have them.
8      Q    Okay.  Now, the meat and the poultry that
9  you requested are, in fact, what you got, correct?
10      MR. LEWIN:  I object to that.  I don't know
11  whether the witness knows that.
12  BY MR. SCHWABER:
13      Q    Do you have any complaint in this lawsuit
14  about the nonconformance of the meat and poultry
15  with your requests?
16      MR. LEWIN:  The lawsuit?  Again, I object
17  to that.  The lawsuit, in terms of the complaint,
18  speaks for itself.  And I don't know that the
19  witness has said or that he knows whether the meat
20  and poultry was or was not kosher.  I mean, he had
21  Ridgewells' representation, I suppose.  But that
22  doesn't necessarily mean that he knows that the meat

Case 1:05-cv-01717-RJL VIDEOTAPED DEPOSITION OF MARK SIEGEL filed 03/03/2006 Page 25 of 56
CONDUCTED ON THURSDAY, JANUARY 19, 2006

25 (Pages 97 to 100)

97

1 and the poultry were kosher.
2     MR. SCHWABER: Counsel, there's a lot of
3 things we don't know. What I'm asking is what we're
4 being sued for here -- what my client's being sued
5 for. And I want to narrow down the contentions.
6 BY MR. SCHWABER:
7     Q So what I'm asking you, Mr. Siegel, is, Are
8 you aware of any fact that would indicate to you
9 that Ridgewells provided unkosher meat?
10     A No.
11     Q Are you aware of any fact that would
12 indicate to you that Ridgewells provided any
13 unkosher poultry?
14     A No.
15     Q Okay. Now, then it says -- as part of your
16 explicit request, it says that, "No dairy product be
17 served at the reception or the meal to conform with
18 Jewish dietary laws." As it relates to that
19 request, is it your -- what is your understanding as
20 to the reason for no dairy products needing to be
21 served?
22     **A Under Kashruth, we don't mix milk and meat.**

98

1     Q Okay. So it's not a problem with dairy
2 products themselves not being kosher, correct? It's
3 a problem of the use of dairy products in a meal
4 that contains meat?
5     **A We didn't want anything dairy served at a**
6 **meal that has -- that has meat, correct.**
7     Q Okay. Now, was there a time after that
8 meal by which dairy products would have been
9 acceptable?
10     **A No. It was not to be at any point,**
11 **including the creamer in the coffee at the end of**
12 **the evening.**
13     Q Okay. Other than the wine and the
14 champagne, was there anything else, any food or
15 beverage component of the evening, that you carved
16 out and did outside of Ridgewells?
17     MR. LEWIN: I'll object to the form of
18 that. Maybe you can rephrase that somehow
19 because --
20 BY MR. SCHWABER:
21     Q I'll rephrase. You dealt with the wine on
22 your own, right?

99

1     **A I did.**
2     Q You had Ridgewells' servers pour it, but
3 you dealt with purchasing the wine?
4     **A Yes.**
5     Q Okay. And what I'm asking is, Did all of
6 the other food and beverage, other than the wine and
7 champagne, come through Ridgewells directly?
8     **A Liquor was provided by the groom. I did**
9 **the wine and the champagne. And in terms of the**
10 **hard liquor, it was provided by the groom.**
11     Q Not simply paid for by the groom through
12 Ridgewells?
13     **A That's right.**
14     Q He bought it separately?
15     **A Yes.**
16     Q Okay. Anything else that was done outside
17 of Ridgewells?
18     **A Not food, as far as I know.**
19     Q Or drink, other than what you've mentioned?
20     **A Correct.**
21     Q Okay. Do you know whether or not -- or
22 strike that.

100

1     Do you recall specifically requesting that
2 no shellfish be served?
3     **A Absolutely.**
4     Q And to whom did you make that request?
5     **A To Toby Nann. It wasn't a request. It was**
6 **a predicate of the -- of the event. And she**
7 **understood that, as a former mashgiach. She said**
8 **she knows what's kosher and what's not. She made it**
9 **clear to us over and over again.**
10     Q Let me be clear with my question because I
11 understand your testimony that she understood and
12 told you that she understood the distinction between
13 kosher and not kosher. What I'm asking is more
14 narrow than that.
15     I'm asking about prior to the night of the
16 wedding. Did you specifically direct her that there
17 was to be no shellfish? Or alternatively, was it
18 just clear in your mind that she would know that?
19     **A We specifically directed her. And we**
20 **delineated the fish that would be acceptable.**
21     Q When you say "delineated the fish that
22 would be acceptable," you're talking about in the

---

101

1   order for the sushi you spoke about, which kinds of
2   sushi to have?
3      A   That's correct.
4      Q   Okay.
5      A   Tuna, salmon, vegetables.
6      Q   Okay.  And now, getting to the issue of
7   shellfish, you recall specifically telling her no
8   shellfish?
9      A   Absolutely.
10     Q   Why did you feel it was necessary to tell
11  her that?
12     A   I just -- you know, when I was talking
13  about the sushi, I just wanted -- I said I wanted to
14  make sure that the sushi -- only kosher stuff, no
15  shellfish, tuna, salmon.  And I just, sort of,
16  delineated it.  She said, "Of course."
17     Q   Did you feel that you needed to clarify
18  that you didn't want shellfish in the sushi?
19     A   No.  Just when I was talking about the
20  sushi, I just -- I said, you know, this is what --
21  you know, this is what I want and this is what I
22  don't want.  That's the way I described the -- the

---

102

1   sushi because there are -- often, people -- normal
2   sushi, you can get things that aren't kosher fish.
3      Q   I understand.  My question is, As it
4   relates to prior to the wedding, not just what you
5   affirmatively picked for sushi, but the exclusion of
6   shellfish, did you feel it necessary to make clear
7   to Ridgewells through Toby that you didn't want any
8   shellfish because of a concern that they might
9   otherwise include shellfish?
10     A   Frankly, my wife is the person who
11  negotiated the exact contents of -- of the food.
12  And I think she's in a better position to talk about
13  that.  I don't -- I don't -- I don't recall the
14  reason.  But I do know that the shellfish was
15  certainly mentioned --
16     Q   And by you?
17     A   -- as an aside.  My wife and I.  I'm not
18  sure which one of us, but clearly one of us.
19     Q   When was it mentioned?  Do you know?
20     A   When we met with Toby at -- at Ridgewells
21  certainly the first time.  She had -- she had some
22  hors d'oeuvres out.  And when we had the final

---

103

1   tasting, she presented the sushi that was going to
2   be served.  And Judy asked why there wasn't more
3   variety.  And Toby said, "Well, you know, we can't
4   use shellfish.  So you know, we -- basically, these
5   are the -- these are the kinds of things we can
6   use."
7      Q   So it was that Ms. Nann told you she
8   couldn't use shellfish rather than you and your wife
9   requested that?
10     A   I think we -- the shellfish was sort of --
11  I mentioned it casually about, of course, no
12  shellfish, but tuna, salmon, smoked salmon.  And I
13  went through the things that I wanted.  But Judy is
14  the one who -- who really got into the detail of
15  that.  And when Judy, sort of, complained at the
16  tasting that these were, sort of, very uninspired in
17  terms of variety, Toby said, "Well, we can't use any
18  shellfish, so we're very limited."
19     Q   And there's a reference here to shellfish
20  or non-kosher fish.  What is your understanding,
21  other than shellfish, as to what constitutes
22  non-kosher fish?

---

104

1      A   Any -- any fish that -- that doesn't
2   have -- like catfish -- what are those things that
3   you scrape off?
4      MR. LEWIN:  Scales.
5      A   Scales, yeah.  You can have -- there could
6   be fish without scales that aren't shellfish that
7   are not kosher.  Shark may be one.
8   BY MR. SCHWABER:
9      Q   Okay.  All right.  Other than scales, is
10  there anything else that would make a fish not
11  kosher, as you understand it?
12     A   I think bottom feeder, catfish, I believe.
13     Q   Okay.  Okay.  Anything else?
14     MR. LEWIN:  This is a rabbinic exam, huh?
15     MR. SCHWABER:  I guess you could call it
16  that.
17     A   And none on the fish.  But you know,
18  certainly, there was a major issue about a dairy
19  product being served at the wedding.  That's also
20  part of number 13.  I was served a dairy product at
21  the wedding.
22  BY MR. SCHWABER:

---

105

```
1    Q   Okay. Well, why don't we jump to that.
2  There are allegations about that later. But while
3  we're on that subject, what dairy product do you
4  believe you were served?
5    A   It's not what I believe. It's what I was
6  told I was served. I had -- at the very end of the
7  reception, when I realized that I hadn't had any
8  food at all, a waitress came by with a plate of
9  black bread and smoked salmon. And I took one of
10 the canapés and took a bite. And it tasted like it
11 had cream cheese on it. I looked down and it had
12 cream cheese on it.
13       And I said to the server, I said, "What is
14 this?"
15       And she said, "It's smoked salmon with
16 cream cheese on black bread."
17       At which point, I went down three flights
18 and then again in the middle of my reception when I
19 should have been the host and told Toby Nann that
20 she was serving cream cheese at the wedding. And
21 she said, "It's margarine."
22       I said, "Look at it. Taste it. It's cream
```

106

```
1  cheese. And your waitress is telling my guests it's
2  cream cheese." And that was the end of that
3  incident.
4    Q   Toby Mann in that --
5    A   Nann.
6    Q   Toby Nann, in that discussion, told you
7  that, in fact, it was a nondairy margarine, correct?
8    A   She said it was margarine.
9        I said, "Look at it and taste it. This
10 isn't margarine. This is cream cheese. And your
11 waitress told me and my guests that it is cream
12 cheese."
13   Q   And Ms. Nann told you her waitress was
14 mistaken, right?
15   A   Yeah, she said that.
16   Q   Okay.
17   A   And I said, "Taste this." She wouldn't
18 taste it.
19   Q   Okay. And have you determined that, in
20 fact, the waitress wasn't mistaken and that it was
21 cream cheese?
22   A   It tasted and looked like cream cheese.
```

107

```
1  And I was told it was cream cheese. And my guests
2  thought it was cream cheese because they were told
3  it was cream cheese too. I was served -- there was
4  cream cheese served at my daughter's wedding.
5    Q   And your basis for that statement is the
6  incident you just told me about?
7    A   That I was served cream cheese, it tasted
8  like cream cheese, it looked like it was cream
9  cheese, and a Ridgewells employee told me it was
10 cream cheese.
11   Q   Okay. Do you have any other basis for your
12 contention that you were served a dairy product at
13 your daughter's wedding other than what you just
14 told me?
15   A   Other than it tasted like cream cheese, it
16 looked like cream cheese, and I was told by
17 Ridgewells that it was, in fact, cream cheese, no.
18   Q   Okay. And you chose to disbelieve what
19 Ms. Nann told you, I assume, correct?
20   A   I chose to believe what I tasted and what
21 the server told me, that it was cream cheese.
22   Q   My question was about what Ms. Nann told
```

108

```
1  you. You understood that Ms. Nann told you that
2  that was wrong, correct? You understood --
3    A   She wouldn't taste it. I said, "Taste it."
4  She wouldn't taste it. I said, "Look at it." She
5  wouldn't look down.
6    Q   Mr. Siegel, just listen to my questions.
7  Okay. Ms. Nann told you that it wasn't cream
8  cheese, correct?
9    A   Yes. She said it was margarine.
10   Q   And she told you that what you were told by
11 the server was incorrect, didn't she?
12   A   Yes.
13   Q   And you chose to disbelieve her?
14       MR. LEWIN: That's the fourth time, I
15 think, we're going over that. He said yes on the
16 basis --
17       MR. SCHWABER: Well, I haven't heard him
18 say yes. It's a yes-or-no question.
19 BY MR. SCHWABER:
20   Q   Did you choose to disbelieve Ms. Nann?
21   A   After tasting the cream cheese --
22   Q   I'm asking you a yes-or-no question.
```

Case 1:05-cv-01717-RJL   Document 52-8   Filed 03/30/2006   Page 28 of 56
VIDEOTAPED DEPOSITION OF MARK M. SIEGEL   Page 28 of 56
CONDUCTED ON THURSDAY, JANUARY 19, 2006

28 (Pages 109 to 112)

109

1    A  — and told it was cream cheese, after —
2 I'm going to get to the yes or no. After being told
3 it was cream cheese by Ridgewells, after tasting it
4 and knowing it was cream cheese, I chose to
5 disbelieve someone who told me it wasn't cream
6 cheese.
7    Q   Okay. So sitting here today, if Ms. Nann
8 says it's not cream cheese, you believe she's lying?
9    MR. LEWIN: I object to that. Go ahead and
10 answer the question.
11   A   I believe that it was cream cheese.
12 BY MR. SCHWABER:
13   Q   So you would believe she's lying?
14   A   I believe —
15   MR. LEWIN: I don't know — I object to the
16 conclusory statement whether she's lying or she's
17 mistaken or she made an error. I don't know. Why
18 does he have to characterize it in terms of whether
19 she's lying? I mean, what does she know? She
20 didn't taste it. How does she know whether it's
21 cream cheese or not.
22 BY MR. SCHWABER:

110

1    Q   Are you — do you have any experience in
2 the — in the food industry?
3    A   Yes.
4    Q   What's your experience?
5    A   I was a mess sergeant in the United States
6 Army.
7    Q   Okay. I imagine the food was not
8 particularly gourmet there. But —
9    A   The food that I cooked was.
10   Q   — are you certain that you can distinguish
11 by your palate between cream cheese and a nondairy
12 whipped margarine product?
13   A   Yes.
14   Q   Okay.
15   A   If you would have said between cream cheese
16 and a parve version of cream cheese, I would have
17 hesitated. But between cream cheese and margarine,
18 absolutely.
19   Q   Okay. So regardless of what Ridgewells
20 could document for you in terms of what products
21 were procured for your daughter's wedding and used
22 for food service there, there is nothing that

111

1 Ridgewells could show you that would convince you
2 that you didn't eat cream cheese. Is that a fair
3 statement?
4    MR. LEWIN: I object. I object to that
5 question. I mean, regardless of what they showed,
6 the whole thing is so hypothetical, so speculative.
7 I don't know whether he's saying that regardless —
8    MR. SCHWABER: That's what I'm trying to
9 find out, Counsel. And I just — would ask that you
10 object without testifying for him.
11   MR. LEWIN: All right.
12 BY MR. SCHWABER:
13   Q   Mr. Siegel, is there anything Ridgewells
14 could present to you today, in light of what you
15 tasted, that would convince you that you didn't have
16 cream cheese that night?
17   A   I don't know what — I don't know what I
18 could be presented with that would change the fact
19 that what I tasted was cream cheese and that I was
20 told that it was cream cheese. And I don't know
21 what, after the fact, could change that. I tasted
22 cream cheese. And I was told it was cream cheese by

112

1 a Ridgewells employee.
2    Q   Let's break those down, and let's start
3 with what you were told by a Ridgewells employee.
4 You were also told by a higher-level Ridgewells
5 employee that it wasn't, right?
6    A   The person who was serving it and telling
7 my guests what it was said it was cream cheese.
8    Q   Is it conceivable to you that the server
9 could be mistaken?
10   MR. LEWIN: Objection to the form. Go
11 ahead. Answer the question.
12   A   If she were mistaken, she was humiliating
13 me in front of my guests who were now told that
14 dairy was being served at a wedding that dairy was
15 not supposed to be served at.
16 BY MR. SCHWABER:
17   Q   Okay. What I'm asking is the ramifications
18 of her mistake. Is it conceivable to you that she
19 was mistaken?
20   A   It's conceivable.
21   Q   Okay. And so is it similarly conceivable
22 to you that Ms. Nann wasn't mistaken in telling you

Case 1:05-cv-01717-RJL   Document 56-8   Filed 10/30/2006   Page 29 of 56
VIDEOTAPED DEPOSITION OF MARK SIEGEL
CONDUCTED ON THURSDAY, JANUARY 19, 2006

29 (Pages 113 to 116)

113

1  it wasn't cream cheese?
2      A   It was not margarine.  If Ms. Nann had told
3  me it was a parve version of cream cheese, I could
4  find that an acceptable explanation.  This was
5  white.  It was not yellow.  It tasted like cream
6  cheese.  I know what margarine tastes like, every
7  version of margarine.  This was not margarine.
8      Q   Do you know who the waitress was that you
9  spoke with?
10     A   No.  I know that she was a Hispanic woman.
11  I don't know any -- I don't know her name.
12     Q   What'd she look like?
13     A   Do you want me to describe her?
14     Q   Yeah.  I want -- I want -- to the best of
15  your ability so I could try to track her down.
16     A   She was -- she was short.  She had dark
17  hair.  I think it was pulled back in a bun.  She was
18  extremely pleasant.  She was pretty, and she was
19  friendly.
20     Q   Was she the server for your table where
21  you're eating?
22     A   No, no.  No.  This is during the reception.

114

1  She was walking around with passed
2  hors d'oeuvres.
3      Q   Okay.  So is it fair to say you don't
4  remember what table she was serving during the
5  dinner?
6          MR. LEWIN:  They weren't serving any tables
7  at that point, were they?
8  BY MR. SCHWABER:
9      Q   No, I don't know.  I understand at that
10  point, but I'm assuming that same woman would have
11  been in the table service.  So I'm just trying to
12  narrow her down.
13     A   I -- I don't know if the -- same woman
14  would be in the table service.
15     Q   But you don't recall her from in there?
16     A   No, I'm sorry.
17     Q   Okay.  And who was next to you that heard
18  the conversation you had with her, if anybody?
19     A   No one was next to me.  I immediately went
20  to my wife and -- and told her and showed her and
21  then went immediately downstairs.  I don't -- I
22  don't recall who was next to me.

115

1      Q   Do you recall no one being next to you?
2      A   Well, I was the father of the bride.  I
3  assume people were around me.  I just don't -- I
4  don't recall.  This is a -- was an area that was not
5  a large area, so there were -- there were people all
6  around.  I just don't know who was near me at that
7  time.
8      Q   Okay.  Did you insist that the
9  salmon canapés be removed?
10     A   I immediately went down -- this was the
11  very end of the reception -- and confronted with
12  Toby Nann with the cream cheese.  And by the time I
13  came back, the food service had ceased and the bar
14  service had ceased and the guests were going
15  downstairs.
16     Q   Did you tell her -- you told me you told
17  your wife.  Did you tell anyone other than your wife
18  and Ms. Nann about your belief that you were eating
19  cream cheese?
20     A   I told -- not at that moment.  Later, I
21  told -- certainly, I told my daughter.  I told my
22  son-in-law.  I think I may have told my sister.  I

116

1  may have told -- I think I told Sheldon and
2  Fay Cohen, who were very upset by the -- the wedding
3  being ruined by shellfish.  And I said they were
4  also serving dairy.  I don't know who else I might
5  have told.
6      Q   What was your purpose in telling the Cohens
7  after the fact?
8      A   The Cohens were trying to console me.  I
9  was very, very upset, and -- and they were trying to
10  console me, and I said, "It's worse than you think.
11  They're also serving dairy."
12     Q   And this was after the evening?
13     A   No.  This was during the evening.
14     Q   But after the salmon canapés had already
15  been removed?
16     A   This was during dinner.
17     Q   So there was no longer anything that you
18  thought was cream cheese at that point?
19     A   At that point, that's correct, but they had
20  not -- there was no margarine ever served on the
21  tables with the bread ever on any of the tables.
22  And I don't know what the reason for that is, but

Case 1:05-cv-01717-RJL VIDEOTAPED DEPOSITION OF MARC COHEN Document 45-8 Filed 03/08/2006 Page 30 of 56
CONDUCTED ON THURSDAY, JANUARY 19, 2006

30 (Pages 117 to 120)

117

1  that was -- it was supposed to be margarine served.
2  No spread at all was served at the wedding.
3      Q   Getting back to my question about the
4  Cohens. Do the Cohens observe a kosher diet?
5      A   I think they have a kosher home. I don't
6  know what they do outside of their home.
7      Q   Okay. So you don't know if they would have
8  had a problem -- you don't know if they eat meat and
9  dairy products together outside the home; is that a
10 fair statement?
11     A   I -- I know that they are well aware of
12 Jewish law and would know that serving dairy at a
13 wedding where meat is being served was a violation
14 of Jewish law.
15     Q   Do you believe that to be a violation of
16 Jewish law?
17     A   Being a violation of Jew -- Jewish law,
18 serving meat and dairy together?
19     Q   Yes.
20     A   Yes.
21     Q   And what is it that -- do you have any
22 understanding as to what law that is you're quoting?

118

1      A   It's the way I was raised.
2      Q   I mean, does it come from a particular
3  provision that you're aware of?
4      A   I think it comes from the Talmud, but it's
5  the way I was raised.
6      Q   Okay. Were you raised in a kosher home?
7      A   I was.
8      Q   Two sets of dishes?
9      A   Yeah, four sets of dishes.
10     Q   Four sets. Passover dishes as well?
11     A   (Nodding.)
12     Q   Is that a yes?
13     A   That's a yes.
14     Q   Okay. So did you wait a certain period
15 after eating meat before you'd eat dairy when you
16 grew up?
17     A   Yeah. There was no dairy and meat ever
18 served at meals together. I -- I don't recall.
19 That's quite a long time ago.
20     Q   Okay. Do you have an understanding as to
21 whether there is a time period by which you need to
22 wait after a meat meal before you can have dairy

119

1  products?
2      A   I -- I'm -- I think you -- I'm not sure.
3  I'm not sure.
4      Q   Okay. How about the other direction?
5      A   That's why I hesitated. I -- I -- I think
6  there is a prescription about you can have one
7  before the other, but I -- I don't know which one.
8      Q   Okay. Are you aware of -- or strike that.
9          You told me that if this server who told
10 you this was cream cheese you were eating when I
11 asked you if it's conceivable to you that she was
12 mistaken, one thing you said in your answer was
13 that, "If she was mistaken, she would have
14 humiliated me in front of my guests."
15     A   That's not what I said. I said if she was
16 telling people -- whether it was cream cheese or
17 not, if she was telling people it was cream cheese,
18 it would humiliate me in front of my guests.
19     Q   Okay. You're not aware of anyone other
20 than you that she said that to, are you?
21     A   I'm not aware. I haven't asked anyone
22 else. But anyone who would have asked her what it

120

1  was, she would have said it was cream cheese,
2  because that was what she was saying.
3      Q   Okay. You don't know of one other person
4  other than you who asked her what it was, do you?
5      A   I don't.
6      Q   Are you aware of Ridgewells' position in
7  this case that you ate on top of the salmon was
8  in fact not cream cheese? Are you aware that that's
9  Ridgewells' position?
10     A   I -- I'm -- I'm aware they're alleging that
11 it was margarine, yes.
12     Q   And you don't believe them?
13     A   I don't believe them.
14     Q   And no matter who says it to you from
15 Ridgewells, you won't believe it; is that a fair
16 statement?
17         MR. LEWIN: Objection.
18     A   I know what I -- what I tasted was not
19 margarine. If they would have said it's a nondairy
20 or parve cream cheese substitute, I would find it
21 credible, but this was not margarine. It was not
22 yellow. It was white. It was a thick slab. It

Case 1:05-cv-01717-RJL   Document 25-13   Filed 03/30/2006   Page 31 of 56
VIDEOTAPED DEPOSITION OF MARK GOODEL
CONDUCTED ON THURSDAY, JANUARY 19, 2006

31 (Pages 121 to 124)

121

1    tasted like cream cheese and looked like cream
2    cheese, and I was told it was cream cheese.
3    BY MR. SCHWABER:
4       Q   So getting back to my question, No matter
5    what anyone from Ridgewells were to say in this
6    case, you won't believe them that this was not cream
7    cheese that you ate, correct?
8          MR. LEWIN:   Objection.  Objection, but
9    answer it.
10      A   I -- I personally won't believe that.
11   That -- what was served to me was not cream cheese.
12   BY MR. SCHWABER:
13      Q   Okay.  Paragraph 14 -- strike that.
14         I don't have a question about paragraph 14.
15         Okay.  Paragraph 20 says, "The family of
16   the groom and the invited guests were advised by
17   plaintiffs that arrangements had been made to have
18   the reception and dinner only include kosher food
19   and that neither non-kosher foods nor dairy products
20   would be served at the reception and dinner on
21   April 2nd, 2005."
22         There is six plaintiffs in this case.  I'm

122

1    asking you right now about your knowledge, not only
2    for yourself, but any of them.  The -- are you aware
3    of -- well, first of all, did you advise the family
4    of the groom and --
5       A   My -- my son-in-law talked to his family,
6    advised his family about the -- about the dinner
7    arrangements.
8       Q   Did he tell you he did that or were you
9    there?
10      A   He told me he did that.
11      Q   Okay.  So you don't know specifically what
12   he said?
13      A   No.
14      Q   All right.  And did you advise anyone about
15   that arrangements had been made to have the
16   reception and dinner only include kosher food?
17      A   Yes.
18      Q   And who did you advise?
19      A   Rabbi Wohlberg, Michael Berenbaum, and many
20   people who I talked to about the wedding.
21      Q   And what was your purpose in advising the
22   people you so advised?

123

1       A   Just talking about all the arrangements of
2    the wedding, all the details of the wedding with
3    some friends.
4       Q   Okay.  Did you advise anyone at all for the
5    purpose of reassuring them that they would be able
6    to eat at the wedding?
7       A   Possibly Rabbi Wohlberg.  Rabbi Wohlberg
8    was officiating and he was going to attend the
9    wedding and I -- and I said that all the food was
10   going to be kosher.
11      Q   Okay.  Was it your understanding that he
12   needed that in order to be able to eat there?
13      A   He wouldn't eat non-kosher food.  He's, you
14   know, been to other family events, and he doesn't
15   eat non-kosher food.
16      Q   Okay.  Did you advise him that you didn't
17   have a mashgiach?
18      A   We didn't -- we didn't discuss it.
19      Q   Okay.  Did you advise him that you weren't
20   using kosher wine?
21      A   We didn't discuss -- well, he was seeing
22   what -- what wine was being used.  It was -- it was

124

1    being poured for him, so he saw what was being used.
2       Q   So other than what he may have observed in
3    the pouring, you didn't advise him about what kind
4    of wine you were using?
5       A   That's correct, and -- but when he's been
6    at my -- at my home, he's -- he had -- he's consumed
7    the wine that I served him, and it -- it's never
8    been kosher wine.
9       Q   Did -- did you advise him that the food was
10   being cooked at the Corcoran?
11      A   Didn't discuss it.
12      Q   Did you advise him that food was being
13   cooked on Shabbat?
14      A   Didn't discuss it.
15      Q   Let's go to paragraph 23.  Paragraph 23
16   talks about -- says, "The groom's mother observed
17   that shrimp was being served at the sushi station.
18   She was extremely distressed at this violation of
19   her religious dietary observance.  She immediately
20   notified plaintiff Judith Siegel that shrimp was
21   being served at the sushi station."
22         Were you present for any of the allegations

32 (Pages 125 to 128)

---

125

1 described in paragraph 23?
2    A   Yes.
3    Q   For what portion?
4    A   After the wedding ceremony, my wife and I
5 were the first to -- to exit, and we immediately
6 went up the three flights of -- of -- of staircases
7 to -- to the top level. I was very excited. It was
8 like the high point of my life. I couldn't have
9 been happier. I was flying. Thrilled. Ceremony
10 had been beautiful, and I wanted to go up and see
11 all the stations that we had so worked hard on and
12 taste the food.
13        Everyone was going to come in back of me so
14 we came up first and the -- the Barons came up
15 second. They were the second people to -- the third
16 couple. The bride and groom left first -- left the
17 huppah first. We came second and the Barons came in
18 after us, and they immediately came up to the third
19 floor with -- right after us.
20        And I was in one side of the room and I
21 looked up and I saw that my wife and Craig's mother
22 were in the middle of the room at the sushi station

---

126

1 and there was something going on. And I immediately
2 walked over 10 feet, and I heard my wife say, "It's
3 not" -- it -- "it's not shrimp. It can't be shrimp.
4 It's just made to look like shrimp." And then I
5 heard -- I saw Craig's mother say, "Look at it.
6 It's shrimp. Taste it." And my wife took a bite of
7 the canapé, of the -- of the sushi, and she looked
8 at me and she went like this (indicating) and she
9 said, "It's shrimp." And then the groom --
10    Q   I'm sorry to interrupt. Your wife eats
11 shrimp, correct?
12    A   Yes.
13    Q   Okay.
14    A   And then the groom's mother said -- very
15 agitated, very shaken, she said, "You understand
16 that if any non-kosher food is served, then all of
17 the food is not kosher?"
18        And at that point, I was already rushing
19 down the staircase, which -- knocking -- almost
20 knocking over my guests to get down to the kitchen.
21 So I don't know what else was said.
22        But then I left and went straight down to

---

127

1 the kitchen, and I said to Toby Nann or I screamed
2 at Toby Nann -- I was totally distraught. I said,
3 "You're serving shrimp at my daughter's kosher
4 wedding."
5        And she said, "That's impossible. We're
6 not."
7        And I took her by the hand, and I said,
8 "Toby, come up the steps with me."
9        And we walked up the steps together, and
10 she finally got there and she looked and she said,
11 "Oh, my God."
12    Q   And at that point, she removed the trays
13 that contained the sushi?
14    A   At that point, she said -- she said
15 that -- that she was going to remove the shrimp.
16 And I don't know exactly what happened at that
17 point, whether everything was removed and then new
18 trays were brought back or whether people came
19 around and removed the shrimp. I have no idea
20 what -- what occurred at -- at that point.
21        The next day, I started to get -- to get
22 calls from friends who told me about octopus and eel

---

128

1 being served. In fact, some of them telling me that
2 they ate the octopus and some saying it was very,
3 very good. And it wasn't one or two, but it was
4 many. And this was -- really, I didn't know
5 that -- at the -- at the wedding, I thought
6 the -- the -- the shellfish was -- was the shrimp,
7 but it was shrimp, eel, and octopus. And even after
8 the shrimp was -- was removed, they continued to
9 serve eel and octopus through the rest of the
10 reception hour.
11    Q   What's your basis for that statement?
12    A   People -- many people told me they were
13 eating eel and octopus. Many people told me they
14 were eating -- eating eel and octopus throughout
15 the -- throughout the cocktail hour from the sushi
16 bar, people in the wedding party, friends of mine,
17 many people.
18    Q   All right. We'll come back to eel and
19 octopus. But to make sure I understand, we'll stick
20 to the shrimp for a minute. The eel and octopus
21 issue first became an issue for you the day after
22 the wedding?

---

33 (Pages 129 to 132)

129

1    A    I -- I learned that eel and octopus was
2    served at my daughter's wedding the day after the
3    wedding.
4    Q    Okay. So you never talked at the wedding
5    about eel and octopus with Toby or anybody else,
6    correct?
7    A    That's correct.
8    Q    Okay. Now, the -- so the incident you
9    described involving your wife and Mrs. Baron that
10   you kind of happened on to when you saw them there,
11   as I understand it, after the wedding ceremony was
12   over, you left first, you and your wife?
13   A    (Nodding.)
14   Q    Correct?
15   A    Yes.
16   Q    And then the Barons came right behind you?
17   A    Yes.
18   Q    And you were let out of the wedding hall,
19   so to speak, before the rest of the guests were so
20   that you could beat them to the reception.
21   A    Well, no -- you -- the -- the -- the people
22   on -- under the huppah leave first and then followed

130

1    by the guest, yeah.
2    Q    Right. I'm just making sure it happened
3    that way. So you were the first to recede from the
4    wedding ceremony?
5    A    After the bride and groom.
6    Q    Okay. And did the bride and groom beat you
7    up to the reception?
8    A    Bride and groom, under Jewish law, went to
9    a place where they could be alone as husband and
10   wife for a few minutes.
11   Q    So they did that and you and your wife and
12   the Barons were literally the first people into the
13   reception?
14   A    Yes.
15   Q    And as soon as you walked in, you already
16   saw your wife and Mrs. Baron having this discussion
17   about --
18   A    But -- no. I would say, you know, a minute
19   into that, yes.
20   Q    So the offending sushi was removed. At
21   least the shrimp trays that you observed was removed
22   at the very outset of the reception, correct?

131

1    A    Absolutely not. I had to go down three
2    flights of -- of stairs to get to the kitchen. All
3    my guests were entering the reception. I had to
4    argue with Toby Nann and convince her that there was
5    sushi -- that the sushi had shellfish. She was
6    resistant. We really argued about it. Then we had
7    to walk up the staircase and back of all of our
8    guests. By the time we got up there, the
9    sushi -- there were two sushi bridges that were at
10   the center of the cocktail reception, and they were
11   surrounded by people eating sushi. You couldn't
12   even get close to them.
13   Q    When you saw -- when you became alerted to
14   the problem -- most people weren't -- there was just
15   the three of you, right?
16   A    Four.
17   Q    Mr. Baron was there too?
18   A    (Nodding.)
19   Q    Is that a yes?
20   A    Yes.
21   Q    Okay. And when your wife tasted the sushi,
22   it was just the four of you there?

132

1    A    I -- I don't know where Mr. Baron -- he was
2    up there. I don't know if he was literally standing
3    with us.
4    Q    It was either three of you or four of you?
5    You don't recall?
6    A    At that moment.
7    Q    Okay. And did -- and -- and you became
8    immediately concerned when your wife tasted it that
9    in fact this was shrimp being served at the wedding?
10   A    Well, I looked at it. It was shrimp. It
11   was big pieces, big, very big pieces of shrimp. I
12   wasn't concerned. I was stunned. I was distraught.
13   I was heartbroken. I was upset. I was angry. I
14   was crushed. I went from the greatest moment of my
15   life leaving my -- my daughter under that -- under
16   that huppah to one of the most awful moments of my
17   life. In -- within -- within 30 seconds, I went
18   from the biggest high to -- to a desperate, horrible
19   situation that was humiliating and hurtful and
20   upsetting and -- and not rectifiable.
21   Q    Did it dawn on you at that moment of this
22   desperate, horrible situation that you realized when

Case 1:05-cv-01717-RJL   Document 59   Filed 03/30/2006   Page 34 of 56
VIDEOTAPED DEPOSITION OF MARK ZAIDEL
CONDUCTED ON THURSDAY, JANUARY 19, 2006

34 (Pages 133 to 136)

**133**

1   you saw the shrimp and your wife tasted the shrimp
2   to stop the shrimp from being served before your
3   guests ate it?  Did that dawn on it?
4        A   I did the appropriate -- I did what
5   I -- the -- the -- all the people who were involved
6   in the -- in the -- in the serving and -- from
7   Ridgewells were at the -- on the basement level
8   where the kitchen is at the Corcoran.  The reception
9   was on the third floor level.  I had to go down,
10   tell the event coordinator what was going on, get
11   her back up there, and have her tell her -- and
12   then -- then she proceed -- proceeded with her staff
13   to remove either the shrimp or the sushi.
14        Q   You didn't tell your wife or Mrs. Baron or
15   Mr. Baron or anyone else for that matter, "Don't let
16   them serve this till I get back," right?
17        A   It wasn't being served.  It
18   wasn't a some -- someone at a station serving it.
19   It was in the middle of the room and people went up
20   to it and -- and ate it.  There was not someone
21   there serving it to anyone.
22        Q   It was on a tray, right?

**134**

1        A   It was not on a tray.  It was on a huge
2   bridge and the sushi was all over the top of the
3   bridge and all over the bottom of the bridge.  There
4   was no -- there was no server there from Ridgewells
5   putting it on people's plates.  There were plates
6   there.  People took it themselves.
7        Q   The sushi that was removed wasn't
8   there -- in order for Toby to do what she ultimately
9   did in getting the shrimp out of there, she
10   physically removed a tray or trays of sushi, didn't
11   she?
12        A   She could -- this was -- this was
13   a -- these were two very huge bridges.  I think -- I
14   don't know if she removed -- she couldn't have
15   removed them.  It's not -- one person couldn't carry
16   it.  It was huge, and I -- as I said, I don't know
17   if she had people pick off the -- the shrimp or
18   whether she actually physically removed the -- the
19   entire thing and then brought it back up.  Sushi
20   continued to be served throughout the reception.
21        Q   And why -- why is -- how is it that you
22   don't know what she did?  Were you not watching?

**135**

1        MR. LEWIN:  Objection to the form of that
2   question.
3   BY MR. SCHWABER:
4        Q   You can answer.
5        A   I was -- I was very, very upset.  My
6   friends were trying to calm me down.  I was
7   screaming at -- at -- at at Toby.  I don't recall
8   specifically seeing whether she or her staff took
9   the whole thing down or not.  I just don't recall
10   that.
11        Q   Were you concerned about telling your
12   rabbi --
13        A   Yes.
14        Q   Please let me finish my questions before
15   you answer.  I wasn't done.
16        Were you concerned about telling your
17   rabbi, prior to the removal of the shrimp, that he
18   shouldn't eat the sushi?
19        A   I don't -- I don't know at what point I
20   saw -- I went -- Jeff Wohlberg, our rabbi, was
21   there, and Judy and I both told him what happened
22   and other friends.  And then an employee from

**136**

1   Ridgewells was walking by and the rabbi told her,
2   "What a disaster this was, what an absolute disaster
3   this was."
4        Q   The rabbi told an employee of Ridgewells?
5        A   Yes.
6        Q   Do you know who that employee was?
7        A   Yes.
8        Q   Who?
9        A   Staley.
10        Q   Julie Staley?
11        A   Julie Staley.
12        Q   Okay.  And did you hear that conversation
13   or did he tell you?
14        A   I was in front of my wife.  My -- my wife
15   can speak to that.
16        Q   Your wife told it to you?
17        A   Yeah.  My wife told me that, yes.
18        Q   Okay.
19        A   And -- and Jeff Wohlberg has told me that
20   since.
21        Q   My question to you was, You discovered the
22   sushi -- the shrimp problem before, presumably, at

Case 1:05-cv-01717-RJL  VIDEOTAPED DEPOSITION OF MARK A. SIEGEL  Document 52-3  Filed 10/30/2006  Page 35 of 56
CONDUCTED ON THURSDAY, JANUARY 19, 2006

35 (Pages 137 to 140)

137

1   least the lion's share of your guests had even
2   entered the reception hall, and did you do anything
3   at that moment to try to mitigate the problem by
4   making sure your guests wouldn't eat the shrimp
5   before you got back upstairs with Toby?
6       **A   I -- I did the appropriate thing for the**
7   **father of the bride.  I ran down three flights of**
8   **stairs knocking over some of my guests -- some of my**
9   **guests have told me that they didn't know what was**
10  **going on, they thought someone was ill -- to tell**
11  **Ridgewells that they were ruining my daughter's**
12  **wedding and to get -- to get them to get -- to get**
13  **the sushi away.  I did the appropriate thing.  I**
14  **went to the Ridgewells staff and said, "Get that**
15  **sushi out of here."**
16      Q   So you didn't tell the Ridgewells staff
17  that was in the reception hall not to let the guests
18  eat the sushi, correct?
19      **A   I went down to -- to talk to the event**
20  **coordinator and I did it as quickly as I could.**
21      Q   But you told nobody else --
22      **A   Who argued with me that it -- that there**

138

1   **was no shrimp being served.**
2       Q   Please listen to my question.  Before going
3   downstairs, you took no steps to make sure that your
4   guests wouldn't eat the sushi.  Is that a fair
5   statement?
6       **A   I was extremely upset and I immediately**
7   **rushed down the stairs to talk to the event**
8   **coordinator.  I was -- I don't exactly remember what**
9   **I did or said because I was beside myself.  I -- I**
10  **was -- we had planned this wedding in incredible**
11  **detail.  This was -- my baby's wedding was supposed**
12  **to be perfect and was -- I was destroyed that it had**
13  **been ruined.  I ran down -- ran down the stairs.  I**
14  **did, I think, what any father would have done, got**
15  **the event coordinator reluctantly to come back up**
16  **and remove the sushi.**
17      Q   So from this moment that you described
18  as -- I think you said the highest moment of your
19  life --
20      **A   Yes.**
21      Q   -- you became destroyed that the event of a
22  lifetime for you had been ruined before you knew

139

1   that anyone, except your wife, had tasted a piece of
2   shrimp.  Is that a fair statement?
3       MR. LEWIN:  I object -- I object to that.
4   I didn't even understand -- couldn't follow that
5   question.
6   BY MR. SCHWABER:
7       Q   I'll rephrase.  You reached the conclusion
8   in your mind that the event was ruined before
9   anybody, except your wife, had tasted a piece of
10  shrimp, correct?
11      **A   I -- at the moment that my -- my-- my**
12  **daughter's new mother-in-law said,**
13  **if -- if -- if -- "If shrimp is being served, none**
14  **of the food here can be kosher."  That was a**
15  **horrible, horrible moment.  It was embarrassing.  It**
16  **was humiliating.  It was offensive.  She was crying.**
17  **She was being told -- at that point, she was trying**
18  **to be comforted by her own husband.  It was**
19  **disrupting the wedding.  People were watching what**
20  **was going on, and I immediately went downstairs.  I**
21  **don't know what else I can tell you about.  I went**
22  **downstairs to try to get this removed.**

140

1       Q   Mr. Siegel, what you're doing, I believe,
2   respectfully, is justifying a position and I'm not
3   asking you to justify a position.  I understand what
4   you did.
5       **A   I'm not sure you understand what**
6   **the -- what the -- what occurred that -- that night,**
7   **how devastating it was.**
8       Q   We don't need to agree on it.  That's not
9   the purpose of this exercise.
10      **A   If it was your daughter's wedding, you**
11  **would feel the same way.**
12      Q   Let me ask you to listen to my precise
13  question and try to answer it.  Okay?  And again,
14  for the court reporter's benefit, let me finish even
15  if you know where I'm going.  I'm just working on
16  the timeline here.
17          The moment you decided that this event,
18  this wedding had been ruined for you was before
19  anyone, except your wife, had had any sushi?
20      **A   At that point, people were surrounding the**
21  **sushi.  There were people eating sushi.  I don't**
22  **know who -- who was there, who was not there, but,**

Case 1:05-cv-01717-RJL    VIDEOTAPED DEPOSITION OF MARK A. SIEGEL    Page 36 of 56
Document 34-3    Filed 10/30/2006
CONDUCTED ON THURSDAY, JANUARY 19, 2006

36 (Pages 141 to 144)

141

1    you know, there were people coming up right in back
2    of us. So by the -- very quickly, that room filled
3    with people.
4        Q   Okay. Can we agree that you -- whether it
5    was the right thing to do or the wrong thing to do,
6    we don't need to debate. But can we agree that you
7    had it within your ability at that moment to prevent
8    guests from eating the shrimp?
9        MR. LEWIN: I -- I object to that. I mean,
10   the -- the witness has testified this was this huge
11   bridge. I mean, how could he prevent guests from
12   eating --
13       MR. SCHWABER: Counsel, that's your
14   testimony.
15       MR. LEWIN: No. I'm just -- I'm in
16   a -- "can we agree," I mean, you know, I -- I object
17   to that.
18       MR. SCHWABER: You can object to the
19   question. I just want the witness's testimony.
20       MR. LEWIN: I object to the question.
21   BY MR. SCHWABER:
22       Q   Did you have the wherewithal -- between you

142

1    and your wife and any Ridgewells people that were up
2    there and the Barons or whoever else, did you have
3    the wherewithal at the moment you discovered the
4    shrimp problem to prevent your guests from ingesting
5    the shrimp or at least the vast majority of your
6    guests?
7        A   Unless I try to physically remove -- I
8    mean, the father of the bride would have to pick up
9    and physically remove a huge and -- and then take it
10   down three flights of stairs. Is that what you're
11   suggesting that I should have done at my daughter's
12   wedding? Is that what you're suggesting?
13       Q   I'm asking you -- if that is the only thing
14   you can think of, then I guess I'm asking you if
15   that's what you should have done. What I'm asking
16   you is, Was there anything you think you could have
17   done to prevent your guests from eating the shrimp?
18       A   I -- I did what I thought was
19   the -- the -- the quickest remedy. I went down. I
20   got the event planner, the woman who would told
21   us -- had told us that she was a mashgiach and would
22   make my daughter's wedding perfect. And I -- I got

143

1    her to remove the shrimp after -- reluctantly after
2    she told me there wasn't shrimp.
3        Q   When you got her, you physically grabbed
4    her and pulled her, correct?
5        A   I told you what had happened. She said
6    that was impossible. I took her by the hand and we
7    walked up the staircase and I -- I said -- I took
8    her by the hand and I said, "Let me show you."
9            And we walked up the staircase. And we got
10   to the top of the staircase, she said, "Oh, my God."
11       Q   On the way up, beginning downstairs, you
12   actually said, "There's fucking shrimp on the
13   sushi," correct?
14       A   I usually don't talk that way. I'm not
15   sure that I said that, but I was so distraught that
16   I could have said it. I just don't know. I mean,
17   it was -- it was a horrible moment.
18       Q   You remember using that particular curse --
19       A   No.
20       Q   -- repeatedly that evening?
21       A   No, I don't.
22       Q   Is it conceivable you did?

144

1        A   I was very, very upset. I don't know
2    exactly what -- what I might have said. I usually
3    don't talk that way, but I was very, very upset.
4        Q   You recall reacting in a way that would,
5    under other -- other circumstances, be
6    inappropriate?
7        A   Well, if I cursed -- I don't -- I don't
8    curse. I'm not a person who curses. So if I -- if
9    I said the word "fucking," it would be something I
10   normally would not do.
11       Q   Okay. You recall telling Toby in front of
12   others downstairs when you got her at that moment,
13   "You've ruined my daughter's wedding"?
14       A   Yes.
15       Q   Do you recall telling her, "I'm going to
16   put Ridgewells out of business"?
17       A   I don't recall that.
18       Q   Is it conceivable you said that to her
19   then?
20       A   I was very, very upset. I don't believe I
21   said that.
22       Q   You recall saying that to others, right?

Case 1:05-cv-01717-RJL VIDEOTAPED DEPOSITION OF MARC MORGENSTERN Document 35-3 Filed 03/30/2006 Page 37 of 56
CONDUCTED ON THURSDAY, JANUARY 19, 2006

37 (Pages 145 to 148)

145

1     A   I don't actually recall, like, saying that
2  to others.
3     Q   You don't recall saying it to the people
4  who were -- at the end of the evening who were
5  cleaning up when you confronted them about the
6  leftover wine?
7     A   The people who were -- who were stealing
8  the wine from -- those people downstairs in the
9  basement who was -- who told me there was no --
10    Q   Can we --
11    A   The people who said there was -- there was
12 no wine leftover when there were actually 6 cases of
13 wine hidden under boxes, those people?
14    Q   Those people.
15    A   Those people.
16    Q   Do you recall telling those people you're
17 going to put Ridgewells out of business?
18    A   I don't recall.
19    Q   Do you recall accusing those people for
20 stealing your wine?
21    A   They were stealing my wine.
22    Q   Did you recall call -- calling them

146

1  "fucking morons" repeatedly in front of others?
2     A   I don't recall that.
3     Q   Is it conceivable you called them "fucking
4  morons" repeatedly in front of others?
5     A   I don't recall that.
6     Q   Is it conceivable?
7     A   I don't believe I said that.
8     Q   And you don't recall telling anyone that
9  night that you were going to put Ridgewells out of
10 business?
11    A   I don't recall.
12    Q   Do you recall telling your son-in-law at
13 the end of the evening that you were going to put
14 Ridgewells out of business?
15    A   I don't recall that.
16    Q   Do you recall your son-in-law coming down
17 and trying to calm you down when you were shouting
18 about the wine?
19    A   Yes.
20    Q   And you were confronting Toby and the other
21 people who were there packing up and your son-in-law
22 came down to try to calm the situation, right?

147

1     A   My son-in-law came down because the two of
2  us were going to bring up all the extra cases of
3  wine that were leftover from the wedding, and I was
4  told that there was no wine leftover from the
5  wedding.
6     Q   Your son-in-law came upon a situation where
7  you were quite agitated.  Is that a fair statement,
8  at that moment?
9         MR. LEWIN:  Objection to the form of that
10 question.
11 BY MR. SCHWABER:
12    Q   At that moment when he came down to help
13 you with the wine, you were quite agitated, right?
14    A   I was told that there was no wine leftover
15 and this was very, very expensive wine.  And I kept
16 saying to the people, "Are you sure that nothing is
17 left over?"
18        And they kept saying, "There's no wine
19 leftover."
20        And then I started looking around and found
21 under -- under cardboard boxes hidden in the corner
22 four cases of Château Margaux that were very, very

148

1  expensive.  I never recovered the champagne that was
2  left over.  I don't know where that is, but I was
3  very, very agitated, yes.
4     Q   Okay.
5     A   And when I -- when I confronted the
6  Ridgewells staff with the wine, they said, "Oh, we
7  don't know where that came from."
8     Q   Okay.  Now, Toby Nann was there and found
9  the wine for you, right?
10    A   No.  I found the wine.
11    Q   In front of Toby?
12    A   I don't remember her being -- even being
13 there.  I found the wine under -- hidden under boxes
14 when I was told -- when I was told that there was no
15 wine leftover.
16    Q   If there were witnesses who heard you when
17 the three cases of wine were found say, and I quote,
18 "You fucking morons, you fucking morons, you're
19 trying to steal my wine.  I'm going to put
20 Ridgewells out of business."  Is it conceivable to
21 you that that's what you said?
22        MR. LEWIN:  I object to the use of the word

38 (Pages 149 to 152)

149

1  "conceivable" repeatedly.
2  BY MR. SCHWABER:
3      Q   Yeah. I'm asking.
4      A   That's not the way I -- I usually talk. So
5  it's -- it's not -- it's not something I think I
6  could have said.
7      Q   And you don't remember Toby even being
8  there at that point?
9      A   That's correct, I don't remember Toby
10  being -- being there.
11      Q   Do you remember saying to her, "Do you have
12  any daughters? Would you want your daughter's
13  ruined? You're Jewish and you should know better"?
14      A   I said that at some point during the
15  evening. I don't know when I said that. I think I
16  said something like that and I strongly feel it and
17  still feel it. But I don't know if I said it at the
18  end or close to the time that the sushi was
19  discovered or -- I don't -- I don't know.
20      Q   Do you remember Craig telling Toby in that
21  final confrontation there, after the -- you had
22  discovered the wine cases, "Things happen, it's

150

1  okay"?
2      A   I don't recall Toby being there, so of
3  course, I don't recall that. I don't believe -- I
4  don't recall Toby being there. And I don't -- I
5  can't speak for what my son-in-law said or didn't
6  say. I didn't hear that.
7      Q   Do you recall pulling your son-in-law out
8  of the room and saying, "No, Craig, I'm going to put
9  Ridgewells out of business"?
10      A   No.
11      Q   If people heard you saying that, is it
12  conceivable to you that it may have happened?
13      A   It's inconceivable that I -- that I talked
14  that way, especially to my son-in-law.
15      Q   Okay. Do you believe that at any point in
16  the evening, you grabbed, physically, Toby Nann by
17  the wrist in an aggressive manner?
18      A   I've already --
19      MR. LEWIN: Objection again to "an
20  aggressive manner." I think he described that
21  point.
22  BY MR. SCHWABER:

151

1      Q   I'm asking you if you believe that your
2  grabbing her by the wrist was aggressive.
3      A   No.
4      Q   Do you believe it could have been
5  interpreted as aggressive?
6      A   No. It was very clear what happened. She
7  said, "There couldn't be sushi -- there couldn't be
8  shrimp and shellfish."
9      I took her by -- not by her wrist. I took
10  her by her hand and led her up the steps, and -- and
11  then when she got up to the steps, she said, "Oh, my
12  God." And then several times during the night, she
13  kept apologizing. And I kept being told that -- I
14  and other people in my family that Ridgewells is
15  going to make this right and Ridgewells is going to
16  contact us Monday morning. And they said it to my
17  daughter. Toby said it to me. So there was nothing
18  aggressive. I wanted to show her
19  what -- what -- what Ridgewells was serving at my
20  daughter's wedding and she said they weren't. So I
21  took her by her -- by the hand and we went up the
22  stairs.

152

1      Q   Okay. And if Ridgewells had made it right
2  by -- what would Ridgewells have to do to make it
3  right by you at that point?
4      A   At -- at what point?
5      Q   The point where you said you were being
6  told by several Ridgewells people that Ridgewells
7  was going to make it right.
8      A   Make it right. They were speaking
9  that I -- I was going to hear from Ridgewells early
10  in the week or first thing on Monday and Ridgewells
11  is going to make this right.
12      Q   And you did, in fact, speak to Tom Keon,
13  right, soon after the wedding?
14      A   Ridgewells did not call me. I called
15  Tom Keon when I didn't receive a phone call from
16  Ridgewells.
17      Q   Okay. And at that time that you called
18  him, did you have an idea of what Ridgewells could
19  do to make it right?
20      MR. LEWIN: Objection.
21      A   I -- I asked him what he -- what he
22  was intending to do, that I -- that his staff said

153

1    that he -- that we would be speaking today or he
2    didn't call -- he didn't call back until, I think,
3    the next day. But I was asking him what he was
4    proposing because they said that -- that Ridgewells
5    is going to make this right. So I -- I asked him
6    that.
7    BY MR. SCHWABER:
8    Q   Did you -- my question was, Did you have a
9    sentence of what it would take, in your mind, for
10   Ridgewells to make it right?
11    A   No.
12   Q   Could Ridgewells have made it right?
13    A   No -- nothing could -- could give me back
14   my daughter's wedding.
15   Q   And you believe that the discovery of the
16   shrimp at that moment ruined your daughter's
17   wedding?
18    A   I think the -- that the serving of -- of
19   shellfish at a wedding when all the food was
20   supposed to be kosher ruined my daughter's wedding,
21   and I will always feel that it was ruined. All my
22   memories have been spoiled of that evening, and it's

154

1    a -- it's a -- it's very, very sad for me because
2    this was -- we worked very hard to make this very
3    special for our -- our daughter.
4    Q   And is it -- and you don't have any
5    pleasant memories of the evening?
6    A   I have wonderful memories of the ceremony,
7    glorious memories of the ceremony. And after that,
8    I have very, very bad memories.
9    Q   Do you believe the evening was ruined for
10   your daughter?
11    A   She could speak for herself.
12   Q   I'm asking your belief.
13    A   I don't know.
14   Q   Did you ever ask her that?
15    A   At -- at -- at Thanksgiving, this
16   Thanksgiving, she said -- when we're going around
17   the table talking about what we would be thankful
18   for, and she said, "I hope someday I could be
19   thankful that my -- that my father could think about
20   my wedding with happy memories." So she's obviously
21   not only upset for what -- for what happened to her
22   own wedding, but she knows how -- how this is with

155

1    me and how unhappy I am and how I really can't, at
2    this point, think of -- of -- of that evening with
3    happy memories other than the very beautiful
4    ceremony that took place that night.
5    Q   It sounds from your testimony -- because
6    you've told me similar things about other friends
7    after the fact, it sounds from your testimony that
8    several people close to you are concerned about your
9    reaction to the events at that party, correct?
10   They're concerned about how much it upset you?
11    A   My daughter is -- is con- -- concerned.
12   Q   And the Cohens?
13    A   The Cohens were very concerned themselves.
14   I mean, the -- the Cohens to this day
15   think it's -- it's -- what happened was -- was just
16   awful and that we had a responsibility to pursue
17   this so this never happens to anyone again.
18   Q   And is that why you're pursuing it?
19    A   I think that's the fundamental reason. I
20   think if -- if the -- if -- if the discussion with
21   Tom Keon that day -- if he would have said, "This
22   was a terrible thing, we're going to do things to

156

1    make sure that this could never happen again, we're
2    going to put procedures in place," I think things
3    would -- would be different.
4    Q   Looking back, do you believe this whole
5    problem could have been avoided if you had simply
6    gone with the first option and paid for the
7    mashgiach?
8    MR. LEWIN: Objection.
9    A   I think when you're dealing with a
10   reputable company, what I thought was a reputable
11   company, when you order kosher food and nondairy
12   food, you should get what you -- what you ordered.
13   You shouldn't have to have other people brought in
14   to supervise to make sure they do what they're
15   supposed to do. I relied on them. I relied on
16   Ridgewells. I relied on Toby Nann telling me she
17   knew exactly what to do and that it was going to be
18   perfect. I relied on them and that was a mistake.
19   BY MR. SCHWABER:
20   Q   Again, I don't think you're listening to my
21   question. Let me ask it again.
22   MR. LEWIN: Oh, I think he did answer your

157

1  question. I'm sorry.
2  BY MR. SCHWABER:
3     Q   Let me ask you a different way. I'll ask
4  you a different question so we'll clarify any
5  confusion. You told me this morning about your
6  renewed dialogue with Ms. Nann after the
7  windows' option disappeared for you. Do you
8  remember that?
9     A   Yes.
10    Q   Okay. And at the time of your renewed
11 discussion with Ms. Nann, she said words to the
12 effect of "there's another option for you," correct?
13    A   Right. Correct.
14    Q   And that other option was to go without a
15 mashgiach and to have kosher meat and no dairy
16 products, correct?
17    A   Correct.
18    Q   Okay. And you chose that other option?
19    A   That's correct.
20    Q   But you were presented with both options
21 for you to choose, correct?
22    A   That's correct.

158

1     Q   Okay. So you knowingly chose an option
2  that you knew had a less rigid standard of Kashruth
3  than the option you knowingly didn't choose,
4  correct?
5     A   I chose -- I chose an option that was
6  consistent with my level of Kashruth, with -- with
7  my community's level of Kashruth, with my
8  synagogue's level of Kashruth, with my friends'
9  level of Kashruth, with my rabbi's level of Kashruth
10 eating in my house, with
11 Michael -- Dr. Michael Berenbaum's level of Kashruth
12 eating in my house. Yes, I did that.
13    Q   That wasn't my question.
14    A   Oh, I think it was and I think I answered
15 it.
16    Q   Go back to my question because my question
17 was a yes-or-no question.
18    MS. LEWIN:  Can you please read my last
19 question?
20       (The reporter read the record as
21 requested.)
22    MS. LINDLEY:  Can you read the last

159

1  sentence of my answer?
2       (The reporter read the record as
3  requested.)
4  BY MR. SCHWABER:
5     Q   So that last sentence answers my question?
6     A   You don't think "Yes, I did that" answers
7  the question?
8     Q   I do.
9     A   Okay.
10    MR. LEWIN:  And the rest is an explanation,
11 which I think the witness can give with regard to
12 his answer.
13 BY MR. SCHWABER:
14    Q   The option you chose with a less rigid
15 standard, without a mashgiach, was that kosher or
16 treif, in your mind?
17    A   Kosher.
18    Q   So if -- getting back to a question I asked
19 you when we started this exercise. If a guest had
20 come to you in advance of the wedding and said, "Is
21 the wedding kosher or treif," you would have said
22 kosher?

160

1     A   I would have said the food was kosher.
2     Q   You continue to qualify it. Are you
3  qualifying it?
4     A   I always say that the food -- that the
5  wedding was -- the food of the wedding was kosher
6  and parve except for the shellfish and the cream
7  cheese that was served.
8     Q   No, I mean, in advance of the wedding, what
9  you would have said.
10    A   I would have said that the wedding was
11 kosher and the food was kosher and parve.
12    Q   Okay. And could you have comfortably
13 answered yes to a question -- let's take an
14 orthodox --
15    A   Maybe I answered yes. I don't know. But
16 to me, the wedding was kosher and parve because the
17 food was kosher and parve. I was comfortable with
18 that level of Kashruth. My friends and family are
19 comfortable with that level of Kashruth. I was
20 raised with that level of Kashruth. It's consistent
21 with conservative American's level of Kashruth.
22    Q   Let's take a conservative rabbi other than

161

1  the one who came. I'm trying to think of one. Do
2  you know Lyle Fishman?
3     A  No.
4     Q  Okay. Let's take another rabbi. Do you
5  know Rabbi Tesler?
6     A  No.
7     Q  Do you know Rabbi Krant (phonetic)?
8     A  Why would I know rabbis who aren't my
9  rabbi? I know my rabbi.
10    Q  I'm just asking.
11    A  I know my rabbi.
12    Q  Okay. If a rabbi from -- have you heard of
13  the synagogue Ohr Kodesh?
14    A  Oh, yes, that's where Toby Nann was a
15  mashgiach.
16    Q  Okay. And you're familiar with that
17  synagogue?
18    A  Yes. Michael Berenbaum went to that
19  synagogue.
20    Q  Okay. If the rabbi at Ohr Kodesh, who I'll
21  represent to you is Lyle Fishman, who you just told
22  me you don't know him, but if he came to you the day

162

1  before the wedding and said, "Is your daughter's
2  wedding kosher," would you have answered that
3  question yes?
4     MR. LEWIN: Objection. Go ahead.
5     A  I would have said what I --
6  when -- when -- whenever we talked about the
7  wedding, that the food was kosher and parve. That
8  would have been my answer. That would have been my
9  answer.
10  BY MR. SCHWABER:
11    Q  Okay. Would you have felt compelled to
12  tell a rabbi you didn't know personally that you
13  didn't have a mashgiach coming?
14    A  There were no rabbis other than two rabbis
15  at the wedding.
16    Q  That wasn't my question. Would you have
17  felt compelled -- had there been another rabbi
18  coming that you didn't know personally, would you
19  have felt compelled to tell that rabbi that there
20  wasn't a mashgiach at the wedding?
21    MR. LEWIN: Object to the "felt compelled"
22  language. If you can understand it, answer it.

163

1     A  I -- I don't quite under- -- understand
2  what you're getting at.
3  BY MR. SCHWABER:
4     Q  Do you -- you understood a distinction
5  between what you got from Ridgewells and the option
6  you didn't get, correct?
7     A  Yes.
8     Q  Would you have felt compelled to make clear
9  that distinction to a rabbi who had called you the
10  day before the wedding?
11    MR. LEWIN: Objection.
12    A  If it -- if it was an Orthodox,
13  glatt kosher rabbi and had called me under those
14  circumstances, yes. If it would have been a
15  Conservative or a Reform rabbi, which is the kind of
16  Judaism that I'm involved in, no.
17  BY MR. SCHWABER:
18    Q  Look at paragraph 30 of the complaint.
19    A  Yes.
20    Q  And paragraph 30 starts by talking about,
21  "No margarine was served with the bread baskets."
22  And then it says, "On information and belief, the

164

1  failure to serve margarine was attributable to the
2  fact the defendant" -- "defendants had brought only
3  butter, a dairy product to the event. And in light
4  of Plaintiff Mark Siegel's objection to the presence
5  of cream cheese, defendant determined prior to the
6  dinner to remove butter, which was the spread it had
7  available from the bed" -- "bread baskets."
8     That's pure speculation, correct?
9     MR. LEWIN: Objection. Pure speculation,
10  no. I think it's based on natural inferences from
11  facts, what it was.
12    MR. SCHWABER: Counsel, again, I don't want
13  you to testify.
14    MR. LEWIN: I'm not.
15    MS. LEWIN: I'm asking the question --
16    MR. LEWIN: I understand.
17    MR. SCHWABER: But you say --
18    MR. LEWIN: You asked questions --
19    MS. LEWIN: Just say objection.
20    MR. LEWIN: You're asking questions about
21  pure speculation. It's an objectionable question.
22    MR. SCHWABER: This a -- this witness

165

1   is a -- you can say it's an objectionable question.
2      MR. LEWIN: Okay. Objectionable question.
3   I'm trying to explain why it's objectionable in
4   terms of form.
5      MR. SCHWABER: I don't mean that the --
6      MR. LEWIN: It's a -- that's a --
7      MS. LEWIN: You can say objection to the
8   form --
9      MR. LEWIN: Okay.
10     MS. LEWIN: -- and leave it at that.
11     MR. LEWIN: Okay.
12  BY MR. SCHWABER:
13    Q  Okay. Paragraph 30 is -- the information
14  and belief sentence in paragraph 30 is pure
15  speculation, isn't it?
16    **A  When no -- when no spread was served at**
17  **dinner with bread, my wife went down to the kitchen,**
18  **confronted Toby Nann and asked why the margarine**
19  **wasn't on the table and asked that margarine be**
20  **brought to the -- to the tables. No margarine was**
21  **ever brought to the table.**
22    **In light of that, in light of the fact that**

166

1  **we -- we -- we were told there was going to be**
2  **margarine, we contracted for margarine, no spread**
3  **was brought even after we went down and asked that**
4  **margarine be brought to the table. And in light of**
5  **the fact that I know I was served cream cheese**
6  **during the reception, it was my conclusion that**
7  **there probably was no margarine, that what was**
8  **probably brought was butter, and that Toby Nann at**
9  **that point knew that she was probably -- it was not**
10  **wise to bring -- to put butter out on the table.**
11    Q  That's what you said in paragraph 30. I
12  understand that. My question was, Are you
13  speculating?
14    **A  In light of the fact that they**
15  **didn't -- that they refused to bring out any other**
16  **spread, I am speculating that they didn't bring out**
17  **any other spread because they didn't have margarine,**
18  **they had butter.**
19    Q  Thank you. Paragraph 31 reflects a
20  complaint by your daughter to Julie Staley and
21  Ms. Staley's reply. My question on that paragraph
22  to see if I have any further questions is, Were you

167

1  a witness to that conversation?
2    **A  It was in the ladies' room.**
3    Q  Okay. So is anything you know about that
4  just from what your daughter would have told you?
5    **A  My daughter told me immediately after when**
6  **she came out of the ladies' room.**
7    Q  Okay. Was there a video of the wedding?
8    **A  There is a -- there is video. There's**
9  **pictures.**
10    Q  A professional videographer? Was a
11  professional videographer hired?
12    **A  There's -- that -- there is a video.**
13    Q  Okay. And the video --
14    **A  I didn't -- I didn't hire the videographer.**
15    Q  Who did?
16    **A  My daughter.**
17    Q  Okay. But do you have a copy of the video?
18    **A  In my possession now at this time, I**
19  **actually don't.**
20    Q  I don't mean here now. I mean in your
21  possessions.
22    **A  I don't -- I don't have a copy of -- of the**

168

1  **video in -- in my possession or in my home.**
2    Q  Okay. Do you know who does?
3    **A  My -- my daughter has a copy of the video.**
4    Q  Okay. And you've seen it?
5    **A  I've seen it.**
6    Q  And the video includes footage of the
7  reception as well as the ceremony, correct?
8    **A  It includes -- yes.**
9    Q  Okay. All the way through to the end?
10    **A  I think so, yes.**
11    Q  Okay. And there was a band?
12    **A  There was a band.**
13    Q  And there was dancing?
14    **A  There was dancing.**
15    Q  Horas?
16    **A  Two horas.**
17    Q  Okay. And were -- and both horas were
18  after the shrimp was discovered, correct?
19    **A  Both during dinner, yes.**
20    Q  Okay. Paragraph 32 talks about willful
21  disregard. Do you see that in the first sentence?
22    **A  Yes.**

Case 1:05-cv-01717-RJL VIDEOTAPED DEPOSITION OF MARK SIEGEL Page 43 of 56
Document 55-31 Filed 05/28/2008
CONDUCTED ON THURSDAY, JANUARY 19, 2006

43 (Pages 169 to 172)

169

1    Q   The willful disregard, do you attribute
2  that to Toby Nann?
3        MR. LEWIN:  That's a lawyer's language.
4  I'll object to any question about willful; what he
5  means by willful disregard.  I admit I wrote the
6  words "willful disregard."
7  BY MR. SCHWABER:
8    Q   Well, I'm simply testing him factually.  Do
9  you believe that there was a willful disregard by
10 Ms. Nann of your desire not to have shrimp on the
11 sushi?
12   A   I believe that Ridgewells, who had assured
13 me that there would be no shellfish on the -- on the
14 sushi, did not take the necessary measures or
15 instructions to whatever person, group, or
16 organization or restaurant that was preparing the
17 sushi to assure that -- that no non-kosher products
18 would be in the sushi.
19   Q   Okay.  And Ms. Nann, when she saw the
20 shrimp, according to you, reacted with some shock,
21 correct?
22   A   Correct.

170

1    Q   And her explanation that you remember was
2  "Oh, my God"?
3    A   Correct.
4    Q   And she was stunned to see the shrimp,
5  right?
6    A   Well, she had told me that it was not true.
7  She didn't believe me, and then she saw that it was
8  true.
9    Q   And when you saw her discover that it was
10 true, did she seem genuinely shocked to you?
11   A   She seemed surprised.
12   Q   Okay.
13   A   She seemed surprised that what I told her
14 was true.
15   Q   Okay.  So you don't believe she did
16 anything willful in putting the shrimp out, do you?
17       MR. LEWIN:  This -- the complaint says
18 "willful disregard."
19 BY MR. SCHWABER:
20   Q   My question is, You don't think she did
21 anything willful in putting the shrimp out, do you?
22   A   I don't -- I don't think she -- she did

171

1  what she promised me to make sure that my daughter's
2  wedding was perfect.  She told me she was a
3  mashgiach.  She knew -- she knew what to do, that
4  everything would be perfect.  And I don't think she
5  took whatever steps were necessary to ensure that
6  that sushi was, in fact, made up only of kosher
7  products.
8    Q   I -- I understand that you don't think she
9  did what she needed to do to ensure that.  My
10 question's a little different.
11   A   And that she could have.
12   Q   I understand.  I understand your testimony
13 on that.  Whether I agree with it or not is
14 immaterial.  I understand what you're saying.  My
15 question is different.  My question is, Do you
16 believe she was intending to honor your wishes?
17   A   I don't believe she deliberately had
18 shellfish, shrimp, eel, and octopus, served.
19   Q   Thank you.  The -- towards the end of 32,
20 it says, "Many guests were prevented from enjoying
21 their meals, and some guests refused to eat entrees
22 at the dinner."  Can you name the -- the guests

172

1  referred to in the two clauses I just read?
2    A   I can't.  There was a huge amount of food
3  that was left over and not eaten.  We -- we think
4  that was because everyone seemed to know what was
5  going on, but I don't have any specific names.
6    Q   For either of these clauses, either "guests
7  that were prevented from enjoying their meals" or
8  "guests that refused to eat entrees"?
9    A   Well, may have consumed food that violated
10 their religious rules.
11   Q   No, no.  I'm not asking you about that
12 clause.  Let's start with the clause, "Many guests
13 were prevented from enjoying their meals."  You
14 don't have any names to give me, correct?
15       MS. LEWIN:  Which paragraph?
16       MR. LEWIN:  32.
17   A   I don't have any names.
18 BY MR. SCHWABER:
19   Q   Okay.  And then the next clause, "Some
20 guests refused to eat entrees at the dinner."  Is
21 that speculation?
22   A   I'm told -- I was aware that some guests

44 (Pages 173 to 176)

173

1  were eating only vegetables. I don't have any
2  names.
3      Q   Okay. And you're speculating that they're
4  eating only vegetables because they refused to eat
5  the entrees?
6      A   Because they thought that the meat was not
7  kosher meat.
8      Q   You're speculating on that, right?
9      A   I'm speculating that they -- that they --
10 that the reason they refused to eat the meat was
11 because they had seen non-kosher food served and
12 they had reason to believe that the meet itself was
13 not kosher.
14         MR. LEWIN: I'll object to the use of the
15 word "speculating." I think you were using the
16 word "speculating" different than the witness is. I
17 think the witness assumes speculating means --
18         MR. SCHWABER: Counsel, I don't want you
19 to -- I don't want you to clarify his testimony.
20         MR. LEWIN: I understand. I -- I want -- I
21 want to note my objection to the use of the word
22 "speculating."

174

1          MR. SCHWABER: You've noted your objection
2  to the use of the word "speculating."
3          MR. LEWIN: Okay.
4  BY MR. SCHWABER:
5      Q   Mr. Siegel, the -- in -- in addition to
6  what you just told me, to make sure I understand,
7  you don't have -- you can't name any guests that
8  refused to eat entrees?
9      A   I personally cannot.
10     Q   Do you know anyone who can?
11     A   Possibly my daughter, possibly her husband.
12     Q   Okay. The joy of the parents of the bride
13 and the groom was ruined, and your perception was
14 your wife's joy for the evening ruined as well as
15 yours?
16     A   Absolutely. And her memory. It's a very
17 painful memory for both of us.
18     Q   So the joy of the evening was ruined for
19 her, in your perception?
20     A   In my perception, yes.
21     Q   And the joy of your son-in-law's mother was
22 ruined?

175

1      A   I don't -- I don't want to speak for them.
2  I don't know.
3      Q   Okay. And --
4      A   She was very, very upset. I know that.
5      Q   Over -- at the time that she discovered the
6  shrimp?
7      A   That night, yes.
8      Q   Okay. And the joy of your son-in-law's
9  father was ruined. Can you speak to that at all?
10     A   I -- I cannot speak to that.
11     Q   Okay. Did your son-in-law's parents send
12 you a thank-you note after the wedding?
13     A   No.
14     Q   Did they call to thank you for hosting the
15 wedding?
16     A   They spoke to us at the -- at the brunch in
17 our home the next day.
18     Q   Did they tell you it was a beautiful
19 evening?
20     A   I don't know if they used those terms,
21 those words. We -- we talked about the incident.
22     Q   Okay.

176

1      A   We talked about that situation.
2      Q   Have your son-in-law's parents, since the
3  time of the wedding, thanked you for putting on the
4  party?
5      A   I don't believe so.
6      Q   Okay. Who was the videographer?
7      A   Again, I did not contract, so I don't know
8  the name of it. It was different than the
9  photographer. I don't know who it is.
10     Q   Do you know who the photographer was?
11     A   I don't. Rebecca, my daughter, contracted
12 for the photographer.
13     Q   As well?
14     A   Mm-hmm.
15     Q   Is that a yes?
16     A   Yes.
17     Q   Okay. And is there a professional album
18 that was put together?
19     A   I have loose pictures. I -- I don't know
20 if my daughter has an album.
21     Q   But you have loose professional photos from
22 a professional photographer?

Case 1:05-cv-01717-RJL   Document 53-18   Filed 10/30/2006   Page 45 of 56
VIDEOTAPED DEPOSITION OF MARK A. SIEGEL
CONDUCTED ON THURSDAY, JANUARY 19, 2006

45 (Pages 177 to 180)

177

1    A   I have pictures, yes.
2    Q   And did your daughter purchase those for
3  you or did you place your own order?
4    A   Those were proofs.  Those were pictures
5  that she wasn't going to need, so she gave it to us.
6    Q   Okay.  And the photographer doesn't need
7  those back?
8    A   Correct.
9    Q   You get to keep those?
10   A   I have those, yes.
11   Q   Are those at your home?
12   A   Those at my home, yes.
13   Q   And those include pictures of the party,
14  correct?
15   A   Yes.
16   Q   Turn to paragraph 34.  In the second
17  sentence of paragraph 34 -- the second sentence of
18  paragraph 34 reads, "Mr. Siegel had raised his voice
19  and made remarks that might, in other circumstances,
20  have been unseemingly and inappropriate."  Do you
21  see that sentence?
22   A   I do.

178

1    Q   What remarks did you make that you recall
2  that you're referring to there?
3    A   I believe I used the term -- I think I was
4  screaming "goddamn," which I would never do under
5  normal conditions.  If I used any other vulgarities,
6  that would fall into that category.  I'm not aware
7  of any specifically.
8    Q   Okay.  Do you believe Ridgewells' employees
9  were trying to steal your wine?
10   A   Yes.
11   Q   And the basis for that belief is that they
12  told you there was none left and then you discovered
13  it?
14   A   They told me there was none left.  I argued
15  with them.  I said, "There has to be some wine
16  left."
17       They said, "There's absolutely no wine
18  left.  It was all consumed."
19       I stayed down there, I went down a hall, I
20  looked on -- I moved some boxes, and I found three
21  cases of Chateau Margaux and one case of Prosecco.
22  And they were clearly, deliberately hidden from --

179

1  from anyone's view, far away from the actual place
2  where the wine was being dispersed.
3    Q   Do you have a belief that it was a rogue
4  individual or was it being done on behalf of
5  Ridgewells?
6    A   I believe it was the staff of Ridgewells.
7  I'm not -- I don't know.  I'm not saying it was
8  Ridgewells.  It was people down there who had put
9  the wine aside and was going -- and they were going
10  to take it with them when they left.
11   Q   To give to Ridgewells or to keep?
12   A   I have no idea what they were going to do
13  with it.  I just know they were going to take my
14  wine.
15   Q   And how do you know that?  Because of where
16  you found it?
17   A   Because they -- because they told me there
18  was no wine.  After I confronted them, again, and
19  said there must have been some wine, they said all
20  of it was consumed, and then I looked and searched
21  and I found four cases of wine hidden, literally
22  hidden under boxes.

180

1    Q   And -- and there was an explanation offered
2  for that, right?
3    A   No.
4    Q   You don't recall -- you're already telling
5  me you don't recall Ms. Nann coming down there?  You
6  don't recall one of the gentleman, who you
7  confronted and called a thief and a fucking moron in
8  the kitchen, saying to you that that wine was hidden
9  in a corner and he hadn't discovered it and that's
10  why he told you there was none?  You don't recall?
11   A   Wait.  I don't -- I don't understand what
12  you just said.
13   Q   You don't recall one of the gentleman in
14  the kitchen telling you that he hadn't seen those
15  boxes when he told you there was no more wine?
16   A   He said he -- when I showed him that, he
17  said he didn't know where they came from.  That's
18  his explanation.  He didn't know where they came
19  from after he denied they existed.
20   Q   And you believe he's lying?
21   A   Yes.
22   Q   Do you know who he is?

Case 1:05-cv-01717-RJL   Document 53-2   Filed 03/30/2006   Page 46 of 56
VIDEOTAPED DEPOSITION OF MARK MODEL
CONDUCTED ON THURSDAY, JANUARY 19, 2006

46 (Pages 181 to 184)

---

181

1    A   No.
2    Q   Does it matter to you who he is?
3    A   No.
4    Q   Okay.  Do you -- can you describe him to
5    me?
6    A   Not really.  I think -- vaguely, I think of
7    him as a big man with -- with dark hair, husky, but
8    I don't -- I don't really recall.
9    Q   Okay.  And the -- was he the only one
10   trying to steal your wine, in your opinion?
11   A   I -- I don't know.  I just know that my --
12   the wine was hidden.  I don't know who was planning
13   to take it.  I just know I wasn't going to get it,
14   and they told me -- I was told that it didn't exist.
15   Q   Have you ever, yourself, been accused of
16   stealing anything?
17   A   No.
18   Q   Have you ever, other than in this instance,
19   accused anyone of stealing something from you or
20   attempting to steal something from you?
21   A   There was an incident with an employee who
22   was using a company credit card.

---

182

1    Q   Okay.  And did you prosecute that employee?
2    A   There was -- there was -- lawyers were
3    involved, but it didn't go to -- to litigation.
4    Q   Okay.  Would you agree that the accusation
5    of attempted theft is a very serious one?
6    A   Yes.
7    Q   Okay.  And you wouldn't make that
8    accusation lightly, correct?
9    A   Correct.
10   Q   Did you follow up with Mr. Keon about your
11   concern that one of his employees -- one or more of
12   his employees may have been attempting to steal your
13   wine?
14   A   No.
15   Q   Why not?
16   A   Because my concern at that point was the --
17   the wedding being ruined by the -- by serving
18   non-kosher food and dairy food.  And I didn't
19   complicate the issue, and we didn't raise the issue
20   in our filings.  I believe you did.  The wine, that
21   could be undone.  I could buy more wine.  Nothing
22   could get me the joy of that memory -- of the memory

---

183

1    of that wedding back.  Nothing could stop the
2    wedding from being ruined, because Ridgewells served
3    non-kosher and dairy food.  The wine, I could always
4    buy more of.  The memory is destroyed.
5    Q   Have you sought any counseling for the
6    emotional harm you've suffered as a result of this
7    incident?
8    A   No.
9    Q   Did you consider seeking any?
10   A   No.
11   Q   Have you ever, at any time, sought
12   counseling?
13   A   Yes.
14   Q   And when was the last time?
15   A   It was after my son died.  I saw a
16   psychiatrist several times after my son died.
17   Q   And was it for a period of months or years?
18   A   Six weeks.
19   Q   Okay.  And was that the only time you've
20   ever --
21   A   Yes.
22   Q   -- sought professional emotional help?

---

184

1    A   Yes.
2    Q   Okay.  Have you taken any medication
3    relating to anxiety, depression, or emotional upset
4    as a result of the wedding incident?
5    A   At about the time of the wedding, a little
6    after the wedding, I started taking an
7    antidepressant.
8    Q   And who prescribed that for you?
9    A   A doctor, my internist.
10   Q   All right.  Did -- who's your internist?
11   A   Dr. Charles Bier, B-i-e-r.
12   Q   And where is Dr. Bier's office?
13   A   It's on 24th Street in the district.
14   Q   Do you -- do you remember the name of that
15   medication?
16   A   Wellbutrin.
17   Q   Say it again?
18   A   Well- --
19   Q   Wellbutrin?
20   A   Mm-hmm.
21   Q   Okay.  And did -- are you still taking
22   that?

---

185

1    A    Yes.
2    Q    In what dosage?
3    A    One pill a day.
4    Q    Do you know how many milligrams that pill
5    is?
6    A    No.
7    Q    Okay.  And when was this prescribed for
8    you?
9    A    I don't know exactly when.
10   Q    Are you certain it was after the wedding?
11   A    I'm not certain.  It could have been the
12   time close to the wedding.  I'm not sure.
13   Q    Okay.  Did -- what did you tell the doctor
14   about symptoms you were experiencing that led him to
15   prescribe Wellbutrin for you?
16   A    I was -- I think it was — there were some
17   work, and -- my work as the chief of staff in the
18   House of Representatives, it was very, very tense.
19   And I had seen my doctor and he asked me how I was
20   and I was telling him about this and he -- I think
21   that's when he prescribed Wellbutrin.
22   Q    If I -- I will ask you out and I won't ask

186

1    you for an answer till you discuss it with your
2    counsel.  But just so you're not surprised, I'm
3    going to ask your consent to let me get information
4    from your doctor to determine when that medication
5    was prescribed and what his file notes says as to
6    the reason.
7    A    Fine.
8    Q    Have you ever been involved in litigation
9    before?
10   A    Just that incident that I told you about
11   over the credit card, employee credit card.
12   Q    Okay.  And what company was that?
13   A    Mark Siegel & Associates.
14   Q    And roughly how long ago was that?
15   A    Twenty years.
16   Q    And that's the only lawsuit you were ever
17   involved in as a plaintiff or a defendant, prior to
18   this one?
19   A    There was a federal election campaign suit
20   filed against me alleging that I was the coordinator
21   of the "draft-Kennedy" movement in 1990.
22   Q    And who were the plaintiffs in that action?

187

1    A    The Carter campaign.
2    Q    Okay.  And what became of that suit?
3    A    The FEC dismissed it.
4    Q    Do you recall what court it was in?
5    A    The Federal Election Commission dismissed
6    it.
7    Q    Do you recall what court the case was in?
8    A    It was the Federal Election Commission.
9    Q    Okay.  And were you individually named as
10   the defendant?
11   A    I and the International Association of
12   Machinists were named as the coordinators of the
13   "draft-Kennedy" movement.
14   Q    Okay.  Do Rebecca and Craig Baron eat
15   non-kosher food in their home?
16   A    Not in their home.
17   Q    But they eat non-kosher food outside the
18   home?
19   A    Yes.  Well, my -- I know my daughter does.
20   I don't know what Craig does.
21   Q    Okay.  Does she eat shellfish outside of
22   the home?

188

1    A    I don't -- she has in the past.  I don't --
2    I don't know.  Since they got married, they keep a
3    kosher home.  And I don't know what she does.
4    Q    Outside the home in the past, has she mixed
5    dairy and meat products?
6    A    Yes.
7    Q    And you and your wife, outside your
8    home, mix dairy and meat products?
9    A    Yes.
10   Q    And what about in your home?
11   A    Yes.
12   Q    Okay.  And you eat shellfish in the home?
13   A    I think we may have had some cocktail
14   parties where shellfish was served.
15   Q    In fact, you've used Ridgewells for prior
16   parties at your home, haven't you?
17   A    Once at my home.
18   Q    That was not a kosher event?
19   A    That was not a kosher event.  But as I
20   recall, there wasn't any shellfish served.  There
21   was shellfish served at another Ridgewells' event
22   that my company used them for.

189

1   Q   Okay. Where was the rehearsal dinner?
2   A   Adas Israel.
3   Q   And who hosted that?
4   A   The groom's parents.
5   Q   Okay. Did you have anything to do with the
6 planning of that event?
7   A   I did the flower arrangements.
8       MR. LEWIN: How much longer do you think
9 you're going to go? I guess it's past 3:00 already.
10      MR. SCHWABER: Yeah. We started at 1:30.
11      MR. LEWIN: Yeah, I know. I know we came a
12 little late.
13      MR. SCHWABER: I -- I mean, I'm in my
14 wrap-up questions, but it might be 3:15. But it
15 won't be long.
16      MR. LEWIN: Okay. All right.
17   A   We -- we also pay -- paid the deposit for
18 renting the room they got us.
19 BY MR. SCHWABER:
20   Q   Okay. And --
21   A   We paid for the room, not just the deposit.
22 We paid for the room.

190

1   Q   Do you -- do you know who catered that
2 meal?
3   A   Yes. Shalom.
4   Q   Okay. And did you deal with Shalom?
5   A   I dealt with Shalom, not for that dinner
6 but for -- for the brunch that was at my home on the
7 Sunday after the wedding.
8   Q   Was it Larry Deckelbaum you were dealing
9 with?
10   A   Yes.
11   Q   Okay. And do you know if Larry Deckelbaum
12 was the person in charge of the rehearsal dinner as
13 well?
14   A   I wasn't involved with the rehearsal
15 dinner.
16   Q   Okay. I mean, do you recall -- so you
17 don't know one way or another?
18   A   No.
19   Q   Okay. And did you consider using
20 Ridgewells for the brunch at your home?
21   A   No.
22   Q   Why not?

191

1   A   Because we wanted appetizer. We wanted lox
2 and bagels and smoked salmon, smoked whitefish, and
3 all the kinds of things that Shalom does so well.
4   Q   Was there a hotel that was used for wedding
5 guests?
6   A   Yes.
7   Q   What hotel?
8   A   Mayflower.
9   Q   And is that where your in-laws stayed?
10   A   Yes.
11   Q   Did you and your wife stay there?
12   A   No.
13   Q   Neither the night before nor the night of
14 the wedding?
15   A   We live six blocks away from the Mayflower.
16   Q   Okay. And how about Craig and Rebecca?
17   A   Craig stayed there for two nights before
18 the wedding. And Craig and Rebecca stayed there
19 their wedding night and then stayed with us the
20 night after.
21   Q   And was there a block of rooms --
22   A   Yes.

192

1   Q   -- under your name?
2   A   Siegel-Baron wedding.
3   Q   Okay. Was there a wedding planner?
4   A   Rebecca hired a wedding planner.
5   Q   And do you know that person's name?
6   A   Michelle.
7   Q   Do you know a last name?
8   A   Hodges.
9   Q   And was she part of a company?
10   A   I don't know.
11   Q   Okay. Did you deal with her?
12   A   I did not deal with her. I saw her at the
13 rehearsal, at the Corcoran, and I saw her at the
14 wedding.
15   Q   Who did you deal with at the Corcoran?
16   A   Elliot Hoopes. It's a woman.
17   Q   What's the last name?
18   A   H-o-o-p-e-s.
19   Q   Okay. The octopus and eel, you said you
20 learned of that the next day from --
21   A   Starting on Sunday.
22   Q   Starting on Sunday and presumably,

193

1  continuing after that?
2      A   When — yes.
3      Q   And how did you first learn of it?
4      A   A couple of the people who came to the
5  brunch told me about it.  I mean, the talk of the
6  brunch was — was about this incident.  A lot of
7  people were talking about this, and people were
8  talking about the fact that — some people were
9  talking about the fact that there was eel and
10  octopus as well.
11         And when other people whom I talked to
12  about the wedding — some people would call and
13  congratulate us on the wedding, and we talked about
14  this incident.  And then they would say that — one
15  in particular, I remember she was telling me that
16  there was octopus and it was delicious, she said.
17     Q   Who was that?
18     A   Her name is Anita Acson, and —
19     Q   What's her last name?
20     A   A-c-s-o-n.
21     Q   Does she live here?
22     A   She lives in Chevy Chase.

194

1      Q   Is she married?
2      A   She is.
3      Q   What's her husband's name?
4      A   Dr. Howard Streicher.  She's Dr. Anita
5  Acson.
6      Q   Streicher, S --
7      A   S-t-r-e-i-c-h-e-r.
8      Q   Was he at the wedding as well?
9      A   He was.
10     Q   But she's the one that told you about the
11  octopus?
12     A   That she ate the octopus, yeah.
13     Q   And did anybody -- did she mention eel?
14     A   I think so.
15     Q   Okay.  Did anybody other than Dr. Acson
16  tell you about octopus or eel?
17     A   Yes.
18     Q   Who?
19     A   I don't recall names.  But there are so
20  many of the people who were there and ate the food
21  that if you want names, we can have names.  If you
22  want testimony, we can have testimony.  I'm saying

195

1  it was many people.  It wasn't one or two.  It was
2  many people.  There was octopus and eel served.  You
3  should be aware of that.
4      Q   You can only name one person, Dr. Acson,
5  that told you anything about octopus and perhaps
6  eel, correct?
7      A   I mean, give me a week, I can name 50.
8         MR. LEWIN:  Pardon?
9      A   If you give me a week, I can name 50 -- I
10  can give 50 names, but --
11  BY MR. SCHWABER:
12     Q   I can't give you a week unless you want to
13  hold the deposition.
14         MR. LEWIN:  No, no.  No.  I don't think we
15  have to hold the deposition.  That's fine.  That's
16  what you know right now.  That's the name you
17  remember right now.  That's all.  I mean, you say
18  there are others --
19     A   My daughter, Sarah Siegel.
20  BY MR. SCHWABER:
21     Q   Told you there was octopus?
22     A   Absolutely.

196

1      Q   And did she eat it?
2      A   She did and she said other people --
3  other -- some of the people in the -- in the bridal
4  party ate it.  I could obviously get their names.
5      Q   Did Sarah Siegel eat it inadvertently or on
6  purpose?
7      A   No, she's -- she's not kosher.  She --
8      Q   So she knew she was picking up a piece of
9  octopus or eel?
10     A   Yes.
11     Q   And she knew that that wasn't supposed to
12  be there, right?
13     A   Yes.  In fact --
14     Q   But she didn't bring that to your
15  attention?
16     A   Yes.  She -- she told me that she was
17  having a lot of people in the bridal party trying to
18  eat up all -- all the non-kosher stuff to get rid of
19  it.
20     Q   She didn't tell you about the existence of
21  octopus or eel at the wedding on the day of the
22  wedding, right?

Case 1:05-cv-01717-RJL   VIDEOTAPED DEPOSITION OF MARK SIEGEL   Page 50 of 56
Document 108-10   Filed 08/30/2006
CONDUCTED ON THURSDAY, JANUARY 19, 2006

50 (Pages 197 to 200)

197

1    A   I'm not — I think it was the next day.
2    Q   Okay.  Did you ask her why she didn't bring
3  it to your attention during the wedding?
4    A   No, I didn't.
5    Q   Do you wish she had?
6    A   I — I don't know.  I mean, she probably
7  thought I was upset enough and didn't want to upset
8  me anymore.
9    Q   Okay.  But you don't know what the reason
10  is that she didn't bring it up to you?
11    A   No.
12    Q   And other than Sarah Siegel and Dr. Acson,
13  can you name anybody else who believed there was
14  octopus or eel there?
15    A   Sarah told me that a number of people in
16  the wedding party were eating up the octopus and the
17  eel, but I don't know their names.
18    Q   Okay.  So you can't name anybody else?
19    A   Not at this time.
20    Q   Okay.  And your — the basis for your
21  certainty that there was octopus and eel was what
22  you heard from others, correct?

198

1    A   Yes.  Anita Acson is — is a Greek — a
2  Greek-American.  She knows what octopus is like.
3  She —
4    Q   You're certain she knows what octopus is
5  like because she's a Greek-American?
6    A   She eats octopus frequently.  It's a —
7  it's a staple in Greece.  And she knows octopus.
8    Q   Have you ever eaten octopus?
9    A   I have.
10    Q   Are there any other food that taste like
11  octopus?
12    A   There's no other foods that look like
13  octopus.  There are other foods that are spongy like
14  octopus, but there — the only thing I can think of
15  is clam.
16    Q   You never — you never saw any octopus at
17  the wedding?
18    A   I — I did not look at that — any of the
19  food after that first incident until I ate the cream
20  cheese at the end of the reception.
21    Q   So you found the shrimp, which obviously
22  devastated you, and you didn't look to see if there

199

1  were any other problems with the food.  Is that your
2  testimony?
3    A   I — at that point, I ran downstairs —
4    Q   I understand that.
5    A   — to get Toby Nann.
6    Q   I mean, at any point —
7    A   No, I didn't eat any — I didn't eat any of
8  the food in the reception.  I didn't mingle with any
9  of the guests at the reception.  I was — I didn't
10  have any — I didn't have a drink at the reception.
11  I didn't act like the father of the bride at the
12  reception.
13    Q   Looking back now, do you believe you
14  overreacted?
15    A   Absolutely not.
16    Q   You think that — do you have any regrets
17  for not mingling with your guests at the reception?
18    A   I — I was distraught.  I mean, I — I
19  regret that I — that that was taken away from me.
20  I was really looking forward to that — to that
21  party.  But again, that's one of the things that
22  can't — can't be recovered.

200

1    Q   Okay.  And the — you issued materials to
2  the media at the time this lawsuit was filed, didn't
3  you?
4    A   I did not.
5    Q   Through your counsel, materials were issued
6  to the media, correct?
7    MR. LEWIN:  Yes.
8    A   Yes.  Well, the media — I didn't — I
9  wouldn't — I didn't talk to the media.  I referred
10  them to my counsel.
11  BY MR. SCHWABER:
12    Q   Okay.  But there was a packet of materials
13  sent out, as you understood it?
14    A   I don't know what was sent out.  I think
15  when calls came in, I think they sent the — the
16  file in.  I'm — I'm not sure.
17    MR. LEWIN:  Okay.  Well, if people asked
18  for the complaint, we forwarded the complaint, but
19  there was no packet of materials sent out.
20  BY MR. SCHWABER:
21    Q   Do you know who Leo Garcia is?
22    A   No.

Case 1:05-cv-01717-RJL   Document 52-8   Filed 03/03/2006   Page 51 of 56
VIDEOTAPED DEPOSITION OF MARK SIEGEL
CONDUCTED ON THURSDAY, JANUARY 19, 2006

51 (Pages 201 to 204)

201

1    Q   You have told people that Ridgewells
2  contracted with you to serve kosher food and
3  breached that contract, right?
4    A   Yes.
5    Q   You've told people of your intention to put
6  Ridgewells out of business, right?
7    A   No.
8    Q   You set out to put Ridgewells out of
9  business after the event, didn't you?
10   A   No.
11   Q   You set out to harm Ridgewells's business
12 after the event as a result of what happened, didn't
13 you?
14   A   No.
15   Q   You told Tom Keon, when you spoke to him,
16 that you're going to make a very public problem for
17 him if he doesn't resolve this for you in a manner
18 different than what he was offering, correct?
19   A   I told Tom Keon that I would file -- if I
20 had to, I would publicly sue, yes.  That's after he
21 accused me of being responsible for the entire
22 incident.

202

1    Q   And you told him, not just that you would
2  sue but that you would make a public problem for
3  him?
4    A   I know I said -- I would publicly sue, is
5  what I said.
6    Q   Okay.
7    A   I thought that's what I said.
8    Q   Other than having you identify some
9  documents, I'm done.  But I do need to go through
10 some of these documents.  I think the quickest way
11 to do this will be just to mark this whole
12 production of Bates pages 1 through 123.
13       MR. LEWIN:  I'm going to step out for a
14 minute.  You go ahead.
15       MR. SCHWABER:  Should we keep going?
16       MR. LEWIN:  Yeah, go ahead.
17       MR. SCHWABER:  Pages 1 to 123, we will mark
18 as Exhibit 3.
19       (Mark Siegel Deposition Exhibit 3 was
20 marked for identification and was retained by
21 counsel.)
22 BY MR. SCHWABER:

203

1    Q   Mr. Siegel, those pages are Bates-stamped
2  in order, so I'm going to refer you to specific
3  pages.  Go to page 93.
4    A   93, yes.
5    Q   My question is, simply, whose handwriting
6  that is?
7    A   My wife.
8    Q   So would she be the better person to answer
9  questions about this?
10   A   Yes.
11   Q   Turn to page 98.  Whose handwriting is
12 that?
13   A   My wife.
14   Q   Okay.  Turn to page 100.  Do you see in the
15 last paragraph of the first page of this letter,
16 there's a line that says, "You must select from our
17 list of approved caterers"?  Do you see it?
18   A   Yes.  It's -- it's black -- I think you
19 must have yellowed it out because it came out black.
20   Q   My -- my question was about that.  Is this
21 just the photocopying of highlighting, or was that
22 line crossed out of your agreement with Corcoran?

204

1    A   No, no.  It -- it was a -- I'm -- I'm sure
2  it was a yellow highlight that came out black.
3    Q   So it's not a provision that you removed?
4    A   No.
5    Q   Okay.  Turn to page 105.  Are you on 105?
6    A   Yeah.
7    Q   It's an e-mail chain between you and your
8  daughter, January of '04.  Starting from the bottom,
9  am I correct in assuming this is a discussion about
10 the pricing for reserving the Corcoran?
11       MS. LEWIN:  I think it actually starts on
12 106 if you're going to go all the way down to the
13 bottom.
14       MR. SCHWABER:  Yes.
15   A   Oh, I'm sorry.  Yes.  I'm sorry.  What was
16 the question?
17 BY MR. SCHWABER:
18   Q   Is that dealing with the Corcoran?
19   A   Yes.
20   Q   Okay.  Turn to 115 and 116, just if you can
21 confirm for me that those represent the wine and
22 champagne that you purchased.

205

1    A    Yes.
2    Q    And did 115 and 116 constitute all of the
3    liquor you purchased for the wedding?
4    A    For the wedding itself. I purchased some
5    additional wine and vodka for Bloody Marys for the
6    brunch, oh, which is on the next page.
7    Q    So that's where 116 is?
8    A    Yes, correct.
9    Q    So 115 is the wedding?
10   A    Yes.
11   Q    And the wine that you were concerned about
12   being stolen, which item is that?
13   A    What I found were three cases of
14   Chateau Margaux and one case of Prosecco. I never
15   found -- the most expensive item is the -- is the
16   French champagne, the Truatt Brut (phonetic), and
17   that I didn't recover any of, nor the Hahn
18   Chardonnay.
19        So I don't -- I speculate that they might
20   have been left in the refrigerator or taken away,
21   but I -- I was told that they didn't -- that they
22   were all consumed. Ridgewells' staff told me they

206

1    were all consumed, all of this wine was consumed.
2    That's what they told me.
3    Q    Go to page 117.
4    A    Yes.
5    Q    117 contains a handwritten confirmation
6    note from Sue Fischer?
7    A    Correct.
8    Q    There appears to be handwriting other than
9    Sue Fischer's on the page?
10   A    That's my wife's handwriting.
11   Q    Okay. And the numbering in the left and
12   the circled item on the top left as well, are those
13   your wife's?
14   A    You know, that -- that does not look like
15   my wife's handwriting.
16   Q    So the bottom left is your wife, beginning
17   with "space issue"?
18   A    The entire bottom left and right is my
19   wife, plus there is -- at the first sentence right
20   in -- right in front of "this is to confirm," it
21   says "plus brunch, plus Andre." That's my wife's
22   handwriting. Andre is the hairdresser.

207

1    Q    Okay. Turn to page 122 and 123.
2    A    Okay.
3    Q    What is that?
4    A    That -- we were having -- we could not get
5    a contract from Windows. We were trying to move the
6    process along. So we wrote out our understanding of
7    what my wife and Sue Fischer had agreed to, and I
8    sent it to her.
9    Q    All right. The date says
10   "August 25th, 2005." Is that a typo?
11   A    Yes.
12   Q    Would it have been August 25th, 2004?
13   A    It certainly wasn't 2005. Yes, 2004, I
14   believe it was August 25th.
15   Q    I mean, that's the right time frame?
16   A    Let me just see her answer.
17   Q    Her answer is on page 117.
18   A    Does it have a date on it?
19   Q    The only date I see is -- I see some notes
20   at the bottom that have September and early October
21   dates.
22   A    Yeah, I guess -- I mean, there's no date on

208

1    there, so I guess the August -- yeah, that makes
2    sense because it says that there'll be a contract
3    coming by the 18th of September. So August 25th
4    sounds reasonable for the other.
5    Q    Okay. And there's no reference on what you
6    and your wife put together to anything kosher about
7    that event, correct?
8    A    No. I think that's -- Sue Fischer only
9    does kosher catering. Sue Fischer only does kosher
10   catering.
11   Q    Is that your understanding, that catering
12   for Windows is --
13   A    No, no. Sue Fischer. Sue Fischer heads
14   the kosher division and only does kosher catering.
15   Q    Okay. So therefore, you felt no need to
16   include kosher in the contract?
17   A    That's correct.
18   Q    And similarly, you felt no need to include
19   kosher in the contract with my client, correct?
20   A    Correct. I was dealing with what I was
21   told was the kosher division of Ridgewells, and
22   every conversation was for kosher food and parve

53 (Pages 209 to 212)

209

1  food.
2  Q  Turn to page 119.
3  A  Yes.
4  Q  Did you type this up?
5  A  I did.
6  Q  Is this your notes of your discussion with
7  Tom Keon on April 25th -- on April 5th, 2005?
8  A  Yeah.  Those were the first -- the first
9  part in the long -- in the large font are the
10  talking points I prepared.  The -- the end in the
11  smaller font are -- is what I typed right after
12  he -- he and I spoke.
13  Q  Okay.  And you in the talking -- so you
14  prepared these talking points before you spoke with
15  him?
16  A  Correct.
17  Q  And then you said them to him when you
18  spoke?
19  A  I -- or something close to them, yes.
20  Q  Okay.  So you -- you told -- you threatened
21  to sue Ridgewells in a very public way if you didn't
22  get what you believed to be appropriate redress?

210

1  A  Right.
2  Q  And in fact, you've done that, correct?
3  A  I have sued Ridgewells, yes.
4  Q  In a very public way?
5  A  Once we -- once we file a litigation, it's
6  public.
7  Q  But you took steps to make sure this was
8  done in a public way, as you had promised Mr. Keon
9  you would, if he didn't satisfy you, correct?
10  A  I -- I instructed counsel that if they were
11  contacted by the press, to give the press the
12  information they -- they required.
13  Q  Okay.  In fact, to solicit the press?
14  A  No.
15  Q  Page 120, is that your handwriting?
16  A  Yep.
17  Q  And do these reflect your notes that
18  ultimately became typed up as part of the page we
19  were just looking at?
20  A  These are things I jotted down that I
21  turned into talking points, correct, except the
22  bottom has nothing to do with this matter and the

211

1  side writing has nothing to do with this matter.
2  Q  So the insurance issue is not something for
3  this case?
4  A  No.  And the -- that name is someone who
5  works in the Senate.
6  Q  Okay.  Page 121, whose handwriting is that?
7  A  My wife's.
8  Q  Page 1 -- I'm sorry.  Page 73.
9  MS. LEWIN:  Page 121, this here is whose
10  handwriting?
11  A  That -- that's -- that's all mine.  Did
12  I -- did I miss something?
13  MR. SCHWABER:  You said your wife.
14  A  Well, I'm looking at 122.  I'm sorry.  122,
15  the word "vegetarian."  121 is my handwriting.  Only
16  the first three lines have any -- anything to do
17  with this case.  Everything else is -- is my work.
18  BY MR. SCHWABER:
19  Q  Okay.  Page 73, is this the list that you
20  referred to earlier that you were given of -- or I'm
21  sorry.  You may not have referred to this.  What is
22  page 73?

212

1  A  These are approved caterers for the dinner
2  that took place at Adas Israel.  This is something
3  that we gave to -- to Craig to give to his -- his
4  parents.
5  Q  And which dinner was at Adas?
6  A  The rehearsal dinner, Friday night before
7  the wedding.
8  Q  Okay.  Page 110 through 114 is a Shalom
9  kosher catering menu?
10  A  Right.  That was for the bunch.
11  Q  Okay.  Back to the very beginning of the
12  stack, page 5?
13  A  Wife's handwriting.
14  Q  Your wife's.  Page -- okay.  I know we're
15  about to run out of tape.  Before I say no further
16  questions, let's just go off the record for a minute
17  and let me make sure.
18  THE VIDEOGRAPHER:  We are going off the
19  record.  The time is 3:28 p.m.
20  (Recess)
21  THE VIDEOGRAPHER:  We are back on the
22  record.  The time is 3:31 p.m.

Case 1:05-cv-01717-RJL VIDEOTAPED DEPOSITION OF MARK MOZGEL Page 54 of 56
Document 62-12 Filed 04/30/2006
CONDUCTED ON THURSDAY, JANUARY 19, 2006

54 (Pages 213 to 216)

213

1    A    Page 73 is a fax from Adas Israel
2 congregation. They were a congregation to my wife
3 listing the approved caterers for Adas Israel. I
4 don't know. You'll have to ask her why she asked
5 for it. I -- I don't know if it was for the
6 rehearsal dinner.
7 BY MR. SCHWABER:
8    Q    I'll ask her. Did you and your wife get
9 thank-you cards from guests, relatives, others?
10    A    We got about a dozen, yeah.
11    Q    Okay. Did you save those?
12    A    I don't think so.
13    Q    Do you know if your wife would have them?
14    A    No, I -- I don't -- well, I'll ask but I --
15 when I say "I don't think so," we do things together
16 so I don't think we saved them.
17    Q    Okay. On the issue of the wine and your
18 concern about attempt to steal it, did you tell
19 others about that?
20    A    I told my lawyers.
21    Q    Other than your lawyers.
22    A    Some of my friends. I'm not sure. I -- I

214

1 don't know. I don't -- I don't recall really.
2    Q    Okay. In the note of your talking points
3 that we spoke about earlier, one thing I'm going to
4 read you from your talking points is you said to
5 Mr. Keon, "I'm prepared to take whatever action is
6 necessary to receive appropriate redress for what
7 you've done to me, including suing Ridgewells in a
8 very public way." And that was in response to him
9 having made a prior offer to you that you deemed
10 inadequate?
11    A    He said what they're prepared to do is not
12 charge me for the -- the shellfish sushi.
13    Q    And he -- he's extended that to you
14 regardless of any settlement, correct?
15    A    I said -- I said what -- I said, "Your
16 staff said that you'd make this right. What are you
17 prepared to do?"
18        And he answered by saying, "We're prepared
19 not to charge you for the shellfish sushi."
20        And I said, "What else?"
21        And he said, "Nothing else."
22        And I said, "Well, you might want to

215

1 reconsider that."
2        And he said, "We're not going to change our
3 position."
4    Q    He told you, "What we're talking about here
5 is money." And you said, "Right"; is that correct?
6    A    That he wasn't going to charge me for the
7 shellfish?
8    Q    No. Let me rephrase. What you were
9 looking for him to do was offer you a bigger
10 financial concession, correct?
11    A    No. That -- that might have been
12 something. What I -- what I was most concerned
13 about, what I wanted from him was to -- to -- for
14 him to apologize and for him to tell me -- lay out a
15 process by which this could never happen again at
16 Ridgewells to any other families. That's what I was
17 looking for. And he was contentious, and he accused
18 me of being responsible for this problem.
19    Q    Ridgewells told you -- Toby told you, at
20 the time, and others that they were sorry about the
21 shrimp on the sushi, correct?
22    A    Yes. And they would -- they would make it

216

1 right.
2    Q    So you want -- you wanted more of an
3 apology than what they gave you that night?
4    A    I -- I wanted a written apology to the
5 parents, Craig's parents, and to me. And I wanted a
6 process in place within Ridgewells, to make sure
7 this could never happen again.
8    Q    Do you think using a mashgiach would be
9 that process?
10    A    I don't think a reputable company has to
11 have a rabbinical supervisor to -- to provide what
12 they contract for.
13    Q    That wasn't my question. Do you think --
14 if a mashgiach had been used -- a mashgiach under
15 rabbinical supervision, this couldn't have happened,
16 right?
17    A    I -- I did not think a mashgiach was
18 necessary when you're dealing with a company like
19 Ridgewells. If they said they were going to give us
20 kosher food and parve food, I had every reason to
21 rely on that.
22    Q    Mr. -- could it have happened with a

Case 1:05-cv-01717-RJL VIDEOTAPED DEPOSITION OF MARK SIEGEL Document 58-8 Filed 03/07/2006 Page 55 of 56
CONDUCTED ON THURSDAY, JANUARY 19, 2006

55 (Pages 217 to 220)

217

1 mashgiach?
2 MR. LEWIN: I'll object to that question.
3 Of course, it could happen.
4 A You know, the -- Toby Nann said that she
5 was mashgiach, and she let it -- let it slip in.
6 Q You knew she wasn't the mashgiach at this
7 affair?
8 A But she said that she would make it perfect
9 and that she knew what has to be done. And somehow,
10 she allowed non-kosher food to be served at my
11 daughter's wedding. A mashgiach also -- a formal
12 mashgiach could make the same mistake.
13 MR. LEWIN: There have been an -- I can
14 only tell you, there have been events with mashgiach
15 where terrible things have happened. I'm just
16 saying for the record.
17 MR. SCHWABER: That's not an objective --
18 an appropriate objection.
19 THE COURT REPORTER: One at a time, one at
20 a time.
21 MR. LEWIN: I understand, but he's given
22 his answer.

218

1 BY MR. SCHWABER:
2 Q Mr. Siegel, we're almost done. But with
3 due respect, I don't think you've answered my
4 question.
5 MR. LEWIN: I think he has.
6 BY MR. SCHWABER:
7 Q Getting back to the question I asked you
8 about your conversation with Mr. Keon about
9 appropriate redress and what you wanted, you told me
10 about the apology issue. We talked about the
11 financial issues, and you told me that you wanted
12 something put in place at Ridgewells to make sure
13 this couldn't happen to others or wouldn't happen to
14 others?
15 A Correct.
16 Q Okay. Now recognizing human error as just
17 a reality in the world so that nothing is fail-safe,
18 do you believe that using a mashgiach, when you're
19 having a kosher event, is what somebody should do if
20 they want to make sure that event is kosher?
21 A I think if you -- if someone tells you that
22 they understand the rules and you rely on them and

219

1 it's someone who has the experience of rabbinical
2 supervision when you're dealing with a -- a
3 significant company, you should be able to rely on
4 that. And a mashgiach could make the same -- a
5 formal mashgiach could make the same error that Toby
6 Nann, who was a mashgiach, said that everything
7 would be perfect at my daughter's wedding day. So
8 people make mistakes. Toby Nann made a very bad
9 mistake. Ridgewells made a very bad mistake, it
10 ruined my daughter's wedding. And if they -- if
11 there was a mashgiach present, I don't know if that
12 would have stopped it or not. But people do make
13 mistakes.
14 Q Among the things you've learned from this
15 experience -- I -- I assume you're never using
16 Ridgewells again. Is that a fair assumption?
17 A Yes.
18 Q Okay. In the event you use another caterer
19 for another happy occasion or another party in the
20 future that you need to be kosher, have you learned
21 that you should use a mashgiach?
22 A You know, I -- I -- we don't think it's

220

1 necessary. If we had another kosher event, I would
2 be -- be very certain that every reference said
3 kosher and dairy; that the contract would be more
4 formal; that I wouldn't rely on people's words. But
5 I don't think, level of Kashruth that my wife and I
6 observed, we would have a mashgiach.
7 Q But your wife and you eat shrimp so --
8 A For an event, for a kosher event that you
9 asked, not --
10 Q You would not use a mashgiach even still
11 going forward?
12 A I would -- I would have a contract written
13 very differently. I would be much more insistent
14 that things were spelled out. I would insist that
15 they check everything before they brought it out,
16 but I don't think I would -- I don't think I would
17 need a mashgiach if I was dealing with a reputable
18 company.
19 Q Oh, yeah. One last exhibit that I need you
20 to identify. Actually, let me do two, 4 and 5.
21 (Mark Siegel Deposition Exhibits 4 and
22 5 were marked for identification and were retained

Case 1:05-cv-01717-RJL   Document 52-8   Filed 03/30/2006   Page 56 of 56
VIDEOTAPED DEPOSITION OF MARK A. SIEGEL
CONDUCTED ON THURSDAY, JANUARY 19, 2006

56 (Pages 221 to 224)

221

1   by counsel.)
2   BY MR. SCHWABER:
3       Q   Is Exhibit 4 the contract at issue in this
4   case?
5       A   As I understood it, yeah.  This is the only
6   signed document, as far as I know.  My wife signed
7   it.
8       Q   Okay.  So that's what you understand to be
9   the contract?
10      A   Well, that and all the endless discussions
11  that we had about what should be included here.
12      Q   The only written contract that's -- when
13  there's a written contract being referred to, is it
14  Exhibit 4?
15      A   A written contract, yes.
16      Q   Okay.  And Exhibit 5 is the final invoice
17  you received from Ridgewells that reflects the sushi
18  credit that was provided, correct?
19      A   Yes.
20      Q   And that invoice has not been paid,
21  correct?
22      A   The balance of $11,000 has not been paid.

222

1       Q   Right.  And you don't intend to pay it
2   absent a Court telling you to, correct?
3       A   That's correct.
4           MR. SCHWABER:  I have nothing further.
5   Thank you for your time.
6           (Signature having not been discussed,
7   the deposition of MARK A. SIEGEL was concluded at
8   3:40 p.m.)
9           (The following Acknowledgement of
10  Deponent Page is included in the event at the
11  conclusion of Mark A. Siegel's deposition he elects
12  to read and sign his deposition transcript.)
13
14
15
16
17
18
19
20
21
22

223

1                       * * *
2           ACKNOWLEDGMENT OF DEPONENT
3       I, Mark A. Siegel, do hereby acknowledge that I
4   have read and examined the foregoing testimony, and
5   the same is a true, correct and complete
6   transcription of the testimony given by me, and any
7   corrections appear on the attached Errata sheet
8   signed by me.
9
10  _____        _____
11      (DATE)                 (SIGNATURE)
12
13
14
15
16
17
18
19
20
21
22

224

1   CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC
2       I, Joan V. Cain, Court Reporter, the officer
3   before whom the foregoing deposition was taken, do
4   hereby certify that the foregoing transcript is a
5   true and correct record of the testimony given; that
6   said testimony was taken by me stenographically and
7   thereafter reduced to typewriting under my direction
8   and that I am neither counsel for, related to, nor
9   employed by any of the parties to this case and have
10  no interest, financial or otherwise, in its outcome.
11      IN WITNESS WHEREOF, I have hereunto set my
12  hand and affixed my notarial seal this 1st day of
13  February 2006.
14
15  My commission expires:
16  June 15, 2009
17
18
19  _____
20  NOTARY PUBLIC IN AND FOR THE
21  DISTRICT OF COLUMBIA
22