1 (Pages 1 to 4)

**Page 1**

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE DISTRICT OF COLUMBIA
3
4  MARK A. SIEGEL, et al.,           )
5      Plaintiffs,           )
6  vs.                  ) Case No.
7  RIDGEWELLS, INC.,           ) 1:05CV01717
8      Defendant/Counter-Plaintiff ) Pages 1-174
9          - - - - -
10  VIDEOTAPED DEPOSITION OF CRAIG BARON
11  WASHINGTON, D.C.
12  FEBRUARY 7, 2006
13  The videotaped deposition of CRAIG BARON was
14  convened on Tuesday, February 7, 2006,
15  commencing at 9:43 a.m., at the offices of Wiley
16  Rein & Fielding, 1776 K Street, Northwest,
17  Washington, D.C. 20006, before Paula G. Satkin,
18  Registered Professional Reporter and Notary
19  Public.
20  Job No. 1-70183
21          - - - - -
22

**Page 2**

1          A P P E A R A N C E S
2
3  ON BEHALF OF THE PLAINTIFF:
4  NATHAN LEWIN, ATTORNEY AT LAW
5  ALYZA D. LEWIN, ATTORNEY AT LAW
6  LEWIN & LEWIN, LLP
7  1828 L Street, Northwest
8  Suite 901
9  Washington, D.C. 20036
10  (202) 828-1000
11
12
13  ON BEHALF OF THE DEFENDANTS/COUNTER-PLAINTIFF:
14  JEFF SCHWABER, ATTORNEY AT LAW
15  IVONNE CORSINO-LINDLEY, ATTORNEY AT LAW
16  STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL &
17  GREENFEIG, P.C.
18  25 West Middle Lane
19  Rockville, MD 20850
20  (301) 340-2020
21
22

**Page 3**

1  ALSO PRESENT:
2  Scott Pickering, Videographer
3  Scott Forman, Videographer
4  Rebecca Baron
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

**Page 4**

1          C O N T E N T S
2
3  CRAIG BARON          EXAMINATION
4
5  BY MR. SCHWABER........................6
6
7  BY MR. LEWIN..........................171
8
9  BY MR. SCHWABER.......................172
10
11
12
13
14          E X H I B I T S
15
16  CRAIG BARON EXHIBIT NO:          PAGE NO:
17
18  Craig Baron Exhibit Number 1.........13
19  Craig Baron Exhibit Number 2.........16
20
21  ** Exhibits retained by counsel.
22

**5**

1    PROCEEDINGS

2

3        THE VIDEOGRAPHER:  Here begins

4    tape number one in the deposition of Mr. Craig

5    Baron, taken in the matter of Mark A. Siegel, et

6    al. versus Ridgewells Incorporated, in the

7    United States District Court for the District of

8    Columbia, Case Number 1:05CV01717.

9        Today's date is February 7th,

10   2006.  The time is now 9:43 a.m.

11       This video deposition is taking

12   place at the office of Wiley, Rein & Fielding,

13   1776 K Street, Northwest, Washington, D.C. 2006,

14   and was noticed by Mr. Jeffrey M. Schwaber,

15   counsel for the Defendant.

16       Would the counsel please identify

17   themselves and state whom they represent.

18       MR. SCHWABER:  Jeff Schwaber, and

19   with me is Ivonne Lindley for the Defendants,

20   Ridgewells, Inc.

21       MR. LEWIN:  Nathan Lewin, and with

22   me is Alyza D. Lewin of Lewin & Lewin, LLP, for

**6**

1    the Plaintiffs.

2        THE VIDEOGRAPHER:  The court

3    reporter today is Paula Satkin of L.A.D.

4    Reporting.  Would the reporter please swear in

5    the witness.

6    Whereupon--

7

8        CRAIG BARON

9    a witness, called for examination, having been

10   first duly sworn, was examined and testified as

11   follows:

12

13       EXAMINATION BY COUNSEL FOR

14       DEFENDANTS/COUNTER-PLAINTIFF

15

16   BY MR. SCHWABER:

17   Q.   Good morning, Mr. Baron.

18   A.   Good morning.

19   Q.   Have you ever had your deposition

20   taken before?

21   A.   No.

22   Q.   What do you do for a living?

**7**

1    A.   I'm an attorney.

2    Q.   And what's your practice?

3    A.   Predominantly insurance coverage

4    litigation.

5    Q.   Do you litigate yourself?

6    A.   With others, yes.  I haven't

7    solely litigated a case.

8    Q.   Okay.  Are you an associate with a

9    law firm?

10   A.   Yes.

11   Q.   What law firm?

12   A.   Mendes & Mount, LLP.

13   Q.   And you're headquartered in New

14   York?

15   A.   Yes.

16   Q.   Is that the firm's headquarters?

17   A.   Yes.

18   Q.   Does the firm have other offices?

19   A.   Yes.

20   Q.   Where?

21   A.   Newark and Los Angeles.

22   Q.   Okay.  How many attorneys are at

**8**

1    Mendes & Mount?

2    A.   In total, the three offices,

3    approximately 160, 170 or so.

4    Q.   And how many of those in your

5    office?

6    A.   About 130, approximately.

7    Q.   Is your department called the

8    Litigation Department or is it more specialized

9    than that?

10   A.   My department is called the Quinn

11   Department.

12   Q.   The what?

13   A.   Quinn, after Thomas Quinn.

14   Q.   Okay.  And what is the Quinn

15   Department?

16   A.   Predominantly asbestos, pollution,

17   health hazard matters.

18   Q.   Okay.  So it's not just litigators

19   in your department?

20   A.   That's correct.

21   Q.   And there are litigators in other

22   practice areas?

**9**

1    A.   Yes.
2    Q.   Okay.  That are not part of the
3  Quinn Department?
4    A.   That's correct.
5    Q.   How many litigators in the Quinn
6  Department?
7    A.   There are two partners that
8  specialize in litigation and several associates
9  that would be attached to those partners.
10    Q.   And when you say several, can you
11  give me a ballpark?
12    A.   Four, five.  It varies, I guess.
13    Q.   And you're one of those?
14    A.   I work with them, but not
15  predominantly.  I work for other partners who do
16  coverage opinions, coverage analysis, and in the
17  recent year or two also do national coordinating
18  counsel matters for asbestos.
19    Q.   And without necessarily naming
20  names, who are your clients?  Are you
21  representing the insureds or the insurers?
22    A.   Generally the insurers.

**10**

1    Q.   The insurers?
2    A.   Almost exclusively, the insurers,
3  the London market.
4    Q.   In defense of coverage claims?
5    A.   Yes.
6    Q.   Okay.  Have you taken depositions?
7    A.   I've defended a couple.
8    Q.   And by a couple do you mean
9  literally, two?
10    A.   Two.  And I've taken two others.
11    Q.   When were those?
12    A.   The most recent was about a month
13  ago, and the other one that I defended was
14  probably about six months ago.
15    Q.   Okay.  The one a month ago, did
16  you take or defend?
17    A.   I defended, along with somebody
18  else.
19    Q.   Were you second chair, so to
20  speak?
21    A.   Yes.
22    Q.   On both?

**11**

1    A.   Yes.  Everything I've been second
2  chair.
3    Q.   Including the two that you took?
4    A.   Right.
5    Q.   So did you do any of the
6  questioning or any of the objecting, or did you
7  just participate?
8    A.   Just participate.
9    Q.   Okay.  Let me, at the risk of
10  probably telling you something you already know,
11  tell you the ground rules for the deposition.
12    A.   Sure.
13    Q.   You've been sworn in.  Everything
14  that is being said out loud here is being
15  transcribed, and there will be a verbatim
16  transcript prepared in writing.  There is also a
17  videographer, and your deposition is being taken
18  pursuant to a videotape, as well.
19          The videotape and the
20  transcription of your testimony are usable in
21  this proceeding, and because you're a party
22  they're useable -- there are rules that govern

**12**

1  how they're used in the case.
2          You should treat your testimony
3  here as if it's testimony to be used in a
4  courtroom, because it very well may be used in a
5  courtroom in this proceeding or in other facets
6  of the case as you go.
7          What we need is a clean
8  transcript, so let me finish my question before
9  you begin your answer.
10          If your answer to a question I
11  have is I don't know, that's a fair answer, just
12  tell me that.  If your answer is I don't recall,
13  tell me that.  And if your attorney objects
14  during the course of my questioning, let the
15  objection finish, and then unless you're
16  specifically instructed not to answer, you can
17  go ahead and answer the question to the best of
18  your ability.  If you are instructed not to
19  answer, which I don't anticipate in light of the
20  questions I'll ask you, but if you are
21  instructed not to answer then you should follow
22  that instruction and the attorneys will deal

Case 1:05-cv-01717-RJL VIDEOTAPED DEPOSITION OF CRAIG BARON Page 4 of 44
Document 54-9 Filed 10/30/2006
CONDUCTED ON TUESDAY, FEBRUARY 7, 2006

4 (Pages 13 to 16)

13

1  with the objections separately as they deem
2  appropriate.
3      Answer with words rather than
4  finger pointing or head gesturing or anything
5  that would make the court reporter need to
6  interpret what you're trying to say. And if you
7  need a break at any point before I've taken one,
8  just let me know and I'll be happy to
9  accommodate it. The only time it's typically
10  not appropriate to take a break is while a
11  question is pending. Although if you feel like
12  you need to consult with counsel before you
13  answer a particular question, let me know that
14  and we'll deal with that when it comes up.
15      Any questions about the procedure,
16  before we begin?
17      A.  No.
18      (Craig Baron Exhibit Number 1 was
19  marked for identification.)
20  BY MR. SCHWABER:
21      Q.  Let me show you what I've had
22  marked as Craig Baron 1, which is the amended

14

1  notice of intention to take your deposition
2  duces tecum today. Have you seen that document
3  before?
4      A.  Yes.
5      Q.  Okay. And the document asked you
6  to bring with you a listing of some 15
7  categories of documents to the extent they exist
8  in your possession, custody, or control. Have
9  you reviewed that list?
10      A.  Yes.
11      Q.  And did you gather any documents
12  to produce in response to that?
13      A.  Yes.
14      Q.  Can I take a look at those then?
15      MR. LEWIN:  The record should
16  reflect that we're providing counsel for the
17  Defendants, Bates stamped pages 124 through 249.
18      MR. SCHWABER:  And do you have a
19  copy that I can mark as an exhibit?
20      MS. LEWIN:  Yes. Sure.
21      MR. SCHWABER:  Okay. Let me mark
22  as Exhibit 2, what I'll cause to be marked as

15

1  Exhibit 2, based on what your counsel just said,
2  I'll assume to be the entirety of the production
3  you've made in response to the Deposition Notice
4  that was marked as Exhibit 1, and that is Bates
5  numbers 124 through 249; is that correct? That
6  is the entirety of the production of documents
7  you're making today?
8      THE WITNESS:  Yes.
9      MR. LEWIN:  Let me be clear in
10  terms of the record. That's the production that
11  is being provided in response to the depositions
12  set for today for both Mr. Baron and his wife,
13  Rebecca Siegel Baron, who is also a Plaintiff in
14  the case.
15  BY MR. SCHWABER:
16      Q.  That was going to be my next
17  question.
18      So this production, and I'll ask
19  your wife the same question for the record, but
20  this production constitutes a compilation of the
21  documents that either or both of you had to
22  produce?

16

1      A.  Yes.
2      Q.  And there aren't separate
3  documents that your wife has?
4      A.  That's correct.
5      MR. SCHWABER:  Okay.
6      (Craig Baron Exhibit Number 2 was
7  marked for identification.)
8      MR. SCHWABER:  What I would like
9  to do is I'm going to need to take a break to
10  look through this, but let me ask you just a few
11  more preliminary questions and then we'll do
12  that.
13      What -- can you describe for me in
14  your own words what your role was in the
15  planning of your wedding?
16      THE WITNESS:  Rebecca and I made
17  decisions together regarding the wedding.
18  Preliminarily we split up the different vendors
19  that we would deal with between my family and
20  her family.
21      My family specifically dealt with
22  the photographer, the florist, the band, the

Case 1:05-cv-01717-RJL   VIDEOTAPED DEPOSITION OF CRAIG BROWN   Page 5 of 44
Document 84-9   Filed 03/30/2006
CONDUCTED ON TUESDAY, FEBRUARY 7, 2006

5 (Pages 17 to 20)

17

1  videographer, and was handling the Friday night
2  dinner before the wedding, but we both played an
3  active role in contacting and dealing with each
4  of the vendors. Rebecca more so than I did, but
5  we both had a hand in it.
6  BY MR. SCHWABER:
7      Q.   And when you say each of the
8  vendors, you don't just mean the ones your
9  family was handling?
10     A.   **Correct.**
11     Q.   Okay. Now, the ones that you
12  listed that your family was taking the primary
13  role on; photographer, florist, band,
14  videographer, and anything associated with the
15  Friday night dinner, was that -- was your family
16  the one responsible for paying for that?
17     A.   **Yes.**
18     Q.   Okay. And any other vendors that
19  your -- other than the ones you listed here,
20  that your wife's parents were paying for?
21     A.   **That's correct.**
22     Q.   Okay.

18

1      A.   **Well, let me -- my wife or my**
2  **wife's family or my wife and I were paying for**
3  **it.**
4      Q.   Okay. And can you list for me any
5  that you and your wife specifically took charge
6  of paying for?
7      A.   **We paid for the stage that was**
8  **used in the ceremony. We paid for the busses**
9  **that we used to come and go from the wedding**
10  **site, the speaker system that the band used to**
11  **supplement their sound, we paid for. That's all**
12  **I can recall right now.**
13     Q.   Okay. I know there was a Sunday
14  brunch. Who was responsible for that?
15     A.   **I was.**
16     Q.   Okay. And when I say responsible,
17  I mean taking the lead on planning and also
18  paying for it. Is your answer the same?
19     A.   **Yes.**
20     Q.   Tell me your -- where did you grow
21  up?
22     A.   **Roslyn, New York.**

19

1      Q.   Did you go to high school in
2  Roslyn?
3      A.   **Yes.**
4      Q.   What was the name of your high
5  school?
6      A.   **Roslyn High School.**
7      Q.   When did you graduate?
8      A.   **1994.**
9      Q.   And did you go straight to
10  college?
11     A.   **Yes.**
12     Q.   Where did you go?
13     A.   **Brandeis University.**
14     Q.   Okay. And did you graduate from
15  Brandeis in '98?
16     A.   **Yes.**
17     Q.   And what was your degree in?
18     A.   **Politics.**
19     Q.   Where did you live while at
20  Brandeis?
21     A.   **I lived on campus for my first two**
22  **years, and then I lived off campus for my last**

20

1  **two years.**
2      Q.   Okay. Were you in a meal plan
3  during any of those years?
4      A.   **Yes.**
5      Q.   Which years?
6      A.   **All four years.**
7      Q.   Okay. So when you lived off
8  campus did you still eat your meals or most of
9  your meals through campus dining?
10     A.   **Not most of them, no.**
11     Q.   Okay. So the first two years did
12  you eat all or most of your meals through campus
13  dining?
14     A.   **Yes.**
15     Q.   And the last two years, can you
16  give me an approximation of how many you ate
17  through campus dining?
18     A.   **Probably about seven or eight a**
19  **week.**
20     Q.   And is that out of 21 meals?
21     A.   **Yes, basically.**
22     Q.   So about a third of your meals?



21

1    A.   That's accurate.
2    Q.   Okay. And that off campus
3  housing, did you live with others?
4    A.   Yes.
5    Q.   How many others?
6    A.   Five others.
7    Q.   And was it a kosher house?
8    A.   No.
9    Q.   Okay. And did you keep kosher in
10  the house?
11    A.   Did I keep kosher in the house?
12  No, I did not.
13    Q.   Okay. Your meals that you ate on
14  campus, at any point over the four years, did
15  you eat a strictly kosher meal plan?
16    A.   There were times that I ate in the
17  kosher cafeteria, but it was not a strictly
18  kosher meal plan that I was on.
19    Q.   Okay. So the meal plan entitled
20  you to eat either in a kosher cafeteria or
21  nonkosher food?
22    A.   I believe that's correct, yes.

22

1    Q.   And you did both?
2    A.   Yes.
3    Q.   Okay. When you say there were
4  times you ate in the kosher cafeteria, was it
5  purely elective or were there any particular
6  times where you necessarily did it?
7    A.   I would say it was more elective.
8    Q.   Okay. In the home in which you
9  grew up in Roslyn, was that a kosher home?
10    A.   Yes.
11    Q.   And were your parents in the same
12  house that you grew up in?
13    A.   Yes.
14    Q.   And do they still keep kosher
15  there, too?
16    A.   Yes.
17    Q.   Do you keep kosher now?
18    A.   My wife and I keep a kosher home.
19    Q.   And can I gather from your answer
20  that you do not keep a kosher diet outside the
21  home?
22    A.   You can.

23

1    Q.   Okay. Do you place any
2  restrictions on what you eat outside the home --
3  strike that.
4        To clarify my question, do you
5  place any restrictions from a standpoint of
6  religious practice on what you eat outside the
7  home?
8    A.   No.
9    Q.   Okay. Is it your understanding
10  that that's true for your wife, as well?
11    A.   My wife does not place any
12  religious restrictions on her diet outside the
13  home.
14    Q.   Okay. And when you say you keep a
15  kosher home, can you describe what you mean?
16    A.   Yes. We have separate dishes. We
17  buy only kosher meat, and we do not mix milk and
18  dairy in the same meal.
19    Q.   You mean milk and meat? You said
20  milk and dairy.
21    A.   I'm sorry. Milk and meat in the
22  same meal. We only purchase fish that is kosher

24

1  and don't -- we only purchase kosher meat. We
2  obviously do not purchase pork products.
3    Q.   Okay. When you say you don't mix
4  milk and dairy products at the same meal --
5    A.   Now you confused them.
6        MS. LEWIN: Now you did it, too.
7  BY MR. SCHWABER:
8    Q.   I did the same thing. I was being
9  literal.
10        When you say you don't mix meat
11  and dairy products at the same meal, do you
12  include any ingredients used to cook in that
13  meal?
14    A.   That's correct.
15    Q.   Okay. And if you're serving
16  coffee or tea at the end of the meat meal, will
17  you use nondairy creamer?
18    A.   We have. We generally have a
19  split of separate -- separate meals, meaning if
20  we serve meat for -- meat for dinner, we will
21  have a break between serving dairy, but I can't
22  say for sure that we've never served milk with

25

1  coffee. We would wait generally a short amount
2  of time, but I can't say it's three hours.
3      Q.   So you may have a dairy dessert at
4  the end of a meat meal?
5      A.   I can't recall specifically, but
6  that's certainly possible.
7      Q.   Okay. Have you had guests to your
8  home for meals?
9      A.   Yes.
10     Q.   And have you had guests bring food
11 with them, either a cake or pastry or something
12 like that?
13     A.   Yes.
14     Q.   Okay. And have you ever checked
15 the ingredients to determine whether that cake
16 or pastry was parve?
17     A.   Not specifically, that I recall.
18     Q.   Okay. Is it conceivable to you
19 that you have served dairy products as part of a
20 dessert after a meat meal in your home?
21     A.   That's conceivable, yes.
22     Q.   The decision to have -- strike

26

1  that.
2          When you decided to -- strike
3  that.
4          The planning of the food for your
5  wedding, did that begin before or after you were
6  engaged?
7      A.   I'm not sure what you mean when
8  you say planning.
9      Q.   Any discussions about the wedding
10 reception itself. Did those first take place,
11 as far as you were concerned, after you were
12 engaged?
13     A.   There was loose discussion at
14 times about our wedding before we were engaged.
15     Q.   I take it from information I have
16 and maybe I'm -- maybe you'll tell me I'm wrong,
17 that your wife, prior to you getting married,
18 did not keep kosher; correct?
19     A.   Yes.
20     Q.   Okay. The discussions about
21 whether to have a kosher wedding reception, do
22 you -- what do you recall as the first time you

27

1  and your wife discussed that?
2      A.   There was definitely -- it was
3  definitely prior to our wedding.
4      Q.   Was it --
5      A.   I'm sorry, prior to our
6  engagement.
7      Q.   Okay. And when were you engaged?
8      A.   June 6th, 2004.
9      Q.   Okay. And what do you recall
10 about those discussions?
11     A.   I don't remember specifically
12 discussions, but it was assumed or we -- Rebecca
13 was well aware that my family was kosher, and it
14 was assumed or well-known that we would have a
15 kosher wedding.
16     Q.   Okay. And when you say it was
17 assumed or well-known, was that in deference to
18 the needs of your family?
19     A.   Correct.
20     Q.   Okay. So that's something you had
21 communicated that you needed at your wedding?
22     A.   Yes. I'm sure I did, but it was

28

1  also something that Rebecca almost didn't need
2  to be communicated, because she was well aware
3  of it. So I probably didn't even communicate
4  it, she just picked up on it very early on, and
5  it was something that was assumed.
6      Q.   Okay. You've described generally
7  the way you keep kosher at your home or the way
8  you keep a diet at your home now. How, if at
9  all, does that differ from the way you grew up?
10     A.   It's generally the same. Perhaps
11 my parents would wait a little bit longer
12 between having meat and milk, but they don't
13 keep a strict time limit. They would wait maybe
14 an hour and a half before, but it's nothing set
15 in stone.
16     Q.   When you buy products now, food
17 products for your home, do you check the
18 labeling to see if there is a religious
19 certification of kashrut, k-a-s-h-r-u-t?
20     A.   No, I don't.
21     Q.   When you were growing up in your
22 family home was it -- were those labels checked?

Case 1:05-cv-01717-RJL   Document 34-9   Filed 03/30/2006   Page 8 of 44
VIDEOTAPED DEPOSITION OF CRAIG
CONDUCTED ON TUESDAY, FEBRUARY 7, 2006

8 (Pages 29 to 32)

29

1    A.  Not really.  They were
2  acknowledged occasionally, but if a can of tuna
3  fish didn't have an OU on it, that wouldn't have
4  precluded us from buying it.  The only time
5  would be Passover.  My parents, for whatever
6  reason, were stricter in looking for the
7  religious symbols on the products.
8    Q.  Okay.  Do you eat cheese in your
9  house then?
10    A.  Yes.
11    Q.  And do you buy cheese without
12  regard to the labeling?
13    A.  Yes.
14    Q.  Was that true growing up?
15    A.  Yes.
16    Q.  How about wine?  Do you drink wine
17  at your home now?
18    A.  Yes.
19    Q.  Do you drink nonkosher wine?
20    A.  I do.
21    Q.  And did your family, growing up?
22    A.  Yes.

30

1    Q.  Do you belong to a synagogue now?
2    A.  Technically, no.
3    Q.  What does that mean?
4    A.  I attend.  When I attend synagogue
5  I attend my parents', but I don't think I'm a
6  member anymore because I've reached the age
7  where I'm no longer a member with my family.
8    Q.  So you're not part of a family
9  membership there any longer and you haven't
10  joined individually or with your wife?
11    A.  That's correct.  I don't believe
12  I'm a family member.  There may be a chance that
13  I am, but I'm not aware.
14    Q.  Where do you live now?
15    A.  Manhattan.
16    Q.  How far is Roslyn from Manhattan?
17    A.  About 21 miles.
18    Q.  Okay.  Do you attend synagogue in
19  Manhattan with any frequency?
20    A.  No.
21    Q.  Can you approximate for me in the
22  last year how many times you've attended

31

1  synagogue?
2    A.  About ten times.
3    Q.  Okay.  Would all ten of those be
4  at your family synagogue in Roslyn?
5    A.  No.
6    Q.  How many of the ten?
7    A.  I would say about 80 percent.  It
8  may be a little more than ten, now that I think
9  about it.  I would say closer to 15.  So I would
10  say about 12 times or so with my parents.
11    Q.  Would the others outside of the
12  family synagogue be where you were invited to an
13  occasion?
14    A.  Generally, yes.
15    Q.  Okay.  When you were growing up --
16  strike that.
17    What kind?
18    A.  If I could clarify an earlier
19  answer, now that I think about it.  I have been
20  to synagogue in the city probably two or three
21  times in the past year with my parents and
22  grandfather.

32

1    Q.  Is that your grandfather's
2  synagogue?
3    A.  He generally attends the same one
4  as my parents, but on occasion he goes to
5  synagogue in the city.
6    Q.  Okay.  Which one is that?
7    A.  The Central Park Synagogue.
8    Q.  Do you know what denomination that
9  is?
10    A.  Conservative.
11    Q.  How about your family's synagogue
12  in Roslyn?
13    A.  Conservative.
14    Q.  What's the name of it?
15    A.  Temple Beth Sholom.
16    Q.  Okay.  With what type of frequency
17  generally did your family attend synagogue when
18  you were growing up?
19    A.  Probably two or three times a
20  month.
21    Q.  Okay.  And your understanding of
22  your parents now, would that be about the same

33

1 today?
2     A.    Generally, yes.
3     Q.    Okay.  Why don't we take a short
4 break here and let us go through the documents
5 that have been marked as Exhibit 2, and then
6 we'll continue.
7     THE VIDEOGRAPHER:  We will go off
8 the record at 10:07:00 a.m.
9     (A brief recess was taken.)
10     THE VIDEOGRAPHER:  We are
11 returning back on the record.  The time is now
12 10:28 a.m.
13 BY MR. SCHWABER:
14     Q.    I have had a chance during the
15 break to review the documents you brought with
16 you, and also separately to take a cursory look
17 at something we didn't mark as an exhibit, but
18 which was brought here in its original form,
19 which appears to be a proof book from the
20 photographer of photos for the wedding.  Am I
21 correct that that's what this is?
22     A.    Yes.

34

1     Q.    Okay.  And my understanding is you
2 have not yet purchased photos out of the book;
3 is that correct?
4     A.    Yes.
5     Q.    Okay.  In the documents I reviewed
6 I noticed the package you had purchased from the
7 photographer, and it appears to include
8 negatives.  Do you have the negatives at this
9 point?
10     A.    I believe we do, but I'm not
11 100 percent sure where they are.  If it comes
12 with the package I'm assuming that we received
13 them, but I don't recall specifically ever
14 looking at the negatives.
15     Q.    Okay.  But if someone has them, is
16 it more likely to be you and your wife than your
17 in-laws?
18     A.    I would say yes.
19     Q.    The photographer was dealing
20 directly with you all?
21     A.    Yes.
22     Q.    Okay.  Do you have photos that

35

1 were taken by or for you or given to you and
2 your wife by someone other than the professional
3 photographer, photos of the wedding reception?
4     A.    Yes.
5     Q.    Okay.  And was any of that
6 orchestrated?  In other words, did you ask
7 amateurs to take pictures, or were these just
8 things people gave you?
9     A.    They were things that people gave
10 us.
11     Q.    Okay.  And are those in your home?
12     A.    Yes.  Although oftentimes they
13 were put on O'Photo or some other on-line
14 depository, so I don't think we printed out the
15 bulk of them, if any.
16     Q.    Have you saved them on your
17 computer?
18     A.    I'm not sure.
19     Q.    Okay.  Was it multiple people that
20 did that or was it just a small list?
21     A.    It was a small list of multiple
22 people.

36

1     Q.    Can you tell me the names?
2 Specifically people that sent you or your wife
3 photos of your wedding reception?
4     A.    I believe Jennifer Smith was one
5 of them, and I really don't recall the rest of
6 them.
7     Q.    Okay.  And who is Jennifer Smith?
8     A.    A friend of mine from college.
9     Q.    Where does she live?
10     A.    She lives in Boston.
11     Q.    Okay.  These are still photos she
12 took?
13     A.    Yes.
14     Q.    Did she send them to you
15 electronically, or hard copy?
16     A.    I believe she sent me an
17 electronic copy.  I guess it's a link to a web
18 site that keeps an album of photos.
19     Q.    Okay.  Do you know sitting here
20 today whether you saved that to some file on
21 your computer or whether you still retain it on
22 your computer?

Case 1:05-cv-01717-RJL    VIDEOTAPED DEPOSITION OF TODD BOZIC    Page 10 of 44
Document 54-5    Filed 03/31/2008
CONDUCTED ON TUESDAY, FEBRUARY 7, 2006

10 (Pages 37 to 40)

---

**37**

1    A.    I probably didn't, but I don't
2    know for sure.
3    Q.    Did you participate in the
4    preparation and/or the review of the lawsuit
5    that you filed in this case?
6    A.    Sorry, could you repeat that
7    question?
8    Q.    Let me ask you a better question.
9         What, if any, role did you play in
10    the -- in advance of the filing of the lawsuit
11    that you filed in this case?
12         MR. LEWIN:  Now, again, I'm going
13    to object to anything that enters into
14    attorney-client discussions.  That's got to be
15    excluded.
16    BY MR. SCHWABER:
17    Q.    The way to deal with that is if
18    your role, for example, was, I spoke with the
19    lawyers, you can tell me that without getting
20    into what the conversations were, but in order
21    to figure out what other questions I may have
22    for you I'm trying to get a general sense of

---

**38**

1    what, if any, role you played in the
2    preparation, review, approval, and ultimate
3    filing of the lawsuit that was filed on your
4    behalf in this case?
5    A.    I had general conversations with
6    my in-laws and my wife regarding the litigation.
7    Q.    Okay.  And you can answer this
8    question with a yes or no.  Did you ever speak
9    to your lawyers about the lawsuit at any time
10    prior to its being filed?
11    A.    No.
12    Q.    Okay.  Did you review the lawsuit
13    that was filed on your behalf prior to its being
14    filed?
15    A.    I believe I did.
16    Q.    Okay.  What, if anything, did you
17    do to prepare for this deposition?
18    A.    I met with my attorneys and I
19    reviewed the Complaint and I reviewed parts of
20    the deposition of Mark Siegel.
21    Q.    Okay.  When you say parts of, do
22    you recall what parts you reviewed?

---

**39**

1    A.    I didn't read the whole thing.  I
2    just read scattered portions of it.
3    Q.    Okay.  So you weren't reading
4    particular pages, you didn't get through the
5    whole thing?
6    A.    It was long.
7    Q.    My question was more were you
8    looking for certain things or were you just
9    skimming it?
10    A.    I was skimming it.
11    Q.    Okay.  So the lawsuit and the
12    Siegel deposition transcript were the only
13    documents you reviewed?
14    A.    I may have skimmed your Notice of
15    Deposition.
16    Q.    Okay.  Anything else?
17    A.    No.  I believe that's it.
18    Q.    When did you meet with counsel?
19    A.    Yesterday.
20    Q.    Okay.  When you reviewed the
21    lawsuit, was it familiar to you?
22    A.    I've seen it before, yes.

---

**40**

1    Q.    You dealt with Toby Nann, I
2    gather, from reviewing the documents, prior to
3    the wedding; correct?
4    A.    Yes.
5    Q.    On multiple occasions?
6    A.    Yes.
7    Q.    And your dealings were both in
8    person and via e-mail?
9    A.    As well as on the phone.
10    Q.    Okay.  And what do you think of
11    Toby?
12         MR. LEWIN:  I object to the form
13    of that question.
14         THE WITNESS:  I did not think she
15    was the most confident person.  I had questions
16    as to whether she was -- I had questions with
17    her whether there would be problems at the
18    wedding.
19    BY MR. SCHWABER:
20    Q.    And when did you first formulate
21    the concerns you just described?
22    A.    When I met her.

**41**

1  Q. And was that at the very beginning
2  of the process?
3  A. No.
4  Q. When did you meet her?
5  A. We came into Ridgewells for a
6  meeting with her and to discuss certain items
7  that we needed to pick out. I don't recall the
8  date, but it was before the formal tasting. I'm
9  guessing in January, but I could be off on that.
10  Q. There's an e-mail among the
11  documents from you to Toby on February 18th?
12  MR. LEWIN: What is the Bates?
13  BY MR. SCHWABER:
14  Q. It's Bates number 000153. I can
15  show you if you want to refer to it. I'm just
16  using it at the moment as a point of reference
17  on timing where you're asking her to provide you
18  with certain items for tasting. This e-mail is
19  dated February 18th, 2005. Would this have been
20  before you ever met Toby?
21  A. No.
22  Q. So you had already met her prior

**42**

1  to this e-mail?
2  A. That's correct.
3  Q. And does this help you in your
4  guess a few minutes ago of January, does that
5  seem right or wrong?
6  A. In the sense that January is
7  before February, yes.
8  Q. I'm relating in time.
9  A. I still believe January may be
10  accurate. It could have been December.
11  Somewhere around January is probably right.
12  Q. Okay. At the time of this e-mail
13  that's on 000153, had you met her only the one
14  time in person?
15  A. I believe so, yes.
16  Q. And that was at Ridgewells?
17  A. Yes.
18  Q. Okay. The tasting -- so the first
19  tasting you ever did would have been after this
20  February 18th e-mail? The first tasting of any
21  Ridgewells' food?
22  A. That's correct.

**43**

1  Q. The Ridgewells' food being tasted
2  on this e-mail, was this supposed to be
3  purchased as kosher meat by Ridgewells, or did
4  that matter for the tasting?
5  A. It was supposed to be kosher meat.
6  Q. For the tasting?
7  A. Correct.
8  Q. Okay. Is it your understanding
9  that it was?
10  A. Yes.
11  Q. And what's the basis for that
12  understanding?
13  A. Toby related to us she was making
14  it kosher, and the chef who we met with informed
15  us that it was kosher.
16  Q. And when you're saying it, you
17  mean the tasting itself?
18  A. Correct.
19  Q. Okay. So there was specific
20  discussion separate and apart from the wedding?
21  A. Yes.
22  Q. I noted that what was presented to

**44**

1  you among menu items was Ridgewells' standard
2  menu items including nonkosher foods; correct?
3  A. Yes.
4  Q. And so when you were selecting
5  what you selected for a tasting, you were
6  selecting it off of Ridgewells' general menu,
7  not off of a kosher menu?
8  A. Correct.
9  Q. Okay. Was it your understanding
10  at all times that Ridgewells was going to
11  prepare the food used both for the tasting and
12  for your wedding on their nonkosher dishes?
13  A. Yes.
14  Q. Okay. And without regard to
15  ingredients, beyond keeping dairy products out
16  of a meat meal?
17  A. I didn't follow the question.
18  Q. In other words, was it your
19  understanding that they could buy products that
20  didn't contain kosher labeling?
21  A. Yes.
22  Q. Okay. So they just simply needed



45

1    to not use dairy products in the meat meal?
2        A.    Or shellfish or anything else that
3    was considered nonkosher.
4        Q.    When you say or shellfish or
5    anything else that was considered nonkosher,
6    what do you mean by that?  I know what you mean
7    by shellfish, but what do you mean by the rest
8    of the phrase?
9        A.    Pork product or anything else that
10   was specifically nonkosher.  You've just simply
11   said anything that was nonkosher meat and dairy.
12       Q.    My question is what do you mean by
13   anything else that's nonKosher?  I asked you
14   specifically about labeling, you said that was
15   not of a concern and not something Ridgewells
16   was obligated to adhere to; correct?
17       A.    Yes.
18       Q.    So -- and you've told me about
19   shellfish and pork products and you've also
20   answered my question about dairy products with a
21   meat meal.  So what else, if anything, would be
22   prohibited from Ridgewells' use, as you

46

1    understood it?
2        A.    Off the top of my head, catfish is
3    nonkosher.  That is something that would also
4    not be included on -- in the meal.
5        Q.    Now, would it be fair for me to
6    assume that there wasn't a specific discussion
7    about catfish?
8        A.    That's fair.
9        Q.    Okay.  So -- but it would be your
10   belief that Ridgewells would have been
11   prohibited from serving catfish?
12       A.    Yes.
13       Q.    And what is -- what is the basis
14   for that belief?
15       A.    Numerous conversations with Toby
16   discussing the fact that we were going to have
17   only kosher fish and/or meat in our wedding.
18       Q.    Okay.  These are conversations
19   that you can relate not just from hearsay, but
20   from your own participation?
21       A.    Oh, yes.
22       Q.    Okay.  And you specifically

47

1    discussed kosher fish?
2        A.    Yes.
3        Q.    And did you discuss pork products,
4    or was that just understood in your mind?
5        A.    We referenced pork products as
6    obviously not having them.
7        Q.    Okay.  And in what context was
8    that reference?
9        A.    The -- regarding what kind of food
10   are we having to our wedding.
11       Q.    So you told Toby you didn't want
12   pork products?
13       A.    I mentioned it on, I believe, the
14   first conversation, and I believe she mentioned
15   it, as well.
16       Q.    Okay.  The -- and do you recall
17   why you mentioned it?
18       A.    We were speaking -- we were
19   speaking about different dishes that they could
20   have, and what you referenced as their standard
21   appetizer and hors d'oeuvres list, and we were
22   going through the list and discussing which

48

1    dishes would be appropriate for our wedding,
2    which ones they couldn't do.  And when something
3    came up, what if it was a pork sausage type
4    dish, we would say obviously we're not having
5    the pork at our wedding, or she would say that
6    also, as well as we would, also.
7        Q.    Okay.  Getting back to my question
8    a few minutes ago about your -- how you felt
9    about Toby, you described essentially immediate
10   concern, as I understood your answer, from the
11   time you met her?
12       A.    From the time I met her, yes.
13       Q.    And you met her sometime in the
14   ballpark of December '04 or January of '05?
15       A.    That's correct.
16       Q.    And what was the reason for your
17   concern at that first meeting?
18       A.    The first issue that came up was
19   the matter of scheduling a tasting, how Rebecca
20   and I met with her, and we were interested in
21   tasting the food.  And Toby was amenable to
22   that, and being that we live in New York, we

49

1  were asking her if we could schedule a tasting
2  on the weekend. And she immediately said, oh,
3  no, we can't do that. And we asked her why not.
4  She said the chef doesn't like to come in and do
5  that. We explained to her that it was very
6  difficult for us to take a day off of work
7  simply to come up to Washington for the day.
8  And she immediately got very upset and very
9  agitated and started raising her voice and
10 quivering in a very bizarre fashion and yelling
11 at us, when we were being very respectful and
12 polite to her. And she kind of shouted at us,
13 you're really pushing me here. It was
14 inappropriate to do that.
15        We calmly explained to her and
16 said, Toby, the very least you can do is ask the
17 chef if he can do that, because this is a very
18 big deal, we would like to have a tasting. She
19 kind of got a hold of her senses, eventually,
20 and said, okay, she'll do that. I believe it
21 was the next day or the day after she said that
22 the chef would have no problem doing it on a

50

1  Saturday, and kind of apologized to us.
2        It was very odd. It was the first
3  of my doubts about her as being competent.
4     Q.  Okay. So you questioned her
5  competence, it wasn't just odd, it also made you
6  question her competence; correct?
7     A.  Yes.
8     Q.  All right. And did you
9  communicate that concern to your fiancee?
10    A.  Yes.
11    Q.  Did she share it?
12    A.  Yes.
13    Q.  Who else was -- was there anyone
14 else with the two of you at that meeting?
15    A.  At that meeting?
16    Q.  Yeah?
17    A.  I'm sorry, the meeting with Toby
18 Nann?
19    Q.  Yes. Were your in-laws there?
20    A.  I'm trying to separate the two
21 meetings right now. I believe that was just --
22 that was just Rebecca and me. Yeah, I'm pretty

51

1  sure it was just the two of us.
2     Q.  Did you communicate either
3  directly or through your wife your concerns
4  about Toby to your in-laws, soon after you met
5  Toby?
6     A.  Not in the full force that I felt,
7  no.
8     Q.  But in some degree?
9     A.  We I believe had discussions that
10 Toby was a little bit odd and unstable.
11    Q.  And from your sense did your
12 in-laws share that assessment?
13    A.  I believe to some degree, but I'm
14 not sure to what degree.
15    Q.  I saw an e-mail that I'll show you
16 in a few minutes, but it may trigger your memory
17 from you to your soon to be mother-in-law where
18 you were dealing with bartenders. Do you recall
19 that incident?
20    A.  Yes.
21    Q.  And you used the phrase, if Toby
22 goes mental again, let me know, or words to that

52

1  effect. Do you recall that?
2     A.  I recall upon reviewing the
3  e-mail. That refreshed my recollection.
4     Q.  Okay. As I read that my sense of
5  it was for you to use an expression like that
6  your would be mother-in-law at least shared to
7  some degree your concerns about Toby. Would
8  that be fair?
9        MR. LEWIN:  Objection to the form
10 of the question.
11 BY MR. SCHWABER:
12    Q.  Would that be fair in your
13 assessment?
14    A.  I'm sorry, could you repeat the
15 question?
16    Q.  As of the time you wrote that
17 e-mail to your mother-in-law was it your
18 impression that she shared your concerns about
19 Toby?
20       MR. LEWIN:  Objection.
21       THE WITNESS:  I know she had
22 concerns. I don't think that they were my same

53

1    concerns, as I was attempting to temper my
2    feelings towards her, because I didn't think
3    that that would be productive.
4    BY MR. SCHWABER:
5        Q.   Why not?
6        A.   Because we were working with this
7    woman and there was no point in making everybody
8    nervous and pessimistic that she would ruin the
9    wedding in some fashion.
10       Q.   Okay.  And were your concerns
11   really at that level, that she would ruin the
12   wedding?
13       A.   I didn't fathom that she would
14   serve shellfish at the wedding, but I had real
15   concerns in my head that she would do something
16   to screw it up.
17       Q.   Okay.  And you communicated those
18   concerns to your wife?
19       A.   Yes.  We discussed that.
20       Q.   And did she share your level of
21   concern?
22           MR. LEWIN:  Objection.

54

1            THE WITNESS:  I don't know what
2    her level of concern was, but I know she had
3    some concerns.
4    BY MR. SCHWABER:
5        Q.   Okay.  I mean from your experience
6    was she attempting to assuage your concerns or
7    was she telling you she shared your worries?
8        A.   I don't think I relayed my full
9    concerns, in an attempt to make her feel
10   comfortable that everything was going okay.  I
11   kind of had a hope that everything would go
12   okay.  So I don't think I made it out -- I think
13   we were more hopeful that everything would go
14   fine.  So I can't -- if anyone was assuaging
15   concerns, it was me.
16       Q.   Did you have confidence in any
17   aspect of Toby?
18           MR. LEWIN:  Objection.
19   BY MR. SCHWABER:
20       Q.   Prior to the wedding?
21           MR. LEWIN:  Objection.
22           THE WITNESS:  I had confidence

55

1    in -- I was hopeful that she would be able to
2    pull off a somewhat flawless or seamless
3    wedding.  I didn't have -- I had some confidence
4    in her, but not all that much.
5    BY MR. SCHWABER:
6        Q.   I didn't ask a particularly artful
7    question.  What I was getting at more was
8    sometimes you can say, well, she's great at A,
9    B, and C, but I have concerns about how she'll
10   do X, Y, and Z.  So I'm talking about aspects of
11   the role she was to play, as you understood it,
12   for the wedding.  Were there areas that you
13   would describe as strengths, or was the concern
14   you were feeling kind of an across the board
15   concern about what she was going to deliver?
16           MR. LEWIN:  Objection.
17           THE WITNESS:  My concern with Toby
18   was across the board type of concern.  She did
19   not have the ability to comprehend things that
20   we told her.  Even in writing we would get an
21   e-mail -- the e-mail you were referring to
22   before was just nonresponsive to what we

56

1    discussed about half an hour before when we
2    relayed to her in detail that we were going to
3    have four bartenders.  She somehow contrives,
4    somehow interpreted that to mean that all of a
5    sudden we're having three bartenders.  It was a
6    small matter, but it was exasperating in that
7    she just didn't have the ability to comprehend a
8    conversation that we had just recently.
9    BY MR. SCHWABER:
10       Q.   Okay.  And that level of concern,
11   although I gather it increased with the more
12   interaction you had with her, that started from
13   your first experience with her?
14           MR. LEWIN:  Objection.
15           THE WITNESS:  I don't say it
16   increased, but it popped up every so often.
17   BY MR. SCHWABER:
18       Q.   Okay.  And it never got better?
19       A.   I don't want to say never got
20   better, but it was always in the back of my
21   mind.
22       Q.   Okay.  Were you aware at any point

57

1  prior to the wedding that Ridgewells offered
2  your in-laws the option of paying for a strictly
3  kosher event?
4      A.  I knew right after we became
5  engaged that my in-laws looked at two catering
6  options, and that we originally decided to go
7  with Sue Fischer, who I believe is at Windows.
8  I didn't know who the other option was, only
9  that it was very expensive.
10     Q.  Okay.  So you knew there was Sue
11 Fischer, and another option that was declined as
12 too expensive?
13     A.  I knew we went with Sue Fischer.
14 I don't know the reason we didn't go with the
15 other one, but I knew the other one was more
16 expensive.
17     Q.  You later found out the other one
18 was Ridgewells?
19     A.  Yes.
20     Q.  And when did you first find that
21 out?
22     A.  I'm sorry.  When did I find

58

1  Ridgewells was the other option?
2      Q.  Yes.
3      A.  When we came back to Ridgewells
4  and we found out that Ridgewells can do a
5  catering option that involved kosher meat and
6  kosher fish, and otherwise nonkosher dishes.
7      Q.  So, in other words, you found out
8  Ridgewells had been, for lack of a better term,
9  the losing bidder in the first round when a
10 decision was made to go with Sue Fischer, you
11 found that out at the time a decision was made
12 to go back to Ridgewells?
13     A.  Right.  I believe we found out
14 when we decided not to use Sue Fischer, that the
15 Kosher Division of Ridgewells of Toby Nann and
16 Julee Staley were able to do a kosher wedding
17 without a mashgiach -- without their regular
18 kosher dishes.
19     MS. LEWIN:  M-A-S-H-G-I-A-C-H.
20 BY MR. SCHWABER:
21     Q.  So -- and you found out that
22 Ridgewells could do the wedding without the use

59

1  of a mashgiach and without the use of their
2  kosher kitchen, but still provide you with a
3  kosher style event?
4      MR. LEWIN:  Objection.
5      THE WITNESS:  No, I never said
6  that.  I said they could provide us with a
7  kosher wedding to our level.  I didn't view that
8  as kosher style.
9  BY MR. SCHWABER:
10     Q.  Okay.  And did you find this out
11 prior to a decision being made by your in-laws
12 to engage Ridgewells?
13     A.  I don't follow the question.
14     Q.  You told me the circumstances
15 surrounding you're finding it out, and my
16 question is were you asked is this okay with you
17 and your family, or were you told this is what
18 we've done?
19     A.  No.  They told us that Ridgewells
20 can do this level of kashrut, and so this is
21 what -- that is what we were comfortable with,
22 so we're going to go ahead and do that.

60

1      Q.  That's what your in-laws said?
2      A.  They told me, Rebecca -- I don't
3  remember exactly the specifics of the
4  conversation, but that Ridgewells can do a
5  wedding with, you know, a lesser standard of
6  kashrut than before that they were doing.
7      Q.  And was that okay with you?
8      A.  Yes.
9      Q.  Did you have any concerns about
10 whether it would be okay with your parents?
11     A.  No.
12     Q.  Did you feel the need to
13 communicate that to your parents?
14     A.  Yeah.  Well, we told them -- I
15 told them we were switching caterers.
16     Q.  From Sue Fischer?
17     A.  Right.
18     Q.  And what did you tell them was the
19 reason?
20     A.  Sue Fischer was not responsive and
21 not -- there was some -- I forget the issue with
22 her.  She was leaving the company that she was

Case 1:05-cv-01717-RJL  Document 49  Filed 03/02/2006  Page 16 of 44
VIDEOTAPED DEPOSITION OF CRAIG BARON
CONDUCTED ON TUESDAY, FEBRUARY 7, 2006

16 (Pages 61 to 64)

61

1  working with and that she wasn't really going to
2  be able to provide a kosher event -- I'm sorry,
3  wasn't able to provide catering for the event.
4      Q.  Okay.  Did you -- and, to be
5  clear, Sue Fischer's departure from the scene,
6  as you understood, had nothing to do with kosher
7  or nonkosher; correct?
8      A.  That's correct.
9      Q.  Did you -- my question about
10  communication to your parents, did you
11  communicate to your parents at or about the time
12  of the switch in caterers that you had decided
13  to go with Ridgewells, but without -- your
14  in-laws had decided to go with Ridgewells, but
15  without the mashgiach or the kosher kitchen?
16      A.  I don't think I specifically
17  referenced that.
18      Q.  Okay.  As far as you know, when
19  did your parents first become aware that there
20  was no mashgiach being used by the caterer at
21  your wedding?
22      A.  I think that's something that we

62

1  just discussed early on, and they were aware of
2  that.
3      Q.  Are you certain sitting here today
4  that your parents knew there was no mashgiach at
5  some point prior to the wedding?
6      A.  Absolutely.
7      Q.  And what's the basis for that
8  certainty?
9      A.  Because we had a discussion about
10  it.  I don't remember when it was or we -- a
11  discussion -- we just referenced that there was
12  no mashgiach, and that was something they were
13  fine with.
14      Q.  Are you aware sitting here today
15  whether your parents knew prior to the wedding
16  that the dishes and the cookware being used for
17  the wedding were not kosher?
18      A.  I believe they did.  I don't
19  remember specifically referencing that, but it
20  was in the conversations that we spoke about it.
21      Q.  Now, you understood that the
22  dishes being used could very well have had pork

63

1  or shellfish or catfish or bacon or any other
2  nonkosher product on them the day before;
3  correct?
4      A.  Yes.
5      Q.  And you understood that the
6  ovenware and the cooking facilities in the
7  kitchen being used at The Corcoran was not a
8  kosher kitchen in any respect; correct?
9      A.  That's correct.
10      Q.  Do you know if your parents knew
11  that at any point prior to the wedding?
12      A.  Yes, I believe they did.
13      Q.  And was that from you?
14      A.  Yes.
15      Q.  Would it have only been from you?
16      A.  Probably, because they wouldn't
17  really discuss it with the Siegels.  It wasn't
18  the way it worked.
19      Q.  Did either you or your parents, as
20  expressed to you, have any concerns about
21  whether the dietary arrangements for your
22  wedding were sufficient from a kashrut

64

1  standpoint for all of the guests at your
2  wedding?
3      MR. LEWIN:  Objection, form.
4      THE WITNESS:  No.  I was pretty
5  familiar -- I am pretty familiar with the guests
6  that came and I was comfortable with the fact
7  that the guests, the level of kashrut we were
8  having was sufficient for all the guests that
9  were invited -- I'm sorry, all the guests that
10  attended.
11  BY MR. SCHWABER:
12      Q.  Okay.  Were there some that were
13  invited that had they been able to attend would
14  have given you some concern?
15      A.  Yes.
16      Q.  Do you remember who, specifically?
17      A.  My parents have several friends
18  that are orthodox and probably would not -- this
19  level of kashrut would not have been sufficient
20  for them.
21      Q.  Now, the decision to go with this
22  level of kashrut was made before invitations

65

1  went out, I take it; correct?
2      A.  That's correct.
3      Q.  So did you discuss what would have
4  happened had any of those orthodox guests
5  decided to come?
6      A.  We were fairly confident they
7  would not be attending, as the wedding was on
8  Saturday night, which would have made it
9  exceedingly difficult to come down for the
10  wedding, and I believe they expressed that
11  beforehand.
12      Q.  Okay.  But my question was a
13  little bit different.
14          Did you have any discussions or
15  contemplation about what would have happened had
16  you had somebody from among those guests come to
17  the wedding that you had concerns about from a
18  kashrut standpoint?
19      MR. LEWIN:  Objection.
20      THE WITNESS:  Again, we -- the
21  discussions we had were solely around the fact
22  that they would almost certainly not be coming

66

1  because of the fact that we were having a
2  wedding right after Shabbat in Washington and it
3  would be very impractical for them to come down.
4      MR. LEWIN:  S-H-A-B-B-A-T.
5  BY MR. SCHWABER:
6      Q.  So other than an assumption they
7  wouldn't be coming, you didn't go any further?
8      A.  If it turned out that they would
9  buy whatever -- if it turned out, however
10  unlikely that they would come, I'm sure we would
11  have had to make arrangements with them, as we
12  had at my sister's wedding.
13      Q.  You mean make arrangements for a
14  special meal?
15      A.  Correct.
16      Q.  You weren't going to switch
17  caterers, you were just going to accommodate
18  them with some other food?
19      A.  We didn't have that discussion, so
20  I have no idea what the discussion was.
21      Q.  But when you said a few minutes
22  ago make arrangements, is that what you meant,

67

1  make arrangements to bring them special food?
2      A.  I don't know what the arrangements
3  would be, because we didn't contemplate them.
4      Q.  What were the arrangements that
5  you referenced at your sister's wedding?
6      A.  They would have special food.
7      Q.  You had a nonkosher caterer?
8      A.  No.  We had a kosher caterer, but
9  it wasn't the level that they required.
10      Q.  And so special food was brought in
11  through that kosher caterer or from someone
12  else?
13      A.  I have no idea.
14      Q.  And the kosher caterer for your
15  sister's wedding, was there a mashgiach?
16      A.  I don't know.
17      Q.  Was your sister's wedding a meat
18  or dairy meal?
19      A.  It was a meat meal.
20      Q.  Your parents sponsored that
21  wedding?
22      A.  Yes.

68

1      Q.  How long ago was that?
2      A.  Six years ago, maybe.
3      Q.  Okay.  Do you remember the name of
4  the caterer?
5      A.  Newman & Leventhal.
6      Q.  And is it your understanding that
7  they are a strictly kosher caterer?  And by
8  strictly kosher, my definition is someone that
9  does nothing but kosher?
10      A.  I'm not sure.  I know they have a
11  Kosher Division.  I don't know what they do
12  outside of that.
13      Q.  Okay.  Are they based in Roslyn?
14      A.  I don't know where they're based
15  at.
16      Q.  Was the wedding in Roslyn?
17      A.  Yes.
18      Q.  At Beth Sholom?
19      A.  Yes.
20      Q.  Okay.  So when you -- getting back
21  to when you were told that Ridgewells, which had
22  been the losing bidder, for lack of a better

Case 1:05-cv-01717-RJL   Document 54-9   Filed 10/30/2006   Page 18 of 44
VIDEOTAPED DEPOSITION OF CRAIG BARON
CONDUCTED ON TUESDAY, FEBRUARY 7, 2006

18 (Pages 69 to 72)

**69**

1  term, the first round was now going to be the
2  caterer, in that context you were told that it
3  was now more -- it was more attractive from a
4  pricing standpoint because of Ridgewells'
5  willingness to do this without a mashgiach and
6  without a kosher kitchen; is that fair?
7          MR. LEWIN: Objection. That's not
8  his testimony.
9  BY MR. SCHWABER:
10     Q.  I'm asking.
11     **A.  I'm sorry, could you repeat the**
12  **question?**
13     Q.  You understood at the time you
14  learned that Ridgewells was now going to be the
15  caterer that they had -- Ridgewells had brought
16  their price down as a result of offering you the
17  option of no mashgiach and no kosher kitchen;
18  right?
19          MR. LEWIN: Objection.
20          THE WITNESS: My focus in really
21  understanding was that we didn't have a caterer
22  because Sue Fischer backed out, so I wasn't

**70**

1  involved in the price at all. My thought
2  process was this was the other option.
3  BY MR. SCHWABER:
4      Q.  You knew in advance of Sue Fischer
5  backing out that Ridgewells, even though you
6  didn't know it was Ridgewells, had once been
7  considerably more expensive; right?
8      **A.  I don't know about considerably**
9  **more expensive. I knew they were more**
10  **expensive.**
11     Q.  Okay. And when you were told not
12  only that Sue Fischer was no longer going to be
13  it, but that Ridgewells was going to be used,
14  you were told Ridgewells could do it without a
15  mashgiach and without a kosher kitchen; right?
16     **A.  I believe so. Again, it's not**
17  **something I focused on because I was just**
18  **focusing on the fact that we have a new caterer**
19  **because they couldn't do it. I knew they**
20  **weren't going to do the bells and whistles,**
21  **which involved not having mashgiach and the**
22  **dishes, but I guess I wasn't really focusing on**

**71**

1  **the details of the kashrut.**
2      Q.  Would it be fair to say though
3  that price being equal, you would choose the
4  bells and whistles; right?
5          MR. LEWIN: Objection.
6          THE WITNESS: No, that's not fair
7  to say.
8  BY MR. SCHWABER:
9      Q.  So is it your testimony that if
10  Ridgewells offered you the same price and you
11  could have it either with the kosher kitchen and
12  with the mashgiach or without the kosher kitchen
13  and without the mashgiach, that you don't know
14  what you would have chosen?
15          MR. LEWIN: Objection.
16          THE WITNESS: I wasn't choosing
17  anything. My in-laws were making the
18  arrangements and they were spending a lot of
19  money on the wedding and they knew the level of
20  kashrut that we needed and they were making the
21  decision. I don't -- can't comment on their
22  decisions based on anything else.

**72**

1  BY MR. SCHWABER:
2      Q.  I'm just trying to get at the
3  context of the information that was imparted to
4  you about the fact that Ridgewells was willing
5  to provide you with this service without the
6  bells and whistles, as you put it. In other
7  words, without the mashgiach and without the
8  kosher kitchen, the context was to tell you that
9  this now made this doable from a price
10  standpoint; right?
11          MR. LEWIN: Objection.
12          THE WITNESS: Now, again, I wasn't
13  focusing on any of that, so I was focusing on
14  the fact we didn't have a caterer and now we do.
15  So what they were providing, what they were
16  taking off or what they were putting in, and the
17  price was not really of issue for me. I didn't
18  know any of those details going back and forth.
19  Excuse me, I didn't focus on any of those
20  details.
21  BY MR. SCHWABER:
22      Q.  Okay. You recall telling me a few

Case 1:05-cv-01717-RJL   Document 54-9   Filed 10/30/2006   Page 19 of 44
VIDEOTAPED DEPOSITION OF CRAIG BARON
CONDUCTED ON TUESDAY, FEBRUARY 7, 2006

19 (Pages 73 to 76)

---

73

1  minutes ago that you were told that Ridgewells,
2  through Toby Nann, as it was told to you,
3  indicated their willingness to do this wedding
4  without the mashgiach and without the kosher
5  kitchen and without, using your term, the bells
6  and whistles; correct?
7        MR. LEWIN: Objection.
8        THE WITNESS: She related that to
9  me?
10 BY MR. SCHWABER:
11     Q.  No. You were told that Ridgewells
12 had communicated now in this second round that
13 willingness; correct?
14     A.  Yes.
15     Q.  And your understanding was that
16 communication by Ridgewells just happened now in
17 this second round and hadn't happened the first
18 time; right?
19       MR. LEWIN: Objection.
20       THE WITNESS: I don't know when
21 that communication happened. I really had no
22 knowledge of when and what communications Toby

---

74

1  Nann had with anyone.
2  BY MR. SCHWABER:
3      Q.  Okay. But you knew at the time
4  that it was communicated to you, I think you
5  answered this, but to be sure, at the time that
6  it was communicated to you that Ridgewells could
7  do this wedding without the bells and whistles
8  if you so contracted. You knew at that time
9  that they had previously offered to do it with
10 the bells and whistles; correct?
11       MR. LEWIN: Objection to form.
12       THE WITNESS: Yes.
13 BY MR. SCHWABER:
14     Q.  Okay. And is it your testimony
15 sitting here today that you didn't understand
16 there to be a price distinction between the
17 option with the bells and whistles and the
18 option without?
19       MR. LEWIN: Objection.
20       THE WITNESS: I did not say that
21 at all.
22 BY MR. SCHWABER:

---

75

1      Q.  Okay. Did you understand there to
2  be a price distinction?
3      A.  If I thought about it I probably
4  figured there was, but it was not something I
5  focused on.
6      Q.  Sitting here today and thinking
7  about it as I'm asking you to do --
8      A.  Sure.
9      Q.  -- is it logical to you that the
10 offer to do it without the bells and whistles,
11 as you've described them, would be cheaper than
12 the offer to do it with the bells and whistles?
13       MR. LEWIN: Objection.
14       THE WITNESS: Yes.
15 BY MR. SCHWABER:
16     Q.  At the time you became
17 concerned -- strike that.
18       You became concerned about Toby
19 Nann's competence and her capability of
20 delivery, what you needed her to deliver, almost
21 immediate by upon meeting her; correct?
22       MR. LEWIN: Objection.

---

76

1        THE WITNESS: No. There was a
2  specific incident that happened that I -- it
3  wasn't immediate upon meeting her, it was a
4  specific incident that happened that raised our
5  eyebrows.
6  BY MR. SCHWABER:
7      Q.  What was that incident? Is that
8  the one you already described?
9      A.  Yes.
10     Q.  Where on the scheduling of the
11 tasting?
12     A.  Correct.
13     Q.  Okay. And that was soon after
14 meeting her?
15     A.  Within the hour.
16     Q.  Okay. And among the things you
17 were concerned about was whether there were
18 going to be foul-ups at the wedding itself;
19 correct?
20       MR. LEWIN: Objection, form.
21       THE WITNESS: Not necessarily
22 foul-ups at the wedding, just her ability to

---

77

1   understand what we wanted. So I guess -- yes,
2   that would relate to foul-ups or just not
3   everything being perfect.
4   BY MR. SCHWABER:
5       Q.   Okay. And specifically I wrote
6   down a phrase you used earlier when you were
7   describing across the board concerns with Toby.
8   You said she did not have the ability to
9   comprehend what we had told her?
10      **A.   At times, yes.**
11      Q.   Okay. And that concern, although
12  as I understand it from your testimony you
13  experienced on multiple separate occasions, you
14  had that from that first meeting?
15      **A.   Yes.**
16      Q.   Okay. At any point after your
17  first meeting with Toby Nann did you develop any
18  concern that maybe you should ask your soon to
19  be in-laws to get a mashgiach for Ridgewells?
20          MR. LEWIN:  Objection.
21          THE WITNESS:  Absolutely not.
22  BY MR. SCHWABER:

78

1       Q.   That never dawned on you?
2       **A.   No.**
3       Q.   Among the concerns you had, did
4   you have concerns about whether Toby would get
5   the specific level of kashrut you felt you
6   needed correct?
7       **A.   No. That actually was the least**
8   **of my concerns, actually.**
9       Q.   Why is that?
10      **A.   Because Toby, when we met her,**
11  **indicated that she actually served as a**
12  **mashgiach in the past, so she knows full well**
13  **what we were looking for in a wedding, and**
14  **related to me that she got married at Leonard's**
15  **of Great Neck on Long Island, which was very**
16  **close to where I grew up. So she understood**
17  **what a Jewish wedding entails, what a New York**
18  **Jewish wedding entails, and what a New York**
19  **kosher wedding entails.**
20      Q.   Have you been to New York Jewish
21  weddings that are kosher, and others that are
22  nonkosher?

79

1       **A.   Yes.**
2       Q.   Okay. And among the ones that are
3   nonkosher, do you recall whether shellfish was
4   served?
5       **A.   Yes.**
6       Q.   And were there New York nonkosher
7   Jewish weddings you've attended with shellfish
8   being served?
9       **A.   Yes.**
10      Q.   Okay. Were all the kosher
11  weddings you attended, did they all have the
12  supervision of a mashgiach?
13      **A.   I have no idea.**
14      Q.   You knew Toby Nann was not a
15  mashgiach at your wedding; correct?
16      **A.   That's correct.**
17      Q.   Okay. And your testimony is
18  notwithstanding your concerns about Toby's level
19  of confidence and notwithstanding your concerns
20  about her inability to comprehend what you had
21  told her, you had no concerns about her ability
22  to deliver a wedding that was sufficiently

80

1   kosher, without a mashgiach, to meet your
2   standards?
3           MR. LEWIN:  Objection.
4           THE WITNESS:  That -- my concerns
5   related to whether there would there be bread on
6   the table, whether there would be enough passed
7   hors d'oeuvres. There were minor concerns. Our
8   discussions with Toby, Toby related to us quite
9   clearly that she was fully aware of the level of
10  kashrut that we wanted and fully aware of the
11  type of wedding with heavy cocktail hour, lots
12  of passed hors d'oeuvres type of thing that we
13  wanted because of her being from New York and
14  being from -- and getting married there.
15  BY MR. SCHWABER:
16      Q.   Do you believe Toby understood
17  prior to the wedding that shrimp was not to be
18  served at the wedding?
19      **A.   Absolutely.**
20      Q.   Do you have any doubt about that
21  in your mind?
22      **A.   No.**

81

1    Q.   Okay.  Do you believe that shrimp
2  was served because a mistake was made?
3        MR. LEWIN:  Objection.
4        THE WITNESS:  I have no -- I have
5  no idea.  A mistake as opposed to what?  I'm not
6  sure.
7  BY MR. SCHWABER:
8    Q.   In other words, you've told me
9  that Toby knew not to serve shrimp, in your
10  opinion; correct?
11   A.   Yes.
12   Q.   So did she serve shrimp
13  maliciously or intentionally, in your opinion?
14       MR. LEWIN:  Objection.
15       THE WITNESS:  I have no way of
16  knowing what her motive was, but if I had to
17  guess I would say she did not do it
18  intentionally.
19  BY MR. SCHWABER:
20   Q.   Okay.  So, in other words, it was
21  a mistake?
22       MR. LEWIN:  Objection.

82

1        THE WITNESS:  Possibly, yes.
2  BY MR. SCHWABER:
3    Q.   To the best of your knowledge was
4  this a mistake, serving shrimp?
5        MR. LEWIN:  Objection.
6        THE WITNESS:  It definitely was a
7  mistake in that we didn't want it, yes.
8  BY MR. SCHWABER:
9    Q.   Okay.  And would it be your
10  belief, recognizing you don't have insight into
11  Toby's brain --
12   A.   Sure.
13   Q.   -- would it be your belief that it
14  was a mistake, not just in that you didn't want
15  it, but that Toby didn't want it?
16       MR. LEWIN:  Objection.
17       THE WITNESS:  Yes, it would be my
18  belief that she did not serve this intentionally
19  and it was a grievous mistake.
20  BY MR. SCHWABER:
21   Q.   Okay.  And how did you come to be
22  aware of the serving of shrimp at your wedding?

83

1    A.   I believe my brother-in-law told
2  me.
3    Q.   Who's your brother-in-law?
4    A.   Bob Siegel.
5    Q.   And who is Bob Siegel in relation
6  to your wife?
7    A.   That's Rebecca's brother.
8    Q.   Okay.  Older or younger?
9    A.   Older.
10   Q.   And when did he tell you that
11  there was shrimp being served?
12   A.   At the beginning of the cocktail
13  hour Rebecca was having her dress bustled,
14  folded under so she would walk around easily,
15  and it was taking a little longer than usual so
16  I -- she told me to go upstairs to greet our
17  guests, because it was taking a while.  As I was
18  walking from the second floor mezzanine area I
19  believe Bob was walking up, also, and he related
20  to me that there was shrimp and shellfish on the
21  sushi platter.
22   Q.   Tell me -- so this was before you

84

1  even entered the reception room?
2    A.   Before I entered the cocktail
3  hour, yes.
4    Q.   Okay.  And so tell me as
5  specifically as you can recall what he told you.
6  This was in the stairwell?
7    A.   Yes.
8    Q.   Okay.
9    A.   He said something along the lines
10  of, I can't believe they did that.  And I guess
11  he knew -- I guess he thought that I knew what
12  he was talking about, and I said what are you
13  talking about?  And he said that they served
14  shrimp.  And Bob and I have a relationship where
15  we kid around, and I just assumed he was
16  kidding, and he said, no, they served shellfish
17  on the sushi platter.  And I was just in
18  disbelief.
19   Q.   When you say you were in
20  disbelief, I take it at some point you knew he
21  wasn't kidding during that conversation?
22   A.   Correct.

85

1     Q.  So when you say you were in
2  disbelief, that becomes a figure of speech. In
3  other words, you knew he was serious?
4     **A.  Yes. I was just shocked. I was**
5  **speechless.**
6     Q.  Okay. And what did you do?
7     **A.  I went upstairs and I found my**
8  **mother and I just kind of gave her a hug, I**
9  **think.**
10     Q.  Now, at the time that you went in
11  there and found your mother, were all or most of
12  the guests already in the cocktail lounge?
13     **A.  Everyone was there.**
14     Q.  Okay. Recognizing it is probably
15  hard for the groom right after his wedding to
16  have a sense of time, how much time had passed
17  since the ceremony ended by the time you spoke
18  to your brother-in-law?
19     **A.  20 minutes, maybe.**
20     Q.  Okay. And so you saw your mother.
21  You gave her a hug, and what did she say?
22     **A.  I think she just had tears in her**

86

1  **eyes. I don't think she -- I don't recall her**
2  **saying anything.**
3     Q.  This is the first moment you had
4  seen your mother since your wedding?
5     **A.  Yes.**
6     Q.  Okay. And were they tears
7  relating to the fact that you had gotten
8  married?
9     **A.  No.**
10     Q.  What were the tears about?
11     **A.  I think it's the fact that we had**
12  **shrimp at our wedding and shellfish at our**
13  **wedding.**
14     Q.  And what's your basis for that
15  statement?
16     **A.  Because I think I said something**
17  **to her along the line of I just heard, I don't**
18  **know what to say. And something along the lines**
19  **of it will be okay, let's just try and forget**
20  **it.**
21     Q.  Who said that, you or her?
22     **A.  I did.**

87

1     Q.  And did she say anything back?
2     **A.  I'm not 100 percent sure what she**
3  **said. She kind of nodded and tried to say okay,**
4  **but something along the lines, I can't believe**
5  **that.**
6     Q.  Did she say anything to you about
7  the -- about the ceremony in that conversation?
8     **A.  I think once she -- once she**
9  **composed herself she, you know, kind of just**
10  **composed herself and saying the ceremony was**
11  **beautiful. But I don't remember exactly what**
12  **she said.**
13     Q.  Okay. At the time you greeted
14  your mother, that you just described, had the
15  shellfish been removed?
16     **A.  I didn't -- I don't think at that**
17  **time I saw the sushi. It was pretty crowded.**
18  **So I don't know specifically when it was**
19  **removed.**
20     Q.  Did you come to learn that at some
21  point it was removed?
22     **A.  Eventually when I made my way**

88

1  **around there I saw that it was removed.**
2     Q.  And can you relate in time from
3  the time you hugged your mother to when you made
4  your way around to the sushi?
5     **A.  It could have been 10 minutes**
6  **after maybe, after that conversation. I'm sure**
7  **I had conversations with other people after**
8  **that.**
9     Q.  Did you have any concern walking
10  into that room after you spoke to your
11  brother-in-law that you needed to make sure the
12  offending sushi had been removed?
13     MR. LEWIN: Objection.
14     THE WITNESS: I believe Bob may
15  have referenced the fact that they took it away.
16  BY MR. SCHWABER:
17     Q.  Okay. So going into the room you
18  knew it was already gone?
19     MR. LEWIN: Objection.
20     THE WITNESS: I believe so.
21  BY MR. SCHWABER:
22     Q.  When did you first come to learn

Case 1:05-cv-01717-RJL VIDEOTAPED DEPOSITION OF RICHARD BLUMENTHAL Document 54-9 Filed 02/08/2008 Page 23 of 44
CONDUCTED ON TUESDAY, FEBRUARY 7, 2006

23 (Pages 89 to 92)

**89**

1 about the circumstances of how it was discovered
2 and how it was brought to Ridgewells' attention?
3     A.    Those are two separate questions I
4 think; right?
5     Q.    I'm not asking what you know about
6 those. I'm asking you when you first came to
7 learn about it. Is the answer different?
8     A.    I'm sorry, could you repeat the
9 question?
10     Q.    When did you first come -- I'll
11 break it down. When did you first come to learn
12 the circumstances of how the shrimp was
13 discovered?
14     A.    Probably somewhere during the
15 cocktail hour I -- somebody told me that my
16 mother or my sister saw the shellfish and that
17 other friends of ours saw it, so I guess it was
18 sometime during the cocktail hour.
19     Q.    Okay. And after your conversation
20 with your mother that you've already
21 described -- strike that.
22           The one you just told me about,

**90**

1 where you came to learn during the cocktail hour
2 about the discovery of the shrimp, who was that
3 conversation with; do you recall?
4     A.    No.
5     Q.    Okay. Other than the conversation
6 you described with your mother, and this one you
7 described with someone you can't recall, do you
8 recall speaking with anyone else during the
9 cocktail hour about the problem with the food
10 that was served?
11     A.    Yes. I spoke to my sister. I
12 spoke to Rebecca about it.
13     Q.    Do you have one sister?
14     A.    Yes.
15     Q.    What's her name?
16     A.    Michelle.
17     Q.    What's her last name?
18     A.    Kantor.
19     Q.    With a C or a K?
20     A.    K-A-N-T-O-R.
21     Q.    Okay. And you spoke to your wife?
22     A.    Yes.

**91**

1     Q.    Anybody else?
2     A.    Yes, I'm sure I did.
3     Q.    Do you remember anybody else?
4     A.    No. I spoke to a lot of people.
5 I don't remember specifically what conversation
6 was what. I'm sure I spoke to my in-laws, as
7 well.
8     Q.    During the cocktail hour?
9     A.    Yes.
10     Q.    Okay. And do you recall
11 conversations with either of your in-laws during
12 the cocktail hour?
13     A.    Not specifically, no.
14     Q.    Did your guests enjoy the cocktail
15 hour?
16           MR. LEWIN: Objection.
17 BY MR. SCHWABER:
18     Q.    From your observation?
19           MR. LEWIN: Objection.
20           THE WITNESS: I believe so.
21 Certain of the guests did anyway. Because if
22 you refer to my parents and close family as

**92**

1 guests, then they most certainly didn't.
2 BY MR. SCHWABER:
3     Q.    Your parents did not enjoy the
4 cocktail hour?
5     A.    They were devastated, to a large
6 extent.
7     Q.    So is it your testimony your
8 parents did not enjoy the cocktail hour?
9     A.    My testimony cannot be -- I can't
10 answer that question yes or no, as it goes
11 deeper than that.
12     Q.    What do you mean?
13     A.    They were able at some points
14 probably to just talk with their friends and
15 relatives, but upon learning there was shellfish
16 served at the wedding caused them to be
17 devastated, angry, hurt. So I don't know if I
18 can say that they enjoyed the cocktail hour.
19     Q.    Okay. And you don't recall
20 speaking to either of your in-laws specifically
21 during the cocktail hour about the shellfish
22 issue; correct?

Case 1:05-cv-01717-RJL  VIDEOTAPED DEPOSITION OF RICHARD B. ROSEN  Document 55-9  Filed 03/03/2006  Page 24 of 44
CONDUCTED ON TUESDAY, FEBRUARY 7, 2006

24 (Pages 93 to 96)

93

1      MR. LEWIN: Objection.
2      THE WITNESS: I recall speaking to
3  them, but I don't recall the contents of the
4  conversations.
5  BY MR. SCHWABER:
6      Q.  Did you enjoy the cocktail hour?
7      A.  I'm not sure if I can describe it
8  as enjoying it. On some levels I did enjoy it,
9  but on other levels I did not.
10     Q.  On what levels did you not?
11     A.  The anxiety that I felt upon
12  learning that there was shellfish served at the
13  wedding. The hurt. The knowledge that my
14  parents were hurt. The knowledge that my
15  in-laws were hurt. The knowledge that, you
16  know, an otherwise wonderful wedding now was
17  marred by what happened, and the fact that
18  nothing we could do could change it. I mean,
19  these were the thoughts that were going through
20  my mind.
21     Q.  Did you ever have any formal
22  Jewish education?

94

1      A.  Yes.
2      Q.  And can you describe it for me?
3      A.  I went to Solomon Schechter Day
4  School up until eighth grade.
5      Q.  In Roslyn?
6      A.  No, in Jericho.
7      Q.  Okay. And then from eighth grade
8  on while you were in public high school in
9  Roslyn did you continue your Jewish education?
10     A.  I went to Prozdor, which is a
11  Hebrew high school.
12     Q.  P-R-O-Z-D-O-R. And you went to
13  Prozdor through what grade?
14     A.  Probably to tenth.
15     Q.  Okay. Did you ever study the laws
16  of kashrut?
17     A.  I was aware of them. I don't
18  remember specifically studying the laws, but
19  something that I became aware of.
20     Q.  Did you ever gain any awareness
21  that you recall today about what Jewish law
22  teaches about the consequences of unwitting

95

1  ingestion of unkosher food?
2      MR. LEWIN: Objection.
3      THE WITNESS: I'm not aware of the
4  law specifically.
5  BY MR. SCHWABER:
6      Q.  How about generally? Do you have
7  a sense of how Jewish law treats or speaks to
8  the consequences of somebody unwittingly
9  ingesting kosher food?
10     A.  No, I don't.
11     Q.  Do you believe there are
12  consequences religiously?
13     MR. LEWIN: Objection.
14     THE WITNESS: Do I believe -- for
15  me personally? I'm not kosher outside the
16  house, no, but I can't speak for anyone else.
17  BY MR. SCHWABER:
18     Q.  Have you -- and I recognize you
19  haven't always kept kosher. You've described
20  the way you've practiced from time-to-time, but
21  have you ever in the context of a situation
22  which you were keeping kosher, unwittingly eaten

96

1  kosher food, unkosher food -- I'm sorry. Have
2  you ever in the context in which you were
3  maintaining a kosher meal or a kosher home, come
4  to discover that you ate something unkosher?
5      MR. LEWIN: Objection.
6      THE WITNESS: No. I don't recall
7  any of that.
8  BY MR. SCHWABER:
9      Q.  Let me make sure you understand my
10  question, because I didn't ask it well.
11     By way of example, you know, if I
12  keep kosher and I eat something at a party
13  thinking it's tuna fish salad and it turns out
14  to be shrimp salad, and I wouldn't have
15  knowingly taken it if it was shrimp salad, but
16  now I realize I've eaten it. That's the kind of
17  situation I'm talking about. Have you ever had
18  an experience like that?
19     MR. LEWIN: Objection.
20     THE WITNESS: Not that I recall.
21  It may have happened, but I just don't remember.
22  BY MR. SCHWABER:

Case 1:05-cv-01717-RJL    VIDEOTAPED DEPOSITION OF CRAIG BARON    Document 54-9    Filed 10/30/2006    Page 25 of 44
CONDUCTED ON TUESDAY, FEBRUARY 7, 2006

25 (Pages 97 to 100)

**97**

1    Q.    Okay.  The concern that you
2    described feeling at the reception that marred
3    your enjoyment there at the cocktail hour, did
4    you get over that by the time you got to the
5    wedding reception itself?
6        **A.    No, I didn't get over it.**
7        Q.    Did you have that same set of
8    emotions you described to me a few minutes ago
9    from the cocktail hour, did those carry with you
10   to the reception itself?
11       MR. LEWIN:  Objection.
12       THE WITNESS:  Well, I did my best
13   to try to enjoy the rest of the night, as it was
14   my wedding night.  And on one level I certainly
15   enjoyed it and had a great time and will
16   remember it fondly, but on another level I can't
17   say I blocked it out and didn't remember any of
18   it.  It definitely affected the rest of the
19   night and it couldn't help but come up the whole
20   night long.
21   BY MR. SCHWABER:
22       Q.    When you say it couldn't help but

**98**

1    come up, what do you mean?
2        **A.    Meaning Rec and I tried to enjoy**
3    **ourselves and our guests, but it still was a**
4    **factor that we had to address.**
5        Q.    Between the two of you or with
6    others?
7        **A.    Between the two of us, between**
8    **others saying I'm so sorry about what happened.**
9    **That continued to come about.  It was something**
10   **that was still pervasive throughout the wedding,**
11   **even though we tried to enjoy ourselves and**
12   **dance and talk to our guests.**
13       Q.    By the time you entered the room,
14   which was approximately 20 minutes after the
15   ceremony ended, the shrimp had already been
16   removed; correct?
17       **A.    That, I don't know.  I was told**
18   **that, but I don't know that that was the case.**
19   **I was also told later that shrimp was brought**
20   **out again.**
21       Q.    Who told you that?
22       **A.    I don't recall.  I believe my**

**99**

1    father-in-law, but I'm not sure.
2        Q.    You have no facts to support that
3    one way or the other; correct?
4        MR. LEWIN:  Objection.
5        THE WITNESS:  That's correct.
6    BY MR. SCHWABER:
7        Q.    And you were told that the shrimp
8    had been removed, before you even went into the
9    room, by your brother-in-law, Bob; correct?
10       **A.    Yes.**
11       Q.    Okay.  And you had sufficient
12   confidence in his information that you didn't
13   even see the need to go check it out; correct?
14       MR. LEWIN:  Objection.
15       THE WITNESS:  Yes.
16   BY MR. SCHWABER:
17       Q.    Okay.  And is it fair to say that
18   at no point after you entered the room did you
19   ever gain a concern that you better check out
20   whether now the right products are being served?
21       MR. LEWIN:  Objection.
22       THE WITNESS:  I don't understand

**100**

1    the question.  Which products are you talking
2    about?
3    BY MR. SCHWABER:
4        Q.    You told me you were later told by
5    someone, who you're guessing may have been your
6    father-in-law, that more shrimp was brought out?
7        **A.    Yes.**
8        Q.    Was that that same night or later?
9        **A.    I believe it was at the end of the**
10   **cocktail hour.**
11       Q.    Okay.  And you didn't
12   independently verify that in any respect?
13       **A.    I didn't independently verify it**
14   **because it was after the fact.  It was at the**
15   **end of the night where everything was gone.**
16       Q.    The end of the cocktail hour?
17       **A.    Correct.**
18       Q.    Okay.  Did you ever hear about any
19   other violations of what you believed you were
20   entitled to from Ridgewells at the wedding,
21   other than the service of shrimp?
22       **A.    Shrimp and other shellfish.  I was**

Case 1:05-cv-01717-RJL Document 50-13 Filed 06/05/2006 Page 26 of 44
VIDEOTAPED DEPOSITION OF CRAIG SPIEGEL
CONDUCTED ON TUESDAY, FEBRUARY 7, 2006

26 (Pages 101 to 104)



101

1 told that there was other shellfish, as well.
2     Q.  Do you know what other shellfish
3 you were told there was?
4     A.  I believe there was octopus and I
5 believe someone mentioned eel.
6     Q.  Okay. And who told you about
7 octopus or eel?
8     A.  Specifically a friend of mine,
9 David Seigal, S-E-I-G-A-L, and another friend,
10 Michelle Samuels.
11     Q.  Okay. And where does Mr. Seigal
12 live?
13     A.  Currently, in France.
14     Q.  And where was he living at the
15 time of the wedding?
16     A.  In Manhattan.
17     Q.  Okay. Does he keep kosher?
18     A.  No, he doesn't.
19     Q.  And what did he tell you?
20     A.  I believe we were talking about
21 them serving shellfish, and I think somebody was
22 talking about shrimp. And I believe he said

102

1 there was eel, also, it was great, as he doesn't
2 keep kosher.
3     Q.  Okay. And that's the first and
4 only time you heard about eel?
5     A.  No. I think several other people
6 told me, but those are the specific ones I
7 remember.
8     Q.  What did Michelle Samuels tell
9 you?
10     A.  I believe she told me that there
11 were other types of shellfish being served,
12 octopus and eel.
13     Q.  She told you octopus and eel?
14     A.  I believe so, yes.
15     Q.  Okay. And Mr. Seigal, David
16 Seigal, only told you about eel?
17     A.  From what I recall, yes.
18     Q.  Okay. And other than Michelle
19 Samuels, did anyone else tell you about octopus?
20     A.  I believe so, but I can't recall
21 specifically.
22     Q.  Okay. Sitting here today you

103

1 don't know one way or the other whether octopus
2 or eel were served; is that a fair statement?
3     MR. LEWIN: Objection.
4     THE WITNESS: Based on what people
5 told me, I believe that it was served.
6 BY MR. SCHWABER:
7     Q.  I understand that. My question is
8 sitting here today do you know whether octopus
9 or eel was served?
10     MR. LEWIN: Objection. He's
11 answered that question.
12     THE WITNESS: Based upon what
13 people told me, I knew that it was served.
14 BY MR. SCHWABER:
15     Q.  And the people who told you
16 anything are the two you just described, plus
17 others that you can't name?
18     A.  Yes, others. I can't recall
19 specifically who they were.
20     Q.  Okay. And where is Michelle
21 Samuels?
22     A.  She lives in New York City.

104

1     Q.  And how do you know her?
2     A.  An old friend.
3     Q.  Childhood?
4     A.  Yes.
5     Q.  How about David Seigal? How long
6 have you known him?
7     A.  From college.
8     Q.  How long is he in France?
9     A.  I'm sorry?
10     Q.  How long is he in France for?
11     A.  Well, he's in Europe. He's
12 traveling in Europe through April or so.
13     Q.  Okay. And, Michelle Samuels, does
14 she keep kosher?
15     A.  Her family kept kosher -- I
16 believe she keeps kosher in her house. I know
17 she doesn't keep kosher out of her house. I
18 know growing up she kept kosher in her house.
19     Q.  Okay. Who in particular were you
20 worried about offending with the shrimp?
21     A.  With the shellfish you mean?
22     Q.  Yeah.

105

1   A.   First and foremost, my family.
2       Q.   Okay.  When you say your family,
3   you mean more than your parents?
4       A.   My mother, my father, my sister,
5   my brother-in-law, aunts and uncles.
6       Q.   Do any of your family eat unkosher
7   food outside their house, the ones you just
8   mentioned?
9       A.   I don't believe so, no.
10      Q.   Your sister and brother-in-law eat
11  strictly kosher outside the house?
12      A.   Yes.
13      Q.   Only kosher restaurants?
14      A.   No.
15      Q.   So they'll eat in unkosher
16  restaurants, they'll just order fish?
17      A.   Or dairy or vegetables or pasta.
18      Q.   Okay.  But they'll order hot food
19  at unkosher restaurants?
20      A.   That's correct.
21      Q.   Okay.  How about your parents?
22      A.   Yes.

106

1       Q.   Is it conceivable to you that in
2   any of those circumstances they mistakenly ate
3   shellfish?
4       MR. LEWIN:  Objection to the form
5   of the question.
6       THE WITNESS:  Anything is
7   conceivable, but I do not -- I am fairly certain
8   that my mother and my sister have never eaten
9   shellfish.
10  BY MR. SCHWABER:
11      Q.   Do you recall going to restaurants
12  with your parents and your sister?
13      A.   Yes.
14      Q.   Including unkosher restaurants?
15      A.   Yes.
16      Q.   Okay.  And ordering hot food?
17      A.   Yes.
18      Q.   Do you recall ever going to like a
19  diner for a breakfast or a brunch?
20      A.   Sure.
21      Q.   And people ordering eggs?
22      A.   Yes.

107

1       Q.   Okay.  Do you recall doing it at a
2   diner where on the same hot griddle or stove
3   where your eggs were being made there was bacon
4   being cooked?
5       A.   I generally don't make it a
6   practice of looking at the griddle in a diner,
7   but I can very possibly conceive of a time where
8   bacon is cooked next to eggs, yes.
9       Q.   Okay.  And has it ever concerned
10  you that in scraping up the eggs to put them on
11  your plate some bacon would have inadvertently
12  been included?
13      MR. LEWIN:  Objection.
14      THE WITNESS:  It never concerned
15  me as our, growing up our level of kashrut was
16  that we would go out and eat at restaurants and
17  order food that was kosher or nontreif and that
18  was our level.  And conceivably it could happen,
19  but I don't recall specifically noticing it or
20  there were times when bacon was mistakingly
21  served and it was on a plate, and we would send
22  it back.

108

1   BY MR. SCHWABER:
2       Q.   Okay.  And I assume from the way
3   you've described your level of kashrut that
4   although you wouldn't eat the bacon, it wouldn't
5   particularly trouble you the risk of having some
6   scooped up on your egg plate?
7       A.   Personally, now, I would eat the
8   bacon.  However, my parents, if that's what
9   you're referring to, or me growing up, I never
10  really fully considered or appreciated bacon
11  being scooped up with my eggs.  It's not
12  something I really was focused on.
13      Q.   It never rose to the level of a
14  concern of yours when you were ordering those
15  eggs; correct?
16      A.   Me, personally, no.
17      Q.   And to the best of your knowledge,
18  your parents?
19      MR. LEWIN:  Objection.
20      THE WITNESS:  I can't speak for
21  them.  They were eating at the restaurant and
22  they're intelligent enough to realize that other

109

1 things are cooked on the grill, and they're
2 still eating there.
3 BY MR. SCHWABER:
4    Q.   Okay.  Would you describe the --
5 how would you characterize the level of upset
6 you felt as a result of discovering, or I
7 shouldn't say discovering -- strike that.
8 Strike that question.
9          You never yourself saw any
10 shellfish at your wedding; correct?
11          MR. LEWIN:  Objection.
12          THE WITNESS:  That's correct.
13 BY MR. SCHWABER:
14    Q.   Other than shellfish -- other than
15 the shellfish issues we've been discussing, are
16 you aware of any other violations or
17 transgressions in any respect by Ridgewells of
18 their responsibilities to your family at your
19 wedding?
20    **A.   It's my understanding that they**
21 **were serving cream cheese, as well, on the**
22 **smoked salmon.**

110

1    Q.   Your understanding of that, again,
2 is not something you observed?
3    **A.   That's correct.**
4    Q.   Okay.  And so your sole basis for
5 the statement you just gave me about cream
6 cheese is something you heard from someone else?
7    **A.   Yes.**
8    Q.   And is it just one person?
9    **A.   I believe so — I believe my**
10 **father-in-law mentioned it to me at the time,**
11 **but I don't remember if anyone else mentioned it**
12 **to me at the wedding, as well.**
13    Q.   Do you think you should have
14 gotten the mashgiach?
15          MR. LEWIN:  Objection.
16          THE WITNESS:  No.
17 BY MR. SCHWABER:
18    Q.   Why not?
19    **A.   Because we were comfortable with**
20 **this level of kashrut and it was — if**
21 **Ridgewells would have provided the services that**
22 **they were supposed to and that they understood**

111

1 to be provided, there was no need for a
2 **mashgiach.**
3    Q.   Did you ever review the contract
4 with Ridgewells prior to its execution?
5    **A.   Are you asking me if I reviewed**
6 **the contract with Ridgewells or reviewed the**
7 **contract?**
8    Q.   Reviewed the contract?
9    **A.   Reviewed the contract.  If I'm not**
10 **mistaken, the contract was a menu that was**
11 **detailed in what we were serving with a**
12 **signature page on the back.  And if that's the**
13 **case, then I believe I did.  I don't recall**
14 **seeing the contract right before it was signed.**
15    Q.   Let me show you what was
16 previously admitted as Mark Siegel Exhibit 4.
17 That's what I'm calling the contract.  Is that
18 what you recall reviewing?
19    **A.   I don't believe I saw the**
20 **signature page on the back prior to the signing**
21 **of it.**
22    Q.   But you did see it at some point

112

1 prior to the wedding?
2    **A.   With the costs and the signature**
3 **page here, I don't think I did.**
4    Q.   What about --
5    **A.   In fact, I'm pretty sure I did**
6 **not.  I did see the first pages, 1 through 7 and**
7 **possibly 8, although I don't specifically recall**
8 **seeing this broken down over here.**
9    Q.   So can I understand from your
10 testimony that you were being shown the
11 substance of the catering contract, but your
12 in-laws were, for predictable reasons, not
13 sharing the price with you?
14    **A.   No.  I think I just received the**
15 **menu section.  It's a menu.  It's not any**
16 **contract wording.  I think I just saw this —**
17 **the menu when we were making the menu.  So this**
18 **is — perhaps maybe I should restate that I**
19 **didn't see the contract, I saw the menu, which**
20 **was part of the contract.**
21    Q.   Okay.  Did you come to understand
22 that what you're looking at as Exhibit 4 was, in

Case 1:05-cv-01717-RJL   Document 54-9   Filed 10/20/2006   Page 29 of 44
VIDEOTAPED DEPOSITION OF CRAIG BARON
CONDUCTED ON TUESDAY, FEBRUARY 7, 2006

29 (Pages 113 to 116)

113

1   fact, the only contract between Ridgewells and
2   the Siegels?
3        A.   I was not really involved in the
4   contract. I don't know.
5        Q.   Sitting here today do you
6   understand what you're looking at as Mark Siegel
7   Number 4 to be the contract for catering
8   services by Ridgewells at your wedding?
9        A.   Yes.
10       Q.   Okay. Have you ever reviewed that
11  document in its entirety?
12       A.   I think I've looked at it in the
13  past -- I've looked at it at one point. I don't
14  recall to what extent I looked at it.
15       Q.   Did you look at it after a problem
16  arose, in other words, after the wedding?
17       A.   I may have. I really don't
18  recall.
19       Q.   Okay. So just to make sure we're
20  on the same page, is it your testimony that you
21  don't know one way or another whether you looked
22  at this contract at any point prior to the

114

1   wedding?
2        A.   I don't believe I did, but I'm not
3   100 percent sure.
4        Q.   Okay. But you have certainly
5   looked at this contract, Mark Siegel Exhibit 4,
6   at some point prior to today?
7        A.   I'm not 100 percent sure that I
8   have. I may have, but I know it wouldn't stand
9   out in my mind, as most of this I've seen in a
10  different form.
11       Q.   Okay. At any point prior to the
12  filing of the lawsuit that was filed listing you
13  as a plaintiff, did you look to determine
14  whether there was a contractual relationship
15  between Ridgewells and the Siegels?
16       MR. LEWIN: Objection.
17       THE WITNESS: I was fairly
18  confident that there was a contractual
19  relationship between them, so I didn't
20  specifically look to insure that.
21  BY MR. SCHWABER:
22       Q.   Okay. At any point prior to today

115

1   were you -- did you look to see what the terms
2   of any written contract between Ridgewells and
3   the Siegels?
4        A.   Not that I recall.
5        Q.   In the course of your professional
6   life as an insurance defense attorney --
7        A.   Coverage.
8        Q.   -- insurance coverage attorney,
9   you review contracts for a living; right?
10       MR. LEWIN: Objection.
11       THE WITNESS: I have reviewed
12  contracts.
13  BY MR. SCHWABER:
14       Q.   Okay. And, as part of your review
15  you're advising your clients about whether a
16  claim is or is not covered, based upon the
17  language of a contract; right?
18       MR. LEWIN: Objection.
19       THE WITNESS: Yes.
20  BY MR. SCHWABER:
21       Q.   And the sole determiner of
22  coverage would be the language of the policy of

116

1   insurance; correct?
2        MR. LEWIN: Objection.
3        THE WITNESS: No.
4   BY MR. SCHWABER:
5        Q.   Are there circumstances where
6   coverage -- where you have advised a client that
7   there is coverage, in the absence of a contract
8   providing for that coverage?
9        MR. LEWIN: Objection.
10       THE WITNESS: I would say that
11  along with the contract there are other
12  considerations, along with applicable state law.
13  But another type of agreement that we made based
14  on the contract, that would -- such as a
15  coverage in place agreement that may be entered
16  into by the parties, so I wouldn't just look at
17  the contract policy.
18  BY MR. SCHWABER:
19       Q.   Okay. But you would look at the
20  contract documents in total to determine whether
21  there was coverage; right?
22       MR. LEWIN: Objection.

Case 1:05-cv-01717-RJL  Document 54-9  Filed 10/30/2006  Page 30 of 44
VIDEOTAPED DEPOSITION OF CRAIG BARON
CONDUCTED ON TUESDAY, FEBRUARY 7, 2006

30 (Pages 117 to 120)

117

1       THE WITNESS: I'm sorry?
2  BY MR. SCHWABER:
3       Q.  In other words, you've described
4  circumstances where there might be an agreement
5  ancillary to the policy itself; correct?
6       A.  Yes.
7       Q.  My question is in order to
8  determine whether there is or is not coverage
9  for one of your clients or by one of your
10 clients, you would look at the contract
11 documents to make that determination; correct?
12      MR. LEWIN: Objection.
13      THE WITNESS: And I said no.
14 BY MR. SCHWABER:
15      Q.  You said no, but as I understood
16 your answer, maybe I misunderstood you, you
17 described the circumstance where there may be
18 some secondary document that ultimately forms a
19 basis for coverage?
20      A.  I also said we would perhaps look
21 at applicable state law, look at certain
22 decisions that have been handed down in that

118

1  jurisdiction. You can't just say look at the
2  documents and the documents alone, that wouldn't
3  be accurate.
4       Q.  Okay. Can you think of any
5  circumstance where you've ever advised a client
6  that there is a specific responsibility for
7  coverage in the absence of a provision for that
8  coverage in a contract document?
9       MR. LEWIN: Objection.
10      THE WITNESS: I can't recall.
11 BY MR. SCHWABER:
12      Q.  Based on your knowledge of
13 insurance law is it conceivable to you that
14 there are circumstances where there would be a
15 responsibility for coverage in the absence of a
16 coverage provision in a contract?
17      MR. LEWIN: Objection.
18      THE WITNESS: I can't think of
19 any, but it's conceivable.
20 BY MR. SCHWABER:
21      Q.  In the sense that anything's
22 conceivable or in the sense of some particular

119

1  mandate of insurance law that you're aware of?
2       MR. LEWIN: Objection.
3       THE WITNESS: Both. There could
4  be some sort of applicable state law that
5  requires a policy to respond to a certain
6  instance that may not be specifically addressed
7  in the policy, but if it's a comprehensive
8  policy it may be required. I really don't know.
9  BY MR. SCHWABER:
10      Q.  That's what I was getting at. Are
11 you aware of any such circumstances?
12      A.  If I was aware I would have
13 specifically told you. I'm just saying it's
14 conceivable. It's more than just is anything
15 conceivable.
16      Q.  Okay. Sitting here today do you
17 know what the contract between Ridgewells and
18 the Siegels required Ridgewells to do?
19      MR. LEWIN: Objection.
20      THE WITNESS: I know the general
21 terms. They were supposed to cater the wedding.
22 Each specific, I don't know if I can name every

120

1  specific in the contract.
2  BY MR. SCHWABER:
3       Q.  Are you aware sitting here today
4  of any contractual undertaking by Ridgewells not
5  to serve shrimp?
6       MR. LEWIN: Objection.
7       THE WITNESS: I do not know what
8  is specifically listed in the contract. I know
9  it was discussed over and over again with
10 Ridgewells' representatives. To the extent
11 that's a verbal contract, that would have to be
12 decided. I know that it's listed in the menu
13 specifically what we were going to have and what
14 type of fish. And based on Ridgewells'
15 representations that we were not going to be
16 having shellfish, and shellfish is not listed in
17 here, I would think that that would be
18 contractually -- the answer is yes, Ridgewells
19 contracted not to serve shrimp.
20 BY MR. SCHWABER:
21      Q.  Did -- do you know sitting here
22 today, other than the kosher issues we've

Case 1:05-cv-01717-RJL   Document 54-8   Filed 01/30/2006   Page 31 of 44
VIDEOTAPED DEPOSITION OF CRAIG ZAXON
CONDUCTED ON TUESDAY, FEBRUARY 7, 2006

31 (Pages 121 to 124)

121

1  discussed in terms of the food, did Ridgewells
2  have -- make any other -- strike that.
3       Did Ridgewells breach any other
4  obligations you contend it had at the wedding,
5  separate and apart from kosher obligations, as
6  I'll call them?
7       MR. LEWIN: Objection.
8       THE WITNESS: If you want to imply
9  an obligation of them not to take things that
10 aren't theirs at the end of the wedding,
11 Ridgewells' employees appeared to be removing
12 and concealing some of the wine that my in-laws
13 purchased, so I would say that would be a breach
14 that they had an obligation to do.
15 BY MR. SCHWABER:
16      Q.   Is it your contention that
17 Ridgewells' employees were trying to steal your
18 in-law's wine?
19      A.   That was what became apparent at
20 the end of the night.
21      Q.   Became apparent to you?
22      A.   To me and to my father-in-law.

122

1       Q.   Do you recall that incident
2  specifically?
3       A.   Parts of it, yes.
4       Q.   Okay.  And at what -- can you
5  describe to me what became apparent to you that
6  led you to conclude that Ridgewells' employees
7  were trying to steal something?
8       A.   My father-in-law went downstairs
9  after the wedding -- as an initial matter, when
10 I was working with the beverage supplier in
11 purchasing the liquor for the wedding he
12 informed me that you better make sure you pick
13 up the liquor after the wedding as it's,
14 oftentimes liquor disappears if it's kept in the
15 hands of the catering staff for any length of
16 time.  So we made arrangements to pick up any
17 excess liquor that was at the wedding that
18 evening, that the wedding was over at 1:00.  The
19 pick up was scheduled at 1:00 or 1:10 or so.
20 And my father-in-law was -- went downstairs to
21 check on what was remaining from the wine, as he
22 purchased a large quantity of wine, in excess of

123

1  what we needed, to be sure, and found out that
2  the red wine, there was nothing left.  And upon
3  him -- upon him doing his research found
4  bottles -- found the wine buried under a number
5  of different boxes in a place that it shouldn't
6  have been.
7       Q.   You weren't there for that
8  discovery of the wine?
9       A.   I was not.  He came upstairs and
10 relayed that to me while I was saying good-bye
11 to certain guests.  So I had to go downstairs to
12 make sure that nothing else was removed until it
13 was picked up.
14      Q.   Your father-in-law asked you to
15 come down to check on it?
16      A.   We discussed it and I believe I
17 volunteered to go down to make sure that nothing
18 would walk away.
19      Q.   Okay.  And did anything walk away?
20      A.   No, because I was watching it.
21      Q.   Okay.  So other than what you
22 heard from your father-in-law about what

124

1  happened, do you have any basis for believing
2  that anybody at Ridgewells was trying to steal
3  anything?
4       A.   A gentleman -- while I was down
5  there a gentleman from Ridgewells came up to me
6  and said I'm very sorry, sir, I didn't realize
7  that the wine was remaining or the wine
8  was where it was or -- I couldn't quite follow
9  him.  If he was apologizing to me for people
10 taking the wine, meaning I didn't know you
11 wanted it or I didn't know that the wine was
12 there when I told you.
13      Q.   You observed your father-in-law in
14 the room being visibly upset and angry; correct?
15      A.   No.  He was not there at the time.
16      Q.   He came back down?
17      A.   He came back down later.
18      Q.   Okay.  And, in fact, you tried to
19 calm him down; right?
20      A.   No.
21      Q.   You don't recall him screaming at
22 people, including that gentleman that was

Case 1:05-cv-01717-RJL   Document 54-9   Filed 10/30/2006   Page 32 of 44
VIDEOTAPED DEPOSITION OF CRAIG BARON
CONDUCTED ON TUESDAY, FEBRUARY 7, 2006

32 (Pages 125 to 128)

125

1   talking to you?
2       A.   This conversation I had -- excuse
3   me -- this conversation I had, he was not there.
4   It was just the two of us.
5       Q.   This was after he had told you --
6   after your father-in-law had told you what had
7   happened?
8       A.   Yes.
9       Q.   Okay.  So is it conceivable to you
10  that this gentleman from Ridgewells, I take it
11  you don't know the gentleman's name?
12      A.   That's correct.
13      Q.   Is it conceivable to you that he
14  was apologizing for having communicated to your
15  father-in-law there was no wine left when, in
16  fact, there was wine left?
17          MR. LEWIN:  Objection.
18          THE WITNESS:  Anything's
19  conceivable.
20  BY MR. SCHWABER:
21      Q.   I mean, is that what he was trying
22  to tell you?

126

1       A.   He was not -- he has heavily
2   accented English, so I didn't quite follow what
3   he was saying.  I couldn't tell if he was
4   saying -- I think he might have been saying
5   both, that I believe that he related to me
6   people did not realize that the wine was meant
7   to be picked up.  And then he also didn't
8   realize when he told my father-in-law that if
9   there was wine left, that the wine was
10  elsewhere.
11      Q.   Do you think he was lying to you?
12      A.   I have no basis to form an opinion
13  on either of them.
14      Q.   Okay.  So he was telling you
15  nobody was stealing anything; right?  Did you
16  gather that from his comments?
17      A.   He was telling me that -- yes.  He
18  was trying to convey the fact either that people
19  didn't realize we wanted the wine or people
20  didn't -- he didn't realize that there was wine
21  left.
22      Q.   Okay.  We have to change the

127

1   videotape, I'm very close to finishing with you,
2   but I only have a minute left.  So let's take a
3   break and change the tape, because I have more
4   than a minute of questions.
5           THE VIDEOGRAPHER:  This is the end
6   of tape one of the deposition of Mr. Craig
7   Baron.  We shall go off the record as of 12:00
8   p.m. to change audio and videotape.
9           (Videotape changed.)
10          THE VIDEOGRAPHER:  We are
11  beginning tape two.  We are now back on the
12  record as of 12:14 p.m. in the deposition of
13  Mr. Craig Baron in the matter of Siegel versus
14  Ridgewells.  You may continue, counselor.
15  BY MR. SCHWABER:
16      Q.   Mr. Siegel, I just have a few
17  questions.
18      A.   Baron.
19      Q.   I'm sorry.  Mr. Baron, I have a
20  few questions left to ask you and then we'll be
21  done.
22          Your parents hosted the rehearsal

128

1   dinner?
2       A.   Yes.
3       Q.   And who was the caterer for that;
4   do you recall?
5       A.   Shalom, maybe, but I'm not sure
6   about that.
7       Q.   And that was a strictly kosher
8   caterer?
9       A.   That's my understanding.
10      Q.   Okay.  You knew -- I may have
11  asked you this.  Forgive me if I did.  You knew
12  Ridgewells was not a strictly kosher caterer;
13  correct?
14      A.   Yes.
15      Q.   And you knew that Ridgewells'
16  business included catering nonkosher events?
17      A.   Yes.
18      Q.   What is a mashgiach, as you
19  understand the term?
20          MR. LEWIN:  Objection.
21          THE WITNESS:  It's a person who
22  watches over -- a person you pay to come in to

Case 1:05-cv-01717-RJL    Document 54-9    Filed 10/30/2006    Page 33 of 44
VIDEOTAPED DEPOSITION OF CRAIG BARON
CONDUCTED ON TUESDAY, FEBRUARY 7, 2006

33 (Pages 129 to 132)

129

1  make sure everything is 100 percent up to the
2  level that they want it to be with regards to
3  kashrut.
4  BY MR. SCHWABER:
5      Q.   Okay.  So the mashgiach's job is
6  to supervise the preparation and service of the
7  food to make sure everything is kosher; correct?
8          MR. LEWIN:  Objection.
9          THE WITNESS:  I think that's what
10  it is, yeah.
11  BY MR. SCHWABER:
12     Q.   Did you get asked in advance of
13  your wedding by any of your guests whether the
14  food was going to be kosher?
15     A.   No.
16     Q.   Did you ever volunteer to anybody
17  anything about the level of kashrut at your
18  wedding, prior to the wedding itself?
19     **A.   I probably referenced to people**
20  **and told them that it was kosher based on what**
21  **our -- it was kosher based on what our guests'**
22  **level of comfortableness was as far as kosher**

130

1  goes.
2      Q.   To make sure I understand your
3  answer, because the transcript is going to read
4  like one statement, you're saying you probably
5  told people in advance that it was kosher, and
6  then you're offering me the explanation for why
7  you would have said that; is that correct?
8      **A.   Yes.  I would tell people it was**
9  **kosher, because all of our guests were**
10  **comfortable with the level of kashrut.**
11     Q.   But you wouldn't tell people all
12  of what you just said, you would just tell
13  people it was kosher?
14     A.   Yes.
15     Q.   Okay.  Do you recall telling
16  people it was kosher?
17     A.   Yes.
18     Q.   Okay.  I asked you briefly before
19  about your recollection of an issue with the
20  bartender or the number of bartenders that you
21  got involved in working out with Ridgewells
22  through Toby Nann; correct?

131

1      A.   Yes.
2      Q.   And, in fact, you drafted the
3  response that you were going to send to Toby
4  about the bartender issue and ran it by your
5  wife before you sent it; correct?
6      A.   Yes.
7      Q.   Okay.  And once she and you
8  discussed the wording, you sent the response to
9  Toby about the bartender?
10     A.   Yes.
11     Q.   And why -- why was it you that was
12  dealing with that issue?
13     A.   It was just an issue that came up.
14     Q.   I'm just trying to figure out as
15  between the various people involved with dealing
16  with Toby, was there some allocation where you
17  took on certain issues as opposed to others?
18     **A.   Not necessarily.  I think it was**
19  **just an issue that I was dealing with at the**
20  **time.  I may have, in a meeting with Toby or**
21  **call with Toby, I probably just discussed that**
22  **with her.**

132

1      Q.   What do you recall -- can you
2  characterize what the problem was for me?
3      **A.   It was just the number of**
4  **bartenders that we were going to have and we**
5  **were going back and forth.  I had a concern that**
6  **we weren't going to have enough bartenders, so**
7  **that's what we were going back and forth trying**
8  **to figure out.**
9      Q.   Okay.  Did that get resolved to
10  your satisfaction?
11     A.   Yes.
12     Q.   You believe there was a
13  misunderstanding that flowed out of Toby not
14  focusing on what had been communicated to her?
15     **A.   We had a conference call and I**
16  **don't think she -- it was more of a situation**
17  **where we were adding one, and I'm not sure how**
18  **it came about, but in the end I sent the e-mail**
19  **and then we spoke to her and she then understood**
20  **it and it was fine.**
21     Q.   You wrote to your soon to be
22  mother-in-law in the context of resolving that

Case 1:05-cv-01717-RJL Document 54-8 Filed 10/30/2006 Page 34 of 44
VIDEOTAPED DEPOSITION OF CRAIG BARON
CONDUCTED ON TUESDAY, FEBRUARY 7, 2006

34 (Pages 133 to 136)

133

1 you said if Toby becomes mental again we will
2 give you a shout. Do you recall that?
3        MR. LEWIN: Can you just give me
4 the Bates number?
5        MR. SCHWABER: It's Bates page
6 000208.
7 BY MR. SCHWABER:
8    Q.   Do you recall that exchange?
9    A.   Yes.
10    Q.   And what did you mean when you
11 said if Toby becomes mental again?
12    A.   I think it was more tongue and
13 cheek that I was saying to her this is one
14 situation she just was not quite following us,
15 so we just -- once we laid it out explicitly
16 like we did with a number of things everything
17 was fine, but at the -- actually, can you tell
18 me what page that was?
19    Q.   208?
20    A.   Basically I was saying we would
21 handle it with Toby and if it became an issue we
22 would let her know. As it says to my

134

1 mother-in-law here, she was under the impression
2 we needed four bartenders. And so if there was
3 a problem with Toby, we would let her know.
4 Ultimately when we spoke to her she had the same
5 understanding that we did and it was basically
6 no longer a problem.
7    Q.   Okay. You told me about the
8 incident you described with the wine during the
9 clean-up?
10    A.   Yes.
11    Q.   And we had talked obviously about
12 the shellfish issues and the issue, the
13 allegation about cream cheese with the salmon.
14 Other than those instances are there any other
15 problems with the delivery by Ridgewells of what
16 was bargained for?
17    A.   Not that I'm aware of.
18    Q.   Okay. Do you know the term kosher
19 style?
20    A.   Yes.
21    Q.   What does that term mean to you?
22    A.   Kosher style would be a form of

135

1 catering or just a style that would be have
2 bagels and lox, Jewish food. It would not
3 include shellfish, it would not include pork,
4 but the meat wouldn't be kosher. There wouldn't
5 be mix milk and meat, but you would have
6 pastrami, which is typically a Jewish food, but
7 the pastrami wouldn't necessarily be kosher, it
8 would just be Jewish style food.
9    Q.   In your communications with Toby
10 Nann do you recall her communicating to you or
11 to others, as you heard it, that kosher style to
12 her meant what she was giving you for your
13 wedding?
14    A.   Only in one instance when I
15 e-mailed her to insure that, or Rebecca did, I
16 forget which one now, e-mailed her that we
17 wanted to make sure not only the wedding was
18 kosher, but that we would have kosher -- the
19 meals we were serving to the vendors were
20 kosher, because that was important to us that
21 everything -- that all the food would be kosher.
22        And she replied back she said does

136

1 it have to be kosher kosher or kosher style,
2 meaning just egg salad or kosher meat, but not
3 prepared in a kosher kitchen. And we told her,
4 I recognized that she said kosher style, which I
5 didn't necessarily agree with, but as long as
6 she got the end product, we didn't have a
7 problem. We indicated to her if it was kosher
8 meat or simply tuna salad or egg salad or
9 something that was not unkosher, we wouldn't
10 have a problem.
11    Q.   In fact, you specifically told her
12 kosher meat in an unkosher kitchen would be okay
13 with you?
14    A.   Yes, which is consistent with what
15 we were having at the wedding.
16    Q.   Okay. And she had offered you to
17 get kosher sandwiches for your vendors from a
18 kosher caterer?
19    A.   Yes.
20    Q.   And she had specifically
21 distinguished what she could provide from what a
22 kosher caterer could provide; right?

Case 1:05-cv-01717-RJL VIDEOTAPED DEPOSITION OF CRAIG BARON Document 54-9 Filed 10/30/2006 Page 35 of 44
CONDUCTED ON TUESDAY, FEBRUARY 7, 2006

35 (Pages 137 to 140)

137

1    MR. LEWIN: Objection.
2    THE WITNESS: No. She
3 distinguished between kosher meat in a kosher
4 kitchen or getting it from somewhere else.
5 BY MR. SCHWABER:
6    Q.   Right. But she explained what she
7 could provide as kosher style and what a kosher
8 caterer could provide as kosher kosher; correct?
9    MR. LEWIN: Objection.
10    THE WITNESS: I don't know that to
11 be the case. I know that she told me she was
12 getting the meat from somewhere else. She
13 always, I assume, has suppliers. I don't know
14 that being a kosher caterer or whatever it was,
15 but she said that she has two options that she
16 can give us.
17 BY MR. SCHWABER:
18    Q.   And only one of them was
19 considered strictly kosher; right?
20    A.   One of them was to the level that
21 we needed and one of them was in excess of the
22 level we needed.

138

1    Q.   One of them -- she was only
2 calling one of them strictly kosher as she
3 communicated it to you; is that right?
4    MR. LEWIN: Objection. I don't
5 think that's the term he used.
6    THE WITNESS: She offered us to
7 have kosher meat, or if you have the page, that
8 would be easier for me to read.
9 BY MR. SCHWABER:
10    Q.   Go to 000142. An e-mail chain
11 that I'm referring to doesn't specifically
12 include you, but I'm gathering from your
13 testimony that this is what you were referring
14 to; is that correct?
15    A.   Yes. It was from Rebecca.
16    Q.   Okay. This is the same
17 communication you were just describing?
18    A.   Yes.
19    Q.   Okay. So presumably you heard
20 about this or saw it from your wife?
21    A.   Correct.
22    Q.   And in Toby Nann's e-mail of

139

1 March 21, 2005 at 11:41 a.m. she says, "for
2 strictly kosher meals we would need to order
3 them from Max's in Wheaton." So the strictly
4 kosher referred to something other than serving
5 kosher meat in a nonkosher kitchen; right?
6    A.   Yes.
7    Q.   Okay. And, in fact, you declined
8 that option of strictly kosher?
9    A.   We chose the option that was
10 consistent with what we were doing for the whole
11 wedding.
12    Q.   Okay. You're aware that some
13 bread products for sandwiches, some breads
14 include dairy products and some doesn't; right?
15    MR. LEWIN: Objection.
16    THE WITNESS: I never really
17 thought of it, I guess. I guess it's possible.
18 BY MR. SCHWABER:
19    Q.   At home do you ever focus on
20 whether your bread that you eat meat with has
21 butter in it or whey or milk?
22    A.   Generally, no.

140

1    Q.   Okay. Is it conceivable to you
2 that it might?
3    A.   Right. Yes.
4    Q.   Okay. So would it have been fine
5 with you had the sandwiches that were made for
6 vendor meals in the option that you all chose
7 have been made with bread that contained dairy
8 products among its ingredients?
9    MR. LEWIN: Objection.
10    THE WITNESS: I don't know. I
11 never really thought about it.
12 BY MR. SCHWABER:
13    Q.   Thinking about it now would that
14 have been a transgression by Ridgewells of what
15 was promised?
16    MR. LEWIN: Objection.
17    THE WITNESS: If it was served at
18 the -- if it was served -- if it was served to
19 the vendors, it probably would not be -- I don't
20 know. It's hard to say. That's a good
21 question, but it would be a transgression, but
22 not as major as having shrimp, I would say.

Case 1:05-cv-01717-RJL   Document 54-9   Filed 10/30/2006   Page 36 of 44
VIDEOTAPED DEPOSITION OF CHAD BARON
CONDUCTED ON TUESDAY, FEBRUARY 7, 2006

36 (Pages 141 to 144)

141

BY MR. SCHWABER:
1   Q.   The wine -- you know the wine
2   served at your wedding was not kosher wine;
3   right?
4   A.   Yes.
5   Q.   And Ridgewells served that wine?
6   A.   Yes.
7   Q.   That wasn't a transgression; was
8   it?
9   A.   No.
10       MR. LEWIN:  Objection.
11  BY MR. SCHWABER:
12       Q.   You -- I think you referenced
13  earlier some communications you had with Julee
14  Staley; is that right?
15       A.   Yes.
16       Q.   How often did you speak with
17  Ms. Staley?
18       A.   I met with her specifically, once.
19       Q.   Did you have any other
20  communications with her other than that meeting?
21       A.   No.

142

1   Q.   Tell me about that meeting, when
2   was it?
3   A.   It was the walk through at the
4   Corcoran and that was probably a month before
5   the wedding.
6   Q.   And what was -- was the purpose of
7   the meeting simply the walk through?
8   A.   Yes, but she was also Toby Nann's
9   boss and she worked in the Kosher Division, we
10  found out.
11       Q.   Okay.  Regardless of her
12  credentials, did you discuss with her anything
13  about the food service during the walk through?
14       A.   We discussed where everything
15  would go, where different stations would go,
16  different items, different -- where we would set
17  up the sushi, where we would set up different
18  type of food areas, where the bars would be,
19  that type of thing.
20       Q.   Other than the set up and
21  placement of the food and drink, generally, did
22  you discuss with her the specifics of the menu?

143

1   A.   I believe we did, yes.  We didn't
2   go through the menu point-by-point, but we
3   constantly referenced the menu.
4   Q.   As it related to where things
5   would be?
6   A.   No, as related to items on the
7   menu, including but not exclusive to the wedding
8   being kosher.
9   Q.   And what, if anything, do you
10  recall communications with Julee Staley on that
11  subject?
12       A.   One thing I remember was we would
13  often mention we would say, okay, we're going to
14  have the bread on the table but no butter, it is
15  to be margarine.  Everyone should say, of
16  course.  That's specifically one of the things I
17  remember coming up.  And talking about the sushi
18  that was being served.  The sushi boat would go
19  here.  And we were discussing, once again, it's
20  a wedding, there's a lot of overkill going back
21  and forth, discussing what kind of food would be
22  there and how it would be laid out.  The tuna,

144

1   the salmon, we're not having any type of
2   shellfish type of thing.
3   Q.   When you say not having any
4   shellfish type of thing, is it your testimony
5   that you communicated with Julee Staley at any
6   point about shellfish?
7   A.   Yes.
8   Q.   And so it would have been during
9   that walk through?
10       A.   Yes.
11       Q.   That is the only time you
12  communicated with Ms. Staley?
13       A.   Correct.
14       Q.   And what specifically do you
15  recall about your communications with Ms. Staley
16  on the subject of shellfish?
17       A.   Just merely commenting that, you
18  know, I didn't know who she was.  I only later
19  found out that she was Toby Nann's superior.  I
20  don't know exactly what her role was, but, you
21  know, just kind of going over the parameters of
22  the wedding, what we discussed in advance, that

Case 1:05-cv-01717-RJL   Document 54-9   Filed 10/30/2006   Page 37 of 44
VIDEOTAPED DEPOSITION OF CRAIG BARRON
CONDUCTED ON TUESDAY, FEBRUARY 7, 2006

37 (Pages 145 to 148)

145

1 we were having kosher meat, we were having no
2 milk and meat together and that there would be
3 the sushi platter wouldn't have any shellfish.
4 And I'm trying to remember what else
5 specifically. We just kind of quickly
6 reaffirmed what exactly we were talking about.
7     Q.   Why did you feel the need to do
8 that?
9     A.   I didn't know this person so I
10 figured might as well, better be safe than
11 sorry.
12     Q.   Okay. Better be safe than sorry,
13 meaning you wanted to make sure the food came
14 out kosher to your satisfaction?
15     A.   Right. We were just discussing --
16 I didn't know what she knew about our wedding,
17 whether she was just there watching over,
18 whether she was going to be involved, whatever.
19 So it was just rehashing briefly what was
20 discussed.
21     Q.   Would you agree from your
22 background, your Jewish education and your

146

1 knowledge generally of the role to be played by
2 a mashgiach, that if you had a mashgiach to be
3 lined up to work with the caterer at your
4 wedding you wouldn't have need to worry about
5 better safe than sorry?
6         MR. LEWIN: Objection.
7         THE WITNESS: No. We contracted
8 with Ridgewells to the level that we felt
9 comfortable with. And if Ridgewells had done
10 what we asked of them then there was no need for
11 a mashgiach.
12 BY MR. SCHWABER:
13     Q.   That wasn't my question.
14         My question was getting back to
15 the rationale you just offered me for your
16 checking things with Julee Staley, and you said
17 better safe than sorry, because you didn't know
18 who she was or what she knew about the
19 parameters for your wedding?
20     A.   Sure.
21     Q.   My question was would you agree,
22 based on your understanding of the role the

147

1 mashgiach plays, that if you had had a mashgiach
2 lined up you wouldn't have needed to worry about
3 any of that?
4         MR. LEWIN: Objection.
5         THE WITNESS: A mashgiach just
6 wasn't necessary because that's -- mashgiach was
7 at a level that is not necessary for us. So
8 communicating at its core to our caterer exactly
9 what we wanted, it had no -- not necessary at
10 all for us to have a mashgiach, when as long as
11 they would do what they were supposed to do and
12 what was in the contract, if they followed the
13 menu like they were supposed to, everything
14 would have been fine. So it was not a concern
15 of mine.
16 BY MR. SCHWABER:
17     Q.   The contract, for example, called
18 for mushroom caps filled with sauteed spinach
19 and sweet onions; correct? Do you recall that
20 particular item? Look at the last item on the
21 first page.
22     A.   Yes, it does.

148

1     Q.   Okay. Hypothetically, if that had
2 been served with sauteed spinach and capers,
3 instead of sweet onions, that would have
4 deviated from the contract; right?
5     A.   Yes.
6     Q.   Okay. I take it that wouldn't
7 have been a transgression in your mind that
8 would have necessitated a lawsuit?
9         MR. LEWIN: Objection.
10         THE WITNESS: Obviously not, but
11 Toby Nann was fully aware over and over and
12 related to us over and over how she understood
13 the parameters that we needed to have for our
14 wedding and constantly assured us that what we
15 wanted would be done. So, yes, the -- I don't
16 remember what you said onions -- radish instead
17 of onions would have necessitated a lawsuit.
18 Clearly, radishes doesn't have the effect, the
19 lasting effect on a lot of people at the wedding
20 that the shrimp and eel and octopus would.
21 BY MR. SCHWABER:
22     Q.   Okay. So that's based on your

Case 1:05-cv-01717-RJL   Document 54-9   Filed 10/30/2006   Page 38 of 44
VIDEOTAPED DEPOSITION OF TOBY NANN BERMAN
CONDUCTED ON TUESDAY, FEBRUARY 7, 2006

38 (Pages 149 to 152)

149

1  reliance and your confidence in Toby Nann that
2  you make that statement?
3     A.  I didn't follow that.
4     Q.  You said the reason that you were
5  comfortable was Toby Nann assured you that she
6  knew what you wanted?
7        MR. LEWIN:  Objection.
8  BY MR. SCHWABER:
9     Q.  Is that right?
10    A.  Toby Nann assured us that she
11 served as a mashgiach, that she was married in
12 Long Island so she knew exactly what we wanted.
13 And when she told me she was a mashgiach, I
14 never thought again for a second that we would
15 ever have a problem with the kosher food.  As my
16 nature just to repeat things over and over, I
17 repeated it to Julee Staley, we discussed it in
18 going over the wedding menu, but it never
19 crossed my mind that they would serve shrimp,
20 that something like that would happen.
21    Q.  Notwithstanding the fact that Toby
22 Nann is someone who you felt didn't hear you

150

1  when you were telling her things?
2     A.  No, not a matter -- we had to go
3  over things to get minute details down when we
4  were planning the bartender at one station and
5  bartender here and how things were laid out,
6  sometimes we went over that a couple times.  But
7  something as fundamental as having a kosher
8  wedding, something she understood full well,
9  that wasn't even a question in my mind.
10    Q.  All right.  But you understand
11 full well that the level of kashrut at your
12 wedding would best be insured by a mashgiach;
13 correct?
14       MR. LEWIN:  Objection.
15       THE WITNESS:  No.  That's not what
16 I'm saying.  The level of kashrut that we
17 follow, that my family follows and the guests on
18 my side does not require a mashgiach.  It
19 requires somebody to simply, you know, after
20 discussion what we wanted to simply follow that
21 and then there's no problem.
22 BY MR. SCHWABER:

151

1     Q.  Do you know what Halacha is,
2  H-A-L-A-C-H-A?
3     A.  I believe it means like custom --
4  why don't you tell me?
5     Q.  Do you understand -- is it your
6  understanding based on your Jewish education
7  that there is more than one level of kashrut or
8  from a Jewish law standpoint is there only
9  kosher and unkosher?
10    A.  In my view everyone has a
11 different level of religious observance that
12 they decide for themselves.
13       And in taking kashrut, for
14 example, I recognize that many different people
15 have many different ways that they approach
16 being kosher, and that's something that's
17 personal.  And in this instance my family and
18 the guests that we had I knew practice a certain
19 level of being kosher that was fulfilled in our
20 wedding.
21    Q.  So in your view everyone has a
22 different level of religious observance.

152

1        My question was more to Jewish law
2  as defined in the Halacha or in tenants of
3  Jewish law as you understand them.
4        Would you agree with the statement
5  that under strict Jewish law there is either
6  kosher or unkosher?
7        MR. LEWIN:  Objection.
8        THE WITNESS:  I can't speak to
9  that.  I don't know that well enough to answer.
10 BY MR. SCHWABER:
11    Q.  Okay.  But in your answer you told
12 me in your experience everybody has their own
13 level?
14    A.  That's correct.
15    Q.  Okay.  And your Complaint in this
16 case for severe emotional injury, as you've
17 alleged for you, yourself, that severe emotional
18 injury is based on Toby Nann not getting your
19 particular individual level right; is that a
20 fair statement?
21       MR. LEWIN:  Objection.
22       THE WITNESS:  No.  Our severe

Case 1:05-cv-01717-RJL   Document 54-9   Filed 10/30/2006   Page 39 of 44
VIDEOTAPED DEPOSITION OF CRAIG BARON
CONDUCTED ON TUESDAY, FEBRUARY 7, 2006

39 (Pages 153 to 156)

153

1    emotional injury comes from the fact that
2    while --
3    BY MR. SCHWABER:
4        Q.   Let me just stop you for a second
5    because I'm asking right now just about yours,
6    your personal severe emotional?
7        A.   It stems from the fact that
8    although there are -- as you were saying, we
9    wanted a certain level of kashrut.  And it may
10   not be up to someone else's level of that but,
11   nevertheless, it was extraordinarily hurtful,
12   devastating to me, my family, my in-laws, who
13   are attempting to do something to bring two
14   families together, and the fact that she served
15   it it's not something -- it's not a seating
16   chart.  It wasn't something replacing the onions
17   with radishes, because those are immaterial.
18   That is not going to have a lasting effect on
19   anyone's lives.
20            But the fact when we come up to a
21   cocktail hour and the one thing, the one thing
22   that she was clear about, the one thing that she

154

1    told us overtly, made the representation to us
2    that she knew exactly what we wanted, that one
3    thing, the one thing that could be hurtful to
4    everyone there, the one thing that could be
5    devastating to the wedding that they didn't do
6    and they totally ignored it for whatever reason,
7    yes, that created an enormous amount of
8    emotional distress to me, as well as for
9    everyone else.
10       Q.   Okay.  At that same cocktail hour
11   unkosher wine was served?
12       A.   That's correct.
13       Q.   And that's because at the level
14   among many different levels as you described of
15   observance and every Jew has their own unique
16   level.
17            At the level of observance that
18   you followed unkosher wine was okay and shrimp
19   wasn't; right?
20       A.   Absolutely.
21       Q.   And at the level of observance
22   that you followed an unkosher sauce pan was okay

155

1    as long as the ingredients in the sauce were
2    kosher?
3        A.   That's correct.
4        Q.   And at the level of observance
5    that you followed the ingredients in the bread
6    products may or may not have been relevant?
7        A.   No, that's not what I said.
8        Q.   So you needed the bread products
9    to contain no dairy?
10       A.   That's correct.
11       Q.   Okay.  But at the level of
12   observance that you followed the labeling on the
13   cans of products used for the ingredients was
14   not relevant?
15       A.   That's correct.
16            MR. LEWIN:  Objection.
17   BY MR. SCHWABER:
18       Q.   And so the severe emotional injury
19   you suffered is Toby Nann got that level wrong
20   in terms -- or Ridgewells got that level wrong
21   in terms of what they ultimately put out there?
22            MR. LEWIN:  Objection.

156

1            THE WITNESS:  The emotional
2    distress that I suffered is having to deal with
3    my parents who don't talk about my wedding
4    because it's too painful for them.  The
5    emotional stress I feel is having my wife break
6    down every so often in just thinking about her
7    wedding that was ruined and she can't, you know,
8    go back to it.  The emotional stress I feel is
9    having my in-laws' devastated look because
10   they're trying to bring our families together
11   and it's never been the same since then.  Our
12   families were on the verge of becoming one
13   wonderful unit, which is something that I've
14   experienced with my brother-in-law who has
15   become one of my best friends.  My parents and
16   his parents are great friends, and that was
17   something that Rebecca and I saw when we started
18   dating and something that we always anticipated
19   our families being able to be celebrating --
20   celebrating different holidays together,
21   different events, and becoming really one
22   family.  And that's something that hasn't

157

1 happened now because, point blank because of
2 what Ridgewells did. It's something that
3 Rebecca has nightmares. And that's something
4 that she wakes up and wakes up says I had a
5 dream that we had to do the wedding over. I
6 have to assure her that we don't have to do the
7 wedding over, no one blames you. She has in her
8 mind my parents blame her. I don't think it's
9 true, but it's always out there. To not have
10 fond memories of your wedding is -- it's awful.
11     Whenever you think back, there
12 were some great times at our wedding and there
13 were great things that I try to focus on, but
14 whenever you focus on a great experience, the
15 disaster, the devastation comes back. Yes,
16 that's in my mind severe emotional distress.
17 BY MR. SCHWABER:
18     Q.   You spoke to Toby Nann at the end
19 of the evening when you went down to the
20 clean-up area we discussed earlier; right?
21     A.   Yes.
22     Q.   She apologized profusely for what

158

1 happened?
2     A.   She said I can't begin to tell you
3 how sorry I am.
4     Q.   Do you believe she was sincere
5 when she said that?
6     A.   Yes, I do.
7     Q.   Did she look distraught about what
8 had happened?
9     A.   She didn't look happy. I don't
10 know if distraught is the word.
11     Q.   Regardless of the word choice,
12 would you agree that she looked genuinely upset
13 about the fact that shellfish was served?
14     A.   That's a possible interpretation,
15 yes.
16     Q.   Did you believe her to be
17 genuinely upset?
18     A.   Yes, I believe she was.
19     Q.   Is it your belief that her
20 transgression was unforgivable?
21     MR. LEWIN: Objection. What do
22 those words mean?

159

1     THE WITNESS: Yeah. I don't know
2 what you mean, unforgivable.
3 BY MR. SCHWABER:
4     Q.   She apologized to you for what had
5 happened; right?
6     A.   She did.
7     Q.   You don't forgive her?
8     MR. LEWIN: Objection.
9     THE WITNESS: It's not a matter of
10 me forgiving her. She can't -- what she did has
11 a lasting effect, so I will never have fond
12 memories of Toby Nann.
13 BY MR. SCHWABER:
14     Q.   Regardless of that, my question is
15 is it conceivable to you that there was a way
16 you and your wife and your families could have
17 gotten beyond what happened, or was that
18 inconceivable to you?
19     MS. LEWIN: Objection.
20     THE WITNESS: You can always get
21 beyond what happened on a certain level, and I
22 think we have gotten beyond it on a certain

160

1 level, but it's not something you can always --
2 you can never get over it completely because
3 it's there. It's our wedding.
4 BY MR. SCHWABER:
5     Q.   Toby Nann told you that this was
6 an error; right?
7     A.   I --
8     Q.   In other words, she didn't
9 communicate to you I can't believe you're upset
10 about the shellfish, what's wrong with
11 shellfish; right?
12     A.   That's correct.
13     Q.   She communicated to you, sorry
14 there was shellfish?
15     A.   That's correct.
16     Q.   Okay. And you told me earlier you
17 have no reason to believe she was acting
18 maliciously or intentionally in putting out
19 shellfish?
20     A.   That's correct.
21     Q.   Okay. And you told me just now
22 you believed her to be sincere when she seemed

Case 1:05-cv-01717-RJL   Document 54-9   Filed 10/30/2006   Page 41 of 44
VIDEOTAPED DEPOSITION OF CRAIG BARON
CONDUCTED ON TUESDAY, FEBRUARY 7, 2006

41 (Pages 161 to 164)

161

1   upset about it?
2       A.   I'm sure she was upset about it.
3       Q.   Okay.  Do you believe that this
4   needed to ruin your wedding?
5           MR. LEWIN:  Objection.  Needed to
6   ruin?
7           THE WITNESS:  I don't really know
8   what that means.
9   BY MR. SCHWABER:
10      Q.   What it means is given the way you
11  observe, what you've acknowledged to me is not a
12  strictly kosher observance, given the way your
13  family observes, which you've acknowledged is
14  not a strictly kosher observance in general or
15  even at the wedding, why was this such a big
16  deal to you?
17      A.   Mr. Schwaber, the fact that my
18  family does not have separate dishwashers, does
19  not have a separate kitchen, does not do
20  everything that people who are more religious
21  than they are does not demean the fact that they
22  are not serious about their religion and they

162

1   don't keep kosher.  They decide what is
2   important to them.
3           My mother has never tasted shrimp.
4   My sister has never tasted shrimp.  She has
5   never tasted eel.  And you know what, that's
6   something that is very important to them.  My
7   parents, when they envisioned my wedding never
8   in a million years would have ever assumed, even
9   thought, even could comprehend that they would
10  have shellfish there.  It is a big deal.
11          Whether you want to belittle it or
12  not, that they don't keep a strictly kosher home
13  or, excuse me, don't keep a strictly kosher diet
14  as defined by you or someone else, it is very
15  important to them.  It is very important that at
16  whatever level they decided, it is something
17  that they believe strongly in it.
18      Q.   My intention wasn't to belittle
19  it.  I apologize if it came across that way.
20  I'm just asking questions because that's my job.
21      A.   Sure.
22      Q.   My purpose was not to belittle the

163

1   way your parents observe, but rather to ask you,
2   because you have an allegation about severe
3   emotional injury, and that's why I'm asking you
4   about your feelings here.
5       A.   Okay.
6       Q.   Okay.  To ask you in light of the
7   fact that there was not strict kosher observance
8   even at the wedding, as you've acknowledged in
9   terms of the wine service, in terms of the pans
10  and pots and those kinds of things in terms of
11  the dishes, why the fact that shellfish was
12  mistakenly put out there, only to be discovered
13  and removed, why the -- why that mistake took on
14  this much importance to you?
15      A.   I guess you could say that there
16  are mistakes and then there are mistakes.  Not
17  serving -- leaving out the margarine at the
18  table, while mildly irritating for not having
19  margarine for your bread is a mistake which is
20  not a big deal.
21          But something that cuts to the
22  core of our wedding and what we were trying to

164

1   do in bringing two families together and respect
2   and Rebecca's parents don't keep kosher, but to
3   them, and if Rebecca, you know, in their mind if
4   they married someone who wasn't kosher, they
5   wouldn't have a kosher wedding.  But to them
6   when -- it was very important to them to let my
7   parents know that we want -- we respect your
8   traditions and we are going out of our way to
9   have a kosher wedding because we want it to be
10  together and have two families together, we're
11  going to have a kosher wedding.  So on so many
12  levels, the fact my parents who are at their
13  son's wedding and all of a sudden see shellfish,
14  see shrimp, see eel, and have to deal with that,
15  and then the fact that Rebecca's parents are the
16  ones who were doing all this to make their
17  son-in-law's parents feel welcome and feel like
18  they're a part of the wedding and bring these
19  two families together, it's -- that's not just a
20  mistake of serving tuna instead of salmon.
21  That's not a mistake of replacing onions in the
22  mushroom caps with radishes or whatever else it

Case 1:05-cv-01717-RJL    Document 54-9    Filed 10/30/2006    Page 42 of 44
VIDEOTAPED DEPOSITION OF CRAIG BARON
CONDUCTED ON TUESDAY, FEBRUARY 7, 2006

42 (Pages 165 to 168)

165

1    is. That is a mistake -- other than somebody
2    getting hurt at the wedding. Other than some
3    physical injury happening, I can't think of a
4    mistake that would be more devastating, more
5    hurting to someone, to people here. And some
6    people -- some people can't understand that, but
7    I guess looking what's going on in the world
8    today and you see a cartoon causes so much anger
9    among the world, serving shrimp at our wedding
10   was pretty devastating.
11       Q.   Your sister is married to -- you
12   have one sister?
13       A.   That's correct.
14       Q.   And the man she's married to, did
15   he grow up more or less observant of kashrut
16   than your sister?
17       A.   Less observant.
18       Q.   Okay. And does his family keep
19   kosher?
20       A.   No.
21       Q.   Okay. Does he and your sister
22   keep kosher?

166

1        A.   Yes.
2        Q.   Have you sought or received any
3    treatment as a result of the emotional injury
4    you allege to have suffered as a result of
5    Ridgewells' actions?
6        A.   No.
7        Q.   Have you ever considered it?
8        A.   No.
9        Q.   Do you know that Ridgewells, in
10   addition to the apology you heard from Toby,
11   Ridgewells without precondition credited the
12   full cost of all the sushi at the wedding? Are
13   you aware of that?
14       A.   I'm aware of that.
15       Q.   Is there anything Ridgewells could
16   do at this point that would bring your families
17   closer together or solve the problems that
18   you've described that you believe resulted from
19   Ridgewells' mistake?
20       MR. LEWIN: Objection.
21       THE WITNESS: I don't know what
22   Ridgewells could do at this point. They've

167

1    firmly entrenched themselves in believing they
2    were right so I don't know -- I can't think of
3    anything offhand that Ridgewells can do right
4    now.
5    BY MR. SCHWABER:
6        Q.   And what is the basis for your
7    statement that Ridgewells firmly entrenched
8    themselves in believing they were right?
9        A.   Your letter.
10       Q.   The letter sent to your counsel?
11       A.   That's correct.
12       Q.   In advance of the lawsuit?
13       A.   That's correct.
14       Q.   Okay. Anything other than that?
15       A.   No.
16       Q.   If Ridgewells hadn't entrenched
17   themselves, as you see it, in believing they
18   were right, what, if anything -- do you believe
19   there is anything they could now to undo the
20   damage that was done?
21       MR. LEWIN: Objection.
22       THE WITNESS: There is certain

168

1    damage that's done that is irreversible. It
2    would have -- it would have been nice to see if
3    Ridgewells would have attempted to mitigate the
4    damage, but I don't know what they can do now to
5    right the wrong.
6    BY MR. SCHWABER:
7        Q.   Did you under -- did you review
8    the letter that my letter responded to?
9        A.   Yes.
10       Q.   Okay. So when you say it would
11   have been nice for Ridgewells to mitigate the
12   damage, is it your belief that to do so would
13   have been to accede to the demands that were
14   presented as nonnegotiable demands to
15   Ridgewells?
16       MS. LEWIN: Objection.
17       THE WITNESS: No, not necessarily.
18   BY MR. SCHWABER:
19       Q.   Do you recall the presentation of
20   demands being nonnegotiable?
21       A.   Vaguely.
22       Q.   Do you believe that the emotional

Case 1:05-cv-01717-RJL   Document 54-9   Filed 10/30/2006   Page 43 of 44
VIDEOTAPED DEPOSITION OF CRAIG BARON
CONDUCTED ON TUESDAY, FEBRUARY 7, 2006

43 (Pages 169 to 172)



169

1   distress that you're suffering and that your
2   loved ones are suffering is exacerbated or
3   mitigated by this litigation?
4           MR. LEWIN:  Objection.
5           THE WITNESS:  A little bit of
6   both.
7   BY MR. SCHWABER:
8       Q.   Can you explain your answer?
9       A.   Well, we have to deal with it on
10  an ongoing basis, but it's -- it's good to know
11  that we're following what we believe is right
12  and it's cathartic in a way, but it also brings
13  up painful memories.
14          MR. SCHWABER:  I have nothing
15  further.  I do have before I close the record I
16  have some questions about the photo album and
17  the video that to the extent I need testimony
18  other than dealing with counsel, I'm assuming
19  your wife can answer those questions as well as
20  you.  Is that a fair assumption?
21          THE WITNESS:  Probably better.
22          MR. LEWIN:  Let me just -- I just

170

1   want to fill in one gap here.
2
3           EXAMINATION BY COUNSEL FOR PLAINTIFFS
4
5   BY MR. LEWIN:
6       Q.   You were asked by counsel for the
7   Defendant about the discussions that you had at
8   the time of the reception when you came up with
9   your mother and your sister.  Did you provide
10  the full range of the conversations in response
11  to that question?
12      A.   I also spoke to my sister who made
13  the point to me that why should she eat the rest
14  of the food, the meat, if she doesn't know that
15  it's kosher.  And I in essence pleaded with her
16  to just eat the food just for everyone's sake,
17  to not make a bad situation worse.
18      Q.   Did you have similar conversations
19  with your mother?
20      A.   Yes.  My sister brought it up and
21  then I spoke with my mother later on at the end
22  of the cocktail hour and said, please, let's try

171

1   to make this as easy -- make the best of the
2   situation with regard to me, to Rebecca, to
3   Rebecca's family, it's our wedding, to whatever
4   extent possible.
5       Q.   And why were they saying that they
6   wouldn't eat the rest of the meal?
7           MR. SCHWABER:  Objection.
8           THE WITNESS:  Because they were
9   just shocked that shrimp was there and shellfish
10  was there, and if they saw the shellfish there
11  then why would they think the meat was kosher.
12          MR. LEWIN:  Okay.  That's all.
13
14          EXAMINATION BY COUNSEL FOR
15          DEFENDANTS/COUNTER-PLAINTIFF
16
17  BY MR. SCHWABER:
18      Q.   Brief follow-up.
19          Did they, to the best of your
20  knowledge, did they accede to your wishes to
21  just to please eat?
22      A.   I know they sat and ate.  I don't

172

1   know if they ate the meat or ate the fish.
2       Q.   Did you ever ask?
3       A.   No, I didn't.
4           MR. SCHWABER:  That's all I have.
5           THE VIDEOGRAPHER:  This is the end
6   of tape two of the deposition of Mr. Craig
7   Baron.  We're off the record as of 12:58 p.m.
8           (Whereupon, at 12:58 p.m., the
9   deposition was concluded.)
10          - - - - -
11          (Reading and signature not
12  waived.)
13
14
15
16
17
18
19
20
21
22

173

1     I do hereby acknowledge that I have read
and examined the foregoing pages of the
2  transcript of my deposition and that:
3     (Check appropriate box):
4     ( ) the same is a true, correct and
complete transcription of the answers given by
5  me to the questions therein recorded.
6     ( ) except for the changes noted in the
attached errata sheet, the same is a true,
7  correct and complete transcription of the
answers given by me to the questions therein
8  recorded.
9
10
11
12
13  _____  _____
14     DATE          SIGNATURE
15
16
17
18
19
20
21
22

174

1          CERTIFICATE OF NOTARY PUBLIC
2     I, Paula G. Satkin, the officer before whom the
3  foregoing proceedings were taken, do hereby
4  certify that the witness whose testimony appears
5  in the foregoing proceeding was duly sworn by
6  me; that the testimony of said witness was taken
7  by me in stenotype and thereafter reduced to
8  typewriting under my direction; that said
9  proceedings is a true record of the testimony
10  given by said witness; that I am neither counsel
11  for, related to, nor employed by any of the
12  parties to the action in which these proceedings
13  were taken; and, further, that I am not a
14  relative or employee of any attorney or counsel
15  employed by the parties hereto, nor financially
16  or otherwise interested in the outcome of the
17  action.
18  My commission expires August 31, 2010.
19
20  _____
21          PAULA G. SATKIN
        Notary Public in and for the
22          District of Columbia