## Page 1

```
IN THE UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF COLUMBIA

                              )
MARK A. SIEGEL, et al.,       )   Case No. 1:05cv01717
                              )
    Plaintiffs,               )
                              )
vs.                           )
                              )
RIDGEWELLS, INC.,             )
                              )
    Defendant/                )
    Counter Plaintiff.        )
                              )
```

DEPOSITION OF
RABBI LEONARD GORDON
Washington, D.C.
Thursday, June 8, 2006
1:37 p.m.

Job No.: 1-79457
Pages 1 through 137
Reported by: John L. Harmonson, RPR

## Page 2

Deposition of
RABBI LEONARD GORDON

Held at the offices of:
    WILEY, REIN & FIELDING
    1776 K Street, N.W.
    Washington, D.C. 20006

Taken pursuant to the Federal Rules of Civil Procedure, by notice, before John L. Harmonson, Registered Professional Reporter, Notary Public in and for the District of Columbia, who officiated in administering the oath to the witness.

## Page 3

APPEARANCES

ON BEHALF OF PLAINTIFF:
    NATHAN LEWIN, ESQ.
    Lewin & Lewin, LLP
    1828 L Street, N.W.
    Suite 901
    Washington, D.C. 20036
    (202)828-1000

ON BEHALF OF DEFENDANT/COUNTER PLAINTIFF:
    JEFF SCHWABER, ESQ.
    Stein, Sperling, Bennett, De Jong,
     Driscoll & Greenfeig, PC
    25 West Middle Lane
    Rockville, Maryland 20850
    (301)340-2020

## Page 4

EXAMINATION INDEX
                                                    PAGE
EXAMINATION BY MR. SCHWABER                         5
EXAMINATION BY MR. LEWIN                            121
EXAMINATION BY MR. SCHWABER                         130
                    * * * * *

EXHIBIT INDEX
(Exhibit retained by counsel.)
GORDON EXHIBIT NO.:                                 PAGE
1 - Complete file of Rabbi Gordon                   87

**Page 125**

1  Q. And would it make a difference if in the
2  course of conversations with that representative of
3  the caterer it was consistently emphasized to that
4  representative of the caterer, "We are trying to
5  provide a kosher event"?
6      MR. SCHWABER: Objection.
7  BY MR. LEWIN:
8  Q. Would that make a difference?
9  A. Yes. I would expect that somebody who was
10 trained and caring about this would want to then
11 clarify the boundaries and either say, "I can do
12 this," or "I can't do this."
13 Q. And in your opinion, would it be credible
14 if a representative of a caterer who was herself a
15 mashgiach said she didn't realize that sushi could
16 contain shrimp?
17     MR. SCHWABER: Objection. Move to strike.
18     You can answer.
19     THE WITNESS: As I mentioned, I think it's
20 so basic to sushi, the use of explicitly very
21 blatantly identifiable non-kosher fish, that that
22 would not be credible to me.

**Page 126**

1  BY MR. LEWIN:
2  Q. Blatant that it's not only shrimp, but
3  other forms of non-kosher fish?
4  A. Yes. Eel, octopus, crab. The whole
5  gestalt of this, it would have to be very, very
6  limited, and I would imagine whoever instructs the
7  vendor would say, "By the way, I need to flag this as
8  very, very limited parts of your selections."
9  Q. Now, if an event is in any form attempted
10 to be kosher, what would be the impact of providing in
11 that event shrimp, eel or octopus?
12     MR. SCHWABER: Objection.
13     THE WITNESS: I think that there is a very
14 powerful boundary in the conservative community
15 between kosher-slaughtered meat that might not have
16 been prepared in keeping with the standards of a
17 kosher kitchen and having explicitly trafe shellfish
18 or seafood brought out. The impact on one is
19 unnoticeable to the eye and to those present and might
20 well meet the needs of everyone present, whereas the
21 other would be clearly offensive to any form of Jewish
22 kosher sensibility.

**Page 127**

1  BY MR. LEWIN:
2  Q. You've described as complex the rules that
3  surround the preparation of meat, even if it's
4  kosher-slaughtered and it's otherwise kosher meat. Is
5  there any complexity to the inclusion of shrimp or eel
6  or octopus in a diet?
7  A. There is no gray areas there. Really these
8  are foods, much like pork, that are symbolic of what
9  it means to eat non-kosher food.
10 Q. And what would you say would be the impact
11 on an event that is attempted to be kosher of having
12 foods such as shrimp, eel or octopus at that event?
13     MR. SCHWABER: Objection. Move to strike.
14     THE WITNESS: From my experience being with
15 observant Jews in various settings, when foods like
16 that are present in the room, it's dramatic. It's
17 alienating. It's something that sticks with you and
18 would impact. It's one of the first stories one would
19 tell when one gets home from such an event. It sort
20 of stands out that way.
21 BY MR. LEWIN:
22 Q. And if that happened at an event such as a

**Page 128**

1  wedding, a Jewish wedding, would it be something that
2  would have lasting impact?
3      MR. SCHWABER: Objection. Are you asking
4  this witness based on his designated expertise if it
5  would have lasting impact? He's not a psychiatric
6  expert.
7  BY MR. LEWIN:
8  Q. As a rabbi familiar with Jewish practices
9  and with both the impressions and reactions of
10 observant conservative Jews to situations that they
11 are confronted with, I'm asking you: What is your
12 view about the impact at a wedding of having something
13 like shrimp, eel or octopus being provided?
14     MR. SCHWABER: Objection. Move to strike.
15     THE WITNESS: I think it casts a pall on
16 the entire event. Again, for the reasons that I
17 specified earlier, it would make someone wonder about
18 the hosts, about their credibility, intelligence,
19 understanding, caring for them and for Judaism. I
20 think to have foods like that served gives -- You
21 know, one would reasonably say the people hosting this
22 event just don't care. So it would be important for

**129**

the host to make very clear to everybody that this was explicitly against my desires. And the impact this would have, again, is in a categorically different place than were people to know that, for example, they chose not to have a mashgiach.

BY MR. LEWIN:

Q. What about the impact on the bride and groom?

A. I think it's something that would stay with you as a memory of the wedding, even were the rest of the wedding to go swimmingly.

Q. Just one final area. You described in terms of preparation of this report of yours, a draft being sent to you. And I think you used the word "extensive" in terms of your modifications and changes on there. Do you recall in that regard how complete your discussions were with Alyza Lewin prior to the time this draft was prepared?

A. Thank you. Let me revisit that. The discussions with Alyza Lewin were very extensive and covered all of the subject areas that are described here. And again, my operating premise, whether

**130**

explicitly stated or not, is that Alyza was taking notes on this, was being very interactive with me about it, was drawing things out from me. And my revisions and what I referred to as extensive, what I really mean -- because I don't think, in terms of the number of words, that a high number of words were changed. There were some significant changes that I made where I felt the sensibility as she had understood things was different from my sensibility and from how I view it. And those were the areas of the changes that I made.

So I guess those changes loom large for me, but I don't think in terms of, say, 80 percent plus of the prose was changed, but that the prose reflected accurately the conversations Alyza and I had.

MR. LEWIN: Thank you. That's all.

FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT/CROSS PLAINTIFF

BY MR. SCHWABER:

Q. A couple of follow-up questions. You're not an expert in the catering industry, are you? Your

**131**

understanding of your designation in this case, your expertise -- Your expertise, as I understand it, is in the standards of kashrut in the context of conservative Judaism. Is that a fair characterization of the universe of your expertise for purposes of this case?

A. I think most narrowly construed. The only other point I would add is that in 12 years of the rabbinate and taking the role I've taken regionally and being in a synagogue where we are really working in a complicated way on these issues with some consistency so that boundary issues come up, I've developed both knowledge and deep experience with the interplay between kashrut standards and trying to build community. And what happens to people when they find that the standards that they had expected at whatever level they are have been violated is an issue of trust that looms large, rather than, for example, an issue of, "Did I sin?" I think the real issue is, "Has my sense of safety in these relationships been violated?" And that's something that, you know, I feel well experienced and understanding of.

**132**

Q. You talked with me about the absence of ramifications on the unwitting ingestion of shrimp in the example I gave you. Under your counseling of Jewish law, it would be without penalty or ramification, correct, if a congregant came to you?

A. I once as a child ordered a tuna sandwich at a Howard Johnson's and was served chicken salad. And I took a bite of it and said, "This doesn't taste right," and we realized want happened and turned it back. I didn't need to go into therapy about it, but it is a memory that stands out for me amongst other memories of childhood that don't.

So I think that the impact that this has for someone who sees themselves as kosher at whatever level of kosher, eating something and then discovering I ate something trafe, can be psychologically powerful even if not in a theological context.

Q. Fair enough. I'm not asking you about the psychological impact. I'm asking about ramification under Jewish law.

A. I stand by what I said to you earlier.

Q. And the absence of ramification is true