UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MARK A. SIEGEL**, *et al.*, ) | |
| ) | |
| *Plaintiffs/ Counter-Defendants*, ) | |
| ) | Civil Action No. 05-1717 (JGP) |
| v. ) | |
| ) | |
| **RIDGEWELL'S, INC.**, ) | |
| ) | |
| *Defendant/ Counter-Plaintiff.* ) | |
| ) | |

**PLAINTIFFS' REPLY MEMORANDUM
OF LAW IN SUPPORT OF SUMMARY JUDGMENT**

**INTRODUCTION**

As we anticipated in our Memorandum of Law supporting our Motion for Summary Judgment, Ridgewell's argues in response that it was guilty only of unintentional misrepresentation in the Siegel-Baron wedding reception and, for that reason, it cannot be held liable under the DCCPPA. Ridgewell's ignores both undisputed facts and a clear statement of the law from the D.C. Court of Appeals.

*First*, as a matter of fact Ridgewell's ignores that it *intentionally* did not provide sushi "made to order" but contracted out its sushi station to a vendor who routinely put shrimp, eel, and octopus in its sushi. The words "Made To Order" describe the sushi that was to be served at the Siegel-Baron wedding reception *according to the terms of the written contract*. According to deposition testimony, those words most customarily mean that a sushi chef would be standing at the sushi station making requested sushi to order. Alternatively, it could mean that the sushi would be made in the Ridgewell´s kitchen according to the customer's order. In fact, Ridgewell´s not only failed to station a chef or

to make the sushi in its own kitchen. It also failed to tell the sushi vendor -- whether by negligence or recklessness -- that salmon and tuna were to be the only seafood in the sushi. The *intentional* failure to make the sushi "to order" thereby ruined the reception by violating the religious convictions of the groom's family and many guests.

*Second*, as a matter of law, Ridgewell's ignores the language of the D.C. Court of Appeals in *Caulfield v. Stark*, 893 A.2d 970, 976 (D.C. 2006), that implies that, as a matter of law, even "unintentional misrepresentation" could give rise to liability under the DCCPPA. This Court could decide that legal question in this case if it does not conclude, as a matter of law, that the failure to provide sushi "made to order" is sufficient to impose liability on Ridgewell's on the undisputed facts.

## ARGUMENT

### I.

### RIDGEWELL'S FAILURE TO PROVIDE SUSHI "MADE TO ORDER" AS SPECIFIED IN THE WRITTEN CONTRACT RENDERS RIDGEWELL'S LIABLE UNDER THE DCCPPA

In its response to our Motion, Ridgewell's ignores the undisputed fact that the sushi served at the Siegel-Baron reception was not, as the signed contract prescribed, "made to order" at the reception itself.  Ridgewell´s itself provided testimony that "Made To Order" means that there is a sushi chef who stands at a station during the event and makes the sushi from ingredients that are before him. Ridgewell´s President and CEO acknowledged in his deposition that "made to order" means that a Ridgewell´s chef is "making sushi," and that it's "made there on site."

> Q	Now, right under that on that page it says made to order. What does that mean?
> A	Made to order?
> Q	Yes.
> A	It means it's made to order.
> Q	What does that mean?
> A	It means it's made to order. There's somebody making it.
> Q	Right there on the spot, right?
> A	Typically, yes.
> Q	So you know as a caterer that made to order sushi means that somebody stands there and makes the sushi, is that correct?
> MR. SCHWABER: Objection. He just told you how Ridgewells defines it, not how catering defines it.
> MR. LEWIN: Yes. How Ridgewells defines it.
> A	As Ridgewells defines it, somewhere in the event somebody's making sushi. It's not pre-made. It's made there on site.

> Keon Dep., pp. 72-73

Ms. Mummert, the sushi vendor, stated:

> Q	And are there words that describe what the chef does in that situation? I mean do people say --
> A	Yes, it will say here chef on site.
> Q	Will it say made to order, for example?
> A	Yes.
> Q	Made to order means the chef is there and prepares it there on the spot?
> A	Right.
> Q	So you have frequently sent out chefs to a location when somebody is willing to spend some more money so that the sushi is made to order; is that correct?
> A.	Right.

> Mummert Dep., pp. 47-48

To be sure, Ms. Mummert attempted, after giving the above testimony, to qualify what she had said so as not to harm Ridgewell´s defense. Nonetheless, it is clear from her testimony and from that of Mr. Keon that "Made To Order" was not how Ridgewell´s prepared the sushi served at the Siegel-Baron wedding.

It is undisputed that the sushi at the Siegel-Baron wedding reception was not "made to order." Instead, Ridgewell's contracted it to Sushi USA without giving any

3

instruction other than that the sushi platter should contain "no meat." Nann Silberstein Dep., pp. 129-130. No matter how one interprets the words "Made To Order" -- whether they mean, as Mr. Keon has unequivocally testified, a sushi chef standing at the station and making it to the guest's "order" -- or whether they mean (at the very least) that Ridgewell´s would be making a sushi platter to "the order" of the customer, Ridgewell´s *intentionally* failed to provide the customer with what it had represented.

Nor can Ridgewell´s claim that the Siegels did not want a sushi chef stationed at the reception to make sushi to order because that would have been too expensive. Ms. Mummert´s testimony was that such a service would have added not more than two hundred dollars to the total cost. Mummert Dep., pp. 59-60.

The intentional violation of the contractual obligation to make sushi "to order" was a cause of the conduct that devastated the wedding reception. Had the sushi been "made to order," there would have been no shrimp ordered for it since the menu in the contract specifically limited the ingredients to tuna and salmon. And if, by some negligence, shrimp, eel, and octopus had been brought to the site of the reception, the sushi chef would immediately have been alerted to the fact that the shrimp, eel, and octopus could not be used.

Hence Ridgewell's committed an intentional misrepresentation that caused extensive damage. It is liable under the DCCPPA to the plaintiffs as a matter of law.

## II.

### UNINTENTIONAL BUT NEGLIGENT MISREPRESENTATIONS ARE A BASIS FOR LIABILITY UNDER THE DCCPPA

Ridgewell's discussion of *Caulfield v. Stark*, 893 A.2d 970 (D.C. 2006), is remarkable for its failure to even advert to the sentence in that opinion that most directly relates to Ridgewell's assertion that it cannot be held liable under the DCCPPA for unintentional misrepresentation. The D.C. Court of Appeals stated explicitly in its opinion (893 A.2d at 977; emphasis added):

> **Thus, unintentional misrepresentation under the CPPA is still an open question.**

Ridgewell's cites and discusses the *Caulfield* case, which involved not the kind of misrepresentation that is ordinarily covered by consumer protection laws, but a claim of medical malpractice. Judge Urbina's opinion in *Dorn v. McTigue*, 157 F. Supp. 2d 37 (D.D.C. 2001), concerned, as the D.C. Court of Appeals noted, "unintentional misrepresentation in a patient-physician context," and the D.C. Court of Appeals held that such a claim resulting in a tortious injury was not within the DCCPPA prior to its amendment in October 2000. With respect to a second claim of misrepresentation that the D.C. Court of Appeals described as a "negligent misrepresentation claim," the D.C. Court of Appeals said that "there was no material misrepresentation" in the *Caulfield* case because the defendant doctor's "notations on his billing form cannot be characterized as misrepresentations or omissions of material facts which had a tendency to mislead." 893 A.2d at 978-980.

A fair and full reading of the *Caulfield* opinion leads to the conclusion that, under D.C. law, the Court of Appeals *would* impose liability under the DCCPPA for negligent

5

misrepresentations in which a vendor engages for entrepreneurial motives. This case involves precisely these elements, and Ridgewell's is liable as a matter of law. In this case it is undisputed that there was negligent misrepresentation. Ridgewell´s only attempted legal defense is that its misrepresentation was unintentional. Apart from the physician-patient context -- where malpractice law may replace liability under the consumer-protection statute -- such negligent misrepresentation is more than adequate to impose liability as a matter of law under the DCCPPA.

### III.

### RIDGEWELL'S COUNTER-CLAIMS ARE FRIVOLOUS

For the reasons stated in our initial Memorandum, it is clear that there is no merit to Ridgewell's counterclaims. Ridgewell's breached the contract, so the plaintiffs are not liable to pay the final installment on the contract. *Dorocon, Inc. v. Burke*, No. 02-2556, 2004 U.S. Dist. LEXIS 29052, (D.C. Sept. 27, 2004); *Ashcraft & Gerel v. Coady*, 244 F.3d 948 (D.C. Cir. 2001). The statements made by Mr. Siegel were not published to anyone other than Ridgewell's employees. The statements were of opinion and they were true. Mr. Siegel took no actions other than the institution of this valid lawsuit that could possibly harm Ridgewell's business.

## CONCLUSION

For the foregoing reasons and those stated in our initial memorandum, summary judgment on liability should be rendered in favor of the plaintiffs on their claim under the DCCPPA and on the counter-claims.

Dated: December 5, 2006                     Respectfully submitted,

                                            /s/ Nathan Lewin
                                            NATHAN LEWIN (D.C. Bar No. 38299)
                                            ALYZA D. LEWIN (D.C. Bar No. 445506)
                                            **LEWIN & LEWIN, LLP**
                                            1828 L Street, N.W., Suite 901
                                            Washington, D.C.  20036
                                            (202) 828-1000
                                            (202) 828-0909 fax

                                            *Attorneys for Plaintiffs*