UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARK A. SIEGEL, *et al.*, ) | |
| ) | |
| *Plaintiffs/ Counter-Defendants,* ) | |
| ) | Civil Action No. 05-1717 (RJL) |
| v. ) | |
| ) | |
| RIDGEWELL'S, INC., ) | |
| ) | |
| *Defendant/ Counter-Plaintiff.* ) | |
| ) | |

PLAINTIFFS' POST-HEARING
SUPPLEMENTAL MEMORANDUM

INTRODUCTION

At the conclusion of the hearing held before this Court on June 4, 2007, the Court authorized the parties to submit, within ten days of receipt of the transcript of the hearing, supplemental memoranda not to exceed ten pages. The transcript was made available to the parties on June 11, 2007, and this Supplemental Memorandum is being submitted to discuss briefly four points that arose during the argument.

*First*, in his rebuttal (to which plaintiff's counsel could not reply), Ridgewell's lawyer asserted in open court that "the wedding cake was procured directly by the Siegels from some wedding cake vendor they had elsewhere," and that if their reception was a kosher event Ridgewell's would "never had allowed" a cake from an outside vendor. Transcript, p. 44. **That assertion was demonstrably erroneous. Ridgewell's baked the wedding cake. In fact, there was substantial discussion between the chef and the Siegels regarding their requirement that the wedding cake be non-dairy.**

*Second,* we acknowledged during our rebuttal that the plaintiffs could not claim that there was "intentional" misrepresentation by reason of the presence of shrimp on the sushi platter. Transcript, p. 34. We did not address the question whether Ridgewell's failure to have the sushi "Made To Order" was "intentional." In fact, contracting out preparation of the sushi platter to an outside vendor rather than having it "Made To Order" at the reception was an "intentional" misrepresentation because there is no evidence whatever that Ridgewell's ever intended to assign a person to the sushi station to perform this task.

*Third,* Ridgewell's counsel asserted that the final payment to be made to Ridgewell's by the Siegels was due three days before the wedding and that the Siegels were contractually obligated to pay that amount even if Ridgewell's failed to perform in accordance with the contract. Transcript 29-30. That representation by counsel is inaccurate. The contract provides only that payment of "an events unpaid balance" be made three days before the event, and even with respect to that specific obligation, payment is not required if amounts due are "guaranteed by credit card." As we establish in this Memorandum, **all the earlier payments made by the Siegels to Ridgewell's were made by charging the credit-card number that the Siegels had given Ridgewell's**. There was, in fact, no "events unpaid balance" requested by Ridgewell's and any balance was "guaranteed by credit card." Hence even if there were some legal merit to the claim that any amount due after the event would have to be paid 3 days before the event -- regardless of the seriousness of Ridgewell's violation of the Consumer Protection Law and breach of the contract -- it was Ridgewell's obligation to charge the credit card when the final payment was allegedly due. Ridgewell's cannot now fault the Siegels for its own failure.

*Finally*, contrary to the representation made by Ridgewell's counsel (Transcript, p. 42) that there was no representation regarding "shellfish" made by Ms. Nann to the Siegels, the testimony of Mr. Siegel was unequivocal that he and Judith Siegel were assured that there would be no shellfish served. Ms. Nann also acknowledged in her deposition that shrimp was not to be served.

## I.

## RIDGEWELL'S PROVIDED THE WEDDING CAKE AND ASSURED THE SIEGELS THAT IT WOULD HAVE ONLY NON-DAIRY INGREDIENTS

Page six of the contract that Ridgewell's and Judith Siegel signed specified that Ridgewell's would provide the wedding cake. Attachment 1. The "Contract Breakdown" for the event, which were Nann Deposition Exhibits 27 and 31 (Attachment 2 to this Supplemental Memorandum) show that the Siegels were charged either $787.50 or $742.50 for the Wedding Cake, plus $201.60 for "Chocolate Sauce." The "Menu Packing Lists" dated November 13, 2004 (Nann Deposition Exhibit 9), November 14, 2004 (Nann Deposition Exhibit 12), November 28, 2004 (Nann Deposition Exhibit 13), and April 4, 2005 (Nann Deposition Exhibit 14) (collectively Attachment 3 to this Memorandum) demonstrate that the Wedding Cake was provided by Ridgewell's for a profit margin to the caterer of $573.75 or $481.25. In fact, as the "Menu Packing Lists" of March 25, 2005 (Ridgewells 0272), March 30, 2005 (Ridgewells 0261), and March 31, 2005 (Nann Deposition Exhibit 7), demonstrate, the Ridgewell's records state that Ridgewell's was responsible for the cake and the cake was to contain "NO DAIRY." See Attachment 4.

Ms. Nann identified a list in her handwriting as indicating that "Pave," which was "the cake," was to have "no dairy." Nann Deposition, p. 136 and Nann Deposition Exhibit 18; Attachment 5 to this Supplemental Memorandum. She testified that "the dessert was a piece of chocolate pave, which is a piece of chocolate cake, in a pool of raspberry and chocolate sauce." Nann Deposition, p. 92; Attachment 6. Ms. Nann acknowledged that although making a kosher nondairy dessert was "a challenge," she and the Siegels "found a meeting of the minds of something that would taste good and something that we were able to make as a pareve dessert." Nann Deposition, pp. 159-160; Attachment 7.

Mark Siegel testified that it was agreed with Ridgewell's that there would be "no milk in anything *including the cake*." (Emphasis added.) Judith Siegel testified that she had discussed the cake specifically with Ms. Nann and that they were told, at a tasting in late February 2005, that "we can't make the kind that you want kosher." Judith Siegel Deposition, p. 109; Attachment 8. Thereafter, the Siegels selected the alternative chocolate cake that could be made kosher and non-dairy.

Details of the discussion between the Siegel family and Toby Nann regarding the wedding cake are also recited in affidavits of Judith Siegel and Rebecca Siegel Baron submitted with this Supplemental Memorandum. Attachments 9 and 10. (We have submitted affidavits because a new factual assertion on a previously undisputed proposition was made at the June 4 hearing. *C.f., Cia Petrolera Caribe, Inc. v. Arco Carribean, Inc.*, 754 F.2d 404, 409-10 (1st Cir. 1985)). It is clear that (a) there was substantial discussion concerning the wedding cake between the Siegels and Ms. Nann, (b) that the wedding cake was actually made by Ridgewell's, and (c) that it was agreed that the wedding cake would contain no dairy. Mark Siegel testified that he was assured by Ms. Nann that there would be "no milk in anything including the cake." Mark

4

Siegel Deposition, p. 26; Attachment 11. Judith Siegel testified that Ms. Nann told the Siegels "that the cake was not made with any dairy." Judith Siegel Deposition, p. 108; Attachment 12.

## II.

### RIDGEWELL'S INTENTIONALLY FAILED TO PROVIDE A "MADE TO ORDER" SUSHI STATION

Page two of the 10-page document that Ridgewell's claims is the contract whose literal terms should govern this case provided that there would be a "SUSHI STATION" at the reception where "Your Guests Will Enjoy Both Sushi And California Rolls." The "Sushi Station" was described as "MADE TO ORDER" with very specific ingredients including "Yellow Fin Tuna" and "Salmon." Attachment 13.

Ridgewell's did not provide a "Sushi Station" where the sushi was "Made To Order." Thomas Keon, Ridgewell's president testified what "Made To Order" means. He said that it means "There's somebody making it." Keon Deposition, p. 72; Attachment 14. Mr. Keon then explained that this "typically" meant that somebody is making the sushi "right there on the spot." When asked to describe how Ridgewell's defines "Made To Order," Mr. Keon replied:

> As Ridgewells defines it, somewhere in the event somebody's making sushi. It's not pre-made. It's made there on site.

In her initial testimony regarding the words "Made To Order," Nomi Mummert, the outside sushi vendor with whom Ridgewell's contracted, testified as follows (Mummert Deposition, p. 47; Attachment 15):

> Q. Made to order means the chef is there and prepares it there on the spot?
>
> A. Right.

Ridgewell's has never suggested that the failure to place a sushi chef at the Sushi

Station to make the sushi "to order" was anything other than intentional. Instead of providing the service that it had contracted to provide – a "To Order Sushi Station" – Ridgewell's assigned preparation of the sushi to a vendor. It then failed to take the precaution of telling the sushi vendor to include as ingredients on the sushi only those fish and vegetables that were provided by contract.

### III.

### THE SIEGELS MADE ALL PAYMENTS TO RIDGEWELL'S AS PRESCRIBED BY THE SIGNED CONTRACT

Ridgewell's counsel erroneously asserted during the hearing of June 4 that payment of the amount that was billed to the Siegels was "due three days before" and that full payment was a "condition precedent." That obligation, he represented, was imposed "by the express language of the contract." Transcript, pp. 29-30.  The relevant language of the contract is as follows (Attachment 16; emphasis added):

> Payment of an *events unpaid balance* is required 3 days prior to the date of the event, *or guaranteed by credit card.*

The Siegels had no obligation to make any payment three days before the event for at least four reasons: *First*, they were never informed of any "events unpaid balance." The precise amount due after the payment of the three deposits specified in the contract – a total of $27,500 that was paid in full – was not calculated by Ridgewell's until it submitted a bill on April 6, 2005. *Second*, any amount due was "guaranteed by credit card" – precisely as the contract provided. *Third*, if Ridgewell's truly expected an amount to be paid three days before the event, it could have charged that amount to the Siegels' credit card – as it had done with respect to each of the three "deposits" specified in the contract. See the credit-card charges shown in Attachment

6

17. *Finally,* for the reasons specified in the oral argument of June 4 (Transcript, p. 31), there is no legal obligation on the Siegels' part to make a payment that was due in advance if, as matters turned out, the goods or services for which they had agreed to pay in advance were not provided. *See Dorocon, Inc. v. Burke,* 2006 U.S. Dist. LEXIS 10098 ( D.D.C., Feb. 27, 2006) and *Ashcraft v. Gerel,* 244 F.3d 948 (2001).

## IV.

### MS. NANN ASSURED THE SIEGELS THAT NO SHELLFISH WOULD BE SERVED DURING THE EVENT

Ridgewell's counsel made the following erroneous representation during the hearing of June 4 (Transcript, p. 42): "[T]here is nothing in this record about a representation Miss Nann made about shellfish ever." He repeated that statement (Transcript, p. 44): "There is no representation in this record by Miss Nann about shellfish of any kind ever. It simply didn't happen or by anyone on behalf of Ridgewell's."

To the contrary, Mark Siegel testified that Ms. Nann made explicit representations regarding shellfish. See page 26 of his deposition (Attachment 18; emphasis added):

> Q.   And what specifically were you assured of?
>
> A.   That everything – all the food, all the meat products Would be kosher meat, *that all the fish would be nonshellfish*, and that there would be no milk products of any kind – no cheese, no butter, no milk in anything including the cake, including the – the cream that was served at the – with coffee. We worked that out in – in very, very careful detail.

The subject was repeated later in Mr. Siegel's deposition (Mark Siegel Deposition, p. 100; Attachment 19):

> Q.   Do you recall specifically requesting that no

...

> shellfish be served?
>
> A. Absolutely.
>
> Q. And to whom did you make that request?
>
> A. To Toby Nann. It wasn't a request. It was a predicate of the – of the event. And she understood that, as a former mashgiach. She said she knows what's kosher and what's not. She made it clear to us over and over again.
>
> \* \* \* \* \*
>
> Q. I'm asking about prior to the night of the wedding. Did you specifically direct her that there was to be no shellfish? Or alternatively, was it just clear in your mind that she would know that?
>
> A. We specifically directed her. And we delineated the fish that would be acceptable.

Pressed further on the subject by Ridgewell's counsel during his deposition, Mr. Siegel replied, "Absolutely" when asked again whether he recalled "specifically telling her no shellfish." He repeated, "I do know that the shellfish was certainly mentioned" and described an occasion when Ms. Nann "presented the sushi that was going to be served." According to his deposition testimony, when Judith Siegel asked why there was no greater variety, Ms. Nann replied, "Well, you know, we can't use shellfish." He testified that her full statement was, "Well, we can't use any shellfish, so we're very limited." Mark Siegel Deposition, pp. 101-103, Attachment 20).

8

## CONCLUSION

For the reasons stated in our Motion for Summary Judgment, as further elaborated in open Court on June 4 and in this Supplemental Memorandum, summary judgment on liability should be entered in favor of the plaintiffs.

Dated: June 21, 2007                    Respectfully submitted,


  /s/ Nathan Lewin
NATHAN LEWIN (D.C. Bar No. 38299)
ALYZA D. LEWIN (D.C. Bar No. 445506)
**LEWIN & LEWIN, LLP**
1828 L Street, N.W., Suite 901
Washington, D.C. 20036
(202) 828-1000
(202) 828-0909 fax

*Attorneys for Plaintiffs*